# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

        *Plaintiffs*,

    v.

DONALD J. TRUMP *et al.*,

        *Defendants*.

Case No.: 8:25-cv-00201-DLB
Honorable Deborah L. Boardman

**<u>PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 3

LEGAL STANDARD.................................................................................................. 5

ARGUMENT .............................................................................................................. 5

   I.    Plaintiffs are Likely to Succeed on the Merits of their Claims............................ 5

      A.   The Executive Order Violates the Fourteenth Amendment and 8 U.S.C. § 1401(a). ...... 5

      B.   Plaintiffs Have Standing............................................................................... 13

   II.   The Remaining Factors Weigh Decisively in Favor of Granting a TRO and PI ............... 18

      A.   The Executive Order Is Causing Irreparable Harm.......................................... 18

      B.   Enjoining the Executive Order Would Serve the Public Interest................................... 20

CONCLUSION.......................................................................................................... 22

CERTIFICATE OF SERVICE.................................................................................... 23

## INTRODUCTION

United States citizenship is a most cherished status. It signifies the citizen's full membership in our country's political, social, and civic community and guarantees the citizen numerous opportunities, rights, privileges, and benefits. From the Founding to today, citizenship has been the birthright of virtually everyone born in the United States, regardless of the citizenship or immigration status of their parents.

Birthright citizenship in the United States derives from the ancient common-law principle of *jus soli*, or "right of the soil." The Supreme Court's *Dred Scott* decision constituted a short-lived and much-reviled departure from that common-law heritage. To ensure that birthright citizenship would never again be denied to a disfavored group—that *Dred Scott* would never again the be law—the framers of the Fourteenth Amendment enshrined it into the Constitution using unmistakable language: "All persons born . . . in the United States, and subject to the jurisdiction thereof, are citizens of the United States." An unbroken line of Supreme Court precedent dating back more than a century acknowledges that this constitutional guarantee applies to children born in the United States regardless of whether their parents are citizens. *See United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). Congress has reaffirmed this understanding by codifying (and re-enacting) birthright citizenship into statutory law over the generations. 8 U.S.C. § 1401(a).

President Trump's Executive Order "Protecting the Meaning and Value of American Citizenship" defies the clear command of the Fourteenth Amendment's Citizenship Clause and 8 U.S.C. § 1401(a), representing an unprecedented break from the promise of birthright citizenship to all children born on our soil. The Executive Order denies birthright citizenship to babies born in the United States "(1) when that person's mother was unlawfully present in the United States

1

and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth." Order § 2(a). The Executive Order calls into doubt the citizenship of babies born in the United States and sows chaos and fear in families yearning for the opportunities, rights, privileges, and benefits that accompany United States citizenship.

Absent an injunction, the effect of the Executive Order will be widespread, immediate, and severe. Every single day, babies are born in the United States who, absent an injunction, will have a cloud placed over their status as United States citizens. Denied their citizenship, these children may be left with no legal status, and no right to remain in their country of birth. These children will be left unable to apply for Social Security numbers or passports and will be denied access to all of the benefits that federal, state, and local governments provide to United States citizens. Those harms will affect not only those babies but their entire families.

Individual Plaintiffs each reside in the United States, are expecting a child in the next few months, and are in immigration statuses that appear to be covered by the Executive Order. Plaintiffs ASAP and CASA have hundreds of thousands of immigrant members across the United States, including thousands of members who fall into the immigration categories covered by the Executive Order (collectively, "Members"). Those Members give birth to children in the United States every day. According to the Constitution, these children are U.S. citizens, but according to the Executive Order, they have no legal status whatsoever. Individual Plaintiffs and Members across the country now must face the uncertainty and psychological toll of knowing that the U.S. government has stated that it will not recognize their children's status as U.S. citizens, nor respect

2

the rights that accrue to their children by virtue of that citizenship. Parents of these children will have their families' lives thrown into chaos and distress, uncertain if their children will be rendered deportable or stateless. Denied access to essential services and benefits of citizenship, parents will be forced to reorganize their families' lives to survive in the United States and seek alternative means of support, subsistence, and education. Parents will face these new challenges because of the Executive Order while also experiencing extreme distress at the potential discrimination their newborn children may now suffer without the protections of citizenship.

The Constitution's clear textual command, centuries of history, and binding Supreme Court precedent all compel one conclusion: the Executive Order is flagrantly unconstitutional and must be enjoined. Plaintiffs are likely to prevail on their challenge to the Executive Order, which is inflicting immediate and irreparable harm on newborns and their families across the United States, including Individual Plaintiffs and Members. The Court should immediately halt Defendants' intrusion on one of the most precious constitutional rights.

## BACKGROUND

On January 20, 2025, President Trump issued an Executive Order titled, "Protecting the Meaning and Value of American Citizenship."[1] The order purports to reinterpret the Fourteenth Amendment as not extending birthright citizenship to babies "born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but

---

[1] Available at www.whitehouse.gov/presidential-actions/2025/01/protecting-the-meaning-and-value-of-american-citizenship.

temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Order § 1. The Executive Order directs that "no department or agency of the United States government shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship, to persons" falling into those two categories. *Id.* § 2(a). The Order states that this directive to agencies "shall apply only to persons who are born within the United States after 30 days from the date of this order." *Id.* § 2(b). The Order directs agencies to issue guidance on implementation during that 30-day window. *Id.* § 3. Notably, however, the Order does not mention any delay in the effect of its declaration in Section 1 that covered children are not citizens, suggesting that the Order's purported denial of citizenship may take immediate effect.

Individual Plaintiffs are Maribel, Juana, Trinidad Garcia, Monica, and Liza. Compl. ¶¶ 45–49. All five Individual Plaintiffs are pregnant women residing in the United States. They fear that the Executive Order will be applied to deprive their children of the citizenship to which they are entitled under the Fourteenth Amendment. Plaintiffs CASA and ASAP are immigrant-rights organizations with hundreds of thousands of members. Compl. ¶¶ 19, 31. This includes thousands of immigrant members who fall into the categories of parents covered by the Executive Order and who are likely to give birth to a child in the United States in the near future. *Id.* Indeed, ASAP estimates that more than 20 of its members give birth to children in the United States each day. ASAP Decl. ¶ 24. The Executive Order purports to deny many of these newborn children their

constitutionally guaranteed citizenship status, placing them at risk for removal and cutting off their access to government benefits that are available to citizen children.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). "The standards for granting a TRO and granting a preliminary injunction are the same." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024).

## ARGUMENT

**I.    Plaintiffs are Likely to Succeed on the Merits of their Claims.**

**A.    The Executive Order Violates the Fourteenth Amendment and 8 U.S.C. § 1401(a).**

The Executive Order violates the Fourteenth Amendment's Citizenship Clause, which provides: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV. The Executive Order also violates 8 U.S.C. § 1401(a), which likewise provides that "a person born in the United States, and subject to the jurisdiction thereof" is a "national[] and citizen[] of the United States at birth." Under the original understanding of these provisions, informed by the ancient common-law principle of *jus soli*, children born to noncitizen parents within the United States are citizens. This Court has authority to enjoin actions by the Executive Branch that violate the Constitution or a federal statute. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667 (2018); *Chamber of*

*Commerce v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996). Because the Executive Order does just that, it should be enjoined.

"Throughout this country's history, the fundamental legal principle governing citizenship has been that birth within the territorial limits of the United States confers United States citizenship." Walter Dellinger, *Legislation Denying Citizenship at Birth to Certain Children Born in the United States*, 19 Op. O.L.C. 340, 340 (1995) (Statement Before the Subcommittees on Immigration and Claims and on the Constitution of the House Committee on the Judiciary). Even before the adoption of the Fourteenth Amendment, the Constitution incorporated this common-law principle of *jus soli*, or the "right of the soil." The Framers referred to citizenship in prescribing the qualifications for holding public office, including the Office of the President, but included no definition of citizenship. *See. e.g.*, U.S. Const. art. II, § 1, cl. 5 ("No Person except a natural born Citizen, or a Citizen of the United States, at the time of the Adoption of this Constitution, shall be eligible to the Office of President."). It was well understood at the time of the Founding that, by not defining citizenship, the Framers intended for the common law to govern.

The "roots" of this common law tradition "lie deep in England's medieval past." Polly J. Price, *Natural Law and Birthright Citizenship in Calvin's Case* (1608), 9 Yale J.L. & Humans. 73, 73 (1997); *see Calvin v. Smith*, 77 Eng. Rep. 377 (K.B. 1608) (holding that after unification of the Scottish and English crowns, children born in Scotland owing allegiance to the King and under the King's protection became English citizens by birth). As the Supreme Court later explained, in surveying the common-law history, "by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, the

faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject." *United States v. Wong Kim Ark*, 169 U.S. 649, 658 (1898). There were only two exceptions to this common law rule, for children born to "an ambassador or other diplomatic agent of a foreign state" and for children born to "an alien enemy in hostile occupation of the place where the child was born." *Id*. Because those children did not owe allegiance to the King, they were not considered the King's subjects, despite their presence within his domain. But all other children born within the King's protection were citizens from birth. *See* 1 Blackstone's Commentaries on the Laws of England 357 (1st ed. 1765) ("Natural allegiance is such as is due from all men born within the king's dominions immediately upon their birth. For, immediately upon their birth, they are under the king's protection; at a time too, when (during their infancy) they are incapable of protecting themselves.").

    In the early years of the Republic, the Supreme Court repeatedly assumed that the common law conferred U.S. citizenship on all people born within the territory of the United States, regardless of their parents' immigration status. *E.g., Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 119–20 (1804) (presuming that all persons born in the United States were citizens thereof); *McCreery v. Somerville*, 22 U.S. (9 Wheat.) 354, 354 (1824) (assuming, in determining title to land in Maryland, that children born in the state to noncitizen parents were "native born citizens of the United States"). It is thus "beyond doubt that," even before ratification of the Fourteenth Amendment, "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or of foreigners, excepting only children of

ambassadors or public ministers of a foreign government, were native-born citizens of the United States." *Wong Kim Ark*, 169 U.S. at 674–75.

The Supreme Court's departure from that bedrock principle of birthright citizenship in *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857), helped spark the Civil War and ultimately led to the Fourteenth Amendment. In that ignominious decision, the Court denied citizenship to African-Americans born in the United States. But following the Civil War, Congress enacted the Civil Rights Act of 1866, and Congress and the States adopted the Fourteenth Amendment, overruling *Dred Scott* and reasserting the principle of birthright citizenship. *See* Act of Apr. 9, 1866, ch. 31, 14 Stat. 27; U.S. Const. amend XIV, § 1. Speaking in support of the Civil Rights Act, the Chairman of the House Judiciary Committee explained that the Act would codify birthright citizenship as described by influential legal theorist William Rawle: "Every person born within the United States, its Territories, or districts, whether the parents are citizens or aliens, is a natural-born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity." Cong. Globe, 39th Cong., 1st Sess. 1117 (1866) (quoting William Rawle, *A View of the Constitution of the United States of America* 80 (1829)). The Fourteenth Amendment's Citizenship Clause ensured that birthright citizenship would not be selectively given to some people born in the United States and denied to others, but instead would serve as a guarantee for all. *Dred Scott* would never again be the law.

In the more than 150 years since then, the Supreme Court has consistently recognized that the Fourteenth Amendment, along with parallel statutory provisions, guarantees citizenship to children born in the United States to noncitizen parents. In *Wong Kim Ark*, the Supreme Court held that a child born in San Francisco to noncitizen parents became a citizen of the United States at

birth, by virtue of the Fourteenth Amendment. As the Court explained, through the Fourteenth Amendment, "the fundamental principle of citizenship by birth within the dominion was reaffirmed in the most explicit and comprehensive terms." *Wong Kim Ark*, 169 U.S. at 675.

To obtain birthright citizenship under the Fourteenth Amendment, a child simply must be "born in the United States, and subject to the jurisdiction thereof." U.S. Const. XIV, § 1. In *Wong Kim Ark*, the Supreme Court held that the Citizenship Clause's qualification that the child must be "subject to the jurisdiction" of the United States was intended merely "to exclude, by the fewest and fittest words," the existing common law exceptions to birthright citizenship for "children born of alien enemies in hostile occupation" and "children of diplomatic representatives of a foreign state." *Id.* at 682. In keeping with those common law exceptions, the Court further excluded from the reach of birthright citizenship children born aboard foreign ships in U.S. waters and children born to Indian tribes, given that those classes of people, under the law of that time, fell within the power of a separate sovereign. But the Court emphasized that the Amendment's qualifying language "was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption." *Id.* at 676. The Fourteenth Amendment is "declaratory in form, and enabling and extending in effect." *Id.*

Aside from those narrow historical exceptions, the Court reasoned, the Amendment "in clear words and in manifest intent, includes the children born within the territory of the United States, of all other persons, of whatever race or color, domiciled within the United States." *Id.* at 693. Children born to noncitizen parents within the United States were thus subject to this Nation's jurisdiction and entitled to birthright citizenship. In reaching that conclusion, the Court drew an

9

analogy between the Citizenship Clause's reference to people "subject to the jurisdiction thereof" and the Equal Protection Clause's reference to people "within its jurisdiction." U.S. Const. amend. XIV, § 1. According to the Court, "[i]t is impossible . . . to hold that persons 'within the jurisdiction' of one of the States of the Union are not 'subject to the jurisdiction of the United States.'" *See Wong Kim Ark*, 169 U.S. at 687. That is because people physically present within a State must necessarily submit to the rule of U.S. law. The *Wong Kim Ark* Court therefore held that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.*; *see also* James C. Ho, *Defining "American,"* 9 Green Bag 2d 359, 360 (2006) ("To be 'subject to the jurisdiction' of the U.S. is simply to be subject to the authority of the U.S. government," and "[t]he phrase thus covers the vast majority of persons within our borders who are required to obey U.S. laws," which, "of course, does not turn on immigration status, national allegiance, or past compliance."); Michael D. Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 472 (2020) ("[T]he Clause's original meaning provides a definite solution to contested modern issues… [T]he original meaning indicates that the Clause does not exclude U.S.-born children of temporary visitors or of persons not lawfully present in the United States.").

Numerous Supreme Court decisions have either reiterated or applied this understanding of Fourteenth Amendment "jurisdiction," further entrenching the rule that people born in the United States to noncitizen parents attain citizenship at birth. In several instances, the Court has explicitly stated that children of undocumented immigrants are birthright citizens. For instance, in *Hirabayashi v. United States*, 320 U.S. 81, 96 (1943), the Court observed that tens of thousands of Americans of Japanese descent were "citizens because born in the United States." No further

10

refinement—no detailed inquiry into familial immigration histories—was necessary to substantiate that claim. In *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957), the Court said that a child born in the United States was "an American citizen by birth," despite his parents' "illegal presence." And even though both sets of respondents in *INS v. Errico*, 385 U.S. 214, 215–16 (1966), had obtained admission through fraud, the Court acknowledged that their native-born children became U.S. citizens at birth. *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985), similarly involved alien parents whose child became "a citizen of this country" at birth, even though they had "enter[ed] . . . without inspection."

The principle that "one born in the United States" becomes "a citizen of the United States by virtue of the *jus soli* embodied in the [Fourteenth] Amendment" pervades Supreme Court precedent. *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927); *see also, e.g.*, *Ah How v. United States*, 193 U.S. 65, 65 (1904); *Zartarian v. Billings*, 204 U.S. 170, 173 (1907); *Morrison v. California*, 291 U.S. 82, 85 (1934); *Perkins v. Elg*, 307 U.S. 325, 328–29 (1939); *Kawakita v. United States*, 343 U.S. 717, 720 (1952); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958); *Rogers v. Bellei*, 401 U.S. 815, 829–30 (1971); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980); *Miller v. Albright*, 523 U.S. 420, 424 (1998) (plurality); *Hamdi v. Rumsfeld*, 542 U.S. 507, 510 (2004) (plurality). The Fourth Circuit also has operated on this understanding of the Fourteenth Amendment. *See United States v. Carvalho*, 742 F.2d 146, 148 (4th Cir. 1984) (describing a child born to removable aliens as "a United States citizen by virtue of her birth in the United States"); *Herrera v. Finan*, 709 F. App'x 741, 743 (4th Cir. 2017) (explaining that the plaintiff "was born in the United States and, thus, is a United States citizen"). The precedent of other circuits is to the same effect. *E.g.*, *Perkins v. Elg*, 99 F.2d 408, 411 (D.C. Cir. 1938) ("[I]t may now be stated as an established rule that every

person born within the United States (except in the case of children of ambassadors, etc.), whether born of parents who are themselves citizens of the United States or of foreign parents, is a citizen of the United States."). The Executive Order's abrupt departure from this settled understanding is not only invalid, but it throws into chaos the countless policies and practices built around the fundamental assumption that any child born in the United States is a United States citizen. *See* Compl. ¶¶ 98–99.

The Supreme Court's Equal Protection precedent subsequent to *Wong Kim Ark* further bolsters this understanding of the Fourteenth Amendment's Citizenship Clause. Most significantly, in *Plyler v. Doe*, 457 U.S. 202, 215 (1982), the Court invoked *Wong Kim Ark*'s reasoning in holding that undocumented aliens are "within [the] jurisdiction" of any state in which they are physically present. "That a person's initial entry into a State, or into the United States, was unlawful . . . cannot negate the simple fact of his presence within the State's territorial perimeter." *Id.* "Given such presence," the Court explained, "he is subject to the full range of obligations imposed by the State's civil and criminal laws." *Id.* In short, "no plausible distinction with respect to Fourteenth Amendment 'jurisdiction' can be drawn between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful." *Id.* at 211 n.10 (citing C. Bouvé, Exclusion and Expulsion of Aliens in the United States 425–427 (1912)).

Congress has likewise reaffirmed birthright citizenship. 8 U.S.C. § 1401(a) provides that "a person born in the United States, and subject to the jurisdiction thereof" is a "national[] and citizen[] of the United States at birth." That statutory provision carries forward the 1866 Civil Rights Act's guarantee of birthright citizenship, which has been repeatedly re-enacted against the backdrop of *Wong Kim Ark*'s understanding of *jus soli*.

Children born to Members covered by the Executive Order are thus entitled to citizenship under the Fourteenth Amendment and 8 U.S.C. § 1401(a). Those children will be born in the United States. And they will be subject to this Nation's jurisdiction because their parents are neither foreign ministers or diplomats, nor serving aboard a foreign ship, nor soldiers in an occupying army.[2] *See Wong Kim Ark*, 169 U.S. at 693. Plaintiffs are therefore likely to succeed on their claim that, by denying those children the citizenship to which they are entitled, the Executive Order is unlawful under the Constitution and federal law.

### B.    Plaintiffs Have Standing.

To demonstrate standing, a plaintiff must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotation marks omitted).

CASA and ASAP assert standing as representatives of their members. Both ASAP and CASA are voluntary organizations, whose members freely affiliate themselves with the groups. ASAP Decl. ¶¶ 10–21; CASA Decl. ¶¶ 5–7. Members are issued cards and IDs to indicate their affiliation, regularly communicate with the organizations, and set the organizations' agendas and

---

[2] *Wong Kim Ark*'s fourth exception, for Indian children, has been superseded by statute. *See* Act of June 2, 1924, ch. 233, 43 Stat. 253 (current version at 8 U.S.C. § 1401(b)).

priorities. ASAP Decl. ¶¶ 10–21; CASA Decl. ¶¶ 5–7. In order for a voluntary membership organization to establish standing as representative of its membership, it "must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (internal quotation marks omitted). So long as one plaintiff has standing to seek each form of relief requested in the complaint, the court need not consider whether other plaintiffs also have standing. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023).

Individual Plaintiffs, as well as Members of CASA and ASAP, are harmed by the Executive Order. Individual Plaintiffs reside in the United States, are pregnant, and their children will be deprived of citizenship under the Executive Order. Both organizations likewise have many Members who currently reside in the United States, who plan to have children while living in this country, and who are covered by the Executive Order. CASA Decl. ¶ 14; ASAP Decl. ¶¶ 22–26. Some are already pregnant. CASA Decl. ¶ 14; ASAP Decl. ¶¶ 25, 36. The Executive Order will deprive those children, once born, of their constitutionally guaranteed United States citizenship. The parents of children who are denied citizenship will also suffer immediate and direct harm. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (explaining that, for purposes of associational standing, "members of Parents Involved can validly claim" Article III injury "on behalf of their children").

"Citizenship is a most precious right," *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963), and interference with a constitutional right undoubtedly creates an Article III injury,

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The Executive Order's threat to newborns' citizenship would deny them "the priceless benefits that derive from that status." *Schneiderman v. United States*, 320 U.S. 118, 122 (1943). For example, although citizens enjoy an unqualified right to remain in their homeland, children denied citizenship may have no legal status in this country. Immediately upon birth, they will face the threat of deportation to a strange land, as noncitizens possess no constitutional right against removal. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 587 (1952). This risk of deportation threatens to tear families apart. For many immigrant families, some family members are legally allowed to remain in the United States, and older siblings are citizens, but under the Executive Order, newborn children will not be citizens and will not have a right to remain. *See also Trump v. Hawaii*, 585 U.S. 667, 698 (2018) ("[A] person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact.").

Worse yet, without U.S. citizenship, many of these U.S.-born children will be unable to obtain citizenship in any country, leaving them stateless, forever having their very existence subject to the mercy of whatever nation in which they find themselves. Statelessness is "a condition deplored in the international community of democracies." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality). Without a homeland, a stateless person's "very existence is at the sufferance of the country in which he happens to find himself." *Id.* at 101.

The Executive Order also cuts off newborns' access to various government benefits on which many families rely, inflicting another concrete injury. Citizen children are eligible to receive public benefits through a variety of programs, such as the Supplemental Nutrition Assistance Program ("SNAP"), Temporary Assistance for Needy Families ("TANF"), the Children's Health

Insurance Program ("CHIP"), and Medicaid. CASA Decl. ¶¶ 16–24. By denying citizenship to newborn children, the Executive Order also denies them access to all of the government benefits citizens enjoy. That is undoubtedly an injury in fact. *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (losing "a small amount of money"—and even losing a "chance" at such funds— "is ordinarily an 'injury'"); *accord, e.g., Kadel v. Folwell*, 100 F.4th 122, 141 n.15 (4th Cir. 2024) (holding that a plaintiff challenging ineligibility for a government benefit need not submit a claim "to show standing" where the relevant law "explicitly excludes" those in the plaintiff's position).

All of those harms inflicted by the Executive Order will affect not only newborn children but their entire families, including Individual Plaintiffs and Members. Parents will experience the fear and uncertainty that accompany their children being deprived of legal status in this country— status to which they are entitled under the Constitution. Juana Decl. ¶ 6; Trinidad Garcia Decl. ¶ 11; CASA Decl. ¶¶ 24–29; ASAP Decl. ¶¶ 27–35; *see also, e.g., id.* ¶ 44 (ASAP member Nohelimar explaining her fears for her son if he is denied birthright citizenship); *id.* ¶ 42 (ASAP member Lesly expressing her concern about the lack of opportunities her child will have in this country without birthright citizenship). And the Executive Order's discrimination threatens to tear families apart, with newborn babies having no legal status in this country even if their older siblings are citizens and their parents have a legal right to remain in the United States. *See* Maribel Decl. ¶ 6; ASAP Decl. ¶ 41 (ASAP member Nivida explaining that she fears her child would face violence and persecution if denied citizenship and then removed from the United States). Parents also worry about the opportunities that their children will be denied in this country if they are not citizens, including educational and employment opportunities. Juana Decl. ¶ 7; Liza Decl. ¶ 6. Parents' settled expectations about their children's status will be thrown into chaos, and they will

16

need to seek additional immigration counsel and expend resources in order to help navigate serious travel restrictions that apply unevenly to their families, prevent their U.S.-born infants from being deported, and protect stateless children. *See* Monica Decl. ¶ 9 (expressing concern that her child will become stateless); Liza Decl. ¶ 4 (same); ASAP Decl. ¶ 38 (same for ASAP member Niurka).

These injuries are the direct result of Defendants' actions and would be redressed by judicial relief. There is a clear "causal connection" between the Executive Order and the injuries that Members have incurred and will continue to incur. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Absent the Executive Order, Members would not face uncertainty as to their children's legal status, nor would their households be ineligible for the array of government benefits for which they plan to apply. The harms at issue here were "caused directly" by the Executive Order, and a "favorable decision" for Plaintiffs would provide "full redress." *Cooksey v. Futrell*, 721 F.3d 226, 238 (4th Cir. 2013).

CASA and ASAP satisfy the remaining requirements for associational standing. The interests at stake in this lawsuit are undoubtedly "germane" to each organization's "purpose." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977); *see Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 741 (D. Md. 2019) ("[A]n interest is germane to an organization's purpose if the lawsuit would reasonably tend to further the general interests that individual members sought to vindicate in joining the association and . . . bears a reasonable connection to the association's knowledge and experience." (internal quotation marks omitted)). A core part of the mission of both CASA and ASAP is to promote the stability and well-being of immigrant families—a mission fundamentally undermined by the Executive Order, which sows uncertainty among immigrant families, subjects them to the threat of family separation, and denies them the

17

opportunity to receive important government benefits. *See* CASA Decl. ¶¶ 24–29; ASAP Decl. ¶¶ 27–35. Finally, as the Supreme Court has recognized, declaratory and injunctive relief of the type sought here do not require the individual participation of an organization's members in the lawsuit but instead are "properly resolved in a group context." *See Hunt*, 432 U.S. at 344. Indeed, this Court has previously recognized that both CASA and ASAP have standing to maintain lawsuits on behalf of their members. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 947 (D. Md. 2020).

## II.    The Remaining Factors Weigh Decisively in Favor of Granting a TRO and PI

The harm that Individual Plaintiffs, Members, and others across the country are suffering as a result of the Executive Order is devastating and irreparable. The Executive Order is also contrary to the public interest. Preliminary injunctive relief is not just appropriate, but necessary.

### A.    The Executive Order Is Causing Irreparable Harm.

"Because there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc); *see also Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) (noting that "the denial of a constitutional right" itself "constitutes irreparable harm for purposes of equitable jurisdiction"). That irreparable harm is especially pronounced here, where the *ultra vires* Executive Order will rip away the promise of citizenship for countless babies and leave them without legal status. Loss of citizenship represents "the total destruction of the individual's status in organized society." *Trop*, 356 U.S. at 101 (plurality). It as "a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development." *Id*. A baby denied citizenship has been denied "status in the national and international political

community." *Id*. Many such newborns will have no other citizenship options available, leaving them stateless, with their "very existence" subjected to "the sufferance of the country in which [they] happen[] to find [themselves]." *Id*. In short, these children have "lost the very right to have rights." *Id*. at 102; *see also* ASAP Decl. ¶¶ 29–31.

Depriving children of their birthright citizenship and leaving them and their families in legal limbo "is offensive to cardinal principles for which the Constitution stands." *Trop*, 356 U.S. at 102. It subjects Members "to a fate of ever-increasing fear and distress," left in the dark about "when and for what cause" their children's "existence in [their] native land may be terminated." *Id*. They must contend with the constant threat that their children could be torn away from them and deported, a separation that would "create not only temporary feelings of anxiety but also lasting strains on the most basic human relationships cultivated through shared time and experience." *Int'l Refugee Ass. Proj. v. Trump*, 883 F.3d 233, 270 (4th Cir. 2018), *vacated on other grounds*, 585 U.S. 1028 (2018). The looming threat of deportation and family separation created by the Executive Order shapes Members' choices about fundamental aspects of their lives and deters them from doing what best serves their families. CASA Decl. ¶ 29.

The lack of clarity in the Executive Order about the status of children born after the Order takes effect and the uncertainty about how the Order will be implemented have engendered widespread confusion and fear, which causes Members additional irreparable harm. Those who are currently pregnant now face a world in which the citizenship status of their unborn children has been thrown into doubt, undermining the plans they have made for those children and for their families more broadly. ASAP Decl. ¶¶ 27–35; *see also id.* ¶ 44 (ASAP member Nohelimar expressing her concerns about her son's status if he is denied birthright citizenship). Some mothers,

19

fearful about their child's immigration status, may be driven by the Executive Order to induce labor or schedule a cesarean section before the effective date, risk harm to their health and the health of their baby. And many will lose the opportunity to apply for government benefits on behalf of their newborn children—benefits on which they planned to rely to ensure their families received necessary nutrition and healthcare. CASA Decl. ¶¶ 16–24; ASAP Decl. ¶ 34. The longer the Order remains in effect, the more dramatic the impact on Individual Plaintiffs' and Members' lives, forcing them to make irreversible choices about growing and caring for their families.

**B.    Enjoining the Executive Order Would Serve the Public Interest.**

The third and fourth preliminary injunction factors also weigh in favor of granting relief. Where the government is a party, analysis of those factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). As the Fourth Circuit has consistently recognized, "upholding constitutional rights surely serves the public interest." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (en banc) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("[I]t is well-established that the public interest favors protecting constitutional rights."); *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest . . . ."). Indeed, "[if] anything," our government "is *improved*" when a court issues "a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle*, 2 F.4th at 346 (emphasis added).

Moreover, while the harms caused by allowing the Executive Order to remain in effect will be severe, the harms to the government if it is enjoined are virtually nonexistent. *See Newsom ex*

20

*rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (recognizing that a governmental entity "is in no way harmed by issuance of a preliminary injunction" that prevents enforcement of a policy likely to be found unconstitutional). Granting preliminary relief will merely preserve a status quo that is reflected across countless regulatory programs and has existed throughout our Nation's history. Compl. ¶¶ 98–99. It will avoid throwing families around the country into chaos as they grapple with unanswerable questions about the status of their children and families. And, in fact, an injunction will save the government billions of dollars per year by avoiding the added bureaucratic costs that would be necessary to make citizenship determinations through means other than birth certificates. *Id.* ¶ 99.

The federal government has recognized birthright citizenship since the Founding, and it will not be harmed by continuing to do so pending a final determination on the merits of this case. That is especially true given that the Executive Order represents a drastic policy change implemented without constitutional amendment or authorization from Congress, and it is in the public interest to protect the "separation of powers by curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided Court*, 570 U.S. 547 (2016). Given the dramatic changes wrought by the Executive Order, the substantial changes that would need to be made to a huge variety of complex federal and state programs in order to implement it fully, and the immediate harm that the Executive Order inflicts on newborns and their families, the public interest strongly favors an injunction.[3]

---

[3] Because Defendants face no monetary cost from the preliminary injunction, because any imposition of bond would work a severe hardship on Plaintiffs as nonprofit organizations, and because the preliminary injunction serves the public interest, this Court should waive any security requirement. *See* Fed. R. Civ. P. 65(c); *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013).

21

## CONCLUSION

This Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction.


Respectfully submitted this January 21, 2025,

Nicholas Katz, Esq. (D. Md. 21920)
CASA, INC.
8151 15th Avenue
Hyattsville, MD 20783
240-491-5743
nkatz@wearecasa.org

Conchita Cruz*
Zachary Manfredi*
Asylum Seeker Advocacy Project
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 600-9910
conchita.cruz@asylumadvocacy.org
zachary.manfredi@asylumadvocacy.org

/s/Joseph W. Mead
Joseph W. Mead (D. Md. 22335)
Mary B. McCord (D. Md. 21998)
Rupa Bhattacharyya*
William Powell*
Alexandra Lichtenstein*
Gregory Briker*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY
  AND PROTECTION
Georgetown University Law Center
600 New Jersey Ave., N.W.
Washington, D.C. 20001
Phone: (202) 662-9765
Fax: (202) 661-6730
jm3468@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
whp25@georgetown.edu
arl48@georgetown.edu
gb954@georgetown.edu


*Attorneys for Plaintiffs*

*Motion for admission pro hac vice forthcoming.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 21, 2025, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system. There is currently no Counsel of Record for Defendants.

I certify that I will serve the foregoing on Defendants.

/s/ Joseph Mead
Joseph Mead