IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA, INC. *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>    *Defendants*. | Case No.: _____ |

### DECLARATION OF SWAPNA C. REDDY, CO-EXECUTIVE DIRECTOR OF THE ASYLUM SEEKER ADVOCACY PROJECT, ("ASAP")

I, Swapna C. Reddy, submit this declaration pursuant to 28 U.S.C. § 1746 and declare under penalty of perjury as follows:

1. I am the Co-Executive Director of the Asylum Seeker Advocacy Project ("ASAP"). I have served in this role since 2019.

2. As Co-Executive Director I oversee much of ASAP's programing, including supervising its membership, technology, and community resource teams. I also oversee the development of all systems for digital communication with ASAP members. I have detailed knowledge about ASAP's membership demographics, membership criteria, member needs and priorities, and the role members play in setting and directing ASAP's mission and advocacy.

3. I make this sworn statement based upon personal knowledge, files and documents of ASAP that I have reviewed (such as case files, reports, and collected case metrics), as well as

1

information supplied to me by employees of ASAP whom I believe to be reliable, including ASAP's management, attorneys, and administrative staff. These files, documents, and information are of a type that is generated in the ordinary course of our business and that I would customarily rely upon in conducting ASAP business.

**Background on ASAP**

4.   ASAP is a national voluntary membership organization of asylum seekers incorporated as a 501(c)(3) nonprofit organization in New York.

5.   As of January 2025, ASAP has over 680,000 members and is the largest membership organization of asylum seekers in the United States.

6.   ASAP members come from over 175 countries and reside in all 50 states and several U.S. territories. ASAP provides its members the same benefits and access to resources regardless of where they are located in the United States.

7.   ASAP members are in various stages of their immigration proceedings. Some ASAP members have filed an asylum application affirmatively before United States Immigration and Citizenship Services (USCIS), while other ASAP members have filed an asylum application defensively and are in immigration court proceedings. Additionally, some ASAP members are in immigration court proceedings and intend to file an asylum application; some have cases at the Board of Immigration Appeals (BIA) on appeal; some have lost asylum; and some have won asylum and are asylees or even green card holders.

8.   We are also aware of ASAP members and their children who have or have had Temporary Protected Status, parole, student visas, tourist visas, and Special Immigrant Juvenile Status.

9.   ASAP's mission is to work with our members to build a more welcoming United

States. ASAP provides our membership of asylum seekers with legal and community support. And we work with our members to make great change by standing together. We are creative, collaborative, and nonpartisan. And we believe all asylum seekers deserve to find safe haven in the United States.

10. Our members voluntarily affiliate themselves with ASAP. Asylum seekers apply to join ASAP by filling out a voluntary online membership form. ASAP welcomes new members who are asylum seekers age 14 or over who believe in ASAP's mission.

11. ASAP issues each member a digital membership card and member ID that they can use to identify themselves to ASAP and access the full range of member benefits.

12. ASAP membership is free of charge, and ASAP has never collected any fees or membership dues from its members.

13. Although ASAP does not issue separate membership cards to anyone under the age of 14, the benefits of ASAP membership also extend to the children of ASAP members as derivative of their parents' membership.

14. ASAP is in regular contact with our members through text message and email.

15. ASAP staff produce how-to-guides, frequently asked questions ("FAQs"), and videos that explain how to navigate the immigration system, including how to apply for asylum, how to apply for a work permit, and more. ASAP also produces guidance and FAQs about access to healthcare, food assistance, and other social services that are accessed by members and others online. Because its resources are so frequently accessed online and due to the size of ASAP's membership, our resources on these issues are some of the most influential and widely read by immigrant communities in the United States.

16. While members have continuous access to ASAP-created information and

resources shared online, ASAP also sends members updates by text message and email at least once each month. These updates include immigration news alerts that include information about policy changes of interest to asylum seekers.

17. ASAP answers our members' legal questions through our virtual help desk. ASAP staff and contractors answer members' questions about asylum and the immigration court process, as well as questions related to work authorization, access to health insurance, education, social services, food assistance, and more.

18. ASAP also engages in high-impact advocacy campaigns, utilizing litigation, policy, and communications work.

19. ASAP members determine the organization's advocacy agenda and policy priorities. When members join ASAP, they have the option to write about what they would change in the immigration system. ASAP staff review these answers, code, and then compile them to determine members' collective priorities. These priorities then determine what litigation, policy, and communications work the organization takes on.

20. Additionally, ASAP gathers feedback from members through a combination of surveys and one-on-one member interactions. This feedback is used to help develop responsive how-to-resources, and to help shape the organization's advocacy efforts.

21. ASAP members vote on whether ASAP can bring a lawsuit alleging associational standing as a voluntary membership organization. ASAP will only allege associational standing in a lawsuit if members have voted and agreed to the organization doing so.

**The Executive Order Will Impact ASAP's Members**

22. ASAP members have expressed to ASAP that protecting birthright citizenship is a priority.

23. When asked in a recent survey of ASAP members, whether ASAP should file a lawsuit defending birthright citizenship, 99% of the ASAP members who responded voted yes and urged ASAP to preserve birthright citizenship for the children of ASAP members and other immigrants.

24. As of today, ASAP serves 686,737 members. According to the National Center for Health Statistics at the Center for Disease Control (CDC), the current U.S. birth rate is 11 births per 1000 people in the United States per year. By a conservative estimate, ASAP members will have 7,529 children in 2025, or an average of more than 20 U.S.-born children per day. This estimate is conservative because our members tend to belong to ethnic groups and come from countries with higher birthrates.

25. A recent survey of members confirms that many members are expecting to have children in 2025. To my knowledge, at least 629 ASAP members are expecting a child or children this year and are worried their future child or children will not be able to claim birthright citizenship despite being born in the United States.

26. ASAP members have already expressed concerns about the threatened action to deny birthright citizenship to children born in the United States to noncitizen parents and have asked questions about how it could impact them as asylum seekers. We have learned from ASAP members that ending birth right citizenship poses unique challenges for asylum seekers and their children.

**How the Executive Order Impacts ASAP's Members**

27.     ASAP is acutely aware of the harms that ending birthright citizenship will cause to children born in the United States to noncitizen parents and to their entire families. The harm will be severe for noncitizen parents, and their U.S.-born children who are denied U.S. citizenship.

28.     ASAP members have expressed that the denial of birthright citizenship would create great psychological distress and emotional pain. The denial of this status, which parents assumed would apply to their unborn children, will disrupt plans regarding immigration status, access to education, and benefits programs.

29.     Parents who are expecting children who could be denied U.S. citizenship are extremely worried about whether they will have to help their children apply for other forms of U.S. immigration relief, including seeking asylum in the United States. Parents are worried that without a pending immigration application, their children could be subject to deportation – even if they as parents are not. Applying for U.S. immigration status for a U.S.-born child would not only be incredibly time consuming and stressful for parents, but it could also be expensive if they have to pay government filing fees, or if they must hire an attorney in order to navigate this complicated and unprecedented immigration process.

30.     Ending birthright citizenship for the children of asylum seekers is particularly concerning because many asylum seekers have been persecuted and tortured by the governments of their home countries, and as such do not have access to or feel safe seeking services from a consular office of their country of origin in the United States. Furthermore, it is common practice for immigration attorneys to advise their clients that availing themselves of consular services from their country of origin could harm their asylum case, because these interactions could be

interpreted as demonstrating a lack of fear of their country of origin. As a result, many asylum-seeking parents will be forced to decide between negatively impacting their own immigration cases or essentially rendering their children stateless, without proof of citizenship from any country.

31.     Our members from Venezuela have told us that they cannot access consular services from their country of origin from within the United States – even if they wanted to do so. This is one reason why our members from Venezuela have expressed anxiety around their future U.S.-born children not being able to claim any citizenship, and potentially becoming stateless.

32.     ASAP members and other asylum seekers are already facing challenges having to flee their home country due to persecution and coming to a new country where they may not speak the language. ASAP members have communicated that this added concern of obtaining citizenship generally and some type of U.S. immigration status for their U.S.-born children is a sudden shock, and a source of tremendous stress and anxiety.

33.     Many ASAP members have reported to ASAP that they are stuck in asylum backlogs, waiting for their cases to be processed for sometimes even more than a decade. This means individuals with pending asylum applications are likely to be in the U.S. for many years to come. As such, the children of asylum seekers will not only be born in the United States, but will go to school in the U.S., learn English, and become part of the fabric of U.S. local communities before their parents' immigration case is decided.

34.     If they are denied citizenship, children born to many ASAP members will have no status in the U.S. at all. Many of them will therefore be ineligible for important programs that families rely on for nutrition and health benefits. For example, if denied citizenship, ASAP

members' U.S.-born children will not be able to access crucial healthcare programs like the Children's Health Insurance Program (CHIP), Medicaid, and the Affordable Care Act (ACA), which provide coverage to citizen children of noncitizen parents. This would also place additional stress on parents.

35. Moreover, ASAP members worry about the serious dignitary and status harms to their children who will be denied citizenship status. Children born in the United States, but deprived of its citizenship, may face not only statelessness, but also social exclusion and discrimination by being excluded from U.S. citizenship at birth. In the long run, noncitizen U.S.-born children will also be denied meaningful opportunities to engage in and enrich the civic life of their birth-country, by being deprived of voting rights, educational opportunities, the ability to serve on juries, and other mechanisms to participate in civic institutions as citizens.

**ASAP Members Impacted by the Executive Order**

36. We know of at least 629 ASAP members who are currently expecting to have children born in the United States in 2025. Below are a few representative examples of ASAP members whose U.S.-born children the Executive Order will unlawfully declare to be non-citizens.

37. **Dina** is an ASAP member living in Washington State.[1] She is pregnant and due in July of 2025. She and her partner are both from Kenya, and they are seeking asylum in the United States. Dina and her partner have been living in the United States since 2018. Dina came to the United States on a student visa, then applied for asylum affirmatively with USCIS. She

---

[1] Some of the members, including Dina, are identified using a pseudonym rather than the member's real name.

8

and her partner have been working legally in the United States for more than 5 years. Dina has a degree in cybersecurity and works as an IT manager. Her partner works for the county government as an IT Specialist. She and her partner are worried that their child will not be able to receive U.S. citizenship. Being an immigrant in the United States has been very stressful for Diana and her partner, and they do not want their son to go through the same struggles they have had to go through.

38. **Niurka** is an ASAP member living in Florida. She is pregnant and due in March of 2025. Niurka and her partner are both from Cuba, and they are currently seeking asylum in the United States. They crossed the Mexico-U.S. border, and were placed in deportation proceedings before the U.S. immigration courts. Niurka and her partner have a pending asylum application and a pending lawful permanent residency application under the Cuban Adjustment Act. Niurka was a medical doctor in Cuba, but she is not working at this time. Her partner studied food science and was a biopharmacist in Cuba. He is now a food safety and quality assurance manager in the food production industry. She and her partner are very worried their child will not receive U.S. citizenship when he is born. They want their son to achieve success in the United States and worry about how not receiving citizenship at birth will impact his future. Niurka and her partner have no intention of ever going back to Cuba because of the dictatorship, would never want their child to be a Cuban citizen, and do not want their child to ever have to set foot in Cuba. If he is denied U.S. citizenship, they are worried that their son would be in a state of limbo and would not have citizenship from any country.

39. **Igor** is an ASAP member living in Texas. He and his wife, Liza, are expecting a child in May of 2025. Igor and Liza are from Russia. Igor applied for asylum with the U.S. immigration courts. Liza came to the United States on a student visa, and is receiving her

Master's degree. Igor and Liza want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. Neither Igor nor Liza feel they can return to Russia without being persecuted, and because of that do not feel they can apply for Russian citizenship for their child. Because of that, Igor and Liza are worried their child will be stateless.

40.     **Adriana** is an ASAP member living in New York. She is pregnant and due in March of 2025. Adriana and her partner are both currently seeking asylum in the United States. They came to the United States as tourists, and subsequently applied for asylum with USCIS. Adriana has previously worked as an administrative and finance assistant abroad, but she is not currently working because she has had a difficult pregnancy. Adriana's partner works as a driver for a company that handles transportation for senior citizens and children. Adriana and her partner are worried that their daughter will face discrimination in the United States if she is not made a U.S. citizen at birth.

41.     **Nivida** is an ASAP member living in Louisiana. She is pregnant and due in April of 2025. Nivida is from Honduras and sought asylum in the United States in 2020. She had filed her asylum application with the U.S. immigration courts. However, her case was recently dismissed. Nivida's partner is from Mexico, and he has an application pending for a U-visa. Nivida and her partner believe it is very important that their child becomes a U.S. citizen at birth. If their child does not have U.S. citizenship at birth, Nivida and her partner are afraid of him having to live in either Honduras or Mexico because they fear violence and persecution in both countries. Nivida and her partner worry about their son's future if he is not a birthright citizen of the United States, and how it could change his life trajectory, his development, and the educational opportunities afforded to him. Nivida and her partner's daughter has U.S. citizenship

from birth already, which also means their son would have a different status than his sister, despite both of them being born in the United States.

42.     **Lesly** is an ASAP member living in New Jersey. She is pregnant and due in July of 2025. She crossed at the Mexico-U.S. border using the CBP One app, and subsequently applied for asylum in the U.S. immigration courts. Her next hearing is not until 2028. Lesly has worked as a cleaner in the U.S. and has a work permit. Neither Lesly nor her partner are U.S. citizens or lawful permanent residents. Lesly and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. They are concerned that without birthright citizenship, their child will not have as many opportunities – either educational or professional. Lesly is very stressed because she is not sure if she is going to have to start a U.S. immigration process for her child who will be born in the United States. Lesly is worried because an immigration attorney could cost a lot of money, and she does not know if she would have to hire an immigration attorney or pay application fees.

43.     **Esther** is an ASAP member living in Delaware. She is pregnant and due in February of 2025. Esther and her partner are currently seeking asylum in the United States in the U.S. immigration courts. Esther worked as a house cleaner in Delaware until she found out she was pregnant. Her husband works at a local pizza shop. She and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship.

44.     **Nohelimar** is an ASAP member living in California. She is pregnant and due in March of 2025. She and her partner came to the United States seeking safe haven. Nohelimar's partner has applied for asylum, but she has not been able to yet. Nohelimar studied criminalistics abroad, but she is not working because she has not yet received her work permit. Nohelimar and

her partner are worried that their child will not be able to receive U.S. citizenship. Nohelimar believes that if her son becomes a U.S. citizen, he will have a better future. If he is denied U.S. citizenship, she is confused and scared about what the process would be for her to get her son citizenship from any other country, and she would be worried about her son's future in the United States.

45.    **Barbara** is an ASAP member living in Kentucky. She is pregnant and due in July of 2025. Barbara and her partner are both from Cuba, and they are currently seeking asylum in the United States. Their green card application under the Cuban Adjustment Act has been pending for more than a year, and they hope to have their lawful permanent residency soon. They have been in the United States since 2022. Barbara was a lawyer in Cuba. She is now working at a school as a school custodian. Her partner is also a school custodian. Barbara and her partner are very worried their child will not receive U.S. citizenship.

46.    **Meny** is an ASAP member living in California. She is pregnant and due in July of 2025. She and her partner both have affirmative asylum applications pending at USCIS. Meny's professional background is as an educator for people with disabilities. Meny and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. They feel their child should have the citizenship of the country he is born in, especially since it is a constitutional right.

47.    **Verónica** is an ASAP member living in Connecticut. She is pregnant and due in June of 2025. She and her partner are both originally from Peru. Verónica and her partner have filed for asylum as a defense to deportation and did so using ASAP's self-help resources and how-to videos. Verónica's professional training in Peru is as an accountant. Verónica and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried

their child will not receive U.S. citizenship.

48.     **Carolina** is an ASAP member living in Florida. She is pregnant and due in June of 2025. She and her partner are both from Chile, but her partner is of Haitian and Chilean descent. Neither Carolina nor her partner are U.S. citizens or lawful permanent residents. Carolina came to the United States on a visa, and then subsequently applied for asylum affirmatively with USCIS. Carolina and her partner want to apply for their child's U.S. passport as soon as possible, but they are worried their child will not receive U.S. citizenship. They are particularly concerned their child will face discrimination if they are not seen as the same as other children who were born in the United States.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:  January 21, 2025                                          Respectfully submitted,

_____
Swapna C. Reddy