# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA, INC., *et al.*,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     *Defendants*. | Case No. 8:25-cv-00201-DLB |

## <u>DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

<strong>TABLE OF CONTENTS</strong>

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

STANDARD OF REVIEW .................................................................................................. 4

ARGUMENT ........................................................................................................................ 5

I.      Plaintiffs Lack a Cause of Action to Assert Their *Ultra Vires* Claims.............................. 5

II.     Plaintiffs' Claims Are Properly Channeled Through Other Means Under the INA........... 7

III.     Plaintiffs Are Not Likely to Succeed on the Merits.......................................................... 8

        A.     The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.................................................................................................. 9

        B.     Children Born of Unlawfully Present Aliens or Lawful But Visitors Fall Outside the Citizenship Clause. .......................................................................... 13

        C.     Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause............................................................................................ 20

        D.     Plaintiffs' Contrary Arguments Are Unpersuasive............................................... 22

IV.     Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of this Lawsuit. ........ 26

V.     The Public Interest Does Not Favor an Injunction. ......................................................... 28

VI.     Any Relief Should be Limited. ........................................................................................ 29

CONCLUSION.................................................................................................................... 30

**INTRODUCTION**

The Citizenship Clause of the Fourteenth Amendment provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.  On January 20, 2025, President Donald J. Trump issued an Executive Order addressing what it means to be "subject to the jurisdiction" of the United States.  *See* Exec. Order No. 14160, "Protecting the Meaning and Value of American Citizenship" (Citizenship EO or EO).  That Executive Order recognizes that the Constitution does not grant birthright citizenship to the children of aliens who are unlawfully present in the United States as well as children of aliens whose presence is lawful but temporary. Text, history, and precedent support what common sense compels:  the Constitution does not harbor a windfall clause granting American citizenship to, *inter alia*: the children of those who have circumvented (or outright defied) federal immigration laws.

Plaintiffs—two non-profit organizations and five pseudonymously named Plaintiffs—filed suit within a day of the EO's issuance.  But their dramatic assertions about the supposed illegality of the EO cannot substitute for a showing that Plaintiffs have established their entitlement to extraordinary emergency relief.  And as to each factor of that analysis, Plaintiffs have failed to carry their burden.  Plaintiffs' claims are unlikely to succeed because they are wrong on the merits, but they also fail on threshold grounds.  Specifically, Plaintiffs lack a cognizable cause of action in their two claims that the Citizenship EO is *ultra vires* under the Citizenship Clause and the Immigration and Nationality Act ("INA"), and any challenge by any individual to their citizenship status is properly channeled under 8 U.S.C. § 1503 and not this lawsuit.

Plaintiffs are also unlikely to succeed on the merits.  As was apparent from the time of its enactment, the Citizenship Clause's use of the phrase "subjection to the jurisdiction" of the United

States contemplates something more than being subject to this country's regulatory power. It conveys that persons must be "completely subject to [the] political jurisdiction" of the United States, *i.e.*, that they have a "direct and immediate allegiance" to this country, unqualified by an allegiance to any other foreign power. *Elk v. Wilkins*, 112 U.S. 94, 102 (1884). Just as that does not hold for diplomats or occupying enemies, it similarly does not hold for foreigners admitted temporarily or individuals here illegally.

Although Plaintiffs contend that the Citizenship EO upends well-settled law, it is their maximalist reading which runs headlong into existing law. Not only is it inconsistent with the Supreme Court's holding in *Elk* that the children of Tribal Indians did not fall within the Clause, even though they were subject to the regulatory power of the United States, *id*. at 101-02, but it would render the Civil Rights Act of 1866 (which defined citizenship to cover those born in the United States, not "subject to any foreign power") unconstitutional just two years after it was passed. But the Citizenship Clause was an effort to *constitutionalize* the Civil Rights Act. Plaintiffs rely heavily on the Supreme Court's decision in *Wong Kim Ark*, 169 U.S. 649 (1898). The Court, however, was careful to cabin its actual holding to the children of those with a "permanent domicile and residence in the United States." *Id*. at 652-53. Reading that decision to leave open the question presented here is consistent with contemporary accounts, prior practices of the political branches, and Supreme Court decisions in the years following *Wong Kim Ark*. Finally, the balance of the equities does not favor injunctive relief.

The Court should deny the pending preliminary injunction motion.

## BACKGROUND

The Citizenship EO is an integral part of President Trump's broader effort to repair the United States' immigration system and to address the ongoing crisis at the southern border. *See,*

2

*e.g.*, Exec. Order No. 14165, Securing Our Borders (Jan. 20, 2025); Proclamation No. 10886, "Declaring a National Emergency at the Southern Border of the United States" (Jan. 20, 2025); Exec. Order No. 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025) ("Invasion EO").  As the President has recognized, individuals unlawfully in this country "present significant threats to national security and public safety," Invasion EO, § 1, and the severity of these problems warrants a full panoply of immigration measures.  Some of these threats are related to the United States' prior, erroneous policy of recognizing near-universal birthright citizenship. For instance, "the nation's current policy of universally granting birthright citizenship to individuals who lack any meaningful ties to the United States provides substantial opportunities for abuse by motivated enemies."  Amy Swearer, Heritage Found., Legal Memorandum No. 250, *The Political Case for Confining Birthright Citizenship to Its Original Meaning* at 8-11 (2019).

The Citizenship EO seeks to correct the Executive Branch's prior misreading of the Citizenship Clause.  It recognizes that the Constitution and the INA provide for citizenship for all persons who are born in the United States and subject to the jurisdiction thereof, and identifies two circumstances in which a person born in the United States is not automatically extended the privilege of United States citizenship:

> (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Citizenship EO § 1.

Section 2(a) of the EO directs the Executive Branch (1) not to issue documents recognizing U.S. citizenship to persons born in the United States under the conditions described in section 1, and (2) not to accept documents issued by state, local, or other governments purporting to

recognize the U.S. citizenship of such persons. The EO specifies, however, that those directives "apply only to persons who are born within the United States after 30 days from the date of this order," or February 19. Citizenship EO § 2(b). The Citizenship EO makes clear that its provisions do not "affect the entitlement of other individuals, including children of lawful permanent residents, to obtain documentation of their United States citizenship." *Id*. § 2(c).

As for enforcement, the EO directs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to take "all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order," and not to "act, or forbear from acting, in any manner inconsistent with this order." Citizenship EO § 3(a). It further directs the heads of all federal agencies to issue public guidance within 30 days (by February 19) "regarding this order's implementation with respect to their operations and activities." *Id*. § 3(b).[1]

## STANDARD OF REVIEW

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very farreaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (citation omitted). To obtain a preliminary injunction, Plaintiffs must make a "clear showing" of each of the four factors: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary injunctive relief; (3) that the balance of equities tips in their favor; and (4) that the public interest favors the requested equitable relief. *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

---

[1] The Citizenship EO has been challenged in several other lawsuits. On January 23, a district judge in the Western District of Washington issued a temporary restraining order "fully" enjoining the Defendants in that case "and all their respective officers, agents, servants, employees, and attorneys," from enforcing or implementing Section 2(a), Section 3(a), or Section 3(b) of the Citizenship EO. *See* TRO, *Washington v. Trump*, No. 2:25-cv-00127-JCC (Jan. 23, 2025), ECF No. 43. That TRO remains in effect "pending further orders from th[e] Court," *id*., and the court has scheduled a preliminary injunction hearing for February 6. *See Washington*, ECF No. 44 at 1.

**ARGUMENT**

**I.    Plaintiffs Lack a Cause of Action to Assert Their *Ultra Vires* Claims.**

Plaintiffs' claims fail at the outset because they lack a cause of action. Plaintiffs do not

bring a cause of action independently under the Fourteenth Amendment's Citizenship Clause or

otherwise invoke the Administrative Procedure Act ("APA"), which permits a Court to "set aside

agency action . . . otherwise not in accordance with law; contrary to constitutional right. . . [or] in

excess of statutory jurisdiction." 5 U.S.C. § 706(2)(A)-(C).  Nor could plaintiffs bring such an

action because the Citizenship Clause does not, by itself, allow Plaintiffs to bring suit.

"Constitutional rights do not typically come with a built-in cause of action to allow private

enforcement in courts." *DeVillier v. Texas*, 601 U.S. 285, 291 (2024).  "Instead, constitutional

rights are generally invoked defensively in cases arising under other sources of law, or asserted

offensively pursuant to an independent cause of action designed for that purpose" (such as 42

U.S.C. § 1983).  *Id.* at 291.  Meanwhile the APA limits judicial review to "final agency action for

which there is no other adequate remedy in a court." 5 U.S.C. § 704.  However, Plaintiffs' claims

do not come within the APA as they do not even attempt to "identify the final agency action being

challenged." *Elk Run Coal Co., Inc. v. U.S. Dep't of Labor*, 804 F. Supp. 2d 8, 30 (D.D.C. 2011).

Nor can they:  The EO is not final agency action as it was issued by the President, who is not

subject to the APA. *See Dalton v. Specter*, 511 U.S. 462, 469 (1994).  Until such time as an agency

named in the Complaint takes action, determines rights or obligations, or otherwise causes legal

consequences, *see, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016),

Plaintiffs have no APA claims.

Instead, Plaintiffs assert that the Citizenship EO is *ultra vires* under the Fourteenth

Amendment and/or the Immigration and Nationality Act ("INA").  *See* Compl. ¶¶ 101-114.  These

5

claims are questionable at best. The decision suggesting the existence of *ultra vires* claims against federal officials, *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682 (1949), predates amendments to the APA that clarified what agency action can and cannot be subject to judicial review. *See Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 2006 WL 581260, at *8 (D. Md. Jan. 10, 2006) ("While *Larson* created an exception to sovereign immunity when federal officers acted *ultra vires*, Section 702 of the APA provides a general waiver of sovereign immunity for all unconstitutional acts where injunctive relief is requested."). Moreover, the Supreme Court has otherwise rejected actions in equity, like *ultra vires* claims, where Congress has provided for a specific remedial scheme as is the case here, *see infra* Sec. II. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327-28 (2015). Nonetheless, some courts have recognized *ultra vires* claims, stating that "[e]ven if a statute does not provide for judicial review, [w]hen an executive acts *ultra vires,* courts are normally available to reestablish the limits on his authority." *Ancient Coin Collectors Guild v. CBP, DHS*, 801 F. Supp. 2d 383, 405 (D. Md. 2011) (quotation omitted).

These claims—even when recognized—are circumscribed. "[*U*]*ltra vires* review is limited to whether the President has violated the Constitution, the statute under which the challenged action was taken, or other statutes, or did not have statutory authority to take a particular action." *Id.* at 406. Indeed, the "modern cases make clear" that an officer may be said to act *ultra vires* "only when he acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 n.11 (1984) (citation omitted). And more recent cases indicate that such claims are inappropriate against non-officers, such as the United States and agencies. *See Taylor Energy Co., LLC v. United States*, 2021 WL 1876845, at *3 (E.D. La. May 10, 2021) (finding *Larson* inapplicable against "the United States and its agencies"); *see also Int'l Fed'n of Pro. & Tech. Eng'rs v. United States*, 934 F. Supp. 2d 816, 821 (D. Md. 2013). Plaintiffs' claims

against the United States, *see* Compl. ¶ 56, are improperly brought as *ultra vires* claims.

Plaintiffs' remaining claims against the President and various agency heads fail as *ultra vires* claims. Regardless of the underlying merits of Plaintiffs' claims, it cannot be said that in issuing an EO in the field of immigration law, the President failed to act "without any authority whatever." To the contrary, immigration law and foreign relations—the subjects of the Citizenship EO—are areas where the Executive Branch's authority is particularly broad, even when those actions implicate constitutional questions and questions under the INA. *See, e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) ("For more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." (quotation omitted)). Thus, even if Plaintiffs were correct regarding their interpretation of the Citizenship Clause and the INA, they cannot bring any challenge based on those disputes as *ultra vires* claims.

## II. Plaintiffs' Claims Are Properly Channeled Through Other Means Under the INA.

Rather than bring *ultra vires* claims and a pre-enforcement challenge to the EO, Plaintiffs have an available and exclusive mechanism to challenge disputes about citizenship under the INA. Pursuant to the INA's comprehensive statutory framework for judicial review, disputes regarding an individual's citizenship are resolved by the individual filing an action for declaratory relief once he is denied a right or privilege as a U.S. national. 8 U.S.C. § 1503. Thus, "[i]f any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States," then that person may institute an action under 8 U.S.C. § 1503, in conjunction with 28 U.S.C. § 2201, for a declaratory judgment that he

is a U.S. national. *See id*. § 1503(a).[2] Under section 1503, district courts conduct *de novo* proceedings as to the alien's nationality status. *See Vance v. Terrazas*, 444 U.S. 252, 256 (1980); *Richards v. Sec'y of State, Dep't of State*, 752 F.2d 1413, 1417 (9th Cir. 1985); *Abimbola v. Clinton*, 2012 WL 5420349, at *2 (D. Md. Nov. 6, 2012) (same).

Because "Congress intended § 1503(a) to be the exclusive remedy for a person within the United States to seek a declaration of U.S. nationality following an agency or department's denial of a privilege or right of citizenship upon the ground that the person is not a U.S. national," *Cambranis v. Blinken*, 994 F.3d 457, 466 (5th Cir. 2021), courts have consistently concluded that section 1503(a) offers an adequate alternative remedy to APA review. *See, e.g.*, *Alsaidi v. U.S. Dep't of State*, 292 F. Supp. 3d 320, 326-27 (D.D.C. 2018); *Abuhajeb v. Pompeo*, 531 F. Supp. 3d 447, 455 (D. Mass. 2021).

## III.   Plaintiffs Are Not Likely to Succeed on the Merits.

The Citizenship Clause provides that "[a]ll persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. Amend. XIV, § 1. And the INA grants U.S. citizenship to any "person born in the United States, and subject to the jurisdiction thereof." 8 U.S.C. § 1401(a). Plaintiffs contend that the EO violates both the Citizenship Clause and the INA, but they are mistaken.[3]

To obtain U.S. citizenship under the Citizenship Clause, a person must be: (1) "born or naturalized in the United States" and (2) "subject to the jurisdiction thereof." U.S. Const. amend XIV, § 1. The Supreme Court has identified multiple categories of persons who, despite birth in

---

[2] If an individual is placed in removal proceedings, Section 1503 is unavailable and the individual can raise the issue of citizenship in those proceedings. 8 U.S.C. § 1252(b)(5) (if an alien appeals a removal order to a circuit court, that court, upon finding a genuine issue of material fact as to U.S. citizenship, transfers the proceeding to the district court for an evidentiary hearing).

[3] Plaintiffs recognize that their statutory claim rises and falls with their constitutional claim. *See* Br. at 12. Because the two provisions are coterminous, Defendants focus here on the constitutional provision.

the United States, are not constitutionally entitled to citizenship because they are not subject to the jurisdiction of the United States:  children of foreign sovereigns or their diplomats, children of alien enemies in hostile occupation, children born on foreign public ships, and certain children of members of Indian tribes.[4]  *United States v. Wong Kim Ark*, 169 U.S. 649, 682, 693 (1898).  The Citizenship EO an additional category of persons not subject to the jurisdiction of the United States:  children born in the United States of foreign parents whose presence is either unlawful or lawful but temporary.

### A.    The Term "Jurisdiction" in the Citizenship Clause Does Not Refer to Regulatory Power.

"Jurisdiction . . . is a word of many, too many, meanings."  *Wilkins v. United States*, 598 U.S. 152, 156 (2023) (citation omitted).  Plaintiffs equate "jurisdiction" with something akin to regulatory power, arguing that it means anyone who "must necessarily submit to the rule of U.S. law."  Br. at 10.  That interpretation is incorrect.  It conflicts with both Supreme Court precedent and ample evidence as to the provision's original public meaning.

1.    Most importantly, Plaintiffs' understanding of the term "jurisdiction" conflicts with Supreme Court precedents identifying the categories of persons who are not subject to the United States' jurisdiction within the meaning of the Citizenship Clause.  For example, the Supreme Court has held that children of members of Indian tribes, "owing immediate allegiance" to those tribes, do not acquire citizenship by birth in the United States.  *Elk*, 112 U.S. at 102; *see Wong Kim Ark*, 169 U.S. at 680-82.  Yet members of Indian tribes and their children are plainly subject to the United States' regulatory power.  "It is thoroughly established that Congress has plenary authority

---

[4]  Although the Citizenship Clause has always been understood to exclude certain children of members of Indian tribes from a constitutional right to citizenship by birth, Congress has by statute extended U.S. citizenship to any "person born in the United States to a member of an Indian, Eskimo, Aleutian, or other aboriginal tribe."  8 U.S.C. § 1401(b).

over the Indians and all their tribal relations." *Winton v. Amos*, 255 U.S. 373, 391 (1921); *see Haaland v. Brackeen*, 599 U.S. 255 272-73 (2023). For example, Congress may regulate Indian commercial activities, *see United States v. Holliday*, 70 U.S. (3 Wall.) 407, 416-18 (1866); Indian property, *see Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); and Indian adoptions, *see Brackeen*, 599 U.S. at 276-280. And the United States may punish Indians for crimes. *See United States v. Kagama*, 118 U.S. 375, 379-385 (1886). If, as Plaintiffs argue, "subject to the jurisdiction thereof" means subject to U.S. law, this longstanding exception for Indians would be inexplicable.

In fact, Plaintiffs' reading cannot even explain the exception to birthright citizenship for "children of foreign sovereigns or their ministers." *Wong Kim Ark*, 169 U.S. at 693. Although foreign leaders and diplomats have traditionally enjoyed immunity as a matter of common law, the Constitution allows Congress to abrogate that immunity or to make exceptions to it. *See Verlinden BV v. Central Bank of Nigeria*, 461 U.S. 480, 486 (1983). And to the extent Plaintiffs argue that children of foreign leaders or diplomats are not subject to the United States' jurisdiction because the U.S. *chooses* to extend immunity to them, their theory would allow Congress to turn the Citizenship Clause on and off at will by extending or retracting immunity.

Against the surplusage canon, on Plaintiffs' reading, the phrase "subject to the jurisdiction thereof" adds nothing to the phrase "born . . . in the United States." Because the United States is sovereign over its territory, everyone who is born (and so present) in the United States would necessarily be subject, at least to some extent, to the United States' regulatory authority. *See Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136 (1812). But "[i]t cannot be presumed that any clause in the [C]onstitution is intended to be without effect; and, therefore, such a construction is inadmissible." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803).

2.       Instead of equating "jurisdiction" with regulatory authority, the Supreme Court has

held that a person is "subject to the jurisdiction" of the United States under the Citizenship Clause if he is born "in the allegiance and under the protection of the country." *Wong Kim Ark*, 169 U.S. at 693. That allegiance to the United States, the Court has further held, must be "direct," "immediate," and "complete," unqualified by "allegiance to any alien power." *Elk*, 112 U.S. at 101-02. In other words, a person is subject to the jurisdiction of the United States within the meaning of the Clause only if he is *not* subject to the jurisdiction of a foreign power, and the "nation" has "consent[ed]" to him becoming part of its own "jurisdiction." *Elk*, 112 U.S. at 102-03; *see also Schooner Exchange*, 11 U.S. at 136 (explaining a nation's "jurisdiction . . . must be traced up to the consent of the nation itself").

That reading of the Citizenship Clause reflects its statutory background. Months before Congress proposed the Fourteenth Amendment, it enacted the Civil Rights Act of 1866. That Act served as "the initial blueprint" for the Amendment, *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 389 (1982), and the Amendment in turn "provide[d] a constitutional basis for protecting the rights set out" in the Act, *McDonald v. City of Chicago*, 561 U.S. 742, 775 (2010). The Act stated, as relevant here, that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens of the United States." Civil Rights Act § 1, 14 Stat. 27 (emphasis added). There is no reason to read the phrase "subject to the jurisdiction thereof" in the Amendment as broader than the phrase "not subject to any foreign power" in the Act—in no small part, because doing so would render the Civil Rights Act unconstitutional. And, as telling, the Act's citizenship language remained on the books until revised by the Nationality Act of 1940, ch. 876, § 201(a), 54 Stat. 1137, 1138—suggesting that Congress regarded the Act's "not subject to any foreign power" requirement as consistent with the Amendment's "subject to the jurisdiction" requirement. The Act thus confirms that, to be subject

to the jurisdiction of the United States under the Clause, a person must owe "no allegiance to any alien power." *Elk*, 112 U.S. at 101.

Debates on the Act and the Amendment show that members of Congress shared that understanding. During debates on the Act, Senator Lyman Trumbull explained that the purpose of the Act was "to make citizens of everybody born in the United States who owe[d] allegiance to the United States." Cong. Globe, 39th Cong., 1st Sess. 572 (1866). Trumbull went on to equate "being subject to our jurisdiction" with "owing allegiance solely to the United States." *Id.* at 2894. And Senator Reverdy Johnson agreed that "all that this amendment provides is, that all persons born in the United States and not subject to some foreign Power . . . shall be considered as citizens." *Id.* at 2893.

The full text of the Citizenship Clause reinforces that reading of the Clause's jurisdictional element. The Clause provides that persons born in the United States and subject to its jurisdiction "are citizens of the United States and of the States wherein they reside." U.S. Const. amend. XIV, § 1. The Clause uses the term "reside[nce]" synonymously with "domicile." *See Robertson v. Cease*, 97 U.S. 646, 650 (1878) (explaining that state citizenship requires "a fixed permanent domicile in that State"). The Clause thus makes clear that citizenship flows from lawful domicile.

Finally, as a decisive cross-check, the government's reading, unlike Plaintiffs' interpretation, is the only one that fully explains the Supreme Court's precedents on citizenship by birth in the United States. It was "never doubted" that "children born of citizen parents" owe allegiance to the United States and are subject to its jurisdiction. *Minor v. Happersett*, 88 U.S. 162, 167 (1874). In *Wong Kim Ark*, the Court held that a child born in the United States "of parents of Chinese descent, who at the time of his birth [were] subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and

are not employed in any diplomatic or official capacity" by China are likewise subject to the jurisdiction of the United States. 169 U.S. at 653. The Court explained that "[e]very citizen or subject of another country, while domiciled here, is within the allegiance . . . of the United States." *Id.* at 693. By contrast, children of diplomats, children of certain alien enemies, and children born on foreign public ships are not subject to the jurisdiction of the United States because they all owe allegiance to foreign sovereigns under background principles of common law. *See id.* at 655. And the Court has held that certain children of members of Indian tribes are not subject to U.S. jurisdiction in the necessary sense because they "owe[] immediate allegiance to their several tribes." *Elk*, 112 U.S. at 99.

**B.      Children Born of Unlawfully Present Aliens or Lawful But Visitors Fall Outside the Citizenship Clause.**

1.      To determine which sovereign may properly claim a person's allegiance, the Supreme Court has looked to the background principles of the common law and the law of nations, as understood in the United States at the time of the ratification of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S. at 653-55. Under those principles, a child born of foreign parents other than lawful permanent residents is domiciled in, and owes a measure of allegiance to, his parents' home country. As a result, such a child is not subject to the jurisdiction of the United States within the meaning of the Citizenship Clause.

Under the common law, a person owes a form of "allegiance" to the country in which he is "domiciled." *Carlisle v. United States*, 83 U.S. (16 Wall). 147, 155 (1872); *see The Pizarro*, 15 U.S. (2 Wheat.) 227, 246 (1817) (Story, J.) ("[A] person domiciled in a country . . . owes allegiance to the country."). A child's domicile, and thus his allegiance, "follow[s] the independent domicile of [his] parent." *Lamar v. Micou*, 112 U.S. 452, 470 (1884); *see also Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989).

Temporary visitors and unlawfully present aliens, however, are not domiciled here but in foreign countries. As touched on above, "[i]n general, the domicile of an individual is his true, fixed and permanent home." *Martinez v. Bynum*, 461 U.S. 321, 331 (1983). Temporary visitors to the United States, by definition, retain permanent homes in foreign countries. And illegal aliens, by definition, have no right even to be present in the United States, much less a right to make *lawful* residence here. Instead, as a matter of law, illegal aliens formally retain their foreign domiciles, because they have not yet been accepted to reside anywhere else. *See, e.g., Elkins v. Moreno*, 435 U.S. 647, 665-66 (1978) (recognizing that federal immigration law restricts the ability of foreigners to establish domiciles in the United States). And if a temporary visitor or illegal alien domiciled in a foreign country has a child with another temporary visitor or illegal alien while in the United States, the child's domicile also lies in the foreign country, and the child owes allegiance to that country. That "allegiance to [an] alien power" precludes the child from being "completely subject" to the United States' jurisdiction, as the Fourteenth Amendment requires. *Elk*, 112 U.S. at 101-02.

Indeed, the Citizenship EO follows directly from Supreme Court precedent recognizing that distinction, and the established exception to birthright citizenship for certain "children of members of the Indian tribes." *Wong Kim Ark*, 169 U.S. at 682. Indian tribes form "an intermediate category between foreign and domestic states." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 396 n.7 (2023) (citation omitted). The Supreme Court long ago determined that Indian tribes are not "foreign nations," instead describing them as "domestic dependent nations." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17 (1831) (Marshall, C.J.). Yet the Court has held that "an Indian, born a member of one of the Indian tribes," has no constitutional birthright to U.S. citizenship given his "immediate allegiance" to his tribe.

*Elk*, 112 U.S. at 99, 101-02; *see Wong Kim Ark*, 169 U.S. at 680-682.

Illegal aliens and temporary visitors have far weaker connections to the United States than do members of Indian tribes. "Our Constitution reserves for the Tribes a place—an enduring place—in the structure of American life." *Brackeen*, 599 U.S. at 333 (Gorsuch, J., concurring). If the United States' link with Indian tribes does not suffice as a constitutional matter for birthright citizenship, its weaker link with illegal aliens and temporary visitors even more obviously does not do so. *See, e.g.*, William Edward Hall, *A Treatise on International Law* 237 n.1 (4th ed. 1895) ("[A] fortiori the children of foreigners in transient residence are not citizens, their fathers being subject to the jurisdiction less completely than Indians.").

2.     The Fourteenth Amendment's historical background provides additional support for the conclusion that, while children born here of U.S. citizens and permanent residents are entitled to U.S. citizenship by birth, children born of parents whose presence is either unlawful or lawful but temporary. Under the common law, "[t]wo things usually concur to create citizenship; [f]irst, birth locally within the dominions of the sovereign; and, secondly, birth . . . within the ligeance of the sovereign." *Wong Kim Ark*, 169 U.S. at 659 (citation omitted). The phrase "born . . . in the United States," U.S. Const. amend. XIV, § 1, codifies the traditional requirement of "birth within the territory," *id.* at 693, and the phrase "subject to the jurisdiction thereof," U.S. Const. Amend. XIV, § 1, codifies the traditional requirement of birth "in the allegiance" of the country, *Wong Kim Ark*, 169 U.S. at 693.

 Drawing from the same tradition, Emmerich de Vattel—"the founding era's foremost expert on the law of nations," *Franchise Tax Bd. of Cal. v. Hyatt*, 587 U.S. 230, 239 (2019)— explained that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status. "[N]atural-born citizens," Vattel wrote, include "those

born in a country, of parents who are citizens." Ememrich de Vattel, *The Law of Nations* § 212, at 101 (London, printed for G.G. and J. Robinson, Paternoster-Row, 1797 ed.). Citizenship by virtue of birth in the country also extends to the children of "perpetual inhabitants" of that country, whom Vattel regarded as "a kind of citize[n]." *Id.*; *see also id.* § 215, at 102. According to Vattel, citizenship does not extend, however, to children of those foreigners who lack "the right of perpetual residence" in the country. *Id.* § 213, at 102.

Justice Story also understood that birthright citizenship required more than mere physical presence. He explained in a judicial opinion later quoted in *Wong Kim Ark* that "children of even aliens born in a country, *while the parents are resident there*," "are subjects by birth." *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. (3 Pet.) 99, 164 (1830) (emphasis added). He also wrote in a treatise:

> Persons, who are born in a country, are generally deemed citizens and subjects of that country. A reasonable qualification of this rule would seem to be, that it should not apply to the children of parents, who were *in itinere* in the country, or abiding there for temporary purposes, as for health, or occasional business.

Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834).

3.    Congressional debates over the Civil Rights Act and Fourteenth Amendment also confirm that children born in the United States to non-resident aliens lack a right to U.S. citizenship because they are not subject to U.S. jurisdiction. For instance, Representative James Wilson explained during a debate over the Civil Rights Act that, under "the general law relating to subjects and citizens recognized by all nations," a "person born in the United States" ordinarily "is a natural-born citizen." Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). But he recognized "except[ions]" to that general rule for "children born on our soil to *temporary sojourners* or representatives of foreign Governments." *Id.* (emphasis added).

When Congress was considering the Civil Rights Act, Senator Trumbull, "who wrote [the

Act's] citizenship language and managed the Act in the Senate, wrote a letter to President Andrew Johnson summarizing the bill."  Mark Shawhan, Comment, *The Significance of Domicile in Lyman Trumbull's Conception of Citizenship*, 119 Yale L. J. 1351, 1352 (2010) (footnotes omitted).  The Act, as noted above, provided that "all persons born in the United States and *not subject to any foreign power*, excluding Indians not taxed, are hereby declared to be citizens."  Civil Rights Act § 1, 14 Stat. 27 (emphasis added).  Senator Trumbull summarized that provision:  "The Bill declares 'all persons' *born of parents domiciled in the United States*, except untaxed Indians, to be citizens of the United States."  Shawhan, *supra*, at 1352-53 (emphasis added) (quoting Letter from Sen. Lyman Trumbull, Chairman, S. Judiciary Comm., to President Andrew Johnson, (*in* Andrew Johnson Papers, Reel 45, Manuscript Div., Library of Congress)).

During a debate over the Fourteenth Amendment, Senator Benjamin Wade proposed a version of the Amendment that would have referred to "persons born in the United States" (without the additional qualification of being "subject to the jurisdiction").  Cong. Globe, 39th Cong., 1st Sess. 2768 (1866).  One of his colleagues objected that "persons may be born in the United States and yet not be citizens," giving the example of "a person [who] is born here of parents from abroad temporarily in this country."  *Id.* at 2769.  Senator Wade acknowledged that the unadorned phrase "born in the United States" would indeed encompass those individuals, but he argued that the situation would arise so infrequently that "it would be best not to alter the law for that case."  *Id.* at 2768-69.  That exchange concludes that "a person [who] is born here of parents from abroad temporarily in this country" is not subject to the jurisdiction of the United States, *id.* at 2768, and is accordingly not constitutionally entitled to citizenship by birth.

4.    Contemporary understanding following ratification accords with that reading of the Fourteenth Amendment.  Perhaps most telling, right on the heels of the Citizenship Clause, the

Supreme Court described its scope as such: "The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, *and citizens or subjects of foreign States* born within the United States." *The Slaughterhouse Cases*, 83 U.S. 36, 73 (1873) (emphasis added). That is wholly consistent with the Citizenship EO. Contemporary commentators expressed similar views. *See, e.g.*, *Hall*, *supra*, 236-237 ("In the United States it would seem that the children of foreigners in transient residence are not citizens."); Alexander Porter Morse, *A Treatise on Citizenship* 248 (1881) ("The words 'subject to the jurisdiction thereof' exclude the children of foreigners transiently within the United States." ).

The Supreme Court of New Jersey similarly linked birthright citizenship with parental domicile in *Benny v. O'Brien*, 32 A. 696 (N.J. 1895). In a passage that was later quoted in *Wong Kim Ark*, the court interpreted the Citizenship Clause to establish "the general rule that, *when the parents are domiciled here*, birth establishes the right of citizenship." *Id.* at 698 (emphasis added). And it explained that the Citizenship Clause's jurisdictional element excludes "those born in this country of foreign parents who are temporarily traveling here" because "[s]uch children are, in theory, born within the allegiance of [a foreign] sovereign." *Id.*

The political branches operated from the same understanding in the years following the Fourteenth Amendment's enactment. For instance, six years after ratification, Representative Ebenezer Hoar proposed a bill "to carry into execution the provisions of the [F]ourteenth [A]mendment . . . concerning citizenship." 2 Cong. Rec. 3279 (1874). The bill would have provided that, as a general matter, "a child born within the United States of parents who are not citizens, and who do not reside within the United States, . . . shall not be regarded as a citizen thereof." *Id.* Although the bill ultimately failed its "parental domicile requirement" generated little meaningful "debate or controversy." Justin Lollman, Note, *The Significance of Parental*

*Domicile Under the Citizenship Clause*, 101 Va. L. Rev. 455, 475 (2015).  The bill thus suggests that, soon after the ratification of the Fourteenth Amendment, members of Congress accepted that children born of non-resident alien parents are not subject to the Citizenship Clause.

The Executive Branch, too, at times took the position that the Citizenship Clause did not confer citizenship upon children born in the United States to non-resident alien parents.  In 1885, Secretary of State Frederick T. Frelinghuysen issued an opinion denying a passport to an applicant who was "born of Saxon subjects, temporarily in the United States."  2 *A Digest of the International Law of the United States* § 183, at 397 (Francis Wharton ed., 2d. ed. 1887) (*Wharton's Digest*).  Secretary Frelinghuysen explained that the applicant's claim of birthright citizenship was "untenable" because the applicant was "subject to [a] foreign power," and "the fact of birth, under circumstances implying alien subjection, establishes of itself no right of citizenship."  *Id.* at 398.

5.      Finally, *Wong Kim Ark* recognized an exception to birthright citizenship for "children born of alien enemies in hostile occupation," *Wong Kim Ark*, 169 U.S. at 682.  Here, the President has determined that the United States has experienced "an unprecedented flood of illegal immigration" in which "[m]illions of illegal aliens"—many of whom "present significant threats to national security and public safety"—have entered the country in violation of federal law.  Invasion EO § 1; *see also id.* (explaining that "[o]thers are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities").  Plaintiffs' maximalist reading of the Citizenship Clause would require extending birthright citizenship to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile networks.

### C. Applicable Interpretive Principles Support the Government's Reading of the Citizenship Clause.

1. "[A]ny policy toward aliens is vitally and intricately interwoven with . . . the conduct of foreign relations." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). "Any rule of constitutional law that would inhibit the flexibility" of Congress or the President "to respond to changing world conditions should be adopted only with the greatest caution." *Trump v. Hawaii*, 585 U.S. 667, 704 (2018) (citation omitted). The government's reading of the Citizenship Clause respects that principle, while Plaintiffs' reading violates it. The Citizenship Clause sets a constitutional floor, not a constitutional ceiling. Although Congress may not deny citizenship to those protected by the Clause, it may, through its power to "establish an uniform Rule of Naturalization," extend citizenship to those who lack a constitutional right to it. U.S. Const. Art. I, § 8, Cl. 4; *see Wong Kim Ark*, 169 U.S. at 688. The government's reading would thus leave Congress with the ability to extend citizenship to the children of illegal aliens or of temporary visitors, just as it has extended citizenship to the children of members of Indian tribes.

As a "sovereign nation," the United States has the constitutional power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). "[O]ver no conceivable subject" is federal power "more complete" than it is over the admission of aliens. *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909). Interpreting the Constitution to require the extension of birthright citizenship to the children of illegal aliens directly undermines that power by holding out a powerful incentive for illegal entry. Contrary to the principle that no wrongdoer should "profit out of his own wrong," *Liu v. SEC*, 591 U.S. 71, 80 (2020) (citation omitted), it also allows foreigners to secure U.S. citizenship for their children (and, potentially, later immigration benefits for themselves) by entering the United States in violation of

its laws.

2.     The Supreme Court has resisted reading the Citizenship Clause in a manner that would inhibit the political branches' ability to address "problems attendant on dual nationality." *Rogers v. Bellei*, 401 U.S. 815, 831 (1971).  Although the United States tolerates dual citizenship in some circumstances, it has "long recognized the general undesirability of dual allegiances." *Savorgnan v. United States*, 338 U.S. 491, 500 (1950).  "One who has a dual nationality will be subject to claims from both nations, claims which at times may be competing or conflicting," and "[c]ircumstances may compel one who has a dual nationality to do acts which otherwise would not be compatible with the obligations of American citizenship."  *Kawakita v. United States*, 343 U.S. 717, 733, 736 (1952).

Plaintiffs' reading of the Citizenship Clause invites just such problems.  For centuries, countries have extended citizenship to the foreign-born children of their citizens because children born abroad "follow the condition of their fathers," so long as "the father has not entirely quitted his [home] country."  Vattel, *supra* § 215, at 102.  England has extended citizenship to certain foreign-born children of its subjects since at least the 14th century.  *See Wong Kim Ark*, 169 U.S. at 668-71.  In 1790, Congress extended citizenship to "children of citizens" born "out of the limits of the United States," with the proviso that "the right of citizenship shall not descend to persons whose fathers have never been resident in the United States."  Naturalization Act of 1790, ch. 3, 1 Stat. 103, 104.  Today, federal law recognizes as a citizen any "person born outside of the United States . . . of parents both of whom are citizens of the United States and one of whom has had a residence in the United States."  8 U.S.C. § 1401(c).  Many other countries have similar laws.  *See Miller v. Albright*, 523 U.S. 420, 477 (1998) (Breyer, J., dissenting).

3.     Finally, "[c]itizenship is a high privilege, and when doubts exist concerning a grant

of it, generally at least, they should be resolved in favor of the United States and against the claimant." *United States v. Manzi*, 276 U.S. 463, 467 (1928); *see Berenyi v. Dist. Dir., INS*, 385 U.S. 630, 637 (1967). For the reasons discussed above, the Citizenship Clause is best read not to extend citizenship to children born in the U.S. of illegal aliens or of temporary visitors.

### D. Plaintiffs' Contrary Arguments Are Unpersuasive.

1. Plaintiffs rely primarily on *Wong Kim Ark*, *see* Br. at 8-10, but they misread that precedent. *Wong Kim Ark* did not concern the status of children born in the United States to parents who were illegal aliens or temporary visitors. To the contrary, the Court precisely identified the specific question presented

> whether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, *but have a permanent domicile and residence in the United States*, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States.

*Wong Kim Ark*, at 653 (emphasis added).

In analyzing that question, the Court repeatedly relied on fact that the parents were permanent residents. For example, it quoted an opinion in which Justice Story recognized that "the children, even of aliens, born in a country, *while the parents are resident there* under the protection of the government, . . . are subjects by birth." *Wong Kim Ark*, 169 U.S. at 660 (emphasis added) (quoting *Inglis*, 28 U.S. (3 Pet.) at 164 (Story, J., dissenting)). It quoted the New Jersey Supreme Court's observation that the Fourteenth Amendment codifies "the general rule, that *when the parents are domiciled here* birth establishes the right to citizenship." *Id.* at 692 (emphasis added; citation omitted). It explained that "[e]very citizen or subject of another country, *while domiciled here*, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States." *Id.* at 693 (emphasis added). And it noted that "Chinese persons

. . . owe allegiance to the United States, *so long as they are permitted by the United States to reside here*; and are 'subject to the jurisdiction thereof,' in the same sense as all other aliens *residing* in the United States." *Id.* at 694 (emphasis added).

After reviewing the relevant history, the Court reached the following "conclusions": "The Fourteenth Amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children born of *resident* aliens." *Wong Kim Ark*, 169 U.S. at 693 (emphasis added). Although the Amendment is subject to certain "exceptions" (*e.g.*, for "children of foreign sovereigns or their ministers"), the Amendment extends citizenship to "children born within the territory of the United States, of all other persons, of whatever race or color, *domiciled within the United States*." *Id.* (emphasis added). The Court then summed up its holding as follows:

> [A] child born in the United States, of parents of Chinese descent, who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicile and residence in the United States*, . . . and are not employed in any diplomatic or official capacity under the Emperor of China, becomes at the time of his birth a citizen of the United States.

*Id.* at 705 (emphasis added).

No doubt some statements in *Wong Kim Ark* could be read to support Plaintiffs' position. *Wong Kim Ark* never purported to overrule any part of *Elk*, however, and the Supreme Court has previously (and repeatedly) recognized *Wong Kim Ark*'s limited scope. In one case, the Court stated that:

> [t]he ruling in [*Wong Kim Ark*] was to this effect: "A child born in the United States, of parents . . . who, at the time of his birth, are subjects of the Emperor of China, *but have a permanent domicile and residence in the United States*, becomes at the time of his birth a citizen."

*Chin Bak Kan v. United States*, 186 U.S. 193, 200 (1902) (emphasis added; citation omitted). In another, the Court cited *Wong Kim Ark* for the proposition that a person is a U.S. citizen by birth

if "he was born to [foreign subjects] *when they were permanently domiciled in the United States*." *Kwock Jan Fat v. White*, 253 U.S. 454, 457 (1920) (citation omitted).

About a decade after *Wong Kim Ark* was decided, the Department of Justice likewise explained that the decision "goes no further" than addressing children of foreigners "domiciled in the United States." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* 121 (1910). "[I]t has never been held," the Department continued, "and it is very doubtful whether it will ever be held, that the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship. It was not so held in the Wong Kim Ark case." *Id.* at 124. Commentators, too, continued to acknowledge the traditional rule denying citizenship to children of non-resident foreigners. *See*, *e.g.*, John Westlake, *International Law* 219-20 (1904) ("[W]hen the father has domiciled himself in the Union . . . his children afterwards born there . . . are citizens; but . . . when the father at the time of the birth is in the Union for a transient purpose his children born within it have his nationality.").

In short, only "those portions of [an] opinion necessary to the result . . . are binding, whereas dicta is not," *Arcam Pharm. Corp. v. Faria*, 513 F.3d 1, 3 (1st Cir. 2007), and the *Wong Kim Ark* Court itself warned that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." 169 U.S. at 679 (citation omitted). The only question that was presented, investigated, and resolved in *Wong Kim Ark* concerned children of parents with "a permanent domicile and residence in the United States." *Id.* at 653; *see id.* at 705. The case should not be read as doing anything more than answering yes.

2.      Nor do Plaintiffs advance their argument by relying on *Plyler v. Doe*, 457 U.S. 202 (1982), a case they assert "invoked *Wong Kim Ark*'s reasoning in holding that undocumented aliens

are 'within [the] jurisdiction' of any state in which they are physically present." Br. at 12 (quoting *Plyler*, 457 U.S. at 215). But the phrase "*within* its jurisdiction" cited in *Plyler* comes from the Equal Protection Clause which focuses on a person's geographic location and differs from the phrase "*subject to* the jurisdiction thereof" in the Citizenship Clause, which focuses on an individual's personal subjection or allegiance to the United States. As Supreme Court cases illustrate, a person may fall outside the scope of the Citizenship Clause even if the person or his parents falls within the scope of the Equal Protection Clause. For example, certain children of members of Indian tribes lack a constitutional right to U.S. citizenship by birth, *see Elk*, 112 U.S. at 102, but Indians *are* entitled to the equal protection of the laws, *see United States v. Antelope*, 430 U.S. 641, 647-650 (1977). Children of foreign diplomats also are not entitled to birthright citizenship, *see Wong Kim Ark*, 169 U.S. at 682, but Plaintiffs do not offer any authority suggesting such individuals are not subject to the Equal Protection Clause.

Plaintiffs also invoke the "common-law principle of *jus soli*, or the 'right of the soil.'" Br. at 6. But the Supreme Court "has long cautioned that the English common law 'is not to be taken in all respects to be that of America.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 39 (2022) (citation omitted). And that admonition holds particular force here. *Cf. United States v. Rahimi*, 602 U.S. 680, 722 & n.3 (2024) (Kavanaugh, J., concurring). The English *jus soli* tradition was premised on an unalterable allegiance to the King (which was conferred via birth on his soil). But this nation was founded on breaking from that idea, and grounded citizenship in the social contract, premised on mutual consent between person and polity. *See, e.g.*, Cong. Globe, 40th Cong., 2nd Sess. 868 (1868) (statement of Rep. Woodward) (calling the British tradition an "indefensible feudal doctrine of indefeasible allegiance"); *id.* at 967 (statement of Rep. Bailey) (calling it a "slavish" doctrine); *id.* at 1130-31 (statement of Rep. Woodbridge) (saying it conflicts

with "every principle of justice and of sound public law" animating America and its independent identity).

Indeed, the Supreme Court has already held that the Citizenship Clause departs from English common law in important respects. For example, the Clause's exception for certain children of members of Indian tribes has no parallel in English law, *see Wong Kim Ark*, 169 U.S. at 693; and the Clause permits voluntary renunciation of citizenship, even though English common law did not, *see Afroyim v. Rusk*, 387 U.S. 253, 257-262 (1967). This Court should thus interpret the Citizenship Clause in light of *American* common-law principles, and as shown above, those principles do not support birthright citizenship for children of illegal aliens or temporary visitors.

Plaintiffs also point to precedent that accords with their view. *See* Br. at 11. But it is not unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions. *See*, *e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 644-45 (2022) (holding that states may prosecute non-Indians for crimes against Indians in Indian country despite decades of contrary Supreme Court dicta); *District of Columbia v. Heller*, 554 U.S. 570, 624 n.24 (2008) (holding that the Second Amendment protects an individual right even though lower courts had long read it to protect a collective right); *INS v. Chadha*, 462 U.S. 919, 944-45 (1983) (holding the legislative veto unconstitutional even though Congress had enacted, and the President had signed, almost 300 legislative-veto provisions over the preceding 50 years).

## IV. Plaintiffs Will Not Suffer Irreparable Harm During the Pendency of this Lawsuit.

Apart from their failure to show a likelihood of success on the merits, Plaintiffs cannot show irreparable harm through non-speculative, non-conclusory allegations. In the Fourth Circuit, a "plaintiff must demonstrate a *likelihood* of irreparable harm without a preliminary injunction; a mere *possibility* of harm will not suffice." *Williams v. Rigg*, 458 F. Supp. 3d 468, 474 (S.D.W. Va.

2020).  Plaintiffs have not done that here.

As a first irreparable harm, Plaintiffs assert that the Citizenship EO "will rip away the promise of citizenship for countless babies and leave them without legal status," and argue that "[m]any such newborns will have no other citizenship options available, leaving them stateless." Br. at 18.  But Plaintiffs do not support this statement with concrete examples.  Instead, Plaintiffs cite to ASAP's declaration that conveys the worries of parents who are expecting children and who believe they will have to seek immigration relief on behalf of their children or otherwise seek consular services from their country of origin.  *See id.* at 18-19 (citing ECF No. 2-3 ¶¶ 29-31).

The declaration, apart from failing to provide specific details that Plaintiffs are likely to be harmed, also undercuts Plaintiffs' argument for irreparable harm.  In particular, the ASAP declaration notes that, contrary to Plaintiffs' claims that children will not have legal status or a path to citizenship, parents could "help their children apply for other forms of U.S. immigration relief," such as through asylum.  ECF No. 2-3 ¶ 29.  Plaintiffs' asserted harm of statelessness and being left without status is thus speculative since they have other routes of obtaining status for children and citizenship.  For instance, "[a]sylum provides individuals who qualify several distinct benefits: a path to citizenship, eligibility for certain government benefits, and the chance for family members to receive asylum as well."  *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 32 (D.D.C. 2020).  Moreover, children can be derivative beneficiaries of their parents' asylum application.  *See* 8 U.S.C. § 1158(b)(3)(A).  The ASAP declaration cites that these pathways can be "time consuming and stressful" and "also . . . expensive," ECF No. 2-3 ¶ 29, but "financial harm generally does not suffice to establish irreparable harm." *Polk v. Montgomery Cnty. Public Schools*, 2025 WL 240996, at *20 (D. Md. Jan. 17, 2025) (Boardman, J.).

Plaintiffs next assert that they suffer irreparable harm because "[t]he looming threat of

deportation and family separation created by the Executive Order shapes Members' choices about fundamental aspects of their lives and deters them from doing what best serves their families." Br. at 19 (citing ECF No. 2-2 ¶ 29). Yet, Plaintiffs do not say what choices the EO impacts and the declaration, to which Plaintiffs cite, does not elaborate on their harms either—instead recollecting the fears of CASA's members that their children might not obtain birthright citizenship without specifying what choices those members will make in light of the EO. *See* ECF No. 2-2 ¶¶ 30-34.

Finally, Plaintiffs argue that they are irreparably harmed because "[t]he lack of clarity in the [EO] about the status of children born after the Order takes effect and the uncertainty about how the Order will be implemented have engendered widespread confusion and fear." Br. at 19. This lack of clarity further emphasizes that Plaintiffs are speculating as to how the Citizenship EO will impact them as Plaintiffs themselves concede that they do not know what consequences they will face as a result of the EO, which has yet to be implemented.

## V.    The Public Interest Does Not Favor an Injunction.

Plaintiffs' asserted harms are, in any event, greatly outweighed by the harm to the government and public interest that would result from the extraordinary relief Plaintiffs request. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the balancing of harms and public interest requirement for injunctive relief merge when "the Government is the opposing party"). As the Supreme Court has recognized, Executive officials must have "broad discretion" to manage the immigration system. *Arizona v. United States*, 567 U.S. 387, 395-96 (2012). It is the United States, not these Plaintiffs, that has "broad, undoubted power over the subject of immigration and the status of aliens," *id*. at 394, and providing Plaintiffs with their requested relief would mark a severe intrusion into this core executive authority, *see INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (warning against "intrusion by a federal

court into the workings of a coordinate branch of the Government").

Plaintiffs further argue that an injunction serves the public interest because it "will save the government billions of dollars per year by avoiding the added bureaucratic costs that would be necessary to make citizenship determinations through means other than birth certificates" and the Citizenship EO otherwise will require "substantial changes . . . to be made to a huge variety of complex federal and state programs in order to implement it fully." Br. at 21. However, Plaintiffs provide no support for these conclusory assertions about burdens and costs beyond a citation to their Complaint. Plaintiffs' bare allegations, without more factual support, do not satisfy Plaintiffs' burden in requesting a preliminary injunction. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 60 (D. Md. 2020) ("Thus, the burden placed upon Plaintiffs to show that each requirement of a preliminary injunction is met is high.") (cleaned up).

## VI.    Any Relief Should be Limited.

For the reasons above, the Court should deny Plaintiffs' motion in its entirety. But even if the Court determines that a preliminary injunction is appropriate, it should limit its scope in three ways. *First*, the nationwide relief that Plaintiffs appear to seek would be improper. *See* ECF No. 2-9 at 3 (describing Plaintiffs' requested injunction without geographic limitation). Based on the well-established principle that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted), the Fourth Circuit has repeatedly vacated or stayed nationwide injunctions. *See, e.g. CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 262-63 (4th Cir. 2020) (appeal dismissed on other grounds); *Emergency One, Inc. v. Am. Fire Eagle Engine Co., Inc.*, 332 F.3d 264, 270 (4th Cir. 2003). Indeed, as one Fourth Circuit panel has noted: "[a] nationwide injunction is a drastic remedy," and, by their nature, such injunctions "are plainly

inconsistent with th[e] conception of the judicial role and the proper scope of the federal courts' remedial power." *CASA de Maryland*, 971 F.3d at 256-57. Even assuming *arguendo* that a nationwide injunction could issue, Plaintiffs also fail to explain why it should issue in this case. *See Emergency One*, 332 F.3d at 270 ("In any event, there was no factual basis in the record from which the court could conclude that a nationwide injunction was appropriate.").

*Second*, although Plaintiffs have named the President as a Defendant, *see* Compl. ¶ 50, "courts do not have jurisdiction to enjoin [the President] . . . and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citations omitted); *see Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general 'this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties.'" (citation omitted)). Accordingly, the Court lacks jurisdiction to enter Plaintiffs' requested relief against the President and should dismiss him as a defendant in this case at a minimum.

*Third*, the Court should reject Plaintiffs' facial challenges to the Citizenship EO so that its lawfulness can be determined in individual as-applied challenges, consistent with the process established by the INA. To mount a successful facial challenge, a plaintiff must show that "no set of circumstances exists" under which the challenged provision "would be valid," *Rahimi*, 602 U.S. at 693 (citation omitted), and as explained in the merits section of the brief, Plaintiffs have failed to do so here. *See supra* Sec. III.[5]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order and preliminary injunction.

---

[5] Because Plaintiffs' claims are purely legal and fully addressed in the parties' briefing on the instant motions, Defendants request that the Court consolidate the February 5 preliminary injunction hearing with a trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2).

Dated: January 31, 2025

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

EREK L. BARRON
United States Attorney

ALEXANDER K. HAAS
Branch Director

BRAD P. ROSENBERG
Special Counsel

*s/ Yuri S. Fuchs*
R. CHARLIE MERRITT
YURI S. FUCHS (CA Bar No. 300379)
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone:  202-598-3869
Fax: 202-616-8460
Email: yuri.s.fuchs@usdoj.gov

MELISSA E. GOLDMEIER (Bar number: 18769)
Assistant U.S. Attorney, District of Maryland
36 S. Charles Street, 4th Fl.
Baltimore, MD 21201
melissa.goldmeier@usdoj.gov
(410) 209-4855

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 31, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/ Yuri S. Fuchs
Yuri S. Fuchs