IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CASA, INC. *et al.*,

    *Plaintiffs*,

v.

DONALD J. TRUMP *et al.*,

    *Defendants*.

Case No.: 8:25-cv-00201-DLB
Honorable Deborah L. Boardman

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**Table of Contents**

ARGUMENT .................................................................................................................................. 1
  I.   The Court Has the Power to Hear this Case ................................................................. 1
     A.  Plaintiffs Have an Equitable Cause of Action to Enjoin the *Ultra Vires* Executive
         Order ................................................................................................................................ 1
     B.  8 U.S.C. § 1503 Does Not Deprive this Court of Jurisdiction over Plaintiffs' Claims .... 3
  II.  The Executive Order Violates the Fourteenth Amendment ............................................ 4
     A.  Supreme Court Precedent Controls this Case ................................................................. 4
     B.  History Cuts Decisively Against Defendants' Position .................................................. 8
     C.  Interpreting the Fourteenth Amendment to Include a Domicile Requirement
         Would Not Justify the Executive Order ......................................................................... 12
     D.  The Executive Order Also Violates Federal Statutes ..................................................... 13
  III. A Universal Injunction Against the Executive Order Is Necessary and Appropriate
       to Prevent Irreparable Harm .......................................................................................... 14
CONCLUSION ............................................................................................................................. 15
CERTIFICATE OF SERVICE ...................................................................................................... 17

# ARGUMENT

## I. The Court Has the Power to Hear this Case

### A. Plaintiffs Have an Equitable Cause of Action to Enjoin the *Ultra Vires* Executive Order

Defendants first argue that Plaintiffs "lack a cause of action" to challenge Executive Order 14,160 ("the Executive Order"). U.S. Br. 5. But under longstanding precedent, Plaintiffs have an equitable cause of action, quite apart from the Administrative Procedure Act,[1] to enjoin Executive Branch officials from violating a statute or the Constitution. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689-90 (1949); *United States v. Lee*, 106 U.S. 196, 218 (1882). It is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (alteration in original) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring)). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). In short, when "an official violates the law to the injury of an individual[,] the courts generally have jurisdiction to grant relief." *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

Defendants concede the existence of this equitable cause of action, while also seeking to cast doubt on its viability. Despite suggesting that *ultra vires* claims are "questionable" because the Supreme Court's *Larson* decision predated certain amendments to the APA, they nevertheless acknowledge that courts, including this Court, continue to recognize the availability of equitable

---

[1] Plaintiffs' complaint does not currently claim a cause of action under the Administrative Procedure Act.

1

suits to enjoin unlawful executive conduct. U.S. Br. 6; *see Ancient Coin Collectors Guild v. U.S. Customs & Border Prot.*, 801 F. Supp. 2d 383, 405 (D. Md. 2011) ("Even if a statute does not provide for judicial review, when an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." (internal quotation marks and alterations omitted)), *aff'd*, 698 F.3d 171 (4th Cir. 2012); *see also Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023); *Murphy Co. v. Biden*, 65 F.4th 1122, 1131 (9th Cir. 2023).

Defendants contend that "even when recognized," *ultra vires* review is limited to considering whether the President has violated the Constitution or statutes. U.S. Br. 6. That is all Plaintiffs are asking this Court to consider. The Executive Order violates the Fourteenth Amendment and federal statutes and should be enjoined on that basis.

Defendants also argue that *ultra vires* review is appropriate only when the President acts "'without any authority whatever.'" U.S. Br. 6 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984)). And that is Plaintiffs' claim: that the President acted without power, and violated the separation of powers. The Citizenship Clause of the Fourteenth Amendment, as the Supreme Court has affirmed, guarantees birthright citizenship. Federal statutes do the same. *See* 8 U.S.C. §§ 1401(a), 1404, 1405. The President has no unilateral authority to override the Supreme Court's interpretation, amend the Constitution, or ignore a statute enacted by Congress. "It is emphatically the province and duty of the judicial department," not the President, "to say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (internal quotation marks and alterations omitted). Finally, Defendants invoke the President's general authority to police immigration. U.S. Br. 7. But vague notions of the Executive's power over foreign relations cannot override the Citizenship Clause's clear constitutional command, or Congress's clear statutory command. Regardless, this is a case about native-born U.S. citizens.

**B.     8 U.S.C. § 1503 Does Not Deprive this Court of Jurisdiction over Plaintiffs' Claims**

Defendants next argue that Plaintiffs were required to channel their claims through 8 U.S.C. § 1503. U.S. Br. 7. That provision creates a remedial mechanism for "any person who is within the United States [and] claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States." 8 U.S.C. § 1503(a). Such a person may file suit seeking declaratory relief "after the final administrative denial of such right or privilege." *Id.* Defendants argue that this scheme is the only avenue of relief in "disputes regarding an individual's citizenship." U.S. Br. 7. But that review provision is inapplicable to Plaintiffs' claims.

First, nothing in the text of Section 1503 indicates that its review mechanism is exclusive. *See Axon Enters., Inc. v. FTC*, 598 U.S. 175, 182 (2023) (Gorsuch, J., concurring) (denouncing "jurisdiction-stripping-by-implication"). The Supreme Court has held that Section 1503(b)—which mirrors Section 1503(a) but applies to persons "not within the United States," 8 U.S.C. § 1503(b)—is not "the only method of reviewing" claims of citizenship. *Rusk v. Cort*, 369 U.S. 367, 375 (1962), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977). Defendants provide no reason to conclude that Section 1503(a) works differently. And even if Section 1503 were exclusive, parties may nevertheless bring suit outside such a scheme when they allege that "some fundamental aspect" of the federal program in question "violates the Constitution," *Axon Enters.*, 598 U.S. at 182, 185, which is exactly what Plaintiffs have done. An individual declaratory judgment action under Section 1503(a) would not be an adequate avenue through which to pursue Plaintiffs' constitutional claims for injunctive relief.

Moreover, Section 1503 does not cover Plaintiffs' claims in the first place. Plaintiffs do not themselves "claim[] a right or privilege as a national of the United States," but instead concede

3

they are not U.S. nationals. Although the parents involved in this lawsuit do claim rights on behalf of their future U.S. national children, those children's constitutional right to citizenship under the Fourteenth Amendment is not the sort of administrative "right or privilege" denied by "any department or independent agency" to which Section 1503(a) refers. To be sure, the denial of birthright citizenship to U.S.-born children will have the *effect* of denying them rights and privileges of citizenship. But granting those children any one specific federal benefit would not redress Plaintiffs' injuries. Rather, at bottom, Plaintiffs' claim is about the Order's denial of "citizenship itself." *See Gonzalez Boisson v. Pompeo*, 459 F. Supp. 3d 7, 17 (D.D.C. 2020). The claims at issue in this case therefore fall outside the ambit of Section 1503's remedial scheme.

Cases involving claims brought under Section 1503 confirm that the provision applies only to agency decisions denying discrete benefits or imposing discrete penalties. *See*, *e.g.*, *Kiviti v. Pompeo*, 467 F. Supp. 3d 293, 298 (D. Md. 2020) (challenge to State Department denial of passport application); *see also Patel v. Napolitano*, 706 F.3d 370, 377 n.3 (4th Cir. 2013) (noting argument by the United States that Section 1503 applies only where a person "allege[s] the deprivation of a right or privilege of nationality"). Here, it is the constitutional right of citizenship itself at stake.

## II. The Executive Order Violates the Fourteenth Amendment

### A. Supreme Court Precedent Controls this Case

#### 1. Defendants cannot avoid *Wong Kim Ark*'s logic

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) is controlling here. *Wong Kim Ark* carefully and methodically discussed precedent, the history of citizenship in the United States, and the goals of the Fourteenth Amendment, and rejected the argument that children born in the United States to foreign parents are not subject to the jurisdiction of the United States. Instead, as the Court's opinion makes clear, the Citizenship Clause incorporates only the narrow exceptions to

4

birthright citizenship that predate the Fourteenth Amendment. *Id.* at 682. Those exceptions were for the children of foreign ministers, children born aboard foreign ships, children born to occupying armies, and children born to Indian tribes in light of the sovereign status of those tribes at the time of the decision. *Id.* at 682, 686. None of these historical exceptions have any application to the children covered by this Executive Order,[2] so Defendants are left to ask this Court to create a new exception inconsistent with *Wong Kim Ark*'s holding.

Defendants suggest an unduly narrow interpretation of *Wong Kim Ark* that would apply *only* to children of parents "domiciled" in the United States—by which Defendants mean parents with permanent residency status. U.S. Br. 22 (emphasis omitted) (quoting *Wong Kim Ark*, 169 U.S. at 692). But the Court's analysis nowhere indicates that domicile was key to the holding. Instead, the Citizenship Clause incorporated "by the fewest and fittest words" only a few well accepted, historically grounded exceptions. *Wong Kim Ark*, 169 U.S. at 682.

Defendants concede that "[n]o doubt some statements in *Wong Kim Ark* could be read to support Plaintiffs' position," but dismiss those statements as dicta. U.S. Br. 23-24. But a court's reasoning that directly supports its holding is not dicta. *Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021). To the contrary, the Supreme Court's authoritative interpretation of the Fourteenth Amendment was an integral part its conclusion. A lower federal court "cannot ignore the Supreme Court's explicit guidance simply by labeling it 'dicta.'" *Hengle v. Treppa*, 19 F.4th 324, 346 (4th Cir. 2021). "Respect for the rule of law demands nothing less: lower courts grappling with complex legal questions of first impression must give due weight to guidance from the Supreme Court, so as to ensure the consistent and uniform development and application of the law." *Manning v.*

---

[2] Defendants' brief invocation of the exception for invading armies occupying hostile territory, U.S. Br. 19, has nothing to do with either the terms of the Executive Order or any of the Plaintiffs in this lawsuit.

*Caldwell ex rel. City of Roanoke*, 930 F.3d 264, 282 (4th Cir. 2019) (en banc).[3]

### 2. Defendants' interpretation of "Subject to the Jurisdiction" defies *Wong Kim Ark*'s holding

Defendants' reading of "subject to the jurisdiction" of the United States is internally inconsistent, and impossible to square with either constitutional text or *Wong Kim Ark*. Defendants at times argue that a person is covered by the Citizenship Clause *only* when they have "complete" allegiance to the United States, "unqualified by 'allegiance to any alien power.'" U.S. Br. 11 (quoting *Elk v. Wilkins*, 112 U.S. 94, 101-02 (1884)). Such a test does not appear in the Citizenship Clause's text, which asks only whether a person is "subject to the jurisdiction" of the United States—not whether a person is subject to the "exclusive jurisdiction" or possesses some particular quantum of allegiance. *See* Michael Ramsey, *Originalism and Birthright Citizenship*, 109 Geo. L. J. 405, 460 (2020) (discussing the original meaning of "subject to the jurisdiction" of the United States). If complete allegiance were the test, then Wong Kim Ark's parents (like most foreign nationals) would not meet it, as they were "subjects of the emperor of China," and undoubtedly owed a measure of allegiance to China. *Wong Kim Ark*, 169 U.S. at 652; *see also* U.S. Br. 18 ("The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation . . . *citizens or subjects of foreign States* born within the United States" (emphasis supplied by United States) (quoting *Slaughterhouse Cases*, 83 U.S. 36, 73 (1873)). But this is not the test, and it is flatly inconsistent with *Wong Kim Ark* to insist upon it.[4] 169 U.S. at 694 (rejecting the argument that

---

[3] *Wong Kim Ark* does not stand alone: the Supreme Court has consistently adhered to this understanding of the Citizenship Clause. *E.g.*, *United States ex rel. Hintopoulos v. Shaughnessy*, 353 U.S. 72, 73 (1957) (noting that a child born in the United States was "of course, an American citizen by birth," despite his parents' "illegal presence."); *see also INS v. Errico*, 385 U.S. 214, 215–16 (1966); *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985).

[4] Congressional debates over the 14th Amendment reinforce this conclusion. Cong. Globe, 39th Congress, 1st Sess. 2890-92 (1866) ("The proposition before us, I will say, Mr. President, relates simply in that respect to the children begotten of Chinese parents in California, and it is proposed to declare that they shall be citizens. We have declared that by law; now it is proposed to incorporate the same prevision in the fundamental instrument of the nation.").

"the fourteenth amendment of the constitution excludes from citizenship the children born in the United States of citizens or subjects of other countries").

Elsewhere, Defendants try to temper the radical consequences of their revisionist account by suggesting that a person owes complete allegiance to whatever jurisdiction they are *domiciled* in, which would exclude temporary visitors. U.S. Br. 18-19. There is little support for Defendants' gloss,[5] and it is hard to square with statements elsewhere in their brief questioning the citizenship of children born in the United States to foreign nationals. A noncitizen present in the United States is subject to this Nation's jurisdiction while they are here, regardless of the duration of their stay. And again, basing the test on allegiance is inconsistent with *Wong Kim Ark*, given that no one doubted that Wong Kim Ark's parents owed at least some measure of allegiance to China. 169 U.S. at 652. Defendants' shifting and idiosyncratic views on the nature of allegiance underscore how far they have strayed from the constitutional text, which asks simply whether a person is "subject to the jurisdiction" of the United States.

### 3. The exception for Indian tribes does not support the Executive Order

Defendants' reliance on the exception for Indian tribes discussed in *Elk v. Wilkins*, is misplaced. U.S. Br. 9-10, 12. To start, Defendants' argument ignores the unique history of tribal sovereignty and the federal government's relationship with Indian tribes, which prevents extrapolation to other areas. *See Haaland v. Brackeen*, 599 U.S. 255, 307 (2023) (Gorsuch, J., concurring) (noting the need to take "a full view of the Indian-law bargain struck in our Constitution"). The Framers of the Fourteenth Amendment excluded Indian tribes from the Citizenship Clause in order to endorse a strong vision of tribal sovereignty that resisted federal and

---

[5] As Secretary of State Daniel Webster observed, a person's duty to the local sovereign exists "independently of a residence with intention to continue such residence, independently of any domiciliation." 6 Daniel Webster, *Works of Daniel Webster* 526 (1851).

state power over tribes. Gerard N. Magliocca, *Indians and Invaders: The Citizenship Clause and Illegal Aliens*, 10 U. Pa. J. Const. L. 499, 515-22 (2008). It is "conceptually incoherent" and historically confused to use the exception for tribal members as an open door to create other exceptions to the Citizenship Clause. *Id.* at 502. And the Supreme Court in *Wong Kim Ark* already squarely rejected an attempt, like that offered by Defendants here, to overread *Elk* and divine from the exception for Indian tribes a broader rule excluding children born to foreign parents. *Wong Kim Ark*, 169 U.S. at 682 ("The decision in *Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country."). Put simply, nothing in history or precedent justifies Defendants' attempt to equate foreign nationals and tribal members.

### B. History Cuts Decisively Against Defendants' Position

#### 1. The common law did not impose a domicile requirement on birthright citizenship

The Fourteenth Amendment was ratified against the backdrop of the common law, which recognized birthright citizenship with only a few narrow exceptions. *See* Ramsey, *supra*, at 472 ("[T]he Clause's original meaning provides a definite solution to contested modern issues. . . . [T]he original meaning indicates that the Clause does not exclude U.S.-born children of temporary visitors or of persons not lawfully present in the United States."); William Rawle, *A View of the Constitution of the United States* 86 (1829) ("Therefore every person born within the United States . . . , whether the parents are citizens or aliens, is a natural born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity."), *quoted in* Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). The Citizenship Clause "was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming

8

citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption." *Wong Kim Ark*, 169 U.S. at 676.

The common law did not impose a parental domicile requirement for birthright citizenship. *E.g., Calvin's Case*, 77 Eng. Rep. 377, 384 (1608) ("[L]ocal obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for if he hath issue here, that issue is . . . a natural born subject. . ."); 1 William Blackstone, *Commentaries on the Laws of England* 357 (1st ed. 1765) ("[A]llegiance is such as is due from all men born within the king's dominions immediately upon their birth."). Thus, for example, the Chancery Court of New York held that a child "born in this state, of alien parents, during their temporary sojourn" was a natural-born citizen. *Lynch v. Clarke*, 1 Sand. Ch. 583, 638 (N.Y. Ch. 1844). The chancellor noted that the child's parents "came here as an experiment, without any settled intention of abandoning their native country, or of making the United States their permanent abode." *Id.* After a comprehensive survey of numerous authorities, the chancellor concluded that he "entertain[ed] no doubt but that [the U.S.-born child] was a citizen of the United States." *Id.* at 683. This case "conclusively show[ed] . . . that all 'children born here are citizens without any regard to the political condition or allegiance of their parents.'" Cong. Globe, 39th Cong., 1st Sess. 1832 (1866) (quoting *Lynch*, 1 Sand. Ch. at 584). Congress intended to ratify that understanding. *Id.*

Defendants resist this conclusion by quoting from Justice Story's conflict of law treatise, in which he proposed a "reasonable qualification" that birthright citizenship should not extend to temporary visitors. U.S. Br. 16 (quoting Joseph Story, *Commentaries on the Conflict of Laws* § 48, at 48 (1834)). But Defendants leave out the very next sentence in which Justice Story candidly admits that "[i]t would be difficult, however, to assert, that in the present state of public law such a qualification is universally established." Story, *supra*, § 48, at 48. And Defendants' argument

9

"that citizenship under the law of nations depended not only on the child's place of birth, but also on the parents' political status," U.S. Br. 15-16, demonstrates another flaw in their argument. United States constitutional law rarely looks to international norms, and the Framers of the Fourteenth Amendment were unequivocally grounded in the common law of England and of this country, not French law. *E.g.*, Frederick Van Dyne, *Citizenship of the United States* 7-12 (1904).[6]

### 2. Post-ratification history underscores the Executive Order's unconstitutionality

Post-ratification history further refutes Defendants' argument. During the years immediately following ratification of the Fourteenth Amendment, the Executive Branch recognized that citizenship applied to children born to foreign parents "temporarily residing" in the United States. Case of Francois A. Heinrich, 14 U.S. Op. Atty. Gen. 154, 155 (1872) (recognizing that an individual born in the United States to foreign national parents "who were then temporarily residing" in the U.S. was a citizen, but holding he could renounce his citizenship). And throughout the 20th Century and into the 21st, the federal government treated nearly everyone born here as a United States citizen, regardless of who their parents were, subject only to the specific exemptions identified in *Wong Kim Ark*. The same understanding permeates federal and state law today. *E.g.*, Compl. ¶ 73 (collecting sources).

Against 150 years of history, Defendants identify just three counterexamples. First, Defendants cite a Congressional bill that would have imposed a domicile requirement on parents, U.S. Br. 18 (citing 2 Cong. Rec. 3279 (1874)), but a bill that was ultimately rejected is hardly

---

[6] Defendants cite (at 16) a statement by Representative Wilson speculating that "it may be that children born on our soil to temporary sojourners" are exempt from the Civil Rights Act's grant of citizenship. Cong. Globe, 39th Cong., 1st Sess. 1117 (1866). This equivocation is hardly conclusive of what even Representative Wilson thought, much less probative of how every other member of Congress—and all of the state legislators who voted to ratify the Fourteenth Amendment—understood the provision.

10

evidence in Defendants' favor. Second, Defendants cite the State Department's 1885 denial of a passport to Ludwig Hausding. U.S. Br. 19. The opinion is somewhat inscrutable, but notably, the Secretary of State concluded that Hausding should have been denied citizenship *even if* his father "had declared his intention to become an American citizen before the birth." 2 Francis Wharton, *A Digest of the International Law of the United States* 398 (1887). Domicile, it seems, was irrelevant to the outcome. Other contemporaneous Secretary of State decisions confirm that length of time in the United States was not relevant to citizenship. *Id*. at 397 (concluding that natural born citizenship is provided to a child who had "intermediately been carried abroad by his parents"). Third, Defendants cite (at 24) a statement by a Department of Justice Assistant Attorney General from 1910 questioning whether "the mere act of birth of a child on American soil, to parents who are accidentally or temporarily in the United States, operates to invest such child with all the rights of American citizenship." Spanish Treaty Claims Comm'n, U.S. Dep't of Justice, *Final Report of William Wallace Brown, Assistant Attorney General* 124 (1910). But the author goes on to posit that "such a child has a right of election" and can choose to assert United States citizenship, *id.* at 125, which undercuts, rather than supports, Defendants' position.

It is thus no surprise that originalists across the political spectrum have rejected historical arguments to try to justify the federal government's abrupt reinterpretation of the Fourteenth Amendment. *E.g.*, John Yoo, *Birthright Citizenship Is American Citizenship*, Civitas Institute (Jan. 24, 2025), https://perma.cc/ZY6Z-44PL ("It is hard to see a conservative, originalist Supreme Court rejecting the traditional American understanding of citizenship held from the time of the Founding, through Reconstruction, to today.").[7] History, like precedent, is against Defendants.

---

[7] *See also* Mike Rappaport, *My Views on Birthright Citizenship with a Nonoriginalist Argument Against Birthright Citizenship*, Originalism Blog (Jan. 30, 2025), https://originalismblog.typepad.com/the-originalism-blog/2025/01/my-

### C. Interpreting the Fourteenth Amendment to Include a Domicile Requirement Would Not Justify the Executive Order

As explained, Defendants' argument that the Citizenship Clause requires parental domicile is wrong as a matter of text, history, and precedent. But remarkably, *even if* the Defendants' domicile argument were accepted, it would fail to justify the Executive Order. Many, if not most, of the parents covered by the Executive Order are domiciled in the United States.

Domicile is based on residence and the "intention of making it the home of the party." Story, *supra,* § 44, at 42. "If it sufficiently appear that the intention of removing was to make a permanent settlement, or for an indefinite time, the right of domicil is acquired by a residence even of a few days." *The Venus*, 12 U.S. (8 Cranch) 253, 279 (1814). Undocumented immigrants often spend years, if not decades, in the United States. They travel to the United States not for a temporary visit but to make the United States their home. Defendants posit that such immigrants "have no right even to be present in the United States, much less a right to make *lawful* residence here," U.S. Br. 14, but lawful status has nothing to do with domicile. *E.g.*, *Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982) (explaining that "illegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State"); Clement L. Bouvé, *A Treatise on the Laws Governing the Exclusion and Expulsion of Aliens in the United States* 340 (1912) (an immigrant who "enter[s] in violation of the Immigration acts . . . [and] takes up his residence here with intent to remain has done all that is necessary for the acquisition of a domicile").

---

views-on-birthright-citizenship-with-a-nonoriginalist-argument-against-birthright-citizenshipmike.html (acknowledging that "the original meaning of the 14th Amendment requires birthright citizenship" even though author personally opposes it on policy grounds).

The same is true for many of the others covered by the Executive Order.[8] In many cases, a person seeking asylum or subject to temporary protected status will possess the necessary intent to remain required by the definition of "domicile."[9] The vast majority of ASAP and CASA members cited in Plaintiffs' complaint, for example, have lived in the United States for years. Other individuals whose children would be denied U.S. citizenship under the Executive Order, such as those enrolled in the Deferred Action for Childhood Arrivals program, have similarly lived in the United States for decades—many for most of their lives. The notion that they are not properly considered "domiciled" in the United States defies both logic and precedent. Even on Defendants' own terms, the Executive Order fails.

### D.   The Executive Order Also Violates Federal Statutes

Defendants make no attempt to explain how the Executive Order complies with federal statutory law. 8 U.S.C. § 1401(a) provides that "a person born in the United States, and subject to the jurisdiction thereof" is a "national[] and citizen[] of the United States at birth." That provision was enacted against the backdrop of settled judicial precedent and administrative practice recognizing birthright citizenship. Other federal statutes tie citizenship to birth alone. *E.g.*, 8 U.S.C. § 1404 ("A person born in Alaska on or after March 30, 1867 . . . is a citizen of the United States at birth."), § 1405 (same for persons born in Hawaii after April 30, 1900). There is no reason to think Congress intended to treat children born in Alaska and Hawaii differently from children

---

[8] It is unclear whether a person seeking asylum in the United States—or even someone who has already won asylum but who has not yet applied for permanent residency—would be covered by the Executive Order. While a person seeking asylum or who has won asylum does not yet have permanent lawful status, their pending application or asylee status indicate they have lawful presence and may soon qualify for permanent residency.

[9] The very act of seeking asylum indicates a desire to remain in the United States. Federal courts have consistently found that asylum seekers are "capable of forming such a lawful intent to remain" in the United States and thus qualify as residents of the jurisdictions where they live, for purposes of establishing venue. *Coyoy v. United States*, 526 F. Supp. 3d 30, 35-36 (D.N.J. 2021); *see also, e.g.*, *Tanyike v. United States*, 603 F. Supp. 3d 572, 578 (S.D. Ohio 2022); *Flores v. United States*, 108 F. Supp. 3d 126, 131 (E.D.N.Y. 2015).

13

born in other states. The Executive Branch has no power to ignore these Acts of Congress.

**III.    A Universal Injunction Against the Executive Order Is Necessary and Appropriate to Prevent Irreparable Harm**

The equities easily favor a broad injunction here. Plaintiffs will be irreparably injured in the absence of an injunction: whenever "there is a likely constitutional violation, the irreparable harm factor is satisfied." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc). Defendants ignore that rule. And they dismissively argue that the stress, fear, and uncertainty caused by the Executive Order are merely speculative. U.S. Br. 26-27. But the harms to Plaintiffs and their unborn children are both concrete and immediate. The Executive Order has decreed that many U.S.-born children will be denied the promise of U.S. citizenship, with many rendered stateless. Reddy Decl. ¶¶ 37-48 & Escobar Decl. ¶¶ 30-34 (identifying 17 pregnant women whose unborn children will lose status under the Order). That harms Plaintiffs now: they are left afraid and uncertain about the status of their children. Indeed, the Order is currently harming the health of pregnant mothers and threatening the well-being of their unborn children. *See* Pilar Melendez, *Seeking Asylum. Pregnant. Terrified.*, The Cut (Jan. 28, 2025), https://perma.cc/GHQ4-8CBH (profiling a pregnant ASAP member who was hospitalized with high blood pressure and increased risk of miscarriage after the Executive Order).

A universal injunction preserving the status quo as it has existed for more than a century will further the public interest without harming the government. And a universal injunction is especially appropriate in this case because "the government relies on a 'categorical policy,'" and "the facts would not require different relief for others similarly situated to the plaintiffs." *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Defense*, 947 F.3d 207, 232 (4th Cir. 2020)). Enjoining the Order in full is necessary to avoid "inequitable treatment" of similarly situated children. *Id*. And it is the most efficient way to grant relief to Plaintiffs, given

14

that ASAP and CASA have hundreds of thousands of members spread throughout the country.[10]

***

The Executive Order represents an unprecedented break from the long-settled understanding of the Fourteenth Amendment. Defendants' arguments in the Order's defense are wrong on precedent, wrong on text, and wrong on history. The defense of the Executive Order also relies on a vision of U.S. citizenship fundamentally at odds with the premise and promise of the Fourteenth Amendment. "If we were now to have a broader nationality as the result of our civil struggle, it was apparent to the mass of men, as well as to the publicist and statesman, that citizenship should be placed on unquestionable ground—on ground so plain that the humblest man who should inherit its protections would comprehend the extent and significance of his title." 2 James Gillespie Blaine, *Twenty Years of Congress* 189 (1884). Where the Citizenship Clause provides certainty and clarity, Defendants would interpose a complicated inquiry into the subjective domiciliary intent of a child's parents. Where the Citizenship Clause extends the promise of citizenship to nearly everyone born in the United States, Defendants would ration it to those the President deems deserving.[11] And where the Citizenship Clause was enshrined into the Constitution to prevent political interference, Defendants would have the Court defer to the whims of the current President. That is not the law, and the Executive Order cannot stand.

## CONCLUSION

Plaintiffs respectfully request the Court grant their motion.

---

[10] The President is not "above the law," and an injunction against him may be warranted when necessary to grant complete relief. *See Mayor and City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 516 (D. Md. 2019). In any event, dismissal is not warranted at this preliminary stage of proceedings. *Id.* at 516-17.

[11] As one member of Congress put it, when responding to the argument that "[i]t degrades . . . the character of American citizenship to admit all men to it who are born and reared upon American soil": "Mr. President, I dissent from that idea altogether. . . . I differ from it so widely and so radically as this, that I say there is not one proposition in the proposed amendment, and nothing in the Constitution as it stands, which will do so much to elevate the character and the dignity of American citizenship as that simple proposition." Cong. Globe, 39th Cong., App'x 219.

15

Respectfully submitted this February 3, 2025,

| | |
|---|---|
| Nicholas Katz, Esq. (D. Md. 21920) <br> CASA, INC. <br> 8151 15th Avenue <br> Hyattsville, MD 20783 <br> 240-491-5743 <br> nkatz@wearecasa.org <br><br> Conchita Cruz* <br> Zachary Manfredi* <br> Dorothy Tegeler* <br> Leidy Perez* <br> Asylum Seeker Advocacy Project <br> 228 Park Ave. S., #84810 <br> New York, NY 10003-1502 <br> (646) 600-9910 <br> conchita.cruz@asylumadvocacy.org <br> zachary.manfredi@asylumadvocacy.org <br> dorothy.tegeler@asylumadvocacy.org <br> leidy.perez@asylumadvocacy.org | /s/Joseph W. Mead <br> Joseph W. Mead (D. Md. 22335) <br> Mary B. McCord (D. Md. 21998) <br> Rupa Bhattacharyya* <br> William Powell* <br> Alexandra Lichtenstein* <br> Gregory Briker* <br> INSTITUTE FOR CONSTITUTIONAL ADVOCACY <br>   AND PROTECTION <br> Georgetown University Law Center <br> 600 New Jersey Ave., N.W. <br> Washington, D.C. 20001 <br> Phone: (202) 662-9765 <br> Fax: (202) 661-6730 <br> jm3468@georgetown.edu <br> mbm7@georgetown.edu <br> rb1796@georgetown.edu <br> whp25@georgetown.edu <br> arl48@georgetown.edu <br> gb954@georgetown.edu <br><br> *Attorneys for Plaintiffs* |

*Admitted pro hac vice.

## CERTIFICATE OF SERVICE

I hereby certify that, on February 3, 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

<u>/s/ Joseph Mead</u>
Joseph Mead