The SEVENTH PART of the REPORTS of SIR EDWARD COKE, Knt., Lord Chief Justice of the Common Pleas, of divers RESOLUTIONS and JUDGMENTS given upon solemn Arguments, and with great Deliberation and Conference of the reverend Judges and Sages of the Law, of CASES IN LAW which were never Resolved or Adjudged before: and the REASONS and CAUSES of the said Resolutions and Judgments. Published in the Sixth Year of the Most High and Most Illustrious JAMES, King of England, France, and Ireland, and of Scotland the XLII., the Fountain of all Piety and Justice, and the Life of the Law. With NOTES and REFERENCES, by JOHN FARQUHAR FRASER, Esq., of Lincoln's Inn, Barrister-at-Law.

[1 a]　* POSTNATI (A).

CALVIN'S CASE.

Trin. 6 Jac. 1.

[See *Low* v. *Routledge*, 1865-68, L. R. 1 Ch. 47 ; L. R. 3 H. L. 100 ; *Reg.* v. *Keyn*, 1876, 2 Ex. D. 236 ; *De Geer* v. *Stone*, 1882, 22 Ch. D. 251.　*Dicta* at 27 b dissented from, *In re Stepney Election Petition*, 1886, 17 Q. B. D. 46 ; *In re Johnson* [1903], 1 Ch. 833.]

　　James by the grace of God of England, Scotland, France, and Ireland, King, defender of the faith, &c.　To the Sheriff of Middlesex greeting : Robert Calvin,

---

* Moor 790.　*Vide* Dyer fo. 304.　2 Jon. 10.　Vaugh. 286. 279. 301.　1 Lev. 59. Plowd. case of the *Dutchy.* Ellesmer, Postnati, 1, 2, &c.　Bacon of Government 2 pt. 76.　Atwood's Superiority 304.　Salk. 411, 412.　Skinner 134. 172. 198. 335. 442. Com. Dig. Allegiance.

　　(A) *Vid. Doe* v. *Acklam*, 2 Barn. and Cress. 779.　S. C. 4 Dow. and Ryl. 394, that children born in the United States of America, since the recognition of their independence, of parents born there before that time, and continuing to reside there afterwards, are aliens, and cannot inherit lands in this country.

CALVIN'S CASE

gent. hath complained to us, that Richard Smith and Nicholas Smith, unjustly, and without judgment, have disseised him of his freehold in Haggard, otherwise Haggerston, otherwise Aggerston, in the parish of St. Leonard, in Shoreditch, within thirty years now last past; and therefore we command you, that if the said Robert shall secure you to prosecute his claim, then that you cause the said tenement to be reseised with the chattels which within it were taken, and the said tenement with the chattels to be in peace until Thursday next after fifteen days of Saint Martin next coming; and, in the mean time, cause twelve free and lawful men of that neighbourhood to view the said tenement, and the names of them to be inbreviated; and summon them by good summoners, that they be then before us wherever we shall then be in England, ready thereof to make recognition; and put, by sureties and safe pledges, the aforesaid Richard and Nicholas, or their bailiffs, (if they cannot be found), that they be then there, to hear the recognition; and have there the summoners, the names of the pledges, and this writ. Witness ourself at Westminster, the 3d day of November, in the 5th year of our reign of England, France, and Ireland, and of Scotland the one-and-fortieth.

For 40s. paid in the hamper,<br>KINDESLEY.

Middlesex, ss. The assize cometh to recognise, if Richard Smith, and Nicholas Smith unjustly, and without judgment, did disseise Rob. Calvin, gent. of his freehold in [1 b] Haggard, otherwise Haggerston, otherwise Aggerston, in the parish of St. Leonard in Shoreditch, within thirty years now last past: and whereupon the said Robert, who is within the age of twenty-one years, by John Parkinson, and William Parkinson, his guardians, by the Court of the said King here to this being jointly and severally specially admitted, complaineth, that they disseised him of one messuage with the appurtenances, &c. And the said Richard and Nicholas, by William Edwards, their attorney, come and say, that the said Robert ought not to be answered to his writ aforesaid, because they say, that the said Robert is an alien born, on the 5th day of Nov. in the 3rd year of the reign of the King that now is, of England, France, and Ireland, and of Scotland the thirty-ninth, at Edinburgh within his kingdom of Scotland aforesaid, and within the allegiance of the said lord the King, of the said kingdom of Scotland, and out of the allegiance of the said lord the King of his kingdom of England; and at the time of the birth of the said Robert Calvin, and long before, and continually afterwards, the aforesaid kingdom of Scotland, by the proper rights, laws, and statutes of the same kingdom, and not by the rights, laws, or statutes of this kingdom of England, was and yet is ruled and governed. And this he is ready to verify, and thereupon prayeth judgment, if the said Robert, to his said writ aforesaid, ought to be answered, &c. And the aforesaid Robert Calvin saith, that the aforesaid plea, by the aforesaid Richard and Nicholas above pleaded, is insufficient in law to bar him the said Robert from having an answer to his writ aforesaid; and that the said Robert to the said plea in manner and form aforesaid pleaded, needeth not, nor by the law of the land is bound to answer; and this he is ready to verify, and hereof prayeth judgment; and that the said Richard and Nicholas to the aforesaid writ of the said Robert may answer. And the said Richard and Nicholas, forasmuch as they have above alleged sufficient matter in law to bar him the said Robert from having an answer to his said writ, which they are ready to verify; which matter the aforesaid Robert doth not gainsay, nor to the same doth in any ways answer, but the said averment altogether refuseth to admit as before pray judgment, if the aforesaid Robert ought to be answered to his said writ, &c. And because the Court of the lord the King here are not yet advised of giving their judgment of and upon the premises, day thereof is given to the parties aforesaid; before the lord the King at Westminster until Monday next after eight days of St. Hilary, to hear their judgment thereof, because the Court of the lord the King here thereof are not yet, &c. And the assize aforesaid remains to be taken before the said lord the King, until the same Monday there, &c. And the sheriff to distrain the recognitors of the assize aforesaid: and in the *interim* to cause a view, &c.; at which day, before the lord the King at Westminster, come as well the aforesaid Robert Calvin, by his guardians aforesaid, as the aforesaid Richard Smith and Nicholas Smith by their attorney aforesaid; and because

CALVIN'S CASE

the Court of the lord the King [2 a] here of giving their judgment of and upon the premises is not yet advised, day thereof is given to the parties aforesaid before the lord the King at Westminster, until Monday next after the morrow of the Ascension of our Lord, to hear their judgment; because the Court of the lord the King here are not yet, &c. And the assize aforesaid remains further to be taken, until the same Monday there, &c.; and the sheriff, as before, to distrain the recognitors of the assize aforesaid, and in the *interim* to cause a view, &c. At which day, before the lord the King at Westminster, come as well the aforesaid Robert Calvin by his guardians aforesaid, as the aforesaid Richard Smith and Nicholas Smith, by their attorney aforesaid, &c.; and because the Court of the lord the King here, &c.

## [2 a] THE CASE.

A man born in Scotland after the accession of King James the First to the English throne, and during his reign, may hold lands in England. S. C. Howel's State Trials, Vol II. p. 559.

The question of this case as to matter in law was, whether Robert Calvin the plaintiff (being born in Scotland since the Crown of England descended to His Majesty) be an alien born, and consequently disabled to bring any real or personal (a) action for any lands within the realm of England. After this case had been argued in the Court of King's Bench, at the Bar, by the counsel learned of either party, the Judges of that Court, upon conference and consideration of the weight and importance thereof, adjourned the same (according to the ancient and ordinary course and order of the law) into the (b) Exchequer Chamber, to be argued openly there; first by the counsel learned of either party, and then by all the Judges of England; where afterwards the case was argued by Bacon, Solicitor-General, on the part of the plaintiff, and by Laur. Hide for the defendant; and afterward by Hobart, Attorney-General, for the plaintiff, and by Serjeant Hutton for the defendant; and, in Easter term last, the case was argued by Heron, puisne Baron of the Exchequer, and Foster, puisne Judge of the Court of Common Pleas; and, on the second day appointed for this case, by Crook, puisne Judge of the King's Bench, and Altham, Baron of the Exchequer; the third day by Snigge, Baron of the Exchequer, and Williams, one of the Judges of the King's Bench; the fourth day by Daniel, one of the Judges of the Court of Common Pleas, and by Yelverton, one of the Judges of the King's Bench: and, in Trinity term following, by Warburton, one of the Judges of the Common Pleas, and Fenner, one of the Judges of the King's Bench; and after by Walmesley, one of the Judges of the Common Pleas, and Tanfield, Chief Baron; and, at two several days in the same term, Coke, Chief Justice of the Common Pleas, Fleming, Chief Justice of the King's Bench, and Sir Thomas Eggerton, Lord Ellesmere, Lord Chancellor of England, argued the case (the like plea in disability [2 b] of Robert Calvin's person being pleaded *mutatis mutandis* in the Chancery in a suit there for evidence concerning lands of inheritance: and, by the Lord Chancellor, adjourned also into the Exchequer-Chamber, to the end that one rule might over-rule both the said cases). And first (for that I intend to make as summary a report as I can) I will at the first set down such arguments and objections as were made and drawn out of this short record against the plaintiff by those that argued for the defendants. It was observed, that in this plea there were four nouns, *quatuor nomina*, which were called *nomina operativa*, because from them all the said arguments and objections on the part of the defendants were drawn; that is to say—1. *Ligeantia* (which is twice repeated in the plea; for it is said, *infra ligeantiam domini Regis regni sui Scot', et extra ligeantiam domini Regis regni sui Angl'*). 2. *Regnum* (which also appeareth to be twice mentioned, viz. *regnum Angl'*, and *regnum Scot'*). 3. *Leges* (which are twice alleged, viz. *leges Angl'*, and *leges Scot'*, two several and dis-

(a) 1 Bulstr. 134. Yelv. 198. Owen 45. Co. Lit. 129. b. 1 And. 25. Moor 431. 1 Keb. 266. Cr. El. 142. 683. Cro. Car. 9. 4 Inst. 152.
(b) 2 Bulst. 146.

CALVIN'S CASE

tinct laws). 4. *Alienigena* (which is the conclusion of all, viz. that Robert Calvin is *alienigena*).

1. *Ligeantia.* By the first it appeareth, that the defendants do make two ligeances, one of England, and another of Scotland ; and from these several ligeances two arguments were framed, which briefly may be concluded thus : Whosoever is born *infra ligeantiam*, within the ligeance of King James of his kingdom of Scotland, is *alienigena*, an alien born, as to the kingdom of England : but Robert Calvin was born at Edinburgh, within the ligeance of the King of his kingdom of Scotland ; therefore Robert Calvin is *alienigena*, an alien born, as to the kingdom of England. 2. Whosoever is born *extra ligeantiam*, out of the ligeance of King James of his kingdom of England, is an alien as to the kingdom of England : but the plaintiff was born out of the ligeance of the King of his kingdom of England ; therefore the plaintiff is an alien, &c. Both these arguments are drawn from the very words of the plea, viz. *quod præd' Robertus est alienigena, natus 5 Nov. anno regni domini Regis nunc Angl' &c. tertio apud Edenburgh infra regnum Scot' ac infra ligeantiam dicti domini Regis dicti regni sui Scot', ac extra ligeantiam dicti domini Regis regni sui Angl'.*

2. *Regna.* From the several kingdoms, viz. *regnum Angl'* and *regnum Scot'* three arguments were drawn. 1. *Quando (a) duo jura (imo duo regna) concurrunt in una persona, æquum est ac si essent in diversis :* but in the King's person there concur two distinct and several kingdoms ; therefore it is all one as if they were in divers persons, [3 a] and consequently the plaintiff is an alien, as all the *antenati* are, for that they were born under the ligeance of another King. 2. Whatsoever is due to the King's several politic capacities of the several kingdoms is several and divided : but ligeance of each nation is due to the King's several politic capacities of the several kingdoms ; *ergo*, the ligeance of each nation is several and divided, and consequently the plaintiff is an alien, for that they that are born under several ligeances are aliens one to another. 3. Where the King hath several kingdoms by several titles and descents, there also are the ligeances several : but the King hath these two kingdoms by several titles and descents ; therefore the ligeances are several. These three arguments are collected also from the words of the plea before remembered.

3. *Leges.* From the several and distinct laws of either kingdom, they did reason thus : 1. Every subject that is born out of the extent and reach of the laws of England, cannot by judgment of those laws be a natural subject to the King, in respect of his kingdom of England : but the plaintiff was born at Edinburgh, out of the extent and reach of the laws of England ; therefore the plaintiff by the judgment of the laws of England cannot be a natural subject to the King, as of his kingdom of England. 2. That subject, that is not at the time and in the place of his birth inheritable to the laws of England, cannot be inheritable or partaker of the benefits and privileges given by the laws of England : but the plaintiff at the time, and in the place of his birth was not inheritable to the laws of England, (but only to the laws of Scotland ;) therefore he is not inheritable or to be partaker of the benefits or privileges of the laws of England. 3. Whatsoever appeareth to be out of the jurisdiction of the laws of England, cannot be tried by the same laws : but the plaintiff's birth at Edinburgh is out of the jurisdiction of the laws of England ; therefore the same cannot be tried by the laws of England. Which three arguments were drawn from these words of the plea, viz. *Quodque tempore nativitatis præd' Roberti Calvin, ac diu antea, et continuè postea, præd' regnum Scot' per jura, leges, et statuta ejusdem regni propria, et non per jura, leges, seu statuta hujus regni Angl' regulat' et gubernat' fuit, et adhuc est.*

4. *Alienigena.* From this word *alienigena* they argued thus : every subject that is *alien' gentis (i.e.) alien' ligeant', est alienigena :* but such a one is the plaintiff ; therefore, &c. And to these nine arguments all that was spoken learnedly and at large by those that argued against the plaintiff may be reduced.

[3 b] But it was resolved by the Lord Chancellor and twelve Judges, viz. the two Chief Justices, the Chief Baron, Justice Fenner, Warberton, Yelverton, Daniel, Williams, Baron Snigge, Baron Altham, Justice Crooke, and Baron Heron, that the

---

(a) Ellesmere's Postnati 88. *Post.* 14 b. 4 Co. 118 a. Cawly 209. Moor 793. 804.

plaintiff was no alien, and consequently that he ought to be answered in this assise by the defendants.

This case was as elaborately, substantially, and judicially argued by the Lord Chancellor, and by my brethren the Judges, as I ever read or heard of any ; and so in mine opinion the weight and consequence of the cause, both *in præsenti et perpetuis futuris temporibus* justly deserved : for though it was one of the shortest and least that ever we argued in this Court, yet was it the longest and weightiest that ever was argued in any Court, the shortest in syllables, and the longest in substance ; the least for the value (and yet not tending to the right of that least) but the weightiest for the consequent, both for the present, and for all posterity. And therefore it was said, that those that had written *de fossilibus* did observe, that gold hidden in the bowels of the earth, was in respect of the mass of the whole earth, *parvum in magno* ; but of this short plea it might be truly said (which is more strange) that here was *magnum in parvo*. And in the arguments of those that argued for the plaintiff, I specially noted, that albeit they spake according to their own heart, yet they spake not out of their own head and invention : wherein they followed the counsel given in God's book, *interroga pristinam generationem* (for out of the old fields must come the new corn) *et diligenter investiga patrum memoriam*, and diligently search out the judgments of our forefathers, and that for divers reasons : first on our own part, *Hesterni enim sumus et ignoramus, et vita nostra sicut umbra super terram ;* for we are but of yesterday, (and therefore had need of the wisdom of those that were before us) and had been ignorant (if we had not received light and knowledge from our forefathers) and our days upon the earth are but as a shadow, in respect of the old ancient days and times past, wherein the laws have been by the wisdom of the most excellent men, in many successions of ages, by long and continual experience, (the trial of right and truth) fined and refined, which no one man, (being of so short a time) albeit he had in his head the wisdom of all the men in the world, in any one age could ever have effected or attained unto. And therefore it is *optima regula, qua nulla est verior aut firmior in jure, neminem oportet esse sapientiorem legibus :* no man ought to [4 a] take upon him to be wiser than the laws. Secondly, in respect of our forefathers : *ipsi* (saith the text) *docebunt te, et loquentur tibi, et ex corde suo proferent eloquia,* they shall teach thee, and tell thee, and shall utter the words of their heart, without all equivocation or mental reservation ; they (I say) that cannot be daunted with fear of any power above them, nor be dazzled with the applause of the popular about them, nor fretted with any discontentment (the matter of opposition and contradiction) within them, but shall speak the words of their heart, without all affection or infection whatsoever.

Also in their arguments of this cause concerning an alien, they told no strange histories, cited no foreign laws, produced no alien precedents, and that for two causes ; the one, for that the laws of England are so copious in this point, as, God willing, by the report of this case shall appear ; the other, lest their arguments concerning an alien born should become foreign, strange, and an alien to the state of the question, which being *quæstio juris* concerning freehold and inheritance in England, is only to be decided by the laws of this realm. And albeit I concurred with those that adjudged the plaintiff to be no alien, yet do I find a mere stranger in this case; such a one as the eye of the law (our books and book-cases) never saw, as the ears of the law (our reporters) never heard of, nor the mouth of the law (for *judex est lex loquens*) the Judges our forefathers of the law never tasted : I say, such a one, as the stomach of the law, our exquisite and perfect records of pleadings, entries, and judgments, (that make equal and true distribution of all cases in question) never digested. In a word, this little plea is a great stranger to the laws of England, as shall manifestly appear by the resolution of this case. And now that I have taken upon me to make a report of their arguments, I ought to do the same as truly, fully, and sincerely as possibly I can. Howbeit, seeing that almost every Judge had in the course of his argument a peculiar method, and I must only hold myself to one, I shall give no just offence to any, if I challenge that which of right is due to every reporter, that is, to reduce the sum and effect of all to such a method, as, upon consideration had of all the arguments, the reporter himself thinketh to be fittest and clearest for the right understanding of the true reasons and causes of the judgment and resolution of the case in question.

In this case five things did fall into consideration. 1. *Ligeantia*. 2. *Leges*. 3. *Regna*. 4. *Alienigena*. 5. What legal inconveniences would ensue on either side.

[4 b] 1. Concerning ligeance: 1. It was resolved that ligeance was: 2. How many kinds of ligeances there were: 3. Where ligeance was due: 4. To whom it was due: and last, how it was due.

2. For the laws: 1. That ligeance or obedience of the subject to the Sovereign is due by the law of nature: 2. That this law of nature is part of the laws of England: 3. That the law of nature was before any judicial or municipal law in the world: 4. That the law of nature is immutable, and cannot be changed.

3. As touching the kingdoms, how far forth by the act of law the union is already made, and wherein the kingdoms do yet remain separate and divided.

4. Of *alienigena*, an alien born: 1. What an alien born is in law: 2. The division and diversity of aliens: 3. Incidents to every alien: 4. Authorities in law: 5. Demonstrative conclusions upon the premises, that the plaintiff can be no alien.

5. Upon due consideration had of the consequent of this case: what inconveniences legal should follow on either party.

And these several parts, I will, in this report, pursue in such order as they have been propounded; and, first, *de ligeantia*.

1. (*a*) Ligeance is a true and faithful obedience of the subject due to his Sovereign. This ligeance and obedience is an incident inseparable to every subject: for as soon as he is born he oweth by birth-right ligeance and obedience to his Sovereign. *Ligeantia est vinculum fidei;* and *ligeantia est quasi legis essentia. Ligeantia est ligamentum, quasi ligatio mentium: quia sicut ligamentum est connexio articulorum et juncturarum, &c.* As the ligatures or strings do knit together the joints of all the parts of the body, so doth ligeance join together the Sovereign and all his subjects, *quasi uno ligamine.* Glanville, who wrote in the reign of H. 2. lib. 9. cap. 4. speaking of the connexion which ought to be between the lord and tenant that holdeth by homage saith, that *mutua debet esse domini et fide litatis connexio, ita quod quantum debet domino ex homagio, tantum illi debet dominus ex dominio, præter solam reverentiam,* and the lord, (saith he) ought to defend his tenant. But between the Sovereign and the subject there is without comparison a higher and greater connexion: for as the subject oweth to the King his true and faithful ligeance and obedience, so the Sovereign is to govern and protect his subjects, [5 a] *regere et protegere subditos:* so as between the Sovereign and the subject there is *duplex et reciprocum ligamen; quia sicut subditus regi tenetur ad obedientiam, ita rex subdito tenetur ad protectionem: merito igitur ligeantia dicitur a ligando, quia continet in se duplex ligamen.* And therefore it is holden in 20 H. 7. 8. a. that there is a liege or ligeance between the King and the subject. And Fortescue, cap. 13. *Rex* (*b*) *ad tutelam legis corporum et bonorum subditorum erectus est.* And in the Acts of Parliament of 10 R. 2. cap. 5. and 11 R. 2. cap. 1. 14 H. 8. cap. 2. &c., subjects are called liege people; and in the Acts of Parliament in 34 H. 8. cap. 1. and 35 H. 8. cap. 3., &c. the King is called the liege lord of his subjects. And with this agreeth M. Skeene in his book De Expositione Verborum, (which book was cited by one of the Judges which argued against the plaintiff) ligeance is the mutual bond and obligation between the King and his subjects, whereby subjects are called his liege subjects, because they are bound to obey and serve him; and he is called their liege lord, because he should maintain and defend them. Whereby it appeareth, that in this point the law of England and of Scotland is all one. Therefore it is truly said that *protectio trahit subjectionem, et subjectio protectionem.* And hereby it plainly appeareth, that ligeance doth not begin by the oath in the leet; for many men owe true ligeance that never were sworn in a leet, and the swearing in a leet maketh no (*c*) denization, as the book is adjudged in 14 H. 4. fol. 19. b. This word ligeance is well expressed by divers several names or *synonyma* which we find in our books. Sometimes it is called the obedience or obeisance of the subject to the King, *obedientia*

---

(*a*) Bacon's Discourse of Laws and Government.   2d Part, fo. 46, 47, &c.   Co. Lit. 129 a.   Grotius, lib. 2. fol. 160.

(*b*) Cro. Arg. 64.

(*c*) Br. Deniz. 11.   *Postea* 15. b.

*Regi*, 9 E. 4. 7. b.   9 E. 4. 6. (*d*) 2 R. 3. 2. a. in the Book of Entries, Ejectione Firm' 7. 14 H. 6. cap. 2.   22 H. 8. cap. 8., &c.   Sometimes he is called a natural liege man that is born under the power of the King, *sub potestate Regis*, 4 H. 3. (*e*) tit. Dower.   *Vide* the statute of 11 E. 3. c. 2.   Sometimes ligeance is called faith, *fides, ad fidem Regis*, &c.   Bracton, who wrote in the reign of H. 3. lib. 5. Tractat' de Exception', cap. 24. fol. 427.   *Est etiam alia exceptio quæ competit ex personâ quærentis, proper defectum nationis, ut si quis alienigena qui fuit ad fidem Regis Franc', &c.* And Fleta (which book was made in the reign of E. 1.) agreeth therewith ; for 1. 6. c. 47. *de except' ex omissione participis*, it is said, *vel decere potuit, quod nihil juris clamare poterit tanquam paraticeps eo quod est ad fidem Regis Franciæ, quia alienigenæ repelli debent in Angl' ab agendo, donec fuerunt ad fidem Reg' Angl'.*   *Vide* 25 E. 3. *de natis ultra mare*, faith and ligeance of the King of England ; and Litt. lib. 2. cap. Homage, (*b*) saving the faith that I owe to our Sovereign Lord the King, and Glanv. 1. 9. c. 1.   *Salva fide debita dom' Regi et hæredibus suis.*   Sometimes ligeance is **[5 b]** called ligealty, 22 Ass. pl. 25.   By all which it evidently appeareth, that they that are born under the obedience, power, faith, ligealty, or ligeance of the King, are natural subjects, and no aliens.   So, as seeing now it doth appear what ligeance is, it followeth in order, that we speak of the several kinds of ligeance.   But herein we need to be very wary, for this caveat the law giveth, *ubi lex non distinguit nec nos distinguere debemus ;* and certainly, *lex non distinguit*, but where *omnia membra dividentia* are to be found out and proved by the law itself.

2. There is found in the law four kinds of ligeances ; the first is, *ligeantia naturalis, absoluta, pura, et indefinita*, and this originally is due by nature and birth-right, and is called *alta ligeantia*, and he that oweth this is called *subditus natus*.   The second is called *ligeantia acquisita*, not by nature but by acquisition or denization, being called a denizen, or rather donaizon, because he is *subditus datus*.   The third is, *ligeantia localis*, wrought by the law ; and that is when an alien that is in amity cometh into England, because as long as he is within England, he is within the King's protection ; therefore so long as he is here, he oweth unto the King a local obedience or ligeance, for that the one (as it hath been said) draweth the other.   The fourth is a legal obedience, or ligeance which is called legal, because the municipal laws of this realm have prescribed the order and form of it ; and this to be done upon oath at the torn of the leet.   The first, that is, ligeance natural, &c. appeareth by the said Acts of Parliament, wherein the King is called natural liege lord, and his people natural liege subjects ; this also doth appear in the indictments of treason (which of all other things are the most curiously and certainly indicted and penned) for in the indictment of the Lord Dacre, in 26 H. 8. it is said, *præd' Dominus Dacre debitum fidei et ligeant' suæ, quod præfato domino Regi naturaliter et de jure impendere debuit, minime curans, &c.*   And Reginald Pool was indicted in 30 H. 8. for committing treason *contra dom' Regem supremum et naturalem dominum suum.*   And to this end were cited the indictment of Edward Duke of Somerset in 5 E. 6. and many others both of ancient and later times. But in the indictment of treason of John Dethick in 2 and 3 Phil. and Mar. it is said, *quod præd' Johannes machinans, &c. prædict' dominum Philippum et dominam Mariam supremos dominos suos*, and omitted (*naturalis*) because King Philip was not his natural liege lord.   And of this point more shall be said when we speak of local obedience.   The second is *ligeant' acquisita*, or denization ; and this in the books and records of the law appeareth to be three-fold : 1. Absolute, as the common denizations be, to them and their **[6 a]** heirs, without any limitation or restraint : 2. Limited, as when the King doth grant letters of denization to an alien, and to the heirs (*a*) males of his body, as it appeareth in 9 E. 4. fol. 7, 8. in *Baggot's case :* or to an alien for term of his life, as was granted to J. Reynel, 11 H. 6.   3. It may be granted upon (*b*) condition, for (*c*) *cujus est dare, ejus est disponere*, whereof I have seen divers precedents.

---

(*d*) Br. Deniz. 8.
(*e*) 4 Hen. 3.   Fitz. Dow. 179.   Ellesmere's Postnati 13, 14.   Jenk. Cent. 3.
(*a*) Lit. sect. 85.
(*a*) 9 E. 4. 8.
(*b*) Co. Lit. 129 a. 274 b.
(*c*) 2 Co. 7 b.   4 Inst. 192.   2 Siderf. 73.   Hard. 412.   Lit. Rep. 128.   1 And. 115.   Salk. 411, 412.   4 Mod. 215. 222.   Vaugh. 405.   Dav. 36.

And this denization of an alien may be effected three manner of ways; by Parliament, as it was in 3 H. 6. 55. in dower: by letters patent, as the usual manner is; and by conquest, as if the King and his subjects should conquer another kingdom or dominion, as well *antenati* as *postnati*, as well they which fought in the field, as they which remained at home, for defence of their country, or employed elsewhere, are all denizens of the kingdom or dominion conquered. Of which point more shall be said hereafter.

3. Concerning the local obedience it is observable, that as there is a local protection on the King's part, so there is a (*d*) local ligeance of the subject's part. And this appeareth in 4 Mar. Br. 32. (*e*) and 3 and 4 Phil. and Mar. Dyer 144. Sherley a Frenchman, being in amity with the King, came into England, and joined with divers subjects of this realm in treason against the King and Queen, and the indictment concluded (*f*) *contra ligeant' suæ debitum*; for he owed to the King local obedience, that is, so long as he was within the King's protection; which local obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for if he hath issue here, that issue is (*g*) a natural born subject; *a fortiori* he that is born under the natural and absolute ligeance of the King (which, as it hath been said, is *alta ligeantia*) as the plaintiff in the case in question was, ought to be a natural born subject; for *localis ligeantia est ligeantia infima et minima, et maxime incerta*. And it is to be observed, that it is *nec cælum, nec solum*, neither the climate nor the soil, but *ligeantia* and *obedientia* that make the subject born; for if enemies should come into the realm, and possess town or fort, and have issue there, that issue is no subject to the King of England, though he be born upon his soil, and under his meridian, for that he was not born under the ligeance of a subject, nor under the protection of the King. And concerning this local obedience, a precedent was cited in Hilar. 36 Eliz. when Stephano Ferrara de Gama, and Emanuel Lewis Tinoco, two Portuguese born, coming to England under Queen Elizabeth's safe conduct, and living here under her protection, joined with Doctor Lopez in treason within **[6 b]** this realm against Her Majesty; and in this case two points were resolved by the Judges. First, that their indictment ought to begin, that they intended treason *contra dominam Reginam. &c.* omitting these words (*naturalem domin' suam*) and ought to conclude *contra* (*a*) *ligeant' suæ debitum*. But if an (*b*) alien enemy come to invade this realm, and be taken in war, he cannot be indicted of treason (B); for the indictment cannot conclude *contra ligeant' suæ debitum*, for he never was in the protection of the King, nor ever owed any manner of ligeance unto him, but malice and enmity, and therefore he shall be put to death by martial law. And so it was in anno 15 H. 7. in *Perkin Warbeck's case*, who being an alien born in Flanders, feigned himself to be one of the sons of Edward the Fourth, and invaded this realm with great power, with an intent to take upon him the dignity Royal: but being taken in the war, it was resolved by the justices, that he could not be punished by the common law, but before the constable and marshal (who had special commission under the Great Seal to hear and determine the same according to martial law) he had sentence to be drawn, hanged, and quartered, which was executed accordingly. And this appeareth in the book of Griffith Attorney-General, by an extract out of the book of Hobart, Attorney-General to King H. 7.

4. Now are we to speak of legal ligeance, which in our books viz. 7 E. 2. tit. Avowry 211. 4 E. 3. fol. 42. 13 E. 3. tit. Avowry 120, &c. is called suit Royal,

(*d*) Co. Lit. 129 a.

(*e*) B. N. C. 487.

(*f*) Hob. 271. Co. Lit. 129 a. Dyer 145, pl. 62. Cawly 184. 3 Inst. 11.

(*g*) Co. Lit. 8 a. 5 Eliz. Dyer 224 a. b.

(*a*) 3 Inst. 11. Dy. 145. pl. 62. Cawly 185. Hob. 271. Co. Lit. 129 a.

(*b*) 3 Inst. 5. 11. Bacon's Hist. H. 7. fo. 11. 6 East 592.

(B) *Vid. Rex* v. *Depardo*, 1 Taunt. 26, that a manslaughter committed in China, by an alien enemy, who had been a prisoner of war, and was then acting as a mariner on board an English merchant-ship, and the deceased being an Englishman, cannot be tried here under a commission issued in pursuance of the statutes 33 H. 8. c. 23, and 43 Geo. 3. c. 113. § 6.

because that the ligeance of the subject is only due unto the King. This oath of ligeance appeareth in Britton, who wrote in anno 5 E. 1. cap. 29. (and is yet commonly in use to this day in every leet) and in our books; the effect whereof is: "You shall swear, that from this day forward, you shall be true and faithful to our Sovereign Lord King James and his heirs, and truth and faith shall bear of life and member and terrene honour, and you shall neither know nor hear of any ill or damage intended unto him that you shall not defend. So help you Almighty God." The substance and effect hereof is, as hath been said, due by the law of nature, *ex institutione naturæ*, as hereafter shall appear: the form and addition of the oath is, *ex provisione hominis*. In this oath of ligeance five things were observed. 1. That for the time it is indefinite, and without limit, "from this day forward." Secondly, two excellent qualities are required, that is, to be "true and faithful." 3. To whom, "to our Sovereign Lord the King and his heirs:" (and albeit Britton doth say, to the K. of Eng. that is spoken *proper excellentiam*, to design the person, and not [7 a] to confine the ligeance; for a subject doth not swear his ligeance to the King, only as King of England, and not to him as King of Scotland, or of Ireland, &c. but generally to the King). 4. In what manner; "and faith and troth shall bear, &c. of life and member," that is, until the letting out of the last drop of our dearest heart's blood. 5. Where and in what places ought these things to be done, in all places whatsoever, for, "you shall neither know nor hear of any ill or damage, &c." that you shall not defend, &c. so as natural ligeance is not circumscribed within any place. It is holden 12 H. 7. 18. b. that he that is sworn in the leet, is sworn to the King for his ligeance, that is, to be true and faithful to the King; and if he be once sworn for his ligeance, he shall not be sworn again during his life. And all letters patent of denization be, that the patentee shall behave himself *tanquam verus et fidelis ligeus domini Regis*. And this oath of ligeance at the torn and leet was first instituted by King Arthur; for so I read, *Inter leges Sancti Edwardi Regis ante conquestum 3 cap.* 35. *Et quod omnes principes et comites, proceres, milites et liberi homines debent jurare, &c. in Folkemote, et similiter omnes proceres regni, et milites et liberi homines universi totius regni Britann' facere debent in pleno Folkemote fidelitatem domino Regi, &c. Hanc legem invenit Arthurus qui quondam fuit inclytissimus Rex Britonum, &c. hujus legis authoritate expulit Arthurus Rex Saracenos et inimicos a regno, &c. et hujus legis authoritate Etheldredus Rex uno et eodem die per universum regnum Danos occidit. Vide Lambert inter leges Regis Edwardi, * &c. fol.* 135 *et* 136. By this it appeareth, when and from whom this legal ligeance had his first institution within this realm. *Ligeantia*, in the case in question, is meant and intended of the first kind of ligeance, that is, of ligeance natural, absolute, &c. due by nature and birth-right. But if the plaintiff's father be made a denizen, and purchase lands in England to him and his heirs, and die seised, this land shall never descend to the plaintiff, for that the King by his letters patent may make a denizen, but cannot naturalize him to all purposes, as an Act of Parliament may do; neither can letters patent make any inheritable in this case, that by the common law cannot inherit. And herewith agreeth 36 H. 6. tit. Denizen Br. 9.

Homage in our book is two-fold, that is to say, *homagium ligeum*; and that is as much as ligeance, of which Bracton speaketh, 1. 2. c. 35. f. 79. *Soli Regi debet' sine dominio seu servitio*, [7 b] and there is *homagium feodale*, which hath his original by tenure. In Fitz. Nat. Brev. 269. there is a writ for respiting of this later homage which is due *ratione feodi sive tenuræ: sciatis quod respectuamus homagium nobis de terr' et tenementis quæ tenentur de nobis in capite debit'*. But *homagium ligeum, i.e. ligeantia*, is inherent and inseparable, and cannot be respited.

3. Now are we come to (and almost past) the consideration of this circumstance, where natural ligeance should be due: for by that which hath been said, it appeareth, that ligeance, and faith and truth which are her members and parts, are qualities of the mind and soul of man, and cannot be circumscribed within the predicament of *ubi*, for that were to confound predicaments, and to go about to drive (an absurd and impossible thing) the predicament of quality into the predicament of *ubi*. *Non respondetur ad hanc quæstionem, ubi est?* to say, *Verus et fidelis subditus est; sed ad hanc quæstionem, qualis est? Recte et apte respondetur, verus et fidelis ligeus, &c. est.* But yet

---

* See L. L. Saxon. per Wilkins, p. 204.

for the greater illustration of the matter, the point was handled by itself, and that ligeance of the subject was of as great an extent and latitude, as the Royal power and protection of the King, *et è converso*. It appeareth by the stat. of 11 H. 7. cap. 1. and 2 E. 6. cap. 2. that the subjects of England are bound by their ligeance to go with the King, &c. in his wars, as well within the realm, &c. as without. And therefore we daily see, that when either Ireland, or any other of His Majesty's dominions, be infested with invasion or insurrection, the King of England sendeth his subjects out of England, and his subjects out of Scotland, also into Ireland, for the withstanding or suppressing of the same, to the end his rebels may feel the swords of either nation. And so may his subjects of Guernsey, Jersey, Isle of Man, &c. be commanded to make their swords good against either rebel or enemy, as occasion shall be offered ; whereas if natural ligeance of the subjects of England should be local, that is, confined within the realm of England or Scotland, &c. then were not they bound to go out of the continent of the realm of England or Scotland, &c. And the opinion of Thirninge in 7 H. 4. tit. Protect' 100. is thus to be understood, that an English subject is not compellable to go out of the realm without wages, according to the statutes of 1 E. 3. c. 7.   18 E. 3. c. 8.   18 H. 6. c. 19, &c.   7 H. 7. c. 1.   3 H. 8. c. 5, &c. In ann. 25 E. 1. Bigot Earl of Norfolk and Suffolk, and Earl Marshal of England, and Bohun Earl of Hereford and High Constable of England, did exhibit a petition to the King in French (which I have seen anciently recorded) on **[8 a]** the behalf of the commons of England, concerning how and in what sort they were to be employed in His Majesty's wars out of the realm of England ; and the record saith that, *post multas et varias altercationes*, it was resolved, they ought to go but in such manner and form as after was declared by the said statutes, which seem to be but declarative of the common law. And this doth plentifully and manifestly appear in our books, being truly and rightly understood. In 3 H. 6. tit. Protection 2. one had the benefit of a protection, for that he was sent into the King's wars *in comitiva* of the protector ; and it appeareth by the record, and by the chronicles also, that this employment was into France ; the greatest part thereof then being under the King's actual obedience, so as the subjects of England were employed into France for the defence and safety thereof : in which case it was observed, that seeing the protector, who was a *proter*, went, the same was adjudged a voyage Royal, 8 H. 6. fol. 16. b. the Lord Talbot went with a company of Englishmen into France, then also being for the greatest part under the actual obedience of the King, who had the benefit of their protections allowed unto them. And here were observed the words of the writ·in the Register, fol. 88. where it appeareth, that men were employed in the King's wars out of the realm *per præceptum nostrum*, and the usual words of the writ of protection be *in obsequio nostro*.   *32 H. 6. fol. 4. a. it appeareth, that Englishmen were pressed into Guyienne, † 44 E. 3. 12. a. into Gascoyne with the Duke of Lancaster, 17 H. 6. tit. Protection, into ‖ Gascoyne with the Earl of Huntington, steward of Guienne, 11 and 12 H. 4. 7. into (*a*) Ireland, and out of this realm with the Duke of Gloucester and the Lord Knolles : *vide* (*b*) 19 H. 6. 35. b. And it appeareth in 19 Ed. 2. tit. Avowry 224. 26 Ass. 66. 7 H. 4. 19, &c. that there was *forinsecum servitium* foreign service, which Bracton, fol. 36. calleth *regale servitium ;* and in Fitz. N. B. 28. that the King may send men to serve him in his wars beyond the sea. But thus much (if it be not in so plain a case too much) shall suffice for this point for the King's power, to command the service of his subjects in his wars out of the realm, whereupon it was concluded, that the ligeance of a natural-born subject was not local, and confined only to England. Now let us see what the law saith in time of peace, concerning the King's protection and power of command, as well without the realm, as within, that his subjects in all places may be protected from violence, and that justice may equally be administered to all his subjects.

    **[8 b]** In the Register, fol. 25 b. *Rex universis et singulis admirall', castellan', custodibus*

———————————
    * Fitz. Protect. 13.
    † Fitz. Protect. 35.    Br. Protect. 24.
    ‖ Fitz. Protect. 56.
    (*a*) Fitz. Protect. 24.    Co. Lit. 130. b.    Br. Protect. 34.
    (*b*) Fitz. Protect. 8.    Br. Protect. 49.

*castrorum, villar', et aliorum fortalitiorum præpositis, vicecom' majoribus, custumariis, custodib' portuum, et alior' locor' maritimor' ballivis, ministr', et aliis fidel' suis, tam in transmarinis quam in cismarinis partib' ad quos, &c. salutem. Sciatis, quod suscepimus in protectionem et defension' nostram, necnon ad salvam et securam gardiam nostram IV. veniendo in regnum nostrum Angl', et potestatem nostram, tam per terram quam per mare cum uno valetto suo, ac res ac bona sua quæcunque ad tracland' cum dilecto nostro et fideli L. pro redemptione prisonarii ipsius L. infra regnum et potestatem nostram præd' per sex menses morando et exinde ad propria redeundo. Et ideo, &c. quod ipsum W. cum valetto, rebus et bonis suis præd' veniendo in regn' et potestat' nostram præd' tam per terr' quam per mare ibid' ut præ-dict' est ex causa antedicta morando, et exinde ad propria redeundo, manuteneatis, protegatis, et defendatis; non inferentes, &c. seu gravamen. Et si quid eis forisfactum, &c. reformari faciatis. In cujus, &c. per sex menses duratur'. T. &c.* In which writ three things are to be observed. 1. That the King hath *fidem et fideles in partib' transmarinis.* 2. That he hath *protection' in partib' transmarinis.* 3. That he hath *potestatem in partibus transmarinis.* In the Register fo. 26. *Rex universis et singulis admirallis, castellanis, custodibus castrorum, villarum, et aliorum fortalitiorum præpositis, vicecom' majoribus, custumariis, custodib' portuum, et alior' locor' maritimorum ballivis, ministris, et aliis fidelibus suis, tam in transmarinis quam in cismarinis partibus ad quos, &c. salutem. Sciatis quod suscepimus in protectionem et defensionem nostram, necnon in salvam et securam conductum nostr' I. valettum P. et L. Burgensium de Lyons obsidum nostrorum, qui de licentia nostra ad partes transmarinas profecturus est, pro finantia magistrorum suorum prædict' obtinenda vel deferenda, eundo ad partes præ'lictas ibidem morando, et exinde in Angl' redeundo. Et ideo vobis mandamus, quod eidem I. eundo ad partes præd' ibidem morando, et exinde in Angl' redeundo, ut præd' est, in personâ, bonis, aut rebus suis, non inferatis, seu quantum in vobi sest ab aliis inferri permittatis injuriam, molestiam, &c. aut gravamen. Sed eum potius salvum et securum conductum, cum per loca passus, seu districtus vestros transierit, et super hoc requisiti fueritis, suis sumptibus habere faciatis. Et si quid eis forisfactum fuerit, &c. reformari faciatis. In cujus, &c. per tres ann' durat' T. &c.* And certainly this was, when Lyons in France (bordering upon Burgundy, an ancient friend to England), was under the actual obedience of King Henry VI. For the King commanded *fidelibus suis,* his faithful magistrates there, **[9 a]** that if any injury were there done, it should be by them reformed and redressed, and that they should protect the party in his person and goods in peace. In the Register, fol. 26. two other writs: *Rex omnibus seneschallis, majoribus, juratis, paribus præpositis, ballivis et fidelibus suis in ducatu Aquitaniæ ad quos, &c. salutem. Quia dilecti nobis T. et A. cives civitat' Burdegal' coram nobis in Cancellar' nost' Angl' et Aquitan' jura sua prosequentes, et metuentes ex verisimilibus conjecturis per quosdam sibi comminantes tam in corpore quam in rebus suis, sibi posse grave damnum inferri, supplicaverunt nobis sibi de protectione regia providere: nos volentes dictos T. et A. ab oppressionibus indebitis preservare, suscepimus ipsos T. et A. res ac justas possessiones et bona sua quæcunque in protectionem et salvam gardiam nostram specialem. Et vobis et cuilibet vestrum injungimus et mandamus, quod ipsos T. et A. familias, res ac bona sua quæcunque a violentiis et gravaminibus indebitis defendatis, et ipsos in justis possessionibus suis manuteneatis. Et si quid in præjudicium hujus protectionis et salvæ gardiæ nost' attentatum inveneritis, ad statum debitum reducatis. Et ne quis se possit per ignorantiam excusare presentem protectionem et salvam gardiam nostram faciatis in locis de quibus requisiti fueritis infra district' vestrum publice intimari, inhibentes omnibus et singulis sub pœnis gravibus, ne dictis A. et T. seu famulis suis in personis seu rebus suis, injuriam molestiam, damnum aliquod inferant seu gravamen: et penocellas nostras in locis et bonis ipsorum T. et A. in signum protectionis et sal' gard' memorat', cum super hoc requisiti fueritis, apponatis. In cujus, &c. dat' in palatio nostro Westm' sub Magni Sigilli testimonio, sexto die Augusti anno 44 E. 3.—Rex universis et singulis seneschallis, constabular' castellanis, præposit', minist', et omnib' ballivis et fidelibus suis in dominio nostro Aquitan' constitutis ad quos, &c. salut'. Volentes G. et R. uxor ejus favore prosequi gratiose, ipsos G. et R. homines et familias suas ac justas possessiones, et bona sua quæcunque, suscepimus in protectionem et defensionem nostram, necnon in salvam gardiam nostram specialem. Et ideo vobis et cuilibet vestrum injungimus et mandamus, quod ipsos G. et R. eorum homines, familias suas, ac justas possessiones et bona sua quæcunque manuteneatis, protegatis, et defendatis: non inferentes eis seu quantum in vobis est ab aliis inferri permittentes, injuriam, molestiam, damnum, violentiam, impedi-*

388                                CALVIN'S CASE                         7 CO. REP. 9 b.

*mentum aliquod seu gravamen. Et si quid eis forisfact', injuriatum vel contra eos indebite attentatum fuerit, id eis sine dilatione corrigi, et ad statum debitum reduci faciatis, prout ad eos et quemlibet restrum noveritis pertinere : penecellas super domibus suis in signum præsentis salvæ gardiæ nostræ (prout moris erit) facientes. In cujus. &c. per unum annum duratur' T. &c.*  **[9 b]**  By all which it is manifest, that the protection and government of the King is general over all his dominions and kingdoms, as well in time of peace by justice, as in time of war by the sword, and that all be at his command, and under his obedience. Now seeing power and protection draweth ligeance, it followeth, that seeing the King's power, command, and protection extendeth out of England, that ligeance cannot be local, or confined within the bounds thereof. He that is abjured the realm, *Qui abjurat regnum amittit regnum. sed non Regem, amittit patriam, sed non patrem patriæ :* for notwithstanding the abjuration, he oweth the King his ligeance, and he remaineth within the King's protection ; for the King may pardon and restore him to his country again. So seeing that ligeance is a quality of the mind, and not confined within any place ; it followeth, that the plea that doth confine the ligeance of the plaintiff to the kingdom of Scotland, *infra ligeantiam Regis regni sui Scotiæ, et extra ligeantiam Regis regni sui Angliæ,* whereby the defendants do make one local ligeance for the natural subjects of England, and another local ligeance for the natural subjects of Scotland, is utterly insufficient, and against the nature and quality of natural lineage, as often it hath been said. And Coke, Chief Justice of the Court of Common Pleas, cited a ruled case out of Hingham's Reports, *tempore* E. 1. which in his argument he shewed in Court written in parchment, in an ancient hand of that time. Constance de N. brought a writ of ayel against Roger de Cobledike and others, named in the writ, and counted that from the seisin of Roger her grandfather it descended to Gilbert his son, and from Gilbert to Constance, as daughter and heir. *Sutton dit, Sir, el ne doit este responde, pur ceo que el est Francois et nient de la ligeance ne a la foy Denglitterre, et demand judgement si el doit action aver :* that is, she is not to be answered, for that she is a French woman, and not of the ligeance, nor of the faith of England, and demanded judgment, if she this action ought to have. Bereford (then Chief Justice of the Court of Common Pleas) by the rule of the Court disalloweth the plea, for that it was too short, in that it referred ligeance and faith to England, and not to the King : and thereupon Sutton saith as followeth : *Sir, nous voilomous averre, que el ne est my de la ligeance Denglitterre, ne a la foy le Roy et demand jugement, et si vous agardes que el doit este responde, nous dirromus assets :* that is, Sir, we will aver, that she is not of the ligeance of England, nor of the faith of the King, and demand judgment, &c. ; **[10 a]** which latter words of the plea (nor of the faith of the King) referred faith to the King indefinitely and generally, and restrained not the same to England, and thereupon the plea was allowed for good, according to the rule of the Court : for the book saith, that afterward the plaintiff desired leave to depart from her writ. The rule of that case of Cobledike, did (as Coke, Chief Justice, said) over-rule this case of Calvin, in the very point now in question ; for that the plea in this case doth not refer faith or ligeance to the King indefinitely and generally, but limiteth and restraineth faith and ligeance to the kingdom : *Extra ligeantiam Regis regni sui Angliæ,* out of the ligeance of the King of his kingdom of England ; which afterwards the Lord Chancellor and the Chief Justice of the King's Bench, having copies of the said ancient report, affirmed in their arguments. So as this point was thus concluded, *Quod ligeantia naturalis nullis claustris coercetur nullis metis refrænatur, nullis finibus premitur.*

4 and 5. By that which hath been said, it appeareth, that this ligeance is due only to the King ; so as therein the question is not now, *cui, sed quomodo debetur.* It is true, that the King hath two capacities in him : one a natural body, being descended of the blood Royal of the realm ; and this body is of the creation of Almighty God, and is subject to death, infirmity, and such like ; the other is a ‖ politic body or capacity, so called, because it is framed by the policy of man (and in 21 E. 4. 39. b. is called a mystical body ;) and in this capacity the King is esteemed to be immortal, invisible, not subject to death, infirmity, infancy, (a) nonage, &c. Pl. Com. in the case of *The*

---

&#124; Politic body. 1 Inst. 15 b. 16.

(a) *Postea* 12. a. Co. Lit. 43 a, 5 Co. 27 a. Plowd. 213 a. 221 a. 364 b. 26 Ass. 54. Fitz. Enfant 15. Br. Age 34.

*Lord Barkley*, 238. and in the case of *The Duchy* 213. 6 E. 3. 291. and 26 Ass pl. 54.
Now, seeing the King hath but one person, and several capacities, and one politic
capacity for the realm of England, and another for the realm of Scotland, it is
necessary to be considered, to which capacity ligeance is due. And it was resolved,
that it was due to the natural person of the King (which is ever accompanied with the
politic capacity, and the politic capacity as it were appropriated to the natural
capacity), and it is not due to the politic capacity only, that is, to his Crown or
kingdom distinct from his natural capacity, and that for divers reasons. First, every
subject (as it hath been affirmed by those that argued against the plaintiff) is presumed
by law to be sworn to the King, which is to his natural person, and likewise the King
is sworn to his subjects, (as it appeareth in Bracton, lib. 3. de Actionibus, cap. 9. fol. 107 )
which oath he taketh in his natural **[10 b]** person : for the politic capacity is invisible
and immortal ; nay, the politic body hath no soul, for it is framed by the policy of
man. 2. In all indictments of treason, when any do intend or compass *mortem et
destructionem domini Regis* (which must needs be understood of his natural body, for
his politic body is immortal, and not subject to death,) the indictment concludeth,
*contra* (a) *ligeantiæ suæ debitum ; ergo*, the ligeance is due to the natural body. *Vide* Fitz.
Justice of Peace 53. and Pl. Com. 384. in *The Earl of Leicester's case*. 3. It is true,
that the King *in genere* dieth not ; but, no question, *in individuo* he dieth : as for
example, H. 8. E. 6. &c. and Queen Eliz. died, otherwise you should have many
Kings at once. In 2 and 3 Ph. and Mar. Dyer 228. (b) one Constable dispersed
divers bills in the streets in the night, in which it was written, that King E. 6. was
alive, and in France, &c. : and in Coleman-street in London, he pointed to a young
man, and said, that he was King Edward the Sixth. And this being spoken *de
individuo* (and accompanied with other circumstances) was resolved to be high treason ;
for the which Constable was attainted and executed. 4. A (c) body politic (being
invisible) can as a body politic neither make or take homage : *vide* 33 H. 8. tit.
Fealty, Brook 15. 5. *In fide*, in faith or ligeance nothing ought to be feigned, but
ought to be *ex fide non ficta*. 6. The King holdeth the kingdom of England by birth-
right inherent, by descent from the blood Royal, whereupon succession doth attend ;
and therefore it is usually said, to the King, his heirs, and successors, wherein heirs is
first named, and successors is attendant upon heirs. And yet in our ancient books
succession and successor are taken for hereditance and heirs. Bract. lib. 2. de
Acquirendo Rerum Dominio c. 29. *Et sciend' est quod hæreditas est successio in
universum jus quod defunctus antecessor habuit, ex causâ quacunque acquisitionis vel
successionis, et alibi affinitatis jure nulla successio permittitur*. But the title is by
descent ; by Queen Elizabeth's death the Crown and kingdom of England descended
to His Majesty, and he was fully and absolutely thereby King, without any essential
ceremony or act to be done *ex post facto :* for coronation is but a Royal ornament and
solemnization of the Royal descent, but no part of the title. In the first year of His
Majesty's reign, before His Majesty's coronation, Watson (d) and Clerke, seminary
priests, and others, were of opinion, that His Majesty was no complete and absolute
King before his coronation, but that coronation did add a confirmation and perfection
to the descent ; and therefore (observe their damnable and damned consequent) that
they by **[11 a]** strength and power might before his coronation take him and his
Royal issue into their possession, keep him prisoner in the Tower, remove such
counsellors and great officers as pleased them, and constitute others in their places, &c.
And that these and other (acts) of like nature could not be treason against His Majesty,
before he were a crowned King. But it was clearly resolved by all the Judges of
England, that presently by the descent His Majesty was completely and absolutely
King, without any essential ceremony or act to be done *ex post facto*, and that
(e) coronation was but a Royal ornament, and outward solemnization of the descent.

(a) *Antea* 6. a. b. 3 Inst. 11. Hob. 271. Dy. 143. pl. 62. Cawly 185.
Co. Lit. 129 a.

(b) This case is not in the book at large, but is in the Abridgment of Dy. fo. 32.
Stow's Abridgm. p. 1062. 1064. Speed's Chron. p. 1127. col. 2. num. 100.

(c) 10 Co. 32 b. Co. Lit. 66 b. 4 Co. 11 a.

(d) 3 Inst. 7.

(e) 3 Inst. 7.

And this appeareth evidently by infinite precedents and book cases, as (taking one example in a case so clear for all) King Henry VI. was not crowned until the 8th year of his reign, and yet divers men before his coronation were attainted of treason, of felony, &c. and he was as absolute and complete a King, both for matters of judicature, as for grants, &c. before his coronation, as he was after, as it appeareth in the Reports of 1, 2, 3, 4, 5, 6, and 7 years of the same King. And the like might be produced for many other Kings of this realm, which for brevity in a case so clear I omit. But which it manifestly appeareth, that by the laws of England there can be no † *inter regnum* within the same. If the King be seised of land by a defeasible title, and dieth seised, this descent shall toll the entry of him that right hath, as it appeareth by 9 (a) E. 4. 51. But if the next King had it by succession, that should take away no entry, as it appeareth by Littleton, fol. 97. If a disseisor of an infant convey the land to the King who dieth seised, this descent taketh away the entry of the infant, as it is said in 34 H. 6. fol. 34. (b) 45. lib. Ass. pl. 6. Plow. Com. 234. where the case was ; K. H. 3. gave a manor to his brother the Earl of Cornwall in tail (at what time the same was a fee-simple conditional) K. H. 3. died, the earl before the Statute of Donis Conditional' (having no issue) by deed exchanged the manor with warranty for other lands in fee, and died without issue, and the warranty and assets descended upon his nephew King Edward I. ; and it was adjudged, that this warranty and assets, which descended upon the natural person of the King, barred him of the possibility of reverter. In the reign of Ed. 2. the Spencers, the father and the son, to cover the treason hatched in their hearts, invented this damnable and damned opinion, that homage and oath of ligeance was more by reason of the King's Crown (that is, of his politic capacity) than by reason of the person of the **[11 b]** King, upon which opinion they inferred execrable and detestable consequences: 1. If the King do not demean himself by reason in the right of his Crown, his lieges be bound by oath to remove the King. 2. Seeing that the King could not be reformed by suit of law that ought to be done by the sword. 3. That his lieges be bound to govern in aid of him, and in default of him. All which were condemned by two Parliaments, one in the reign of Ed. 2. called *Exilium Hugonis le Spencer*, and the other in Ann 1. Ed. 3. c. 1. Bracton, lib. 2. de Acquirendo Rerum Dominio, c. 24. f. 55, saith thus, *Est enim Corona Regis facere justitiam et judic', et tenere pacem, et sine quibus Corona consistere non potest nec tenere; hujusmodi autem jura sive jurisdictiones ad personas vel tenementa transferri non poterunt, nec a privata persona possideri, nec usus nec executio juris, nisi hoc datum fuit ei desuper, sicut jurisdictio delegata delegari non poterit quin ordinaria remaneat cum ipso Rege. Et lib. 3. De Actionibus, cap. 9. fol 107. Separare autem debet Rex, cum sit Dei vicarius in terra, jus ab injuria, æquam ab iniquo, ut omnes sibi subjecti honeste vivant, et quod nullus alium lædat, et quod unicuique quod suum fuerit recta contributione reddatur.* In respect whereof one saith, that *Corona est quasi cor ornans, cujus ornamenta sunt misericordia et justicia.* And therefore a King's Crown is an hieroglyphic of the laws, where justice, &c. is administered ; for so saith P. Val. 1. 41. p. 400. *Coronam dicimus legis judicium esse, propterea quod certis est vinculis complicata, quibus vita nostra veluti religata coercetur.* Therefore if you take that which is signified by the Crown, that is, to do justice and judgment, to maintain the peace of the land, &c. to separate right from wrong, and the good from the ill : that is to be understood of that capacity of the King, that *in rei veritate* hath capacity, and is adorned and endued with endowments as well of the soul as of the body, and thereby able to do justice and judgment according to right and equity, and to maintain the peace, &c. and to find out and discern the truth, and not of the invisible and immortal capacity that hath no such endowments ; for of itself it hath neither soul nor body. And where divers books and Acts of Parliament speak of the ligeance of England, as 31 E. 3. tit. Cosinage 5. 52 Ed. 3. 2. 13 E. 3. tit. Brief 677. 25 Ed. 3. Stat. de Natis Ultra

---

† *Q.* If not so between K. J. 2. abdication and K. W. 3. succession ? *post* 12 a.
(a) 4 Co. 58 b.
(b) 10 Co. 96 b. Co. Lit. 19 b. 370 b. Plowd. 234 a. 553 b. Fitz. Garranty 68. Br. Assets per Descent. 31. Br. Tail. 34. Br. Prærog. 52. Br. Serch. pur le Roy 5. Br. Garranty 52. 9 Co. 132 b. 1 H. P. C. 67.

Mare. All these and other speaking briefly in a vulgar manner (for (a) *loquendum ut vulgus*) and not pleading (for *sentiendum ut docti*) are to be understood of the ligeance due by the people of England to the King; for no man will affirm, that England itself, taking it for the continent thereof, doth owe any **[12 a]** ligeance or faith, or that any faith or ligeance should be due to it: but it manifestly appeareth, that the ligeance or faith of the subject is *proprium quarto modo* to the King, *omni soli et semper*. And oftentimes in the reports of our book cases, and in Acts of Parliament also, the Crown or kingdom is taken for the King himself, as in † Fitzh. Natur. Brev. fol. 5. Tenure *in capite* is a tenure of the Crown, and is a seignory in gross, that is of the person (c) of the King: and so is 30 H. 8. Dyer fol. 44, 45. a tenure in chief, as of the Crown, is merely the tenure of the person of the King and therewith agreeth 28 H. 8. tit. Tenure 65. Br. The statute of 4 H. 5. cap. *ultimo* gave priors aliens, which were conventual to the King and his heirs, by which gift saith 34 H. 6. 34. the same were annexed to the Crown. And in the said Act of 25 Ed. 3. whereas it is said in the beginning, within the ligeance of England, it is twice afterwards said in the said Act within the ligeance of the King, and yet all one ligeance due to the King. So in 42 Ed. 3. fol. 2. where it is first said, the ligeance of England, it is afterwards in the same case called the ligeance of the King; wherein though they used several manner and phrases of speech, yet they intended one and the same ligeance. So in our usual commission of assise, of gaol delivery, of oyer and terminer, of the peace, &c. power is given to execute justice, *secundum legem et consuetudinem regni nostri Angliæ;* and yet Littleton, lib. 2. in his chapter of Villenage, fol. 43. in disabling of a man that is attainted in a *præmunire* saith, that the same is the King's law; and so doth the register in the writ of *ad jura regia* style the same.

The reasons and cause wherefore by the policy of the law the King is a body politic, are three, viz. 1. *causa majestatis,* 2. *causa necessitatis,* and 3. *causa utilitatis.* First, *causa majestatis,* the King cannot give or take but by matter of record for the dignity of his person. Secondly, *causa necessitatis,* as to avoid the (a) attainder of him that hath right to the Crown, as it appeareth in 1 H. 7. 4. lest in the *interim* there should be an (b) *interregnum,* which the law will not suffer. Also by force of this politic capacity, though the (c) King be within age, yet may he make leases and other grants (D), and the same shall bind him; otherwise his revenue should decay, and the King should not be able to reward service, &c. Lastly, *causa utilitatis,* as when lands and possessions descend from his collateral ancestors, being subjects, as from the Earl **[12 b]** of March, &c. to the King, now is the King seised of the same *in jure Coronæ,* in his politic capacity; for which cause the same shall go with the Crown; and there, albeit Queen Elizabeth was of the half blood to Queen Mary, yet she in her body politic enjoyed all those fee-simple lands, as by the law she ought, and no collateral cousin of the whole blood to Queen Mary ought to have the same. And these are the causes wherefore by the policy of the law the King is made a body politic: so as for these special purposes the law make him a body politic, immortal and invisible, whereunto our ligeance cannot appertain. But to conclude this point, our ligeance is to our natural liege Sovereign, descended of the blood royal of the Kings of this realm. And thus much of this general part *de ligeantiâ.*

Now followeth the Second Part, De Legibus, wherein these parts were considered: first that the ligeance or faith of the subject is due unto the King by the law of nature: secondly, that the law of nature is part of the law of England: thirdly, that

---

(a) 3 Keb. 20. Cart. 120. 2 Roll. Rep. 239. Het. 101. 4 Co. 46 b.

† *I.e.* of the politic capacity.

(c) *Vid.* Hargrave's note 1. Co. Lit. 77 a.

(a) Co. Lit. 16. a. Bacon's H. 7. fo. 8, 9. Fitz. Parl. 2. Br. Parl. 37. 105. Plowd. 238 b.

(b) 1 W. & M. cap. 4. sect. 10. Co. Lit. 43 a.

(c) 5 Co. 27 a. 1 Roll. 728. Plowd. 213 a. 238. 221 a. 364. b. 26 Ass. 54. Fitz. Enfant 15. Br. Age 14. 5 Mod. 55. Co. Lit. 15 b. See Treby's Argument in the Quo Warranto.

(D) *Vid.* as to the King's grants the notes to the case of *Alton Woods,* 1 Co. 40. b. *et seq.*

the law of nature was before any judicial or municipal law: fourthly, that the law of nature is immutable.

The law of nature is that which God at the time of creation of the nature of man infused into his heart, for his preservation and direction; and this is *lex æterna*, the moral law, called also the law of nature. And by this law, written with the finger of God in the heart of man, were the people of God a long time governed, before the law was written by Moses, who was the first reporter or writer of law in the world. The Apostle in the second chapter to the Romans saith, *Cum enim gentes quæ legem non habent naturaliter ea quæ legissunt faciunt*. And this is within the command of that moral law, *honora patrem*, which doubtless doth extend to him that is *pater patriæ*. And that Apostle saith *Omnis anima potestatibus sublimioribus subdita sit*. And these be the words of the Great Divine, *Hoc Deus in Sacris Scripturis jubet, hoc lex naturæ dictari, ut quilibet subditus obediat superio*, and Aristotle, nature's secretary, lib. 5. Æthic. saith, that *jus naturale est, quod apud omnes homines eandem habet potentiam*. And herewith doth agree Bracton, lib. 1. cap. 5. and Fortescue, cap. 8. 12. 13. and 16. Doctor and Student, cap. 2. and 4. And the reason hereof is, for that God and nature is one **[13 a]** to all, and therefore the law of God and nature is one to all. By this law of nature is the faith, ligeance, and obedience of the subject due to his Sovereign or superior. And Aristotle 1. Politicorum proveth, that to command and to obey is of nature, and that magistracy is of nature: for whatsoever is necessary and profitable for the preservation of the society of man is due by the law of nature: but magistracy and government are necessary and profitable for the preservation of the society of man; therefore magistracy and government are of nature. And herewith accordeth Tully, lib. 3. *De legibus, sine imperio nec domus ulla, nec civitas, nec gens, nec hominum universum genus stare, nec ipse denique mundus potest.* This law of nature, which indeed is the eternal law of the Creator, infused into the heart of the creature at the time of his creation, was two thousand years before any laws written, and before any judicial or municipal laws. And certain it is, that before judicial or municipal laws were made, Kings did decide causes according to natural equity, and were not tied to any rule or formality of law, but did *dare jura*. And this appeareth by Fortescue, cap. 12 and 13. and by Virgil that philosophical poet, 7th Æneid.

> *Hoc Priami gestamen erat, cum jura vocatis*
> *More daret populis.*

> And 5th Æneid.

> ———— *Gaudet regno Trojanus Acestes,*
> *Indicitque forum et partibus dat jura vocatis.*

And Pomponius, lib. 2. cap. De Origine Juris, affirmeth that, in Tarquinius Superbus's time there was no civil law written, and that Papirius reduced certain observations into writing, which was called Jus Civile Papirianum. Now the reason wherefore laws were made and published, appeareth in Fortescue, cap. 13. and in Tully, lib. 2. Officiorum: *at cum jus æquabile ab uno viro homines non consequerentur, inventi sunt leges.* Now it appeareth by demonstrative reason, that ligeance, faith, and obedience of the subject to the Sovereign, was before any municipal or judicial laws. 1. For that government and subjection were long before any municipal or judicial laws. 2. For that it had been in vain to have prescribed laws to any but to such as owed obedience, faith, and ligeance before, in respect whereof they were bound to obey and observe them: *Frustra enim* **[13 b]** *feruntur leges nisi subditis et obedientibus.* Seeing then that faith, obedience, and ligeance are due by the law of nature, it followeth that the same cannot be changed or taken away; for albeit judicial or municipal laws have inflicted and imposed in several places, or at several times, divers and several punishments and penalties, for breach or not observance of the law of nature, (for that law only consisted in commanding or prohibiting, without any certain punishment or penalty), yet the very law of nature itself never was nor could be (*a*) altered or changed. And therefore it is certainly true, that (*b*) *jura naturalia*

(*a*) 1 Black. 41. 57. Dr. and Stud. 4. a. *ante* 12 b.
(*b*) Cart. 130.

*sunt immutabilia.* And herewith agreeth Bracton, lib. 1. cap. 5. and Doctor and Student, cap. 5 and 6. And this appeareth plainly and plentifully in our books.

If a man hath a ward (E) by reason of a seigniory, and is outlawed, he forfeiteth the wardship to the King: but if a man hath the wardship of his own son or daughter, which is his heir apparent, and is outlawed, he doth not (a) forfeit this wardship; for nature hath annexed it to the person of the father, as it appeareth in 33 H. 6. 55. b. *Et bonus Rex nihil a bono patre differt, et patria dicitur a patre, quia habet communem patrem, qui est pater patriæ.* In the same manner, *maris et fæminæ conjunctio est de jure naturæ,* as Bracton, in the same book and chapter, and St. Germin in his book of the Doctor and Student, cap. 5., do hold. Now, if he that is attainted of treason or felony, be slain by one that hath no authority, or executed by him that hath authority, but pursueth not his warrant, in this case his eldest son can have no appeal(F), for he must bring his appeal as heir, which being *ex provisione hominis,* he loseth it by the attainder of his father; but his (b) wife (if any he have) shall have an appeal, because she is to have her appeal as wife, which she remaineth notwithstanding the attainder, because *maris et fæminæ conjunctio* is *de jure naturæ,* and therefore (it being to be intended of true and right matrimony) is indissoluble; and this is proved by the book in 33 H. 6. 57. So if there be mother and daughter, and the daughter is attainted of felony, now cannot she be heir to her mother for the cause aforesaid; yet after her attainder, if she kill her mother, this is parricide and petit treason; for yet she remaineth her daughter, for that is of nature, and herewith agreeth 21 E. 3. 17. b. If a man be attainted of felony or treason, he hath lost the King's legal protection, for he is thereby utterly disabled to sue any action real or personal (which is a greater disability than an alien in league hath) and yet such a person so attainted hath not lost that **[14 a]** protection which by the law of nature is given to the King, for that is *indelebilis et immutabilis,* and therefore the King may protect and pardon him, and if any man kill him without warrant, he shall be punished by the law as a manslayer, and thereunto accordeth 4 Ed. 4. and 35 H. 6. 57. 2 Ass. pl. 3. By the statute of 25 Ed. 3. cap. 22. a man attainted in a *præmunire,* is by express words out of the King's protection generally; and yet this extendeth only to legal protection, as it appeareth by Littleton, fol. 43. for the Parliament could not take away that protection which the law of nature giveth unto him; and therefore notwithstanding that statute, the King may protect and pardon him. And though by that statute it was farther enacted, that it should be done with him as with an enemy, by which words any man might have slain such a person (as it is holden in 24 H. 8. tit. Coron. Br. 197.) until the statute made anno 5 Eliz. cap. 1. yet the King might protect and pardon him. A man outlawed is out of the benefit of the municipal law; for so saith Fitz. N. B. 161. a. *utlagatus est quasi extra legem positus:* and Bract. 1. 3. tract. 2. c. 11. saith, that *caput geret lupinum;* and yet is he not out either of his natural ligeance, or of the King's natural protection; for neither of them is tied to municipal laws, but is due by the law of nature, which (as hath been said) was long before any judicial or municipal laws. And therefore if a man were outlawed for felony, yet was he within the King's natural protection, for no man but the sheriff could execute him, as it is adjudged in 2 lib. Ass. pl. 3. Every subject is by his natural ligeance bound to obey and serve his sovereign, &c. It is enacted by the Parliament of 23 H. 6. that no man should serve the King as sheriff of any county, above one year, and that notwithstanding any clause of *non obstante* to the contrary, that is to say, notwithstanding that the King should expressly dispense with the said statute: howbeit it is agreed in 2 H. 7. that against the express purview of that Act, the King may, by a special *non obstante* dispense with that Act, for that the Act could not bar the King of the service of his subject, which the law of nature did give unto him. By these and many other cases that might be cited out of our books, it appeareth, how plentiful the authorities of

---

(E) Wardships, by reason of knight's service abolished, stat. 12 Car. 2, cap. 24.

(a) 3 Co. 39 a. 7 Co. 12 b. Co. Lit. 84 b. Br. Gard. 6. Br. Forfeit, 70. Plowd. 294 a. *Englefield's case.* 2 Inst. 234.

(F) Appeals of treason, felony, and other offences abolished, stat. 59 Geo. 3. cap. 46.

(b) Stamf. Cor. 59. c. 35 H. 6. 58 a. Br. Appeal 5. 131. Fitz. Cor. 21. 2 Inst. 215.

K. B. VI.—13*

our laws be in this matter. Wherefore to conclude this point (and to exclude all that hath been or could be objected against it) if the obedience and ligeance of the subject to his sovereign be due by the law of nature, if that law be parcel of the laws, as well of England, as of all other nations, and is immutable, and that *postnati* † and we of England are united by birth-right, **[14 b]** in obedience and ligeance (which is the true cause of natural subjection) by the law of nature; it followeth that Calvin the plaintiff being born under one ligeance to one King, cannot be an alien born; and there is great reason, that the law of nature should direct this case, wherein five natural operations are remarkable: first the King hath the Crown of England by birth-right; being naturally procreated of the blood royal of this realm: secondly, Calvin the plaintiff naturalized by procreation and birth-right, since the descent of the Crown of England: thirdly, ligeance and obedience of the subject to the sovereign, due by the law of nature: fourthly, protection and government due by the law of nature: fifthly, this case, in the opinion of divers, was more doubtful in the beginning, but the further it proceeded, the clearer and stronger it grew; and therefore the doubt grew from some violent passion, and not from any reason grounded upon the law of nature, *quia quanto magis violentus motus (qui fit contra naturam) appropinquat ad suum finem, tanto debiliores et tardiores sunt ejus motus; sed naturalis motus, quanto magis appropinquat ad suum finem, tanto fortiores et velociores sunt ejus motus.* Hereby it appeareth how weak the objection grounded upon the rule of (a) *quanto duo jura concurrunt in unâ personâ, &c.* is: for that rule holdeth not in personal things, that is, when two persons are necessarily and inevitably required by law, as in the case of an alien born there is; and therefore no man will say, that now the King of England can make war or league with the King of Scotland, *et sic de cæteris;* and so in case of an alien born, you must of necessity have two several ligeances to two several persons. And to conclude this point concerning laws, *non adservatur diversitas regnor' sed regnant', non patriarum, sed patrum patriar', non coronarum, sed coronatorum, non legum municipalium, sed regum majestatum.* And therefore thus were directly and clearly answered, as well the objections drawn from the severalty of the kingdoms, seeing there is but one head of both, and the *postnati* and us joined in ligeance to that one head, which is *copula et tanquam oculus* of this case; as also the distinction of the laws, seeing that ligeance of the subjects of both kingdoms, is due to their sovereign by one law, and that is the law of nature.

For the third, it is first to be understood, that as the law hath wrought four unions, so the law doth still make four separations: The first union is of both kingdoms under one natural liege Sovereign King, and so acknowledged by the Act of **[15 a]** Parliament of recognition. The 2d is an union of ligeance and obedience of the subjects of both kingdoms, due by the law of nature to their sovereign: and this union doth suffice to rule and overrule the case in question: and this in substance is but a uniting of the hearts of the subjects of both kingdoms one to another, under one head and sovereign. The 3d union is an union of protection of both kingdoms, equally belonging to the subjects of either of them: and therefore the two first arguments or objections drawn from two supposed several ligeances were fallacious, for they did *disjungere conjungenda.* The 4th union and conjunction is of the three lions of England, and that one of Scotland, united and quartered in one escutcheon.

Concerning the separations yet remaining:—1. England and Scotland remain several and distinct kingdoms. 2. They are governed by several judicial or municipal laws. 3. They have several distinct and separate Parliaments. 4. Each kingdom hath several nobilities: for albeit a *postnatus* in Scotland, or any of his posterity, be the heir of a nobleman of Scotland, and by his birth is legitimated in England, yet he is none of the (a) peers or nobility of England; for his natural ligeance and obedience, due by the law of nature, maketh him a subject and no alien within England: but that subjection maketh him not noble within England; for that nobility had his original by the King's creation, and not of nature. And this is manifested by express authorities, grounded upon excellent reasons in our books. If

---

† *I.e.* of Scotland.

(a) Ellesmere's Postnat. c. 88.   4 Co. 118 a.   Cawly 209.   *Antea* 2 b.   Moor 793. 834.

(a) Dyer 360. pl. 6.   9 Co. 117. a. b.   2 Inst. 48.

a baron, viscount, earl, marquis, or duke of England, bring any action, real or personal, and the defendant pleadeth in abatement of the writ that he is no baron, viscount, earl, &c. and thereupon the demandant or plaintiff taketh issue; this issue shall not be tried by jury, but by the (a) record (G) of Parliament, whether he or his ancestor, whose heir he is, were called to serve there as a peer, and one of the nobility of the realm. And so are our books adjudged in 22 Ass. 24. 48 Edw. 3. 30. 35 H. 6. 40. 20 Eliz. Dyer. 360. *Vide* in the Sixth Part of my Reports, in *The Countess of Rutland's case.* So as the man, that is not *de jure* a peer, or one of the nobility, to serve in the Upper House of the Parliament of England, is not in the legal proceedings of law accounted noble within England. And therefore if a countee of France or Spain, or any other foreign kingdom, should come into England, he should not here sue, or be sued by the name of countee, &c. for that he is none of the nobles that are members of the **[15 b]** Upper House of the Parliament of England; and herewith agree the book-cases of (b) 20 Ed. 4. 6. a. b. and 11 Ed. 3. tit. Bre. 473. like law it is, and for the same reason, of an earl or baron of Ireland, he is not any peer, or of the nobility of this realm: and herewith agreeth the book in 8 R. 2 tit. (c) Proces. pl. Ultim.; where in an action of debt, process of outlawry was awarded against the Earl of Ormond in Ireland; which ought not to have been, if he had been noble here. *Vide* Dyer (d) 20 Eliz. 360.

But yet there is a diversity in our books worthy of observation; for the highest and lowest dignities are universal: for if a King of a foreign nation come into England, by the leave of the King of this realm (as it ought to be) in this case he shall sue and be sued by the name of a King; and herewith agreeth 11 E. 3. tit. Br. (e) 473. where the case was, that Alice, which was the wife of R. de O. brought a writ of dower against John Earl of Richmond, and the writ was *præcip. Johann' Comiti Richmondiæ custodi terr' et hæredis* of William the son of R. de. O. the tenant pleaded that he is duke of Britain, not named duke, judgment of the writ? But it is ruled that the writ was good; for that the dukedom of Britain was not within the realm of England. But there it is said, that if a man bring a writ against Edward (f) Baliol, and name him not King of Scotland, the writ shall abate for the cause aforesaid. And hereof there is a notable precedent in Fleta, lib. 2. cap. 3. sec. 9. where treating of the jurisdiction of the King's Court of Marshalsea it is said *et hæc omnia ex officio suo licite facere poterit (ss. seneschal' aul' hospitii Regis) non obstante alicujus libertate, etiam in alieno regno dum tamen reus in hospitio Regis poterit inveniri secundum quod contigit Paris. anno 14 Ed. 1. de Engelramo de Nogent capto in hospitio Regis Angl' (ipso rege tunc apud Parisiam existente) cum discis argenti furatis recenter super facto, rege Franc' tunc presente, et unde licet Curia Regis Franc' de præd' latrone per castellanum Paris. petita fuerit, habitis hinc et inde tractatibus in Consilio Regis Franc', tandem consideratum fuit; quod Rex Angl' illa regia prærogativa, et hospitii sui privilegio uteretur, et gauderet, qui coram Roberto Fitz-John milite tunc hospitii Regis Angl' seneschallo de latrocinio convictus, per considerationem, ejus cur, fuit (a) suspensus in patibulo sancti Germani de pratis.* Which proveth, that though the King be in a foreign kingdom, yet he is judged in law a King there. The other part of the said diversity is proved by the book-case in 20 (b) E. 4. fol. 6. a. b. where, in a writ of debt brought by Sir J. Douglas, Knight, against Elizabeth Molford, the defendant, demanded judgment of the writ; for that **[16 a]** the plaintiff was an earl of Scotland (H), but not of England; and that our

(a) Co. Lit. 16. b.   6 Co. 53. a.   9 Co. 31. a. 49. a.   12 Co. 70. 94, 95.   2 Inst. 50.   2 Roll. 575.   Moor 767.

(G) *Vide* note (A) *Countess of Rutland's case,* 5 Co. 26. b.

(b) 9 Co. 117. b.   Br. Nosme de Dignity 49.

(c) 9 Co. 117. b.   Fitz. Proc. 224.

(d) Dy. 360. pl. 6.   Co. Lit. 261. b.   Acc. Freem. 249.

(e) Moor 803.   9 Co. 117. b.   *Postea* 16. a.

(f) Moor 803.

(a) Moor 798, 799.

(b) 9 Co. 117. b.   Br. Nosme de Dignity, 49.

(H) By the Acts of Union, 5 Ann. c. 8, and 39 and 40 Geo. 3. c. 67. peers of Scotland and Ireland shall enjoy all privileges of peers, as fully as the peers of Great

Sovereign Lord the King had granted unto him safe conduct, not named by his name of dignity, judgment of the writ, &c.   And there Justice Littleton giveth the rule: the plaintiff (saith he) is an earl in Scotland, but not in England ; and if our Sovereign Lord the King grant to a duke of France a safe conduct to merchandize, and enter into his realm, if the duke cometh and bringeth merchandize into this land, and is to sue an action here, he ought not to name himself duke ; for he is not a duke in this land, but only in France.   And these be the very words of that book-case ; out of which I collect three things.   First, that the plaintiff was named by the name of a knight, wheresoever he received that degree of dignity.   *Vide* (c) 7 H. 6. 14 b. accord. 2. That an earl of another nation or kingdom is no earl (to be so named in legal proceedings) within this realm : and herewith agreeth the book of (d) 11 Ed. 3. *The Earl of Richmond's case* before recited.   3. That albeit the King by his letters patent of safe conduct do name him duke, yet that appellation maketh him no duke, to sue or to be sued by that name within England : so as the law in these points (apparent in our books) being observed and rightly understood, it appeareth how causeless their fear was that the adjudging of the plaintiff to be no alien should make a confusion of the nobilities of either kingdom.

Now are we in order come to the fourth noun (which is the fourth general part), *alienigena ;* wherein six things did fall into consideration.   1. Who was *alienigena,* an alien born by the laws of England.   2. How many kinds of aliens born there were. 3. What incidents belonged to an alien born.   4. The reason why an alien is not capable of inheritance or freehold within England.   5. Examples, resolutions, or judgments reported in our books in all successions of ages, proving the plaintiff to be no alien.   6. Demonstrative conclusions upon the premises, approving the same.

1. An alien is a subject that is born out of the ligeance of the King, and under the ligeance of another ; and can have no real or personal action for or concerning land : but in every such action the tenant or defendant may plead that he was born in such a country which is not within ligeance of the King ; and demand judgment if he shall be answered.   And this is in effect the description which Littleton himself maketh, lib. 2. cap. 14. Villen. fol. 43. *Alienigena est alienæ gentis seu alienæ ligeantiæ, qui etiam* **[16 b]** *dicitur peregrinus, alienus, exoticus, extraneus, &c.   Extraneus est subditus, qui extra terram, i.e. potestatem Regis natus est.*   And the usual and right pleading of an alien born doth lively and truly describe and express what he is.   And therein two things are to be observed.   1. That the most usual and best pleading in this case, is, both exclusive and inclusive, viz. *extra ligeantiam domini Regis, &c. et infra ligeantiam alterius Regis,* as it appeareth in (a) 9 Ed. 4. 7. b. Book of Entries, fol. 244, &c. which cannot possibly be pleaded in this case, for two causes.   1. For that one King is sovereign of both kingdoms.   2. One ligeance is due by both to one sovereign ; and in case of an alien there must of necessity be several Kings and several ligeances. Secondly, no pleading was ever *extra regnum,* or *extra legem,* which are circumscribed to place, but *extra ligeantiam,* which (as it hath been said) is not local or tied to any place.

It appeareth by Bracton, lib. 3. tract. 2. c. 15. fol. 134. that (b) Canutus the Danish King, having settled himself in this kingdom in peace, kept notwithstanding (for the better continuance thereof) great armies within this realm.   The peers and nobles of England, distasting this government by arms and armies, *odimus accipitrem quia semper vivit in armis,* wisely and politically persuaded the King, that they would provide for the safety of him and his people, and yet his armies, carrying with them many inconveniencies, should be withdrawn : and therefore offered that they would consent to a law, that whosoever should kill an alien, and be apprehended, and could not acquit himself, he should be subject to justice : but if the manslayer fled, and could not be taken, then the town where the man was slain should forfeit sixty-six

_____

Britain ; the right and privilege of sitting in the House of Lords, and the privileges depending thereon, and the right of sitting on the trial of peers, only excepted.

(c) Br. Brief 159.   Fitz. Brief 35.

(d) 11 E. 3.   Fitz. Brief. 473.   *Antea* 15 b.   Moor 803.   9 Co. 117 b.

(a) *Antea* 5 a.

(b) Stanf. Cor. 17. f.

marks unto the King; and if the town were not able to pay it, then the hundred should forfeit and pay the same unto the King's treasure: whereunto the King assented. This law was penned *quicunque occiderit Francigenam, &c.*; not excluding other aliens, but putting *Francigena*, a Frenchman, for example, that others must be like unto him, in owing several ligeance to a several sovereign, that is, to be *extra ligeantiam Regis Angl'*, and *infra ligeantiam alterius Regis*. And it appears before, out of Bracton and Fleta, that both of them use the same example (in describing of an alien) *ad fidem Regis Franciæ*. And it was holden, that except it could be proved that the party slain was an Englishman, that he should be taken for an alien: and this was called Englesherie, *Englesheria*, that is, a proof that the party slain was an Englishman. (Hereupon **[17 a]** Canutus presently withdrew his armies, and within a while after lost his Crown, and the same was restored to his right owner.) The said law of Englesherie continued until 14 Ed. 3. cap. 4. and then the same was by Act of Parliament ousted and abolished. So amongst the laws of William the First, (published by Master Lambert, fol. 125.) *omnis Francigena* (there put for example as before is said, to express what manner of person *alienigena* should be) *qui tempore Edvardi propinqui nostri fuit particeps legum et consuetudinem Anglorum* (that is made denizen) *quod dicunt ad scot et lot persolvat secundum legem Anglorum.*

Every man is either *alienigena*, an alien born, or *subditus*, a subject born. Every alien is either a friend that is in league, &c. or an enemy that is in open war, &c. Every alien enemy is either *pro tempore*, temporary for a time, or *perpetuus*, perpetual, or *specialiter permissus*, permitted especially. Every subject is either *natus*, born, or *datus*, given or made: and of these briefly in their order. An alien friend, as at this time, a German, a Frenchman, a Spaniard, &c. (all the Kings and princes in Christendom being now in league with our sovereign: but a Scot being a subject, cannot be said to be a friend, nor Scotland to be *solum amici*) may by the common law have, acquire, and get within this realm, by gift, trade, or other lawful means, any treasure, or (*a*) goods personal whatsoever, as well as an Englishman, and may maintain any (*b*) action for the same: but (*c*) but lands within this realm, or houses (but for their necessary habitation only) alien friends cannot acquire, or get, nor maintain any action real or personal, for any land or house, unless the house be for their necessary habitation. For if they should be disabled to acquire and maintain these things, it were in effect to deny unto them trade and traffic, which is the life of every island. But if this alien become an enemy, (as all alien friends may) then is he utterly disabled to maintain any action, or get any thing within this realm. And this is to be understood of a temporary alien, that being an enemy may be a friend, or becoming a friend may be an enemy. But a perpetual enemy (though there be no wars by fire and sword between them) cannot maintain any action, or get any thing within this realm. All infidels are in law *perpetui* (*d*) *inimici*, perpetual enemies (for the law presumes not that they will be converted, that being *remota potentia*, a remote possibility) for between them, as with the devils, whose subjects they be, and the Christian, there is perpetual **[17 b]** hostility, and can be no (*a*) enmity; for as the Apostle saith, 2 Cor. 6. 15. *Quæ autem convention Christi ad Belial, aut quæ pars fideli cum infideli*, and the law saith, *Judæo Christianum nullum serviat mancipium, nefas enim est quem Christus redemit blasphemum Christi in servitutis vinculis detinere.* Register 282. *Infideles sunt Christi et Christianorum inimici.* And herewith agreeth the book in 12 H. 8. fol. 4. where it is holden that a Pagan cannot have or maintain any action at all (I).

And upon this ground there is a diversity between a conquest of a kingdom of a

---

(*a*) Co. Lit. 2 b.

(*b*) 1 Bulst. 134. Yel. 198. Owen. 45. Co. Lit. 129. b. 1 And. 25. Moor 431. 1 Keb. 266. Cr. El. 142. 683. Cr. Car. 9. 4 Inst. 152. Dy. 2. pl. 8. O. Benl. 10. B. N. C. 375. Br. Non-ability 62.

(*c*) Poph. 36. Co. Lit. 2 b. Dy. 2. pl. 8. 1 Saund. 5. 1 Bos. & Pull. 163.

(*d*) Wing. Maz. 10. Skin. 166.

(*a*) 4 Inst. 155.

(I) The position in the text seems to have been a common error founded on a groundless opinion of Justice Brooke, *Anon.* 1 Salk. 46, and has long since been exploded, *Omichund* v. *Barker*, 1 Atk. 21. S. C. 1 Wils. 84. S. C. Willes's Rep. 538.

Christian King, and the conquest of a kingdom of an infidel ; for if a King come to a Christian kingdom by conquest, seeing that he hath *vitæ et necis potestatem*, he may at his pleasure alter and change the laws of that kingdom : but until he doth make an alteration of those laws the ancient laws of that kingdom remain (K). But if a Christian King should conquer a kingdom of an infidel, and bring them under his subjection, there *ipso facto* the laws of the infidel are abrogated, for that they be not only against Christianity, but against the law of God and of nature, contained in the decalogue ; and in that case, until certain laws be established amongst them, the King by himself, and such Judges as he shall appoint, shall judge them and their causes according to natural equity, in such sort as Kings in ancient time did with their kingdoms, before any certain municipal laws were given, as before hath been said. But if a King hath a kingdom by title of descent, there seeing by the laws of that kingdom he doth inherit the kingdom, he cannot change those laws of himself, without consent of Parliament. Also if a King hath a Christian kingdom by conquest, as King Henry the Second had Ireland, after King John had given unto them, being under his obedience and subjection, the laws of England for the government of that country, no succeeding King could alter the same without Parliament. And in that case, while the realm of England, and that of Ireland were governed by several laws, any that was born in Ireland was no alien to the realm of England. In which precedent of Ireland three things are to be observed. 1. That then there had been two descents, one from Henry the Second to King Richard the First, and from Richard to King John, before the alteration of the laws. 2. That albeit Ireland was a distinct dominion, yet the title thereof being by conquest, the same by judgment of law might by express words be bound by Act of the Parliament of England. 3. That albeit no **[18 a]** reservation were in King John's charter, yet by judgment of law a writ of error did lie in the King's Bench in England of an erroneous judgment in the King's Bench of Ireland. Furthermore, in the case of a conquest of a Christian kingdom, as well those that served in wars at the conquest as those that remained at home for the safety and peace of their country, and other the King's subjects, as well *antenati* as *postnati*, are capable of lands in the kingdom or country conquered, and may maintain any real action, and have the like privileges and benefits there, as they may have in England.

The third kind of enemy is, *inimicus permissus*, an enemy that cometh into the realm by the King's safe conduct, of which you may read in the Register, fol. 25. Book of Entries, Ejectione Firmæ, 7, 32 H. 6. 23. b. &c. Now what a subject born is, appeareth at large by that which hath been said *de ligeantia :* and so likewise *de*

---

(K) Memorandum 9th of August, 1722, it was said by the Master of the Rolls to have been determined by the Lords of the Privy Council, upon an appeal to the King in Council from the foreign plantations :—

1st. That if there be a new and uninhabited country found out by English subjects, as the law is the birthright of every subject, so wherever they go, they carry their law with them, and therefore such new found country is to be governed by the laws of England, though after such country is inhabited by the English, Acts of Parliament made in England, without naming the foreign plantations, will not bind them ; for which reason it has been determined that the Statute of Frauds and Perjuries, which requires three witnesses, and that these should subscribe in the testator's presence in the case of a devise of a land, does not bind Barbadoes : but that

2ndly. Where the King of England conquers a country, it is a different consideration ; for there the conqueror, by saving the lives of the people conquered, gains a right and property in such people, in consequence of which he may impose upon them what law he pleases : but

3dly. Until such laws given by the conquering prince, the laws and customs of the conquered country shall hold place, unless where there are contrary to our religion, or enact any thing that is *malum in se*, or are silent ; for in all such cases the laws of the conquering country shall prevail. 2 Peere Williams, 75. *et vid. Collett* v. *Lord Keith*, 2 East 260. *Blankard* v. *Galdy*, 4 Mod. 225. S. C. 2 Salk. 411. *Attorney General* v. *Stewart*, 2 Meriv. 159.

*subdito dato*, of a *donaison*: for that is the right name, so called, because his legitimation is given unto him; for if you derive denizen from *deins nee*, one born within the obedience or ligeance of the King, then such a one should be all one with a natural-born subject. And it appeareth before out of the laws of King W. 1. of what antiquity the making of denizens by the King of England hath been.

3. There be regularly (unless it be in special cases) three incidents to a subject born. 1. That the parents be under the actual obedience of the King. 2. That the place of his birth be within the King's dominion. And, 3. The time of his birth is chiefly to be considered; for he cannot be a subject born of one kingdom that was born under the ligeance of a King of another kingdom, albeit afterwards one kingdom descend to the King of the other. For the first, it is termed actual obedience, because, though the King of England hath absolute right to other kingdoms or dominions, as France, Aquitain, Normandy, &c. yet seeing the King is not in actual possession thereof, none born there since the Crown of England was out of actual possession thereof, are subjects to the King of England. 2. The place is observable, but so as many times ligeance or obedience without any place within the King's dominions may make a subject born, but any place within the King's dominions may make a subject born, but any place within the King's dominions without obedience can never produce a natural subject. And therefore if any of the King's ambassadors in foreign nations, have children there of their wives, being English women, by the common laws of England they are natural-born subjects, and yet they are born out of the King's dominions. But if enemies should come into any of the King's dominions, and surprise any castle or fort, and **[18 b]** possess the same by hostility, and have issue there, that issue is no subject to the King, though he be born within his dominions, for that he was not born under the King's ligeance or obedience. But the time of his (a) birth is of the essence of a subject born; for he cannot be a subject to the King of England, unless at the time of his birth he was under the ligeance and obedience of the King. And that is the reason that *antenati* in Scotland (for that at the time of their birth they were under the ligeance and obedience, of another King) are aliens born, in respect of the time of their birth.

4. It followeth next in course to set down the reasons, wherefore an alien born is not capable of inheritance within England, and that he is not for three reasons. 1. The secrets of the realm might thereby be discovered. 2. The revenues of the realm (the sinews of war, and ornament of peace,) should be taken and enjoyed by strangers born. 3. It should tend to the destruction of the realm. Which three reasons do appear in the statute of 2 H. 5. cap. and 4 H. 5. cap. ultimo. But it may be demanded, wherein doth that destruction consist; whereunto it is answered; first, it tends to destruction *tempore belli;* for then strangers might fortify themselves in the heart of the realm, and be ready to set fire on the commonwealth, as was excellently shadowed by the Trojan horse in Virgil's Second Book of his Æneid, where a very few men in the heart of the city did more mischief in a few hours, than ten thousand men without the walls in ten years. Secondly, *tempore pacis,* for so might many aliens born get a great part of the inheritance and freehold of the realm, whereof there should follow a failure of justice (the supporter of the commonwealth) for that aliens born cannot be returned of juries (a) for the trial of issues between the King and the subject, or between subject and subject. And for this purpose, and many other, (see a charter worthy of observation) of King Ed. 3. written to Pope Clement, *datum apud Westm'* 26. *die Sept. ann. regni nostri Franciæ* 4 *regni vero Angliæ* 17.

5. Now are we to come to the examples, resolutions, and judgments of former times; wherein two things are to be observed, first, how many cases in our books do over-rule this case in question for *ubi* (*b*) *eadem ratio ibi idem jus, et de similibus idem est judicium.* 2. That for want of an express text of law *in terminis terminantibus* and of examples and precedents in like cases (as was objected by some) we are driven to determine the question by natural reason: for it was said, *si cesset lex scripta id custodiri* **[19 a]** *oportet quod moribus et consuetudine inductum est, et si qua in re hoc defecerit, recur-*

---

(a) 2 Vent. 6.  Vaugh. 286.
(a) 10 Co. 104 a.  Co. Lit. 156 a.  Poph. 36.
(b) Co. Lit. 10 a. 191 a. 232 a.

*rendum est ad rationem.* But that receiveth a threefold answer :—First, That there is no such rule in the common or civil law : but the true rule of the civil law is, *lex scripta si cesset, id custodiri oportet quod moribus et consuetudine inductum est, et si qua in re hoc defecerit, tunc id quod proximum et consequens ei est, et si id non appareat, tunc jus quo urbs Romana utitur, servari oportet.* Secondly, If the said imaginative rule be rightly and legally understood, it may stand for truth : for if you intend *ratio* for the legal and profound reason of such as by diligent study and long experience and observation are so learned in the laws of this realm, as out of the reason of the same they can rule the case in question, in that sense the said rule is true : but if it be intended of the reason of the wisest man that professeth not the laws of England, then (I say) the rule is absurd and dangerous ; for *(a) cuilibet in suâ arte perito est credendum et quod quisque (b) norit in hoc se exerceat. Et omnes prudentes illa admittere solent quæ probantur iis qui in suâ arte bene versati sunt,* Arist. 1. Topicorum cap. 6. Thirdly, There be multitudes of examples, precedents, judgments, and resolutions in the laws of England, the true and unstrained reason whereof doth decide this question ; for example the dukedom of Acquitain, whereof Gascoign was parcel, and the earldom of Poitiers, came to King Henry the Second by the marriage of Eleanor, daughter and heir of William Duke of Acquitain, and Earl of Poitiers, which descended to Rich. 1., Hen. 3., Ed. 1., Ed. 2., Ed. 3., &c. In 27 lib. *(c)* Ass. pl. 48. in one case there appear two judgments and one resolution to be given by the Judges of both Benches in this case following. The possessions of the Prior of Chelsey in the time of war were seised into the King's hands, for that the prior was an alien born : the prior by petition of right sued to the King, and the effect of his petition was, that before he came Prior of Chelsey, he was Prior of Andover, and whilst he was prior there, his possessions of that priory were likewise seised for the same cause supposing that he was an alien born ; whereupon he sued a former petition, and alleged that he was born in Gascoin within the ligeance of the King : which point being put in issue and found by jury to be true, it was adjudged that he should have restitution of his possessions generally without mentioning of advowsons. After which restitution, one of the **[19 b]** said advowsons became void, the prior presented, against whom the King brought a *quare impedit,* wherein the King was barred ; and all this was contained in the latter petition. And the book saith, that the Earl of Arundel, and Sir Guy of B. came into the Court of Common Pleas, and demanded the opinion of the Judges of that Court concerning the said case, who resolved, that upon the matter aforesaid the King had no right to seize. In which case, amongst many notable points, this one appeareth to be adjudged and resolved, that a man born in Gascoin under the King's ligeance, was no alien born, as to lands and possessions within the realm of England, and yet England and Gascoin were several and distinct countries. 2. Inherited by several and distinct titles. 3. Governed by several and distinct municipal laws, as it appeareth amongst the records in the Tower, Rot. Vasc. 10. Ed. 1. Num. 7. 4. Out of the extent of the Great Seal of England, and the jurisdiction of the Chancery of England. 5. The like objection might be made for default of trial, as hath been made against the plaintiff. And where it was said that Gascoin was no kingdom, and therefore it was not to be matched to the case in hand, it was answered, that this difference was without a diversity as to the case in question ; for if the plea in the case at the Bar be good, then without question the prior had been an alien ; for it might have been said, (as it is in the case at the Bar) that he was born *extra ligeantiam Regis regni sui Angliæ, et infra ligeantiam dominii sui Vasconiæ,* and that they were several dominions, and governed by several laws : but then such a conceit was not hatched, that a King having several dominions should have several ligeances of his subjects. Secondly, it was answered, that Gascoin was sometime a kingdom, and likewise Millan, Burgundy, Bavaria, Bretagne, and others were, and now are become, dukedoms. Castile, Arragon, Portugal, Barcelona, &c. were sometime earldoms, afterwards dukedoms, and now kingdoms. Bohemia and Poland were

---

*(a)* 4 Co. 29 a.   5 Co. 7 a.   *Cawdry's case.*   Cawly 31.   Co. Lit. 125 a.

*(b)* 11 Co. 10 b.   12 Co. 66.   13 Co. 12.   Co. Lit. 125 a.   8 Co. 130 a.   Gascoin, Vasconia, Gasconia.

*(c)* Moor 796. 801.   *Post* 20 b.

sometime dukedoms, and now kingdoms; and (omitting many other, and coming nearer home,) Ireland was before 32 H. 8. a lordship; and now is a kingdom, and yet the King of England was as absolute a prince and sovereign when he was Lord of Ireland, as now when he is styled King of the same. 10 Ed. 3. 41. an exchange was made between an Englishman and a Gascoin, of lands in England and in Gascoin; *ergo*, the Gascoin was no alien, for then had he not been capable of lands in England, 1 H. 4. 1. the King brought a writ of right of ward against one Sybil, whose husband was exiled into Gascoin; **[20 a]** *ergo* Gascoin is no parcel or member of England, for *exilium est patriæ privatio, natalis soli, mutatio, legum nativarum amissio;* 4 E. 3. 10 b. the King directed his writ out of Chancery under the Great Seal of England, to the Mayor of (*a*) Burdeaux, (a city in Gascoin) then being under the King's obedience, to certify, whether one that was outlawed here in England, was at that time in the King's service under him *in obsequio Regis:* whereby it appeareth that the King's writ did run into Gascoin, for it is the trial that the common law hath appointed in that case. But as to other cases, it is to be understood, that there be two kinds of writs *brevia mandatoria et remedialia, et brevia mandatoria et non remedialia: brevia mandatoria et remedialia,* as writs of right, of *formedon, &c.* of debt, trespass, &c. and shortly all writs real and personal, whereby the party wronged is to recover somewhat, and to be remedied for that wrong was offered unto him, are returnable or determinable in some Court of Justice within England, and to be served and executed by the sheriffs, or other ministers of justice within England, and these cannot by any means extend into any other kingdom, country, or nation, though that it be under the King's actual ligeance and obedience. But the other kind of writs that are mandatory, and not remedial, are not tied to any place, but do follow subjection and ligeance, in what country or nation soever the subject is, as the King's writ to command any of his subjects residing in any foreign country to return into any of the King's own dominions, *sub fide et ligeantia quibus nobis tenemini.* And so are the aforesaid mandatory writs cited out of the Register of protection for safety of body and goods, and requiring that if any injury be offered, that the same be redressed according to the laws and customs of that place. *Vide* le Reg. fol. 26. Stamford Prærog. cap. 12. fol. 39. saith, that men born in Gascoin are inheritable to lands in England. This doth also appear by divers Acts of Parliament: for by the whole Parliament, 39 E. 3. cap. 16. it is agreed, that the Gascoins are of the ligeance and subjection of the King. *Vide* 42 Ed. 3. cap. 2. and 28 H. 6. cap. 5. &c.

Guienne was another part of Aquitain, and came by the same title; and those of Guienne were by Act of Parliament in 13 H. 4. not imprinted, *ex Rot. Parliament. eodem anno,* adjudged and declared to be no aliens, but able to possess and purchase, &c. lands within this realm. And so doth Stamford take the law. Prærog. c. 12. f. 39. **[20 b]** And thus much of the dukedom of Aquitain, which (together with the earldom of Poitiers) came to King Henry the Second (as hath been said) by marriage, and continued in the actual possession of the Kings of England by ten descents, viz. from the first year] of King Henry the Second, unto the two and thirtieth year of King Henry the Sixth, which was upon the very point of three hundred years, within which duchy there were (as some write) four archbishoprics, 24 bishoprics, 15 earldoms, 202 baronies, and above a thousand captainships and bailiwicks; and in all this long time neither book case nor record can be found wherein any plea was offered to disable any of them that were born there, by foreign birth, but the contrary hereof directly appeareth by the said book case of (*a*) 27 lib. Ass. 48.

The Kings of England had sometimes Normandy under actual ligeance and obedience. The question is then, whether men born in Normandy, after one King had them both, were inheritable to lands in England; and it is evident by our books that they were: for so it appeareth by the declaratory Act of 17 Ed. 2. de Prærog. Reg. c. 12. that they were inheritable to, and capable of lands in England; for the purview of that statute is *quod Rex habebit escaetas de terris Normannorum, &c. Ergo* Normans might have lands in England, *et hoc similiter intelligendum est, si aliqua hæreditas descendat alicui nato in partibus transmarinis, &c.* Whereby it appeareth,

(*a*) Vaugh. 290.   9 Co. 31 b.   2 Roll. 583.   Co. Lit. 74 a.   Br. Trial 126.
(*a*) Dav. 19 a.   Moor 796. 801.   Normandy.   Normannia.   Normandia.

　　　　　　　CALVIN'S CASE　　　　　　

that they were capable of lands within England by descent. And that this Act of 17 E. 2. was but a declaration of the common law, it appeareth both by Bracton who (as it hath been said) wrote in the reign of Henry the Third, lib. 3. tract. 2. c. 1. f. 116. and by Britton who wrote in 5 E. 1. c. 18. that all such lands as any Norman had either by descent or purchase, escheated to the King for their treason, in revolting from their natural liege lord and sovereign. And therefore Stamford Prærog. cap. 12. fol. 39. expounding the said statute of 17 E. 2. cap. 12. concludeth, that by that chapter it should appear (as if he had said, it is apparent without question) that all men born in Normandy, Gascoin, Guienne, Anjou, and Britain, (whilst they were under actual disobedience) were inheritable within this realm as well as Englishmen. And the reason thereof was, for that they were one ligeance due to one sovereign *. And so much (omitting many other authorities) for Normandy : saving I cannot let pass the isles of Guernsey and Jersey, parts and parcels of the dukedom of Normandy, yet remaining under the actual ligeance and obedience of the King, I think no man will doubt, but those that are **[21 a]** born in Guernsey and Jersey (though those isles are no parcel of the realm of England, but several dominions enjoyed by several titles, governed by several laws) are inheritable, and capable of any lands within the realm of England, 1 E. 3. fol. 7. Commission to determine the title of lands within the said isles, according to the laws of the isles ; and Mich. 41 E. 3. in the Treasury, *Quia negotium præd' nec aliqua alia negotia de insulâ præd' emergentia non debent terminari nisi secundum legem insulæ præd', &c.* And the Register fol. 22. *Rex fidelibus suis de Jernsey et Gersey.* King William the First brought this dukedom of Normandy with him, which by five descents continued under the actual obedience of the Kings of England ; and in or about the 6th year of King John, the Crown of England lost the actual possession thereof, until King Henry the Fifth recovered it again, and left it to King Henry the Sixth, who lost it in the 28th of his reign ; wherein were (as some write) one archbishopric and six bishoprics, and an hundred strong towns and fortresses, besides those that were wasted in war. Maud the Empress, the only daughter and heir of Henry the First, took to her second husband Jeffrey Plantagenet, Earl of Anjou, Tourain, and Mayne, who had issue King H. 2. to whom the said earldom by just title descended, who, and the Kings that succeeded him, stiled themselves by the name of *comes Andegav', &c.* until King E. 3. became King of all France ; and such as were born within that earldom, so long as it was under the actual obedience of the King of England, were no aliens, but natural-born subjects ; and never any offer made, that we can find, to disable them for foreign birth.· But leave we Normandy and Anjou, and speak we of the little, but yet ancient and absolute kingdom of the Isle of Man *, as it appeareth by diverse ancient and authentic records ; as taking one for many. Artold King of Man sued to King H. 3. to come into England to confer with him, and to perform certain things which were due to King H. 3. Thereupon King H. 3. 21 *Decemb. ann. regn. sui* 34, at Winchester, by his letters patent gave licence to Artold King of Man, as followeth : *Rex omnibus salutem. Sciatis, quod licentiam dedimus, &c. Artoldo Regi de Man veniendo ad nos in Angl', ad loquend' nobisc' et ad faciend' nobis quo l facere debet ; et ideo vobis mandamus quod ei Regi in veniendo ad nos in Angl', vel ibi morando, vel inde redeundo nullum faciat' aut fieri permittatis damnum, injur', molestiam, aut gravamen, vel etiam hominib' suis quos secum ducet et si aliquid eis forisfact' fuerit, id eis sine dilat' faciat' emendari. In cujus, &c. duratur' usque ad fest' S. Mich.* Wherein **[21 b]** two things are to be observed ; 1. That seeing that Artold King of Man sued for a licence in this case to the King, it proveth him an absolute King ; for that a monarch or an absolute prince cannot come into England without licence of the King, but any subject being in league, may come into this realm without licence. 2. That the King in his licence doth style him by the name of a king. It was resolved in 11 H. 8. that where an office was found after the decease of Thomas Earl of Derby, and that he died seised,

---

* Kel. 202. pl. 19.　4 Inst. 286.　Co. Lit. 11 b.　Seld. Mare Clau. lib. 2. cap. 19. Guernsey and Jersey.

* Man, Mannia.　4 Inst. 283, 284.　Co. Lit. 11 b.　Kelw. 202. pl. 19.　2 And. 155, 156.

&c. of the Isle of Man, that the said office was utterly void †, for that the Isle of Man, Normandy, Gascoign, &c. were out of the power of the Chancery, and governed by several laws; and yet none will doubt, but those that are born within that isle are capable and inheritable of lands within the realm of England. Wales * was some time a kingdom, as it appeareth by 19 H. 6. fol. 6. and by the Act of Parliament of 2 H. 5. c. 6. but whilst it was a kingdom, the same was holden, and within the fee, of the King of England; and this appeareth by our books, Fleta, lib. 1. cap. 16. 1 E. 3. 14. 8 E. 3. 59. 13 E. 3. tit. Jurisdict'. 10 H. 4. 6. Plow. Com. 368. And in this respect in divers ancient charters, Kings of old time styled themselves in several manners, as King Edgar, *Britanniæ Βασιλευς; Etheldredus, totius Albion' Dei providentiâ Imperator; Edredus Magn' Britann' Monarcha*, which among many other of like nature I have seen. But by the statute of 12 E. 1. Wales was united and incorporated into England, and parcel of England in possession; and therefore it is ruled in 7 H. 4. f. 13. a. that no protection doth lie *quia moratur in Wallia*, because Wales is within the realm of England †. And where it is recited in the Act of 27 H. 8. that Wales was ever parcel of the realm of England, it is true in this sense, viz. that before 12 E. 1. it was parcel in tenure, and since it is parcel of the body of the realm. And whosoever is born within the fee of the King of England, though it be in another kingdom, is a natural-born subject, and capable and inheritable of lands in England, as it appeareth in Plow. Com. 126. And therefore those that were born in Wales before 12 E. 1. whilst it was only holden of England, were capable and inheritable of lands in England.

Now come we to France and the members thereof, as Callice, Guynes, Tournay, &c. which descended to King Edward the Third, as son and heir to Isabel, daughter and heir to Philip le Beau, King of France. Certain it is, whilst **[22 a]** King Henry the Sixth had both England and the heart and greatest part of France under his actual ligeance and obedience (for he was crowned King of France in Paris), that they that were then born in those parts of France, that were under actual ligeance and obedience, were no aliens, but capable of and inheritable to lands in England. And that is proved by the writs in the register, fol. 26. cited before. But in the inrolment of letters patent of denization in the Exchequer, *int' originalia*, ann. 11 H. 6. with the Lord Treasurer's remembrancer was strongly urged and objected; for (it was said) thereby it appeareth, that King H. 6. in anno 11 of his reign, did make denizen one Reynel born in France; whereunto it was answered, that it is proved by the said letters patent, that he was born in France before King Henry the Sixth had the actual possession of the Crown of France, so as he was *antenatus;* and this appeareth by the said letters patent whereby the King granteth, that *Magister Johannes Reynel serviens noster, &c. infra regnum nostrum Franc' oriundus pro termino vitæ suæ sit ligeus noster, et eodem modo teneatur sicut verus et fidelis noster infra regnum Angl' oriundus, ac quod ipse terras infra regnum nostrum Angl' seu alia dominia nostra perquirere possit et valeat.* Now if that Reynel had been born since Henry the Sixth had the quiet possession of France (the King being crowned King of France about one year before), of necessity he must be an infant of very tender age, and then the King would never have called him his servant, nor made the patent (as thereby may be collected) for his service, nor have called him by the name of *Magister Johannes Reynel:* but without question he was *antenatus,* born before the King had the actual and real possession of that Crown.

Calais is a part of the kingdom of France, and never was parcel of the kingdom of England, and the Kings of England enjoyed Calais * in and from the reign of King Edward the Third, until the loss thereof in Queen Mary's time, by the same title that they had to France. And it is evident by our books, that those that were born in Calais were capable and inheritable to lands in England, 42 E. 3. c. 10. *Vide* 21 H. 7.

---

† Acc. Keilw. 202.

* Wales, Cambria, Wallia. 3 Keb. 402. 4 Inst. 239, 240, &c. Plow. 126 b. 129. Vaugh. 281.

† Co. Lit. 130 b. Fitz. Protect. 23. Br. Protect. 33. 3 Keb. 405. Vaugh. 414.

* Kelw. 202. pl. 19. 2 And. 116. Br. Trial 58, 133. Br. Error 101. Br. Cinque Ports 10. Vaugh. 401. 4 Inst. 282.

33. b.   19 H. 6.   2 E. 4. l. a. b.   39 H. 6. 39 a.   21 E. 4. 18 a.   28 H. 6. 3 b. By all which it is manifest, that Calais being parcel of France was under the actual obedience and commandment of the King, and by consequent those that were born there were natural-born subjects, and no aliens. Calais from the reign of King Edward 3. until the fifth year of Queen Mary, remained under the actual obedience of the King of England.   [22 b] Guines also, another part of France, was under the like obedience to King Henry the Sixth, as appeareth by 31 H. 6. fol. 4.   And Tournay was under the obedience of Henry the Eighth, as it appeareth by 5 El. Dyer, fol. 224 ; for there it is resolved, that a bastard born at Tournay, whilst it was under the obedience of Henry the Eighth, was a natural subject, as an issue born within this realm by aliens.   If then those that were born at Tournay, Calais, &c. whilst they were under the obedience of the King, were natural subjects, and no aliens, it followeth, that when the Kingdom of France (whereof those were parcels) was under the King's obedience, that those that were then born there were natural subjects and no aliens.

Next followeth Ireland *, which originally came to the Kings of England by conquest : but who was the first conqueror thereof, hath been a question.   I have seen a charter made by King Edgar in these words: *Ego Edgarus Anglorum Βασιλευς, omniumque insularum oceani, quæ Britanniam circumjacent, Imperator et Dominus, gratias ago ipsi Deo omnipotenti Regi meo, qui meum imperium ampliavit et exaltavit super regnum patrum meorum, &c. mihi concessit propitia divinitas, cum Anglorum imperio omnia regna insularum oceani, et cum suis ferocissimis Regibus usque Norvegiam, maximamque partem Hibern', cum suâ nobilissimâ civitate de Dublina, Anglorum regno subjugare, quapropter et ego Christi gloriam et laudem in regno meo exaltare, et ejus servitium amplificare devotus disposui, &c.*   Yet for that it was wholly conquered in the reign of Henry the Second the honour of the conquest of Ireland is attributed to him, and his style was, *Rex Angl' Dominus Hibern' Dux Normann' Dux Acquittan' et Comes Andegav'*, King of England, Lord of Ireland, Duke of Normandy, Duke of Aquitain, and Earl of Anjou*.   That Ireland is a dominion separate and divided from England, it is evident from our books, 20 H. 6. 8.   *Sir John Pilkington's case.* 32 H. 6. 25.   20 Eliz. Dyer 360.   Plow. Com. 360.   And 2 R. 3. 12 a. *Hibernia habet Parliamentum, et faciunt leges, et nostra statuta non ligant eos, quia non mittunt milites ad Parliamentum* (which is to be understood, unless they be especially named) *sed personæ eorum sunt subjecti Regis, sicut inhabitantes in Calesiâ, Gasconiâ, et Guyan.*   Wherein it is to be observed, that the Irishman (as to subjection) is compared to men born in Calais, Gascoin, and Guienne.   Concerning their laws, *ex rotulis potentium de anno* 11 *Regis H.* 3. there is a charter which that King made, beginning in these words, *Rex, &c., Baronibus, militibus, et omnibus libere tenentibus L. salutem, satis ut credimus* [23 a] *vestra audivit discretio, quod quando bonæ memoriæ* (a) *Johannes quondam Rex Angl' pater noster venit in Hiberniam ipse duxit secum viros discretos et legis peritos, quorum communi consilio et ad instantiam Hibernensium statuit et precepit leges Anglicanas in Hibern' ita quod leges easdem in scripturas redactas reliquit sub sigillo suo ad Scaccarium Dublin'.*   So as now the laws of England became the proper laws of Ireland ; and therefore, because they have Parliaments holden there whereat they have made divers particular laws concerning that dominion, as it appeareth in 20 H. 6. 8. & 20 El. (b) Dyer 360. and for that they retain unto this day divers of their ancient customs, the book in 20 H. 6. 8. holdeth, that Ireland is governed by laws and customs, separate and diverse from the laws of England.   A voyage royal may be made into Ireland.   *Vide* (c) 11 H. 4. 7. a. & 7 (d) E. 4. 27. a. which proveth it a distinct dominion.   And in anno 33 Reg. El. it was resolved by all the Judges of England in the case of (e) *O'Rurke* an Irishman, who

----

* 12 Co. 108, 109. &c.   4 Inst. 349, 350, &c.   Dav. 60.   Præf. 4.   Rep. 32, 33. 2 Ventr. 4.

* 12 Co. 111.   4 Inst. 351.   1 And. 263.   2 And. 116.   Dav. 37 a.   Jenk. Cent. 164.   Br. Parliam. 98.   Vin. Ab. Ireland (A).   Co. Litt. 141 a.

(a) Co. Litt. 141. b. 2 Vent. 4.

(b) 9 Co. 117 b.   Cart. 186.

(c) Fitz. Protect. 24.   Br. Protect. 34.

(d) Fitz. Protect. 16.   Br. Protect. 72.

(e) 3 Inst. 11, 18, 24.   Co. Litt. 261. b.   1 And. 262, 263.   2 Vent. 4.   Cart. 190. Cawly 93.

had committed high treason in Ireland, that he, by the statute of 23 H. 8. c. 33. might be indicted, arraigned, and tried for the same in England, according to the purview of that statute: the words of which statute be, "That all treasons, &c. committed by any (*f*) person out of the realm of England shall be from henceforth enquired of, &c." and they all resolved (as afterwards they did also in *Sir John Perrot's case*) that Ireland was out of the realm of England, and that treasons committed there were to be tried within England by that statute. In the statute of 4 Hen. 7. cap. 24. of (*g*) Fines, provision is made for them that be out of this land; and it is holden in Plow. Com. in *Stowel's case* 375, that he that is in Ireland is out of this land, and consequently within that proviso. Might not then the like plea be devised as well against any person born in Ireland, as (this is against Calvin that is a *postnatus*) in Scotland? For the Irishman is born *extra ligeantiam Regis regni sui Angl'*, &c. which be *verba operativa* in the plea: but all men know that they are natural-born subjects, and capable of and inheritable to lands in England. Lastly, to conclude this part with (*h*) Scotland itself: in ancient time part of (*i*) Scotland (besides Berwick) was within the power and ligeance of the King of England, as appeareth by our books (*k*) 42 E. 3. 2. b. *The Lord Beaumont's case*, 11 E. 3. c. 2, &c. and by precedents hereafter mentioned; and that part (though it were under the King of England's ligeance and obedience) yet was it governed by the laws of Scotland. [23 b] *Ex rotulis Scotiæ*, anno 11 Ed. 3. amongst the records in the Tower of London. *Rex, &c. Constituimus Rich. Talebot Justiciarium nostrum villæ Berwici super Twedam, ac omnium aliarum terrarum nostrarum in partibus Scot', ad faciend' omnia et singula quæ ad officium justiciarii pertinent, secundum legem et consuetudinem regni Scot'*. And after anno 26 E. 3. *ex eodem rot. Rex Henrico de Percey, Ricarda de Nevil, &c. Volumus et vobis et alteri vestrum tenore præsentium committimus et mandamus, quod homines nostri de Scot' ad pacem et obedientiam nostram existentes, legibus, libertatibus, et liberis consuetudinibus, quibus ipsi et antecessores sui tempore celebris memoriæ Alexandri quondam Regis Scot' rationabiliter usi fuerunt, uti ut gaudere deberent, prout in quibusdam indenturis, &c. plenius dicitur contineri*. And there is a writ in the Register 295 a. *Dedimus potestatem recipendi ad fidem et pacem nostram homines de Galloway*. Now the case in (*a*) 42 Ed. 3. 2. b. (which was within sixteen years of the said grant, concerning the laws in 26 E. 3.) ruleth it, that so many as were born in that part of Scotland that was under the ligeance of the King were no aliens, but inheritable to lands in England; yet was that part of Scotland in another kingdom, governed by several laws, &c. And if they were natural subjects in that case, when the King of England had but part of Scotland, what reason should there be why those that are born there, when the King hath all Scotland, should not be natural subjects, and no aliens? So, likewise, (*b*) Berwick is no part of England, nor governed by the laws of England; and yet they that have been born there, since they were under the obedience of one King, are natural-born subjects, and no aliens, as it appeareth in 15 R. 2. cap. 7, &c. *Vide* (*c*) 19 H. 6. 35. b. & 39 H. 6. 39. a. And yet in all these cases and examples, if this new devised plea had been sufficient, they should have been all aliens, against so many judgments, resolutions, authorities, and judicial precedents in all successions of ages. There were sometimes in England, whilst the heptarchy lasted, seven several crowned Kings of seven several and distinct kingdoms; but in the end the West Saxons got the monarchy, and all the other Kings melted (as it were) the crowns to make one imperial diadem for the King of the West Saxons over all. Now when the whole was under the actual and real ligeance and obedience of one King, were any that were born in any of those several and distinct kingdoms aliens one to another? Certainly they being born under the obedience of one King

---

(*f*) 35 H. 8. c. 2.
(*g*) Cawly 93.   Co. Litt. 261 b.   3 Inst. 11.
(*h*) 3 Inst. 18.   Plowd. 368. b. Scotland, Scotia.
(*i*) Heylin's Cosmog. lib. 4. p. 305, 306.
(*k*) Fitz. Brief. 551.
(*a*) Fitz. Brief. 551.   *Ant.* 23. a.
(*b*) 1 Sid. 381, 382.   2 Burro. 858.
(*c*) Fitz. Protect. 8.   Br. Protect. 49.

and sovereign were all natural-born subjects, and capable of and inheritable unto any lands in any of the said kingdoms.

[24 a] In the holy history reported by St. Luke, *ex dictamine Spiritus Sancti, cap.* 21 *et* 22 *Act. Apostolorum*, it is certain that St. Paul was a Jew, born in Tarsus, a famous city of Cilicia; for it appeareth in the said 21st chapter, ver. 39. by his own words, *Ego homo sum quidem Judæus a Tarso Ciliciæ, non ignotæ civitatis municeps.* And in the 22d chapter, ver. 3. *Ego sum vir Judæus natus Tarso Ciliciæ, &c.;* and then made that excellent sermon there recorded, which, when the Jews heard, the text saith, ver. 22. *Levaverunt vocem suam dicentes, Tolle de terra hujusmodi, non enim fas est eum vivere; vociferantibus autem eis et projicientibus vestimenta sua, et pulverem jactantibus in aerem,* Claudius Lysias, the popular Tribune, to please this turbulent and profane multitude (though it were utterly against justice and common reason) the text saith *Jussit Tribunus induci eum in castra; 2. flagellis cædi,* and 3. *torqueri eum (quid ita?) ut sciret propter quam causam sic acclamarent;* and when they had bound Paul with cords, ready to execute the Tribune's unjust commandment, the blessed Apostle (to avoid unlawful and sharp punishment) took hold of the law of a heathen emperor, and said to the Centurion standing by him, *Si hominem Romanum et indemnatum licet vobis flagellare?*) Which when the Centurion heard, he went to the Tribune and said, *Quid acturus es? Hic enim homo cives Romanus est.* Then came the Tribune to Paul, and said unto him, *Dic mihi si tu Romanus es? At ille dixit, etiam.* And the Tribune answered, *Ego multa summa civitatem hanc consequutus sum.* But Paul, not meaning to conceal the dignity of his birth-right, said, *Ego autem et natus sum:* as if he should have said to the Tribune, you have your freedom by purchase of money, and I (by a more noble means) by birth-right and inheritance. *Protinus ergo* (saith the text) *decesserunt ab illo qui illum torturi erant, Tribunus quoque timuit postquam rescivit, quia civis Romanus esset, et quia alligasset eum.* So as hereby it is manifest that Paul was a Jew, born at Tarsus in Cilicia, in Asia Minor; and yet being born under the obedience of the Roman Emperor, he was by birth a citizen of Rome in Italy in Europe, that is, capable of and inheritable to all privileges and immunities of that city. But such a plea as is now imagined against Calvin might have made St. Paul an alien to Rome. For if the Emperor of Rome had several ligeances for every several kingdom and country under his obedience, then might it have been said against St. Paul, that he was *extra* [24 b] *ligeantiam Imperatoris regni sui Italiæ, et infra ligeantiam Imperatoris regni sui Ciliciæ, &c.* But as St. Paul was *Judæus patriâ et Romanus privilegio, Judæus natione et Romanus jure nationum;* so may Calvin say, that he is *Scotus patriæ, et Anglus privilegio; Scotus natione, et Anglus jure nationum.*

Samaria in Syria was the chief city of the ten tribes: but it being usurped by the King of Syria, and the Jews taken prisoners, and carried away in captivity, was after inhabited by the Panyms. Now albeit Samaria of right belonged to Jewry, yet because the people of Samaria were not under actual obedience, by the judgment of the Chief Justice of the whole world they were adjudged *alienigenæ,* aliens: for in the Evangelist St. Luke, c. 17. when Christ had cleansed the ten lepers, *unus autem ex illis* (saith the text) *ut vidit quia mundatus esset, regressus est cum magnâ voce magnificans Deum, et cecidit in faciem ante pedes ejus gratias agens, et hic erat Samaritanus. Et Jesus respondens dixit, Nonne decem mundati sunt, et novem ubi sunt? Non est inventus qui rediret et daret gloriam Deo nisi hic alienigena.* So as, by his judgment, this Samaritan was *alienigena,* a stranger born; because he had the place, but wanted obedience. *Et si desit obedientia non adjuvet locus.* And this agreeth with the divine, who saith, *Si locus salvare potuisset, Satan de cælo pro sua inobedientia non cecidisset. Adam in paradiso non cecidisset, Lot in monte non cecidisset, sed potius in Sodom.*

6. Now resteth the sixth part of this division, that is to say, six demonstrative illations or conclusions, drawn plainly and expressly from the premises.

1. Every one that is an alien by birth, may be, or might have been, an enemy by accident: but Calvin could never at any time be an enemy by any accident; *Ergo,* he cannot be an alien by birth. *Vide* 33 H. 6. f. 1. a. b. the difference between an alien enemy, and a subject traitor. *Hostes sunt qui nobis, vel quibus nos bellum decernimus, cæteri proditores, prædones, &c.* The *major* is apparent, and is proved by that which hath been said. *Et vide* Magna Charta, cap. 30. 19 E. 4. 6. 9 E. 3. c. 1. 27 E. 3. c. 2. 4 H. 5. c. 7. 14 E. 3. stat. 2. c. 2. &c.

2. Whosoever are born under one natural ligeance and obedience due by the law of nature to one sovereign are natural-born subjects: but Calvin was born under one natural ligeance and obedience, due by the law of nature to one sovereign; *ergo*, he is a natural-born subject.

[25 a] 3. Whosoever is born within the King's power or protection, is no alien: but Calvin was born under the King's power and protection; *ergo* he is no alien.

4. Every stranger born must at his birth be either *amicus* or *inimicus*: but Calvin at his birth could neither be *amicus* nor *inimicus*; *ergo* he is no stranger born. *Inimicus* he cannot be, because he is *subditus*: for that cause also then he cannot be *amicus*; neither now can *Scotia* be said to be *solum amici*, as hath been said.

5. Whatsoever is due by the law or constitution of man, may be altered: but natural ligeance or obedience of the subject to the sovereign cannot be altered; *ergo* natural ligeance or obedience to the sovereign is not due by the law or constitution of man. Again, whatsoever is due by the law of nature, cannot be altered: but ligeance and obedience of the subject to the sovereign is due by the law of nature; *ergo* it cannot be altered. It hath been proved before, that ligeance or obedience of the inferior to the superior, of the subject to the sovereign, was due by the law of nature many thousand years before any law of man was made; which ligeance or obedience (being the only mark to distinguish a subject from an alien) could not be altered; therefore it remaineth still due by the law of nature. For *leges naturæ perfectissimæ sunt et immutabiles, humani vero juris conditio semper in infinitum decurrit, et nihil est in eo quod perpetuo stare possit. Leges humanæ nascuntur, vivunt, moriuntur.*

Lastly, whosoever at his birth cannot be an alien to the King of England, cannot be an alien to any of his subjects of England: but the plaintiff at his birth could be no alien to the King of England; *ergo* the plaintiff cannot be an alien to any of the subjects of England. The *major* and *minor* both be *propositiones perspicue veræ*. For as to the *major* it is to be observed, that whosoever is an alien born, is so accounted in law, in respect of the King: and that appeareth first, by the pleading so often before remembered, that he must be *extra ligeantiam Regis*, without any mention making of the subject. 2. When an alien born purchaseth any lands, the King only shall have them, though they be holden of a subject, in which case the subject loseth his seigniory. And as it is said in our books an alien may purchase *ad proficuum Regis*; but the act of law giveth the alien nothing: and therefore if a woman alien marrieth a subject, she shall not be endowed (L), neither shall an alien be tenant by the curtesy. *Vide* 3 H. 6. 55 a. 4 H. 3. 179. 3. The subject shall plead that the defendant is an [25 b] alien born, for the benefit of the King, that he upon office found may seize; and 2. that the tenant may yield to the King the land, and not to the alien, because the King hath best right thereunto. 4. Leagues between our sovereign and others are the only means to make aliens friends, *et fœdera percutere*, to make leagues, only and wholly pertaineth to the King. 5. Wars do make aliens enemies, and *bellum indicere* belongeth only and wholly to the King, and not to the subject, as appeareth in 19 Ed. 4. 4. fol. 6 b 6. The King only without the subject may make not only letters of safe conduct, but letters patent of denization, to whom, and how many he will, and enable them at his pleasure to sue any of his subjects in any action whatsoever real or personal, which the King could not do without the subject, if the subject had any interest given unto him by the law in any thing concerning an alien born. Nay, the law is more precise herein than in a number of other cases to of higher nature: for the King cannot grant to any other to make of strangers born, denizens; it is by the law itself so inseparably and individually annexed to his Royal person (as the book is in 20 H. 7. fol. 8). For the law esteemeth it a point of high prerogative, *jus majestatis, et inter insignia summæ potestatis* to make aliens born subjects of the realm, and capable of the lands and inheritances of England in such sort as any natural born subject is. And therefore by the statute of 27 H. 8. c. 24. many of the most ancient prerogatives and Royal flowers of the Crown, as authority to pardon treason, murther, manslaughter, and felony, power to make justices in eyre, Justices of Assise, justices of peace, and gaol delivery, and such like, having been severed and divided

---

(L) But if a woman alien marries by the licence of the King, she shall be endowed. *Vid.* Hargrave's note (9). Co. Litt. 39 b.

CALVIN'S CASE

from the Crown, were again re-united to the same : but authority to make letters of denization was never mentioned therein to be resumed, for that never any claimed the same by any pretext whatsoever, being a matter of so high a point of prerogative. So as the pleading against an alien, the purchase by any alien, leagues and wars between aliens, denizations, and safe conducts of aliens, have aspect only and wholly unto the King. It followeth therefore, that no man can be alien to the subject that is not alien to the King. *Non potest esse alienigena corpori, qui non est capiti, non gregi qui non est Regi.*

The authorities of law cited in this case for maintenance of the judgment, 4 H. 3. tit. Dower. Bracton, lib. 5. fol. 427. Fleta, lib. 6. cap. 47. *In temp.* E. 1. Hingham's Report. 17 Ed. 2. cap. 12. 11 Ed. 3. **[26 a]** cap. 2. 14 Ed. 3 Statut de Franciâ. 42 Ed. 3. fol. 2. 42 Ed. 3. cap. 10. 22 Lib. Ass. 25. 13 Rich. 2. cap. 2. 15 Rich. 2. cap. 7. 11 Hen. 4. fol. 26. 14 Hen. 4. fol. 19. 13 H. 4. Statutum de Guyan. 29 Hen. 6. tit. Estoppel 48. 28 H. 6. cap. 5. 32 Hen. 6. fol. 23. 32 Hen. 6. fol. 26. Littl. *temps* Ed. 4. lib. 2. cap. Villenage. 15 Ed. 4. fol. 15. 19 Ed. 4. 6. 22 Ed. 4. cap. 8. 2 Rich. 3. 2. and 12. 6 Hen. 8. fol. 2. Dyer. 14 H. 8. cap. 2. No manner of stranger born out of the King's obeisance, 22 H. 8. c. 8. Every person born out of the realm of England, out of the King's obeisance, 32 H. 8. c. 16. 25 H. 8. c. 15, &c. 4 Ed. 6. Plowd. Comment. fol. 2. *Fogassa's case.* 2 and 3 Ph. and Mar. Dyer 145. *Shirley's case.* 5 El. Dyer 224. 13 El. c. 7. de Bankrupts. All commissions ancient and late, for the finding of offices, to entitle the King to the lands of aliens born ; also all letters patent of denization of ancient and later times do prove, that he is no alien that is born under the King's obedience.

Now we are come to consider of legal inconveniences : and first of such as have been objected against the plaintiff ; and, secondly, of such as should follow, if it had been adjudged against the plaintiff.

Of such inconveniences as were objected against the plaintiff, there remain only four to be answered ; for all the rest are clearly and fully satisfied before : 1. That if *postnati* should be inheritable to our laws and inheritances, it were reason they should be bound by our laws ; but *postnati* are not bound by our statute or common laws ; for they having (as it was objected) never so much freehold or inheritance, cannot be returned of juries, nor subject to scot or lot, nor chargeable to subsidies or quinzimes, nor bound by any Act of Parliament made in England. 2. Whether one be born within the kingdom of Scotland or no, is not triable in England, for that it is a thing done out of this realm, and no jury can be returned for the trial of any such issue : and what inconvenience should thereof follow, if such pleas that wanted trial should be allowed (for then all aliens might imagine the like plea) they that objected it, left it to the consideration of others. 3. It was objected, that this innovation was so dangerous, that the certain event thereof no man could foresee, and therefore some thought it fit, that things should stand and continue as they had been in former time, for fear of the worst. 4. If *postnati* were by law legitimated in England, it was objected what inconvenience and confusion should **[26 b]** follow if (for the punishment of us all) the King's Royal issue should fail, &c. whereby those kingdoms might again be divided. All the other arguments and objections that have been made have been answered before, and need not to be repeated again.

1. To the first it was resolved, that the cause of this doubt was the mistaking of the law : for if a *postnatus* do purchase any lands in England, he shall be subject in respect thereof, not only to the laws of this realm, but also to all services and contributions, and to the payment of subsidies, taxes, and public charges, as any denizen or Englishman shall be ; nay, if he dwell in England, the King may command him, by a writ of *ne exeat regnum*, that he depart not out of England. But if a *postnatus* dwell in Scotland, and have lands in England, he shall be chargeable for the same to all intents and purposes as if an Englishman were owner thereof, and dwelt in Scotland, Ireland, in the Isles of Man, Guernsey, or Jersey, or elsewhere. The same law is of an Irishman that dwells in Ireland, and hath land in England. But if *postnati*, or Irishmen, men of the Isles of Man, Guernsey, Jersey, &c. have lands within England, and dwell here, they shall be subject to all services and public charges within this realm, as any Englishman shall be. So as to services and charges, the *postnati* and Englishmen born are all in one predicament.

CALVIN'S CASE

2. Concerning the trial, a threefold answer was thereunto made and resolved: 1. That the like objection might be made against Irishmen, Gascoins, Normans, men of the Isles of Man, Guernsey, and Jersey, of Berwick, &c. all which appear by the rule of our books to be natural born subjects; and yet no jury can come out of any of those countries and places, for trial of their births there. 2. If the demandant or plaintiff in any action concerning lands be born in Ireland, Guernsey, Jersey, &c. out of the realm of England, if the tenant or defendant plead, that he was born out of the ligeance of the King, &c. the demandant or plaintiff may reply, that he was born under the ligeance of the King at such place within England; and upon the evidence the place shall not be material, but only the issue shall be, whether the demandant or plaintiff were born under the ligeance of the King in any of his kingdoms or dominions whatsoever: and in that case the jury, (if they will) may find the special matter, viz. the place where he was born, and leave it to the judgment of the Court: and that jurors may take knowledge of things done [27 a] out of the realm in this and like cases, *vide* 7 H. 7. 8 b. 20 Ed. 3. Averment 34. 5 Ric. 2. tit. Trial 54. 15 Ed. 4. 15. 32 H. 6. 25. Fitz. Nat. Brev. 196. *Vide Dowdales case*, in the Sixth Part of my Reports, fol. 47. and there divers other judgments be vouched (M). 3 Brown, in anno 32 H. 6. reporteth a judgment then lately given, that where the defendant pleaded that the plaintiff was a Scot, born at St. John's town in Scotland, out of the ligeance of the King; whereupon they were at issue, and that issue was tried where the writ was brought, and that appeareth also by 27 Ass. pl. 24. that the jury did find the prior to be born in Gascoin. (for so much is necessarily proved by the words *trove fuit*.) And 20 Ed. 3. tit. Averment 34. in a *juris utrum*, the death of one of the vouchees was alleged at such a castle in Britain, and this was inquired of by the jury; and it is holden in 5 Rich. 2. tit. Trial 54. that if a man be adhering to the enemies of the King in France, his land is forfeitable, and his adherency shall be tried where the land is, as oftentimes hath been done, as there it is said by Belknap: and Fitz. Nat. Br. 196 in a *mortdanc.*, if the ancestor died *in intinere peregrinationis sum vers. Terram sanctam* the jury shall enquire of it: but in the case at Bar, seeing the defendant hath pleaded the truth of the case, and the plaintiff hath not denied it, but demurred upon the same, and thereby confessed all matters of fact, the Court now ought to judge upon the special matter, even as if a jury upon an issue joined in England, as it is aforesaid, had found the special matter, and left it to the Court.

3. To the third it was answered and resolved, that this judgment was rather a renovation of the judgments and censures of the reverend Judges and sages of the law in so many ages past, than any innovation, as appeareth by the book and book-cases before recited: neither have Judges power to judge according to that which they think to be fit, but that which out of the laws they know to be right and consonant to law. *Judex bonus nihil ex arbitrio suo faciat, nec proposito domesticæ voluntatis, sed juxta leges et jura pronuntiat.* And as for *timores*, fears grounded upon no just cause, *qui non cadunt in constantem virum, vani timores æstimandi sunt.*

4. And as to the fourth, it is less than a dream of a shadow, or a shadow of a dream: for it hath been often said, natural legitimation respecteth actual obedience to the sovereign at the time of the birth; for as the *antenati* remain aliens as to the Crown of England, because they were born when there were several Kings of the several kingdoms, and the [27 b] uniting of the kingdoms by descent subsequent cannot make him a subject to that Crown to which he was alien at the time of his birth: so albeit the kingdoms (which Almighty God of his infinite goodness and mercy divert) should by descent be divided, and governed by several Kings; yet it was resolved, that all those that were born under one natural obedience while the realms were united under one sovereign, should remain natural born subjects, and no aliens; for that naturalization due and vested by birthright, cannot by any separation of the Crowns afterward be taken away: nor he that was by judgment of law a natural subject at the time of his birth, become an alien by such a matter *ex post facto*. And in that case, upon such an accident, our *postnatus* may be *ad fidem utriusque Regis*, as Bracton saith in the afore remembered place, fol. 427. *Sicut Anglicus non*

(M) *Vid.* note *Dowdale's case*, 6 Rep. 47 b.

CALVIN'S CASE

*auditur in placitando aliquem de terris et tenement' in Franciâ ita nec debet Francigena et alienigena, qui fuerit ad fidem Regis Franciæ, audiri placitando in Angliâ: sed tamen sunt aliqui Francigenæ in Franciâ qui sunt ad fidem utriusque; et semper fuerunt ante Normaniam deperditam et post, et qui placitant hic et ibi, eâ ratione qua sunt ad fidem utriusque, sicut fuit Willielmus comes mareschallus et manens Angliâ, et M. de Gynes manens in Franciâ, et alii plures.* Concerning the reason drawn from the (a) etymologies, it made against them, for that by their own derivation *alienæ gentis* and *alienæ ligeantiæ* is all one: but arguments drawn from etymologies are too weak and too light for Judges to build their judgments upon: for *sæpenumero ubi proprietas (b) verborum attenditur, sensus veritatis amittitur:* and yet when they agree with the judgment of law, Judges may use them for ornaments. But on the other side, some inconveniences should follow, if the plea against the plaintiff should be allowed: for first it maketh ligeance local: *videlicet, ligeantia Regis regni sui Scotiæ,* and *ligeantia Regis regni sui Angliæ:* whereupon should follow, first, that faith or ligeance, which is universal, should be confined within local limits and bounds: secondly, that the subjects should not be bound to serve the King in peace or in war out of those limits; thirdly, it should illegitimate many, and some of noble blood, which were born in Gascoin, Guienne, Normandy, Calais, Tournay, France, and divers other of His Majesty's dominions, whilst the same were in actual **[28 a]** obedience, and in Berwick, Ireland, Guernsey, and Jersey, if this plea should have been admitted for good. And, thirdly, this strange and new devised plea inclineth too much to countenance that dangerous and desperate error of the Spencers, touched before, to receive any allowance within Westminster-hall.

In the proceeding of this case, these things were observed, and so did the Chief Justice of the Common Pleas publicly deliver in the end of his argument in the Exchequer Chamber. First, that no commandment or messuage by word or writing was sent or delivered from any whatsoever to any of the Judges, to cause them to incline to any opinion in this case; which I remember, for that it is honourable for the State, and consonant to the laws and statutes of this realm. Secondly, there was observed, what a concurrence of judgments, resolutions, and rules, there be in our books in all ages concerning this case, as if they had been prepared for the deciding of the question of this point: and that (which never fell out in any doubtful case) no one opinion in all our books is against this judgment. Thirdly, that the five Judges of the King's Bench, who adjourned this case into the Exchequer Chamber, rather adjourned it for weight than difficulty, for all they in their arguments *una voce* concurred with the judgment. Fourthly, that never any case was adjudged in the Exchequer Chamber with greater concordance and less variety of opinions, the Lord Chancellor and twelve of the Judges concurring in one opinion. Fifthly, that there was not in any remembrance so honourable, great, and intelligent an auditory at the hearing of the arguments of any Exchequer Chamber case, as was at this case now adjudged. Sixthly, it appeareth, that *jurisprudentia legis communis Angliæ est scientia socialis et copiosa:* sociable, in that it agreeth with the principles and rules of other excellent sciences, divine and human: copious, for that *quamvis ad † ea quæ frequentius accidunt jura adaptantur,* yet in a case so rare, and of such a quality, that loss is the assured end of the practice of it (for no alien can purchase lands, but he loseth them; and *ipso facto* the King is entitled thereunto, in respect whereof a man would think few men would attempt it) there should be such a multitude and *farrago* of authorities in all successions of ages, in our books and bookcases, for the deciding of a point of so rare an accident. *Et sic determinata et terminata est ista quæstio.*

**[28 b]** *The Judgment in the said Case, as entered on Record, &c.*

"Whereupon all and singular the premises being seen, and by the Court of the Lord the now King here diligently inspected and examined, and mature deliberation being had thereof; for that it appears to the Court of the Lord the now King here, that the aforesaid plea of the said Richard Smith and Nicholas Smith above pleaded,

---

(a) Co. Lit. 68. b.
(b) 9 Co. 110. b.
† 5 Co. 127 b.    Co. Lit. 218 a.    2 Inst. 137.    Cart. 13.    6 Co. 87 a.

is not sufficient in law to bar the said Robert Calvin from having an answer to his aforesaid writ: therefore it is considered by the Court of the lord the now King here, that the aforesaid Richard Smith and Nicholas Smith to the writ of the said Robert do further answer."

[See now the statutes for the union of both kingdoms.]—*Note to former edition.*

## [1 a] BULWER'S CASE.

### Mich. 26 & 29 Eliz.

[See *British South Africa Company* v. *Companhia de Moçambique* [1893], A. C. 631.]

B. brought an action on the case in the county of N. for maliciously causing him to be outlawed in London upon process sued out of a Court at Westminster, and causing him to be imprisoned in N. upon a *capias utlagatum* directed to the sheriff of that county, but issued at Westminster; and upon demurrer it was adjudged that the action was well brought in the county of N.

In all cases where the action is founded on two things done in several counties, and both are material or traversable, and the one without the other does not maintain the action, the plaintiff may bring his action in which county he will. S. C. 4 Leon. 52.

Bulwer of Dalling in Norfolk, brought an action on his case against George Smith, and declared that one Henry Heydon, Esq. did recover 20l. &c. in the Common Pleas against the plaintiff, and after judgment, and before execution, the said Henry Heydon died, and afterwards the said defendant knowing thereof, at W. in the county of Norfolk to outlaw the plaintiff upon the said judgment in the name of Henry Heydon *malitiosè et deceptivè machinatus est*, in performance of which the defendant, Trin. 23 Eliz. at Westminster in Middlesex, purchased a writ of *capias ad satisfaciendum*, in the name of the said Henry, upon the said judgment, directed to the Sheriffs of London, who by the procurement of the defendant returned *non est inventus*; whereupon the defendant purchased a writ of *exigent* in the name of the said Henry, which writ the said sheriff by the procurement of the said defendant returned, that at several Hustings the said now plaintiff had been demanded, *et ad Hustingum ad communibus placitis tent' in Guildhaldá civitatis præd' die Lun' prox' post Festum Apostol. Simonis et Jud', anno supradict' præd'* the now plaintiff, *quint' exactus fuit, &c., et ideo ipse* the plaintiff *utlagatus fuit:* and afterwards Pasch. 24 El. the defendant purchased out of the said Common Pleas a writ of *capias utlagatum*, in the name of the said Henry, directed to the Sheriff of Norfolk, to arrest his body, &c. which writ did mention that the said now plaintiff was outlawed *die Lun' prox' ante Festum Apostolorum Simonis et Jud', &c.* And the said writ the defendant at W. aforesaid in the said county of Norfolk, did deliver to one Robert Godfrey then deputy to the sheriff of the said county, to the intent that he should execute the said writ, the which Robert by force of the said writ took, and arrested the said now plaintiff, and did imprison him by the space of two months, until the now plaintiff purchased his charter of pardon, by reason of which outlawry he forfeited all his goods and chattels: and upon this declaration the defendant did demur in law; and the principal cause of the demurrer was because this action, by the pretence of the defendant, [1 b] ought to have been brought in Middlesex where the wrong began, for there (as it was said) the defendant took out as well the *cap' ad satisfac'* as the *exigent* and the *cap' utlagatum* also. And although the *cap' utlagat'* was executed in Norfolk, yet the action ought to be brought where the wrong began; as in the case of conspiracy in 42 E. 3. 14 a. and divers other cases also were put; also by the outlawry which was in London all his goods and chattels were forfeited where it is more reason to bring the action than in Norfolk. But it was answered and resolved, that the (*a*) action was well brought in Norfolk; for it

---

(*a*) Cr. El. 574. 844.   Dyer 38. pl. 51.   Cr. Car. 20, 21.   Dy. 40. pl. 66.