until six o'clock I shall have the privilege of a short reply if I deem it necessary, ["Certainly," "Certainly,"] and that will not be considered as opening the debate again.

Mr. HENDERSON. Let us have that understanding. ["Agreed."]

The PRESIDENT pro tempore. The motion before the Senate is that the further consideration of this resolution be postponed until to-morrow at one o'clock, and made the special order for that hour.

Mr. FESSENDEN. I should like to know, first, whether that is universally agreed to on the other side.

Mr. SHERMAN. We will sit it out to-morrow.

Mr. DAVIS. I understand that those who are opposed to the resolution are willing that the question shall be taken at six o'clock to-morrow, and if the gentleman from Maine wants any time afterwards, I suppose there will be no objection to his taking just such time as he wishes.

Mr. HENDERSON. And that the vote be taken at the close of his speech.

Mr. DAVIS. Yes, sir.

Mr. HENDERSON. That is satisfactory. ["Agreed."]

Mr. CLARK. I move that the Senate do now adjourn.

The motion was agreed to; and the Senate adjourned.

## HOUSE OF REPRESENTATIVES.

THURSDAY, *March* 1, 1866.

The House met at twelve o'clock m. Prayer by the Chaplain, Rev. C. B. BOYNTON.

The Journal of yesterday was read and approved.

NATIONAL SAFE DEPOSIT COMPANY.

Mr. BLAINE, by unanimous consent, introduced a bill to incorporate the National Safe Deposit Company, of Washington, District of Columbia; which was read a first and second time, referred to the Committee for the District of Columbia, and ordered to be printed.

RELIEF OF CHAMBERSBURG.

Mr. COFFROTH. I ask unanimous consent to submit the following resolution:

Whereas the citizens of Chambersburg, Pennsylvania, were assessed with an internal revenue tax for the year 1864, and the said tax was collected from the said citizens after the town of Chambersburg had been burned by the rebel army commanded by the notorious and fiendish General McCauslin: Therefore,

*Be it resolved,* That the Committee of Ways and Means be, and are hereby, instructed to report, by bill or otherwise, an act for the relief of such persons whose property was burned, or whose business was destroyed or suspended by the burning of said town, by refunding to said citizens the amount of the internal revenue tax they paid for said year.

Mr. WASHBURNE, of Illinois. That resolution is mandatory upon the committee as it now reads. It should be modified so as to instruct the committee to inquire into the expediency of doing so and so.

Mr. COFFROTH. I have no objection to that modification.

The resolution was modified accordingly; and as modified it was agreed to.

PACIFIC RAILROAD.

Mr. PRICE, from the Committee on the Pacific Railroad, reported back House bill No. 138, to lay out and construct a railroad and telegraph line from the city of Portland, in Oregon, to the Central Pacific railroad, with a substitute; and the substitute was ordered to be printed, and, with the bill, was recommitted to the committee.

LAND GRANT FOR MICHIGAN RAILROADS.

Mr. TROWBRIDGE, by unanimous consent, introduced a bill to amend an act entitled "An act making a grant of lands to the State of Michigan, in alternate sections, to aid in the construction of railroads in said State, and for other purposes," approved June 3, 1856, and supplemental thereto; which was read a first and second time, and referred to the Committee on Public Lands.

NATIONAL CAPITAL INSURANCE COMPANY.

Mr. MERCUR, by unanimous consent, introduced a bill to incorporate the National Capital Insurance Company; which was read a first and second time, and referred to the Committee for the District of Columbia.

DUTY ON PAPER.

Mr. KETCHAM, by unanimous consent, submitted the following resolution; which was read, considered, and agreed to:

*Resolved,* That the Committee of Ways and Means be instructed to inquire into the expediency of reducing the duty on paper, and that they report by bill or otherwise.

PORTAGE LAKE SHIP-CANAL.

Mr. DAVIS presented the joint resolution of the Legislature of the State of New York, relative to a ship-canal from Portage Lake to Lake Superior, across the base of Keweenaw Point; which was referred to the Committee on Public Lands, and ordered to be printed.

Mr. WASHBURNE, of Illinois. Cannot all these bills and joint resolutions be introduced on Monday next?

The SPEAKER. On next Monday, during the morning hour, States and Territories will be called for bills and joint resolutions on leave.

Mr. WASHBURNE, of Illinois. Then I object to any more being introduced now.

LEAVE OF ABSENCE.

Mr. DELANO. I ask leave of absence for my colleague, Mr. CLARKE, who has been compelled to return home.

Leave was accordingly granted.

RIGHTS OF CITIZENS.

Mr. WILSON, of Iowa. I now call up the motion I made a few days since to reconsider the vote of the House, referring to the Committee on the Judiciary Senate bill No. 61, to protect all persons in the United States in their civil rights, and to furnish the means for their vindication; and upon that motion I call the previous question.

The previous question was seconded, and the main question ordered; and under the operation thereof the motion to reconsider was agreed to.

The question recurred upon the motion to refer the bill to the Committee on the Judiciary.

Mr. WILSON, of Iowa. I now withdraw that motion.

The House then proceeded to the consideration of the bill.

Mr. WILSON, of Iowa. This bill has been considered by the Committee on the Judiciary, and I have been instructed by that committee to offer several amendments to it. The first amendment is in the seventh line of the first section, to strike out the words "inhabitants of" and insert the words "citizens of the United States in;" so that that portion will read:

There shall be no discrimination in civil rights or immunities among the citizens of the United States in any State or Territory, &c.

This amendment is intended to confine the operation of this bill to citizens of the United States, instead of extending it to the inhabitants of the several States, as there seems to be some doubt concerning the power of Congress to extend this protection to such inhabitants as are not citizens.

I demand the previous question on the amendment.

Mr. BINGHAM. I hope that the previous question will not be seconded until I can have an opportunity to offer a further amendment.

The SPEAKER. The gentleman from Iowa [Mr. WILSON] proposes, as the Chair understands, to perfect the bill by offering these amendments, after which the whole bill will be before the House.

Mr. BINGHAM. Very well.

The previous question was seconded, and the main question ordered; and under the operation thereof the amendment was agreed to.

Mr. WILSON, of Iowa. I move further to amend, as follows:

In line nine, strike out the words "but the inhabit-ants," and insert in lieu thereof the words "and such citizens;" so that the clause will read, "and such citizens of every race and color."

The amendment was agreed to.

Mr. WILSON, of Iowa. I offer the following amendment, not as coming from the committee, but because it is necessary to perfect the amendment already offered:

Insert after the word "property," in line fifteen of the first section, the words "as is enjoyed by white citizens;" so that the clause will read:

Shall have the same right to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, as is enjoyed by white citizens.

The amendment was agreed to.

Mr. WILSON, of Iowa. I move further to amend as follows:

On page 3, in lines fifteen and sixteen, strike out the words "enlarge the powers of the Freedmen's Bureau," and insert in lieu thereof the words "establishing a Bureau for the Relief of Freedmen and Refugees, and all acts amendatory thereof."

The amendment was agreed to.

Mr. WILSON, of Iowa. I now desire, Mr. Speaker, to enter a motion to recommit the bill.

Mr. BINGHAM. Is that designed to cut off amendments?

The SPEAKER. It will have that effect.

Mr. BINGHAM. Then I object.

The SPEAKER. The gentleman from Iowa has the right to enter the motion.

Mr. WILSON, of Iowa. The gentleman from Ohio will understand what I propose, before I get through.

Mr. BINGHAM. I only want to know whether the gentleman makes that motion for the purpose of cutting off further amendments?

Mr. WILSON, of Iowa. The motion does have that effect for the present.

Mr. Speaker, I desire to bring this bill to a vote to-morrow after the morning hour, and I hope that the House will second my endeavor to accomplish this object. As there are many other measures of great importance demanding the action of the House, I trust that we shall so conduct the discussion on this bill as to get it out of the way as speedily as possible, that we may proceed with the other business before us.

Mr. Speaker, the importance of this bill, the magnitude of the questions involved in it, the objects sought to be reached and secured by it, will insure for it the most deliberate consideration of this House. Few measures of graver import have ever commanded the attention of Congress. It is a very positive bill, and I expect it to meet with most positive opposition, but I believe it will survive this and triumph.

Some of the questions presented by this bill are not entirely free from difficulties. Precedents, both judicial and legislative, are found in sharp conflict concerning them. The line which divides these precedents is generally found to be the same which separates the early from the later days of the Republic. The further the Government drifted from the old moorings of equality and human rights, the more numerous became judicial and legislative utterances in conflict with some of the leading features of this bill.

The Committee on the Judiciary bestowed on this subject a degree of careful examination which we believe will enable us to maintain successfully our conclusions both as to the propriety and constitutionality of this measure.

The first section of the bill contains the following declaration concerning citizenship:

That all persons born in the United States and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States without distinction of color.

This provision, I maintain, is merely declaratory of what the law now is. This, I presume, would not be disputed if the language were qualified by the presence of the word "white." In the absence of this word, I am sure that my proposition will be disputed by every member of this House who believes that this Government is exclusively a "white man's Government." I think this question of sufficient im-

Case 8:25-cv-00201-DLB   Document 46-5   Filed 02/03/25   Page 2 of 10

portance to justify me in giving it something more than a mere passing notice.

Blackstone says:

"The first and most obvious division of the people is into aliens and natural-born subjects. Natural-born subjects are such as are born within the dominions of the Crown of England; that is, within the ligeance, or, as it is generally called, the allegiance of the king; and aliens are such as are born out of it."—*Sharswood's Blackstone*, vol. 1, p. 364.

The principle here laid down applies to this country as well as to England. It makes a man a subject in England, and a citizen here, and is, as Blackstone declares, "founded in reason and the nature of government."

The English law made no distinction on account of race or color in declaring that all persons born within its jurisdiction are natural-born subjects; nor does it do so in regard to naturalization. This law bound the colonies before the Revolution, and was not changed afterward.

The Constitution of the United States recognizes the division of the people into the two classes named by Blackstone—natural-born and naturalized citizens. It speaks of "natural-born" citizens, and also provides for the establishment of "a uniform rule of naturalization" by Congress. But in neither case does it apply race or color as a limitation on citizenship; and Congress, when it came to establish a uniform rule of naturalization, recognized by implication the citizenship of the native-born negro by providing "that any alien, being a free white person, may be admitted to become a citizen of the United States," &c. Why use the word "white" in this way if a negro cannot be a citizen of the United States? If he is excluded from citizenship because of his race or color, though born within our jurisdiction and on our own soil, could Congress make him a citizen by naturalization? If he could not be born a citizen could he be legislated into one? No one, I presume to say, will assume the affirmative of this question. But unless some one will affirm this absurdity we have in the naturalization act of April 14, 1802, that which amounts to an unqualified declaration that a negro may be a citizen of the United States; for in the first section of that act it is provided:

"That any alien who was residing within the limits, and under the jurisdiction of the United States, before the 29th day of January, 1795, may be admitted to become a citizen on due proof made to some one of the courts aforesaid; that he has resided two years at least within and under the jurisdiction of the United States, and one year at least immediately preceding his application within the State or Territory where such court is at the time held."

No one can doubt that an alien African could be naturalized under this part of the act of 1802, who was residing in the United States prior to the 29th day of January, 1795. Well, if Africans naturalized under this law should have had children born to them, will any person say that such children would be less citizens than their parents? The parents being citizens of the United States by naturalization, would it not follow that children born to them would be citizens by birth? I apprehend that it will not be claimed by any one that the children of naturalized citizens of the United States do not partake of the citizenship of their parents.

The act of February 28, 1803, provides that:

"No master or captain of any ship or vessel, or any other person, shall import or bring, or cause to be imported or brought, any negro, mulatto, or other person of color, not being a native, a citizen, or registered seaman of the United States, or seamen natives of countries beyond the Cape of Good Hope, into any port or place of the United States, which port or place shall be situated in any State which by law has prohibited, or shall prohibit, the admission or importation of such negro, mulatto, or other person of color."—*Brightly's Digest*, p. 487.

This is a very direct admission by the law-making power of the Government that a negro may be a citizen of the United States. Shipmasters are prohibited from bringing into any State described in the section of the act quoted any negro who is not either a native or a citizen of the United States. If no negro could be a citizen, why use this language? Why use the term citizen as a descriptive term if the persons described cannot be citizens of the United States? Let him answer who can.

Section ten of the act of September 4, 1841, says:

"That from and after the passage of this act, every person being the head of a family, or widow, or single man, over the age of twenty-one years, and being a citizen of the United States, or having filed his intention to become a citizen, as required by the naturalization laws, who since the 1st day of June, A.D. 1840, has made or shall hereafter make a settlement in person on the public lands to which the Indian title had been at the time of such settlement extinguished, and which has been or shall have been surveyed prior thereto, and who shall inhabit and improve the same; and who has or shall erect a dwelling thereon, shall be, and is hereby, authorized to enter with the register of the land office of the district in which such land may lie, by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter section of land, to include the residence of such claimant, upon paying to the United States the minimum price of such land," &c.—*United States Statutes-at-Large*, vol. 5, p. 455.

Under this section a colored man made application to preëmpt land in the State of Illinois. The Secretary of the Treasury, Hon. John C. Spencer, submitted to the Attorney General of the United States, for his opinion, the question, can a free man of color be admitted to the privileges of a preëmptioner under the act of 4th September, 1841? On March 15, 1843, Mr. H. S. Legare, the then Attorney General, gave his opinion in writing, from which I quote the following:

"I have delayed giving an opinion on the subject, because I was desirous of bestowing upon it very deliberate consideration. The result is, that I am of opinion that a free man of color, a native of this country, may be admitted to the privileges of a preëmptioner under the tenth section of the act of 4th September, 1841."—*Opinions of Attorneys General*, vol. 4, p. 147.

I am aware that the Attorney General tried to soften this opinion down by speaking of "denizens." But the statute says citizens. The law officer of the Government tells us that his opinion was given after "very deliberate consideration," and the law shows us that the limitation of citizenship was acting upon his deliberation. He gave in his opinion what every man must admit to be true, that a negro can be a citizen of the United States, and as such enjoy the privileges of a preëmptioner under the act of 1841. Besides this, Mr. Legare was well aware that—

"A denizen is an alien born who has obtained *ex donatione legis* letters patent to make him an English subject, and that in the United States there is no such civil condition."—*Bouvier's Law Dictionary*, vol. 1, title Denizen.

And further, that—

"Citizens, under our Constitution and laws, mean free inhabitants, born within the United States or naturalized under the law of Congress."—*Kent's Commentaries*, vol. 2, p. 278, note.

Hence the free negro upon whose case the opinion was given became a preëmptioner because he was a native-born citizen of the United States.

On this question of citizenship, Mr. Marcy, while he was Secretary of State, in a note dated March 6, 1854, expressed himself as follows:

"Although in general it is not the duty of the Secretary of State to express opinions of law, and doubts may be entertained of the expediency of making an answer to your inquiries an exception to this rule, yet I am under the impression that every person born in the United States must be considered a citizen of the United States, notwithstanding one or both of his parents may have been alien at the time of his birth."

I quote this not to claim that it was written concerning a colored person, but for the purpose of showing how broad the rule is which Mr. Marcy affirmed. Every person born in the United States must include negroes, for they are persons and are born in the United States; and I submit that, under the rule thus laid down, all such persons "must be considered citizens of the United States."

I know, Mr. Speaker, that Mr. Marcy subsequently modified this opinion, at least a letter written by his Assistant Secretary, Mr. Thomas, to Mr. Rice, of New York, of date November 4, 1856, substantially affirms that negroes "are not citizens of the United States." This change of opinion may not be without a solution. The first letter is dated March 6, 1854, the second November 4, 1856; between these two dates an important political event occurred. The Kansas-Nebraska bill passed Congress in May, 1854, receiving the approval of President Pierce on the 30th day of that month. This act was full of trouble to the Democratic party; and the leaders of that organization became very anxious to have the question of slavery, so far as it related to the Territories and the *status* of negroes, adjudged and "settled" by the Supreme Court of the United States. The case of Dred Scott *vs.* Sanford found its way to the docket of that court, and was argued the first time at the December term, 1855, and ordered to be reargued at the December term, 1856. It was not safe to cast the monstrosities of that decision into the presidential campaign of 1856. The Democratic party had all it could carry without the abominations which the end of that case was destined to disclose. The case was held over, Buchanan was elected, and then the leaders of the party were ready to let slip the pestilent doctrines of the Dred Scott case.

No one now doubts that the leaders of the Democratic party knew what was to come out of that case in the form of aid and comfort to them. Buchanan doubtless knew what it would be, for in his inaugural address, delivered March 4, 1857, in speaking of the slavery question, he says:

"This is, happily, a matter of but little practical importance. Besides, it is a judicial question which legitimately belongs to the Supreme Court of the United States, before whom it is now pending, and will, it is understood, be speedily and finally settled. To their decision, in common with all good citizens, I shall cheerfully submit."—*Senate Journal*, 1856-57, p. 378.

The opinion of the court was soon after given to the country, but instead of becoming a triumphant platform for the Democratic party, it proved to be the scaffold on which the party was executed. These facts, taken in their proper relation to each other, may explain the change which transpired in the Department of State between the 6th day of March, 1854, and the 4th day of November, 1856. The first opinion was an honest and true statement of the law, the latter a mere partisan subterfuge.

The ablest and most exhaustive opinion ever given on the subject of negro citizenship by any law officer of the Government is that of Attorney General Bates, of date November 29, 1862. This opinion was called for by the Secretary of the Treasury, Hon. S. P. Chase, by a letter from which the following extract is taken:

"The schooner Elizabeth and Margaret, of New Brunswick, is detained by the revenue cutter Tiger at South Amboy, New Jersey, because commanded by a 'colored man,' and so by a person not a citizen of the United States; as colored masters are numerous in our coasting trade, I submit for your opinion the question suggested by Captain Martin of the Tiger: are colored men citizens of the United States, and therefore competent to command American vessels?"

No ship or vessel can be deemed a ship or vessel of the United States unless wholly owned by a citizen or by citizens of the United States, nor unless commanded by a citizen of the United States, and no American registry can be granted to any ship or vessel until after the filing with the proper officer of the Government affidavits stating that the entire ownership vests in a citizen or citizens of the United States, and that the commander is a citizen. (Act of December 31, 1792; Brightly's Digest, page 823.)

From this statement of the law it will be seen that the question propounded by Secretary Chase to the Attorney General was of the highest importance to the shipping and commercial interests of the country. Many vessels engaged in the coasting trade were commanded by colored men; many vessels were owned in whole or in part by colored men, and all such would forfeit their American registry and character if the colored men interested as owners or commanders were not citizens of the United States; for the first section of the act of 1792 expressly provides that they shall not continue to enjoy the benefits and privileges of ships and vessels of the United States "longer than they shall continue to be wholly owned and to be commanded by a citizen or citizens of the said States." And the fourth section of said act provides as a penalty for a false statement of the facts to be set out in the oath required by said section, among which facts so required is the citizenship of the owner

and commander, "a forfeiture of the ship or vessel," &c. Under this law it was held in the case of the Venus "that if two part owners own jointly a commercial house in New York and one of them obtains an American register for a ship by swearing that he, together with his partner, of the city of New York, are the only owners of the vessel for which the register is obtained, when in fact his partner is domiciled in England, the vessel is liable to forfeiture," and it was forfeited. (8 Cranch R., page 253.)

Attorney General Bates fully appreciated the importance of the question submitted to him for his opinion by the Secretary of the Treasury, and devoted to it a most careful and painstaking examination. This is amply evidenced by the elaborateness of the opinion and by the ability manifested in every one of its twenty-seven pages. I might with profit draw largely from the pages of this opinion in support of the position I maintain, but the time allotted me by the rules of the House constrains me to confine myself to quoting the conclusion arrived at by the author of this able paper. It is in these words:

"And now, upon the whole matter, I give it as my opinion that the free man of color mentioned in your letter, if born in the United States, is a citizen of the United States, and, if otherwise qualified, is competent, according to the acts of Congress, to be master of a vessel engaged in the coasting trade."

Here I might let this branch of the case rest, for it is known to every member of this House that every department of the Government is now following the lead of the doctrine supported by the authorities I have cited; but, sir, I feel unwilling to omit some others that I have examined.

It is in vain we look into the Constitution of the United States for a definition of the term "citizen." It speaks of citizens, but in no express terms defines what it means by it. We must depend on the general law relating to subjects and citizens recognized by all nations for a definition, and that must lead us to the conclusion that every person born in the United States is a natural-born citizen of such States, except it may be that children born on our soil to temporary sojourners or representatives of foreign Governments, are native-born citizens of the United States. Thus it is expressed by a writer on the Constitution of the United States:

"Every person born within the United States, its Territories, or districts, whether the parents are citizens or aliens, is a natural-born citizen in the sense of the Constitution, and entitled to all the rights and privileges appertaining to that capacity."—*Rawle on the Constitution*, p. 80.

And this writer continues, as if he intended a refutation of the position assumed by some persons at this time, that a negro is neither a citizen nor an alien, but a mere person with no definable national character, and adds:

"It is an error to suppose, as some have done, that a child is born a citizen of no country, and subject of no Government, and that he so continues till the age of discretion, when he is at liberty to put himself under what Government he pleases."—*Pages* 80, 81.

No nation, I believe, ever did recognize this absurd doctrine; and the only force it ever had in this country, was that given it by the Democratic party which used the negro as a football for partisan games. The growing importance of the colored race in the United States, now that the entire race is free, will soon cause even the Democratic party to abandon the indefensible position it occupies on this question. That we have six million persons in this Government subject to its laws, and liable to perform all the duties and support all the obligations of citizens, and yet who are neither citizens nor aliens, is an absurdity which cannot survive long in the light of these days of progressive civilization.

It will not be denied by any one, I presume, that the English doctrine which claims as a subject every person born within the jurisdiction of the Crown, made negroes born in the colonies out of which the original thirteen States were created, British subjects; nor will it be contended that they were not citizens of the States after the States threw off their allegiance to the mother country, and being citizens of the States that they became, on the establishment of the Government of the United States, citizens of the United States. A very clear statement of this doctrine occurs in the case of the State *vs.* Manuel, 3 Devereaux & Battle's N. C. R., page 26, in these words:

"The term 'citizen' as understood in our law is purely analogous to the term subject in the common law, and the change of phrase has entirely resulted from the change of government. The sovereignty has been transferred from one man to the collective body of the people, and he who before was a 'subject of the king' is now a citizen of the State.'"

This position is maintained by Rawle on the Constitution, page 80; Kent's Commentaries, volume two, lecture twenty-five; Lawrence's Appendix to Wheaton on International Law. I might multiply authorities, but I have referred to enough for my purpose. By our law colored persons are citizens of the United States. Of this there can be no reasonable doubt; and we have been too tenaciously devoted to the doctrine "once a citizen always a citizen" to strike out of our column of citizens six million persons in obedience to any such political irrationality as lies buried in the Dred Scott case.

But, sir, suppose I should admit for the sake of an argument that negroes are not citizens, would that be an objection to the power of Congress to enact the provision of this bill to which I have called the attention of the House? If they are not citizens may we not naturalize them? If this can be done, then in either view of the case the provision of the bill which I am now discussing is proper, and is not obnoxious to the objection that we do not possess the power to pass it.

The Constitution, in article one, section eight, provides that Congress shall have power "to establish a uniform rule of naturalization." This does not mean that the power of Congress exhausts itself by being once used, nor that there can be but one rule, nor that the rule established must provide that the naturalization shall be by action upon single or individual cases, nor yet that only foreigners can be thus made citizens. The practice of the Government is against all these positions. The rule must be uniform in its operation upon the class affected by it, and must not be confined in terms in its operation to any particular State or district of country, except when it operates only on a particular class of persons who may be occupying a limited district of country. Several statutes, establishing as many different rules, each uniform in itself, have been enacted on this subject. Most of these rules provide for the naturalization by individual cases:

"But, a collective naturalization may also take place, of a class of persons, natives of the country or otherwise, and who, without any act on the part of the individuals, may be made citizens."—*Lawrence's Appendix to Wheaton on International Law; Opinion of Attorney General Cushing, in Opinions of Attorneys General*, vol. 7, p. 746.

The power thus to naturalize collectively has been exercised in several instances by the Government. The most striking case is that which is found in the act of March 3, 1843, in which it is provided that the

"Stockbridge tribe of Indians, and each and every of them, shall be deemed to be, and from that time declared to be, citizens of the United States."

Mr. Speaker, these authorities are sufficient upon this point, and I will leave the question of citizenship as presented in the first part of this section, and call the attention of the House to the next proposition of the section as proposed to be amended by the committee. It is in these words:

There shall be no discrimination in civil rights or immunities among citizens of the United States in any State or Territory of the United States on account of race, color, or previous condition of slavery; and such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

This part of the bill will probably excite more opposition and elicit more discussion than any other; and yet to my mind it seems perfectly defensible. It provides for the equality of citizens of the United States in the enjoyment of "civil rights and immunities." What do these terms mean? Do they mean that in all things civil, social, political, all citizens, without distinction of race or color, shall be equal? By no means can they be so construed. Do they mean that all citizens shall vote in the several States? No; for suffrage is a political right which has been left under the control of the several States, subject to the action of Congress only when it becomes necessary to enforce the guarantee of a republican form of government. Nor do they mean that all citizens shall sit on the juries, or that their children shall attend the same schools. These are not civil rights or immunities. Well, what is the meaning? What are civil rights? I understand civil rights to be simply the absolute rights of individuals, such as—

"The right of personal security, the right of personal liberty, and the right to acquire and enjoy property." "Right itself, in civil society, is that which any man is entitled to have, or to do, or to require from others, within the limits of prescribed law."—*Kent's Commentaries*, vol. 1, p. 199.

To use the language of Attorney General Bates, in the opinion already cited, "The word rights is generic, common, embracing whatever may be lawfully claimed." The definition given to the term "civil rights" in Bouvier's Law Dictionary is very concise, and is supported by the best authority. It is this:

"Civil rights are those which have no relation to the establishment, support, or management of government."

From this it is easy to gather an understanding that civil rights are the natural rights of man; and these are the rights which this bill proposes to protect every citizen in the enjoyment of throughout the entire dominion of the Republic.

But what of the term "immunities?" What is an immunity? Simply "freedom or exemption from obligation;" an immunity is "a right of exemption only," as "an exemption from serving in an office, or performing duties which the law generally requires other citizens to perform." This is all that is intended by the word "immunities" as used in this bill. It merely secures to citizens of the United States equality in the exemptions of the law. A colored citizen shall not, because he is colored, be subjected to obligations, duties, pains, and penalties from which other citizens are exempted. Whatever exemptions there may be shall apply to all citizens alike. One race shall not be more favored in this respect than another. One class shall not be required to support alone the burdens which should rest on all classes alike. This is the spirit and scope of the bill, and it goes not one step beyond.

Mr. Speaker, I think I may safely affirm that this bill, so far as it declares the equality of all citizens in the enjoyment of civil rights and immunities, merely affirms existing law. We are following the Constitution. We are reducing to statute form the spirit of the Constitution. We are establishing no new right, declaring no new principle. It is not the object of this bill to establish new rights, but to protect and enforce those which already belong to every citizen. I am aware, sir, that this doctrine is denied in many of the States; but this only proves the necessity for the enactment of the remedial and protective features of this bill. If the States would all observe the rights of our citizens, there would be no need of this bill. If the States would all practice the constitutional declaration, that

"The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." (*Article four, section two, Constitution of the United States*,)

and enforce it, as meaning that the citizen has

"The right of protection by the Government, the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; to claim the benefit of the writ of *habeas corpus*; to institute and maintain actions of any kind in the courts of the State; to take, hold, and dispose of property, either

the rag-money-changers are turned over, and I hope they will never be set up, converting the temple of our freedom into a den of brokers. It is entirely unnecessary to make a loan, as the able financier from Massachusetts [Mr. HOOPER] has demonstrated, and while I would not increase our bonds, (except to equalize bounties,) it will prove safe to leave the volume or amount of legal tenders to the regulation of the law of supply and demand quoted by the able chairman who reported this bill.

Sir, if the currency becomes redundant, if the people have more than they require for business, give them seven-thirties or five-twenties. If they again want more currency, give them again the bonds. If under this system our revenue receipts far exceed your estimates, and we are rapidly going up to the point of par with gold, even more rapidly than the Treasurer desires, as stated by the gentleman from Ohio, and every day in peace restoring that wealth which we wasted in war, why disturb our onward march? In whose interest is this to be done? What great public interest is to be subserved by contracting and retiring national currency, exchanging bonds payable, principal and interest, in gold in Europe for bonds held by our own people, and payable in the lawful money of the United States?

Sir, we are not left to doubt as to the party that urges this measure. It is the great creditor party that wish to increase their gains and their incomes. They have the intelligence to see and the conscience to accomplish, regardless of consequences, the end. While they make money scarce to bring down prices and wages, do they propose to bring down the sums due to them? No, sir, no; they tell us, through the honest lips of the gentleman from Ohio, [Mr. SPALDING,] that "small incomes will be, in effect, greatly increased," and thus relieve some wants, which I would gladly do if we could stop there; but I answer that gentleman, that while it doubles in effect the small incomes, it also extends the same to all incomes and all credits!

If this measure increases incomes, does it not follow that it also increases the cost of your debts? The farmer and the merchant have bills and mortgages and bonds to pay; make money scarce, and they can pay them more readily, is a mode of reasoning utterly unsatisfactory to me. Give them no medium of value with which to do business, require them to sacrifice in the impoverished condition of our country their all to get specie, which will rise according to the demand for it, until 240 in the war will be lost sight of in the dizzy height to which the value of gold will ascend in this Treasury balloon.

We have been reminded by the gentleman from Massachusetts [Mr. BANKS] that we, in the West, have been blessed by their loans to us of $800,000,000 to create our railroads. If small incomes are to be doubled by this process, will it not also double the gains to our philanthropic friends whose investments are in our railroads, and the interest upon which is now promptly paid in a plentiful and valuable currency?

Pleasant as this game may be to our greedy creditors, in behalf of the paying millions I exclaim, as the old frog in the fable did to the boys who stoned his family, "It may be sport to you, but it is death to us!" To the aggregate credit of this nation, seen in the face of the greenbacks, we may look for that protection which we need and must have until our wasted wealth is restored. Take from us this friend, and while our creditors may gloat upon the spoils that they share in our convulsed and prostrate condition, they will learn, although late, that they have killed the goose to get the golden egg. That enlightened self-interest is true patriotism; for creditors and debtors will ultimately find a common financial grave.

Give us time to develop our resources, to heal the wounds of war, to rebuild the waste places; withdraw not from us the life-blood of business, a plentiful national currency, and every just debt will be honorably paid.

I shall not attempt to ring any changes with my esteemed colleague, [Mr. WENTWORTH,] whose impulses are always for the public welfare upon the theme of paying specie to the soldiers. The interests of the soldiers are identical with the interest of the country they have so bravely battled to save, and no scent of specie can divert them from the support of measures necessary for the public welfare, and lead them to "hunt" in the pack of the Shylocks, who would ultimately have us all in their merciless grasp. For one I am more anxious to equalize bounties and extend pensions, thus paying a debt, the withholding of which will not enrich us than to fund the "war debt of the States." While I will not load the nation, the property of the people, and the soldier, with burdens, incurred mainly to hire substitutes, I shall with grateful pleasure devote our means to pay the debt of the nation to its saviors! But I shall hesitate to invest in the venture of the war debt of the States or to adopt the policy of the money-changers.

CIVIL RIGHTS.

Mr. LAWRENCE, of Ohio. Mr. Speaker, the President in his annual message said to us—

"That good faith requires the security of the freedmen in their liberty, their right to labor, and their right to claim the just return of their labor. I cannot too strongly urge a dispassionate treatment of this subject, which should be carefully kept aloof from all party strife."

In pursuance of this recommendation, Congress passed a measure known as the "civil rights bill," the essential purpose of which is declared in these words:

"SEC. 1. That all persons born in the United States, and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right in every State and Territory to make and enforce contracts, to sue, to be sued, be parties and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to be entitled to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding.

"SEC. 2. That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any citizen of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and on conviction shall be punished by fine not exceeding $1,000, or imprisonment not exceeding one year, or both, in the discretion of the court."

This bill has met with the executive veto. When it passed the House I was satisfied to record my vote in its favor without consuming time in discussion, leaving the measure to commend itself to the judgment of the world. It has already been debated somewhat at large. (See speeches of WILSON, and others, March 1, Globe, March 2; of BINGHAM, February 28, Globe, March 1; of BINGHAM and SHELLABARGER, March 9, Globe, March 10; DELANO, March 8, Globe, March 13.)

I will not therefore attempt a full discussion of it now, but content myself with briefly presenting some of the grounds upon which I will again perform the proudest act of my political life in voting to make this bill the law of the land.

It is scarcely less to the people of this country than Magna Charta was to the people of England.

It declares who are citizens.

It does not affect any political right, as that of suffrage, the right to sit on juries, hold office, &c. This it leaves to the States, to be determined by each for itself. It does not confer any civil right, but so far as there is any power in the States to limit, enlarge, or declare civil rights, all these are left to the States.

But it does provide that as to certain enumer-

ated civil rights every citizen "shall have the same right in every State and Territory." That is whatever of certain civil rights may be enjoyed by any shall be shared by all citizens in each State, and in the Territories, and these are:
1. To make and enforce contracts.
2. To sue, to be sued, and to be parties.
3. To give evidence.
4. To inherit, purchase, lease, sell, hold, and convey real and personal property.
5. To be entitled to full and equal benefit of all laws and proceedings for the security of person and property.

The bill does not declare who shall or shall not have the right to sue, give evidence, inherit, purchase, and sell property. These questions are left to the States to determine, subject only to the limitation that there are some inherent and inalienable rights, pertaining to every citizen, which cannot be abolished or abridged by State constitutions or laws.

The first clause of section one provides:

"That all persons born in the United States, and not subject to any foreign Power, excluding Indians not taxed, are hereby declared to be citizens of the United States."

This clause is unnecessary, but nevertheless proper, since it is only declaratory of what is the law without it. This has been sufficiently demonstrated by the distinguished chairman of the Judiciary Committee, (Mr. WILSON's speech, March 1,) and by the authorities he has cited. (1 Sharswood's Blackstone, 364; Naturalization Act of April 14, 1802; Act of February 28, 1803; Brightly's Digest, 487; Section 10 of Act of September 4, 1841; Opinions of Attorneys General, vol. 4, p. 147, (Legare;) 1 Bouvier's Law Dictionary, title Denizen; 2 Kent Com., 278, note; Marcy, Secretary of State, March 6, 1854; Attorney General Bates, Opinion, November 29, 1862; Rawle on Constitution, 80; State vs. Manuel, 3; Deveraugh & Battle's N. C. R., 26.)

In the great case of Lynch vs. Clarke, it was conclusively shown that in the absence of all constitutional provision or congressional law "declaring citizenship by birth, it must be regulated by some rule of national law" "coeval with the existence of the Union," which was and is that all "children born here are citizens without any regard to the political condition or allegiance of their parents." (1 Sandford's Ch. R., 583.)

This was the common law of England, and "the statute (25 Edward III, St. 2, De natis ultra mare) was declaratory of the old common law."

It has also been sufficiently demonstrated that the nation may by solemn act of Congress, or even by treaty, declare that classes of people collectively, shall be citizens. (Louisiana treaty, April 30, 1800; Florida treaty, 1817; Mexican treaty, 1848; Choctaw treaty, September 27, 1830; Resolution March 1, 1845, annexing Texas; Act of December 29, 1848, admitting Texas; Cherokee treaty, December 29, 1855; Act of March 3, 1843, Stockbridge Indians; Opinions of Attorneys General, vol. 7, p.746, (Cushing;) Lawrence's Appendix to Wheaton on International Law.)

It is an exercise of authority which belongs to every sovereign Power, and is essentially a subject of national jurisdiction. The whole power over citizenship is intrusted to the national Government, which can make citizens of any foreign people as an exercise of sovereignty, or under the power, "to establish a uniform rule of naturalization." (Constitution, art. 1, section 7.)

There is, then, a national citizenship. And citizenship implies certain rights which are to be protected, and imposes the duty of allegiance and obedience to the laws.

There is in this country no such thing as "legislative omnipotence." When it is said in State constitutions that "all legislative power is vested in a Senate and House of Representatives," authority is not thereby conferred to destroy all that is valuable in citizenship. Legislative powers exist in our system to pro-

tect, not to destroy, the inalienable rights of men. (1 Story Constitution, sec. 207; Taylor *vs.* Porter, 4 Hill's Reports, 147; 2 Dallas, 471; People *vs.* Morris, 13 Wendell, 328.) This has been the common understanding in our whole history, and upon which governments have been created.

The Continental Congress of 1774, composed of delegates from twelve colonies, in their Declaration of Rights, among other things, declared:

"That the inhabitants of the English colonies of North America, by the immutable laws of nature, the principles of the English constitution, and the several charters or compacts, have the following rights:

"*Resolved*, That they are entitled to life, liberty, and property, and that they have never ceded to any sovereign Power whatever a right to dispose of either without their consent."—*Hurd on Habeas Corpus*, chap. 5, p. 107.

The Declaration of Independence affirms—

"That all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness. That to secure these rights, Governments are instituted among men."

The Constitution was established, as its preamble declares, to—

"Promote the general welfare and secure the blessings of liberty."

All the law-writers agree that every citizen has certain "absolute rights," which include—

"The right of personal security, the right of personal liberty, and the right to acquire and enjoy property. These rights have been justly considered and frequently declared by the people of this country to be natural, inherent, and inalienable."—1 *Kent's Commentaries*, 599; *Federalist*, No. 84.

In Wilkinson *vs.* Leland, 2 Pet. 657, Judge Story said:

"The fundamental maxims of a free Government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority."

(See Turrett *vs.* Taylor, 9 Cranch, 43; People *vs.* Morris, 13 Wend., 328; Taylor *vs.* Porter, 4 Hill, 147; Fletcher *vs.* Peck, 6 Cranch, 87.)

The bill of rights to the national Constitution declares that:

"No person" * * * * "shall be deprived of life, liberty, or property without due process of law, nor shall private property be taken for public use without just compensation."

It has never been deemed necessary to enact in any constitution or law that citizens should have the right to life or liberty or the right to acquire property. These rights are recognized by the Constitution as existing anterior to and independently of all laws and all constitutions.

Without further authority I may assume, then, that there are certain absolute rights which pertain to every citizen, which are inherent, and of which a State cannot constitutionally deprive him. But not only are these rights inherent and indestructible, but the means whereby they may be possessed and enjoyed are equally so.

We learn from Coke that—

"When the law granteth anything to any one that also is granted without which the thing itself cannot be."—*Oath before the Justices*, 12 Co., 130; *Heard vs. Pierce*, 8 Cush. 333–345.

In law the incident always adheres to and accompanies the principle. (Broom's Legal Maxims, 198; 20 Ohio R., 409.)

It is idle to say that a citizen shall have the right to life, yet to deny him the right to labor, whereby alone he can live. It is a mockery to say that a citizen may have a right to live, and yet deny him the right to make a contract to secure the privilege and the rewards of labor. It is worse than mockery to say that men may be clothed by the national authority with the character of citizens, yet may be stripped by State authority of the means by which citizens may exist.

Even Shylock, when the decree of confiscation was pronounced against him, reasoned better; for he said:

"Nay, take my life and all, pardon not that;
You take my house, when you do take the prop
That doth sustain my house; you take my life,
When you do take the means whereby I live."

Every citizen, therefore, has the absolute right to live, the right of personal security, personal liberty, and the right to acquire and enjoy property. These are rights of citizenship. As necessary incidents of these absolute rights, there are others, as the right to make and enforce contracts, to purchase, hold, and enjoy property, and to share the benefit of laws for the security of person and property.

Now, there are two ways in which a State may undertake to deprive citizens of these absolute, inherent, and inalienable rights: either by prohibitory laws, or by a failure to protect any one of them.

If the people of a State should become hostile to a large class of naturalized citizens and should enact laws to prohibit them and no other citizens from making contracts, from suing, from giving evidence, from inheriting, buying, holding, or selling property, or even from coming into the State, that would be prohibitory legislation. If the State should simply enact laws for native-born citizens and provide no law under which naturalized citizens could enjoy any one of these rights, and should deny them all protection by civil process or penal enactments, that would be a denial of justice.

Yet twelve years have not passed since these and other hostile measures against naturalized citizens were gravely discussed in several of the States, and beyond this, it was urged that their political rights should be denied or so abridged as to be useless. History is full of instances where all this has been done or attempted. (Com. *vs.* York, 9 Metcalf Rep., 116; 2 Bennett & Heard's Lead. Crim. Cases.)

This bill, in that broad and comprehensive philanthropy which regards all men in their civil rights as equal before the law, is not made for any class or creed, or race or color, but in the great future that awaits us will, if it become a law, protect every citizen, including the millions of people of foreign birth who will flock to our shores to become citizens and to find here a land of liberty and law.

But there is a present necessity for this bill which I find forcibly stated thus:

"The fact that no single southern Legislature has yet recognized the right of blacks to the civil rights accorded to every white alien, suffices to prove the need of such legislation by Congress. We believe no single southern State has yet enabled blacks to sue and be sued, to give testimony and rebut testimony on equal terms with whites. All that they do, under the pressure of necessity, is meanly, grudgingly, shabbily done. What can be more absurd than to provide that a black may testify in cases between blacks and whites, but not when the parties are both white? If he would even swear falsely, would he not be likely to do so in a case between a white and a black? And if his oath can be taken in cases where he will naturally have a bias, why not in cases where he is likely to have none?"

"Consider the case of a riotous white attack on a colored school kept by a white woman. A black who witnessed the outrage is called to tell what he knows, and turned off because the schoolma'am was white, like the rowdies; so he is not a competent witness, unless he can swear that the roughs assaulted also a pupil; then he may be. Why is the distinction made but to insult and degrade the blacks?"

"The Cincinnati Commercial has a letter from a correspondent traveling through Mississippi, who states that the barbarous vagrant law recently passed by the rebel State Legislature is rigidly enforced, and under its provisions the freed slaves are rapidly being reënslaved. No negro is allowed to buy, rent, or lease any real estate; all minors of any value are taken from their parents and bound out to planters; and every freedman who does not contract for a year's labor is taken up as a vagrant. The officers of the Freedmen's Bureau are often not accessible, and the freedmen are kept back, by the distance, from complaining. Finally, as the writer estimates, it would take an army of twenty thousand men to compel the planters to do justice to the freedmen.

"This bill takes right hold of this matter, and subjects the oppressors to pains and penalties which they will seldom choose to invoke."

Since this statement of the condition of southern law, I believe Georgia, by an act of March 17, 1866, has made provision for the enforcement of civil rights.

It is barbarous, inhuman, infamous, to turn over four million liberated slaves, always loyal to the Government, to the fury of their rebel masters, who deny them the benefit of all laws for the protection of their civil rights. To do so, would make the age of Draco and Nero respectable in comparison with the infamy of this. It is partly because there is no such law

that the Freedmen's Bureau now, by order of the President, interposes military authority to secure the civil rights of the white Union population, and of the freedmen, the wards of the nation, in their new-born liberty.

I find in the testimony of Major General Alfred H. Terry, commanding the department of Virginia, which was taken before the reconstruction committee, March, 1866, the following:

"*Question.* What is the political character of the present Legislature of Virginia?

"*Answer.* I judge, by its actions and by the language used by many of its members in debate, that it is not a loyal Legislature.

"*Question.* In case of the withdrawal of military protection from Virginia, what would be the condition of the loyal people in Virginia, and of the blacks?

"*Answer.* I think they would be in a lamentable condition. So great is the prejudice entertained, especially against those who were faithful in their obligations to the Government during the war, that I do not think they would receive any adequate protection for their rights of person and property from the courts, and I think that they would be persecuted through the machinery of the courts, as well as privately. Even now, when military law prevails in the State, and when military authority is supreme, attempts were made in the courts to punish the Unionists for acts done by them under military authority during the war, and I have been obliged to interfere, and release from prison men thus prosecuted.

"*Question.* Has that been of frequent occurrence?

"*Answer.* I have directed the cessation of proceedings in some five or six cases of this kind. In some of them the parties had been admitted to bail; in some, they were imprisoned. I have released those in prison, and in all cases have taken possession of the indictments and warrants, and, when bonds had been given, of the bonds.

"*Question.* Would the Unionists be safe in case of the removal of the protecting troops?

"*Answer.* I think not. And in that opinion I am supported by, as I think, the unanimous feeling of the Unionists themselves, which has been frequently and still continues to be expressed to me.

"*Question.* Has the liberal policy of President Johnson, in granting pardons and amnesties to the rebels, had the effect, in your opinion, to increase or decrease the feeling of respect toward the Government of the United States on the part of the people of Virginia?

"*Answer.* I am unable to trace results to their causes in that matter; but since the time when I took command, especially since military restraint has been so much relaxed as it has been during two or three months, disloyal publications have very much increased. They seem to have increased in proportion to the relaxation of military restraint.

"*Question.* The newspaper known as the Richmond Examiner has been recently suppressed by an order emanating from General Grant?

"*Answer.* Yes, sir.

"*Question.* For the utterance of disloyal sentiments, and of language insulting to the Unionists, and to the northern section of the country?

"*Answer.* Yes, sir.

"*Question.* How is it regarded? Is it regarded as one of the leading exponents of public feeling and opinion in Virginia?

"*Answer.* It seems to be an exponent of the secession feeling.

"*Question.* Did you execute the order of General Grant?

"*Answer.* I caused it to be executed. I gave the order to General Turner, who commands in Richmond, and he executed it.

"*Question.* Has the order been revoked or modified in any way?

"*Answer.* It has.

"*Question.* By whose order, so far as you know?

"*Answer.* So far as I know officially, by General Grant's order.

"*Question.* Has it been revoked?

"*Answer.* It has been revoked, temporarily, by order of General Grant, and, as I understood, on the condition that in the future it will not pursue a course detrimental to the Government, or the growth or expression, in acts and words, of Union sentiment among the people of the States lately in rebellion, or to the cultivation of friendly relations between the people of those States, or any of them, and the other States of the Union; and that it will not, in any way, fail in its editorial correspondence, or transfer of articles from other newspapers, to give support, countenance and friendship to the Union and its supporters.

"*Question.* What is their [the late rebels] treatment, generally, of the freedmen?

"*Answer.* It is very various. Many persons are treating the freedmen kindly and justly, endeavoring to accommodate themselves to the changed circumstances of the times, and to enter into the proper relations between them, as between the employers and the employed. Many others, on the contrary, treat them with great harshness and injustice, and seek to obtain their service without just compensation, and to reduce them to a condition which will give to the former masters all the benefits of slavery, and throw upon them none of its responsibilities.

"*Question.* So far as you can judge, which class is the most numerous, those who treat the freedmen kindly or those who treat them with injustice and severity?

"*Answer.* The latter.

"*Question.* Do you think they greatly predominate in numbers?

"*Answer.* I can hardly estimate the relative proportion. I should think they predominate.

"*Question.* Do you suppose, from what you have

The motion was agreed to; and Messrs. WILSON, ANTHONY, and HENDRICKS were appointed conferees on the part of the Senate.

FORTIFICATION APPROPRIATION BILL.

The Senate proceeded to consider its amendment to the bill (H. R. No. 255) making appropriations for the construction, preservation, and repair of certain fortifications and other works of defense for the year ending June 30, 1867, which was disagreed to by the House of Representatives.

Mr. FESSENDEN. I move that the Senate insist on its amendment, and agree to the conference asked by the House.

The motion was agreed to; and Messrs. MORGAN, MORRILL, and SAULSBURY were appointed conferees on the part of the Senate.

WOMEN'S HOSPITAL.

Mr. MORRILL. There is a bill on the table which comes from the House of Representatives amended. I desire to call it up and concur in the amendments. It is Senate bill No. 167, to incorporate the Women's Hospital Association of the District of Columbia.

Mr. HOWARD. It is very nearly one o'clock, and I hope the joint resolution to amend the Constitution will be taken up.

Mr. MORRILL. This is pending simply on a question of concurring in the amendments made by the House to a bill of the Senate, and will not occupy two minutes.

Mr. HOWARD. If it does not go beyond one o'clock I shall not object.

Mr. MORRILL. Let it come up. I move to take it up.

The motion was agreed to; and the Senate proceeded to consider the amendments of the House of Representatives to the bill (S. No. 167) to incorporate the Women's Hospital Association of the District of Columbia.

The PRESIDENT pro tempore. The first amendment of the House has already been concurred in.

The Secretary read the second amendment of the House of Representatives, which was in the first section, line three, after the name "Adelaide J. Brown," to strike out all the names to and including that of "Mary K. Lewis," in line seven, except that of "Mary W. Kelly," and to insert "Elmira W. Knap, Mary C. Havermer, Mary Ellen Norment, Jane Thompson, Maria L. Harkness, Isabella Margaret Washington, and Mary F. Smith."

Mr. MORRILL. I move that the Senate concur in that amendment.

The motion was agreed to.

The next amendment was after the word "Columbia," at the end of section one, to add "by the name of the Columbia Hospital for Women and Lying-in Asylum."

Mr. MORRILL. I move that the Senate concur in that amendment.

The motion was agreed to.

The next amendment was in section two, line two to strike out the word "twelve" and insert "twenty-four" as the number of directors.

The amendment was concurred in.

The next amendment was in section three, after the word "directors" at the end of line three to insert "to consist of the first twelve of the above-named incorporators."

The amendment was concurred in.

The next amendment was in section four, line one, after the word "the" to insert "first twelve."

The amendment was concurred in.

The next amendment was in section five, after the word "Women" in line three, to insert "and Lying-in Asylum."

The amendment was concurred in.

The next amendment was in section five, line four, after the word "with" to insert "board, lodging."

The amendment was concurred in.

The PRESIDENT pro tempore. The amendments are completed.

DEATH OF GENERAL SCOTT.

The PRESIDENT pro tempore laid before the Senate the following message from the President of the United States:

*To the Senate and House of Representatives:*

With sincere regret I announce to Congress that Winfield Scott, late lieutenant general in the Army of the United States, departed this life at West Point, in the State of New York, on the 29th day of May instant, at eleven o'clock in the forenoon. I feel well assured that Congress will share in the grief of the nation which must result from its bereavement of a citizen whose high fame is identified with the military history of the Republic.

ANDREW JOHNSON.
WASHINGTON, May 30, 1866.

Mr. WILSON. I offer the following resolution:

*Resolved by the Senate,* (the House of Representatives concurring,) That the Committee on Military Affairs and the Militia of the Senate and the Committee on Military Affairs of the House of Representatives, be, and they are hereby, appointed a joint committee of the two Houses of Congress to take into consideration the message of the President of the United States announcing to Congress the death of Lieutenant General Winfield Scott, and to report what method should be adopted by Congress to manifest their appreciation of the high character, tried patriotism, and distinguished public services of Lieutenant General Winfield Scott, and their deep sensibility upon the announcement of his death.

There being no objection, the Senate proceeded to consider the resolution; and it was adopted unanimously.

Mr. WILSON. As this committee is to be a joint one, and the resolution will have to be acted on by the House of Representatives, I move, for the present, that the message of the President be laid upon the table, and printed.

The motion was agreed to.

RECONSTRUCTION.

Mr. HOWARD. I now move to take up House joint resolution No. 127.

The motion was agreed to; and the Senate, as in Committee of the Whole, resumed the consideration of the joint resolution (H. R. No. 127) proposing an amendment to the Constitution of the United States.

The PRESIDENT pro tempore. The question is on the amendments proposed by the Senator from Michigan, [Mr. HOWARD.]

Mr. HOWARD. The first amendment is to section one, declaring that "all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside." I do not propose to say anything on that subject except that the question of citizenship has been so fully discussed in this body as not to need any further elucidation, in my opinion. This amendment which I have offered is simply declaratory of what I regard as the law of the land already, that every person born within the limits of the United States, and subject to their jurisdiction, is by virtue of natural law and national law a citizen of the United States. This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of embassadors or foreign ministers accredited to the Government of the United States, but will include every other class of persons. It settles the great question of citizenship and removes all doubt as to what persons are or are not citizens of the United States. This has long been a great desideratum in the jurisprudence and legislation of this country.

The PRESIDENT pro tempore. The first amendment proposed by the Senator from Michigan will be read.

The Secretary read the amendment, which was in line nine, after the words "section one," to insert:

All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside.

So that the section will read:

SEC. 1. All persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

Mr. DOOLITTLE. I presume the honorable Senator from Michigan does not intend by this amendment to include the Indians. I move, therefore, to amend the amendment—I presume he will have no objection to it—by inserting after the word "thereof" the words "excluding Indians not taxed." The amendment would then read:

All persons born in the United States, and subject to the jurisdiction thereof, excluding Indians not taxed, are citizens of the United States and of the States wherein they reside.

Mr. HOWARD. I hope that amendment to the amendment will not be adopted. Indians born within the limits of the United States, and who maintain their tribal relations, are not, in the sense of this amendment, born subject to the jurisdiction of the United States. They are regarded, and always have been in our legislation and jurisprudence, as being *quasi* foreign nations.

Mr. COWAN. The honorable Senator from Michigan has given this subject, I have no doubt, a good deal of his attention, and I am really desirous to have a legal definition of "citizenship of the United States." What does it mean? What is its length and breadth? I would be glad if the honorable Senator in good earnest would favor us with some such definition. Is the child of the Chinese immigrant in California a citizen? Is the child of a Gypsy born in Pennsylvania a citizen? If so, what rights have they? Have they any more rights than a sojourner in the United States? If a traveler comes here from Ethiopia, from Australia, or from Great Britain, he is entitled, to a certain extent, to the protection of the laws. You cannot murder him with impunity. It is murder to kill him, the same as it is to kill another man. You cannot commit an assault and battery on him, I apprehend. He has a right to the protection of the laws; but he is not a citizen in the ordinary acceptation of the word.

It is perfectly clear that the mere fact that a man is born in the country has not heretofore entitled him to the right to exercise political power. He is not entitled, by virtue of that, to be an elector. An elector is one who is chosen by the people to perform that function, just the same as an officer is one chosen by the people to exercise the franchises of an office. Now, I should like to know, because really I have been puzzled for a long while and have been unable to determine exactly, either from conversation with those who ought to know, who have given this subject their attention, or from the decisions of the Supreme Court, the lines and boundaries which circumscribe that phrase, "citizen of the United States." What is it?

So far as the courts and the administration of the laws are concerned, I have supposed that every human being within their jurisdiction was in one sense of the word a citizen, that is, a person entitled to protection; but in so far as the right to hold property, particularly the right to acquire title to real estate, was concerned, that was a subject entirely within the control of the States. It has been so considered in the State of Pennsylvania; and aliens and others who acknowledge no allegiance, either to the State or to the General Government, may be limited and circumscribed in that particular. I have supposed, further, that it was essential to the existence of society itself, and particularly essential to the existence of a free State, that it should have the power, not only of declaring who should exercise political power within its boundaries, but that if it were overrun by another and a different race, it would have the right to absolutely expel them. I do not know that there is any danger to many of the States in this Union; but is it proposed that the people of Cal-

ifornia are to remain quiescent while they are overrun by a flood of immigration of the Mongol race? Are they to be immigrated out of house and home by Chinese? I should think not. It is not supposed that the people of California, in a broad and general sense, have any higher rights than the people of China; but they are in possession of the country of California, and if another people of a different race, of different religion, of different manners, of different traditions, different tastes and sympathies are to come there and have the free right to locate there and settle among them, and if they have an opportunity of pouring in such an immigration as in a short time will double or treble the population of California, I ask, are the people of California powerless to protect themselves? I do not know that the contingency will ever happen, but it may be well to consider it while we are on this point.

As I understand the rights of the States under the Constitution at present, California has the right, if she deems it proper, to forbid the entrance into her territory of any person she chooses who is not a citizen of some one of the United States. She cannot forbid his entrance; but unquestionably, if she was likely to be invaded by a flood of Australians or people from Borneo, man-eaters or cannibals if you please, she would have the right to say that those people should not come there. It depends upon the inherent character of the men. Why, sir, there are nations of people with whom theft is a virtue and falsehood a merit. There are people to whom polygamy is as natural as monogamy is with us. It is utterly impossible that these people can meet together and enjoy their several rights and privileges which they suppose to be natural in the same society; and it is necessary, a part of the nature of things, that society shall be more or less exclusive. It is utterly and totally impossible to mingle all the various families of men, from the lowest form of the Hottentot up to the highest Caucasian, in the same society.

It must be evident to every man intrusted with the power and duty of legislation, and qualified to exercise it in a wise and temperate manner, that these things cannot be; and in my judgment there should be some limitation, some definition to this term "citizen of the United States." What is it? Is it simply to put a man in a condition that he may be an elector in one of the States? Is it to put him in a condition to have the right to enter the United States courts and sue? Or is it only that he is entitled as a sojourner to the protection of the laws while he is within and under the jurisdiction of the courts? Or is it to set him upon some pedestal, some position, to put him out of the reach of State legislation and State power?

Sir, I trust I am as liberal as anybody toward the rights of all people, but I am unwilling, on the part of my State, to give up the right that she claims, and that she may exercise, and exercise before very long, of expelling a certain number of people who invade her borders; who owe to her no allegiance; who pretend to owe none; who recognize no authority in her government; who have a distinct, independent government of their own—an *imperium in imperio*; who pay no taxes; who never perform military service; who do nothing, in fact, which becomes the citizen, and perform none of the duties which devolve upon him, but, on the other hand, have no homes, pretend to own no land, live nowhere, settle as trespassers wherever they go, and whose sole merit is a universal swindle; who delight in it, who boast of it, and whose adroitness and cunning is of such a transcendent character that no skill can serve to correct it or punish it; I mean the Gypsies. They wander in gangs in my State. They follow no ostensible pursuit for a livelihood. They trade horses, tell fortunes, and things disappear mysteriously. Where they came from nobody knows. Their very origin is lost in mystery. No man to-day can tell from whence the Zingara come or whither they go, but it is understood that they are a distinct people. They never intermingle with any other. They never intermarry with any other. I believe there is no instance on record where a Zingara woman has mated with a man of any other race, although it is true that sometimes the males of that race may mate with the females of others; but I think there is no case in history where it can be found that a woman of that race, so exclusive are they, and so strong are their sectional antipathies, has been known to mate with a man of another race. These people live in the country and are born in the country. They infest society. They impose upon the simple and the weak everywhere. Are those people, by a constitutional amendment, to be put out of the reach of the State in which they live? I mean as a class. If the mere fact of being born in the country confers that right, then they will have it; and I think it will be mischievous.

I think the honorable Senator from Michigan would not admit the right that the Indians of his neighborhood would have to come in upon Michigan and settle in the midst of that society and obtain the political power of the State, and wield it, perhaps, to his exclusion. I do not know that anybody would agree to that. It is true that our race are not subjected to dangers from that quarter, because we are the strongest, perhaps; but there is a race in contact with this country which, in all characteristics except that of simply making fierce war, is not only our equal, but perhaps our superior. I mean the yellow race; the Mongol race. They outnumber us largely. Of their industry, their skill, and their pertinacity in all worldly affairs, nobody can doubt. They are our neighbors. Recent improvement, the age of fire, has brought their coasts almost in immediate contact with our own. Distance is almost annihilated. They may pour in their millions upon our Pacific coast in a very short time. Are the States to lose control over this immigration? Is the United States to determine that they are to be citizens? I wish to be understood that I consider those people to have rights just the same as we have, but not rights in connection with our Government. If I desire the exercise of my rights I ought to go to my own people, the people of my own blood and lineage, people of the same religion, people of the same beliefs and traditions, and not thrust myself in upon a society of other men entirely different in all those respects from myself. I would not claim that right. Therefore I think, before we assert broadly that everybody who shall be born in the United States shall be taken to be a citizen of the United States, we ought to exclude others besides Indians not taxed, because I look upon Indians not taxed as being much less dangerous and much less pestiferous to society than I look upon Gypsies. I do not know how my honorable friend from California looks upon Chinese, but I do know how some of his fellow-citizens regard them. I have no doubt that now they are useful, and I have no doubt that within proper restraints, allowing that State and the other Pacific States to manage them as they may see fit, they may be useful; but I would not tie their hands by the Constitution of the United States so as to prevent them hereafter from dealing with them as in their wisdom they see fit.

Mr. CONNESS. Mr. President, I have failed to learn, from what the Senator has said, what relation what he has said has to the first section of the constitutional amendment before us; but that part of the question I propose leaving to the honorable gentleman who has charge of this resolution. As, however, the State of California has been so carefully guarded from time to time by the Senator from Pennsylvania and others, and the passage, not only of this amendment, but of the so-called civil rights bill, has been deprecated because of its pernicious influence upon society in California, owing to the contiguity of the Chinese and Mongolians to that favored land, I may be excused for saying a few words on the subject.

If my friend from Pennsylvania, who professes to know all about Gypsies and little about Chinese, knew as much of the Chinese and their habits as he professes to do of the Gypsies, (and which I concede to him, for I know nothing to the contrary,) he would not be alarmed in our behalf because of the operation of the proposition before the Senate, or even the proposition contained in the civil rights bill, so far as it involves the Chinese and us.

The proposition before us, I will say, Mr. President, relates simply in that respect to the children begotten of Chinese parents in California, and it is proposed to declare that they shall be citizens. We have declared that by law; now it is proposed to incorporate the same provision in the fundamental instrument of the nation. I am in favor of doing so. I voted for the proposition to declare that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States, entitled to equal civil rights with other citizens of the United States.

Now, I will say, for the benefit of my friend, that he may know something about the Chinese in future, that this portion of our population, namely, the children of Mongolian parentage, born in California, is very small indeed, and never promises to be large, notwithstanding our near neighborhood to the Celestial land. The habits of those people, and their religion, appear to demand that they all return to their own country at some time or other, either alive or dead. There are, perhaps, in California to-day about forty thousand Chinese—from forty to forty-five thousand. Those persons return invariably, while others take their places, and, as I before observed, if they do not return alive their bones are carefully gathered up and sent back to the Flowery Land. It is not an unusual circumstance that the clipper ships trading between San Francisco and China carry at a time three or four hundred human remains of these Chinese. When interred in our State they are not interred deep in the earth, but laid very near the surface, and then mounds of earth are laid over them, so that the process of disinterment is very easy. That is their habit and custom; and as soon as they are fit for transmission to their own country they are taken up with great regularity and sent there. None of their bones are allowed to remain. They will return, then, either living or dead.

Another feature connected with them is, that they do not bring their females to our country but in very limited numbers, and rarely ever in connection with families; so that their progeny in California is very small indeed. From the description we have had from the honorable Senator from Pennsylvania of the Gypsies, the progeny of all Mongolians in California is not so formidable in numbers as that of the Gypsies in Pennsylvania. We are not troubled with them at all. Indeed, it is only in exceptional cases that they have children in our State; and therefore the alarming aspect of the application of this provision to California, or any other land to which the Chinese may come as immigrants, is simply a fiction in the brain of persons who deprecate it, and that alone.

I wish now to address a few words to what the Senator from Pennsylvania has said as to the rights that California may claim as against the incursion of objectionable population from other States and countries. The State of California at various times has passed laws restrictive of Chinese immigration. It will be remembered that the Chinese came to our State, as others did from all parts of the world, to gather gold in large quantities, it being found there. The interference with our own people in the mines by them was deprecated by and generally objectionable to the miners in California. The Chinese are re-

garded, also, not with favor as an addition to the population in a social point of view; not that there is any intercourse between the two classes of persons there, but they are not regarded as pleasant neighbors; their habits are not of a character that make them at all an inviting class to have near you, and the people so generally regard them. But in their habits otherwise, they are a docile, industrious people, and they are now passing from mining into other branches of industry and labor. They are found employed as servants in a great many families and in the kitchens of hotels; they are found as farm hands in the fields; and latterly they are employed by thousands—indeed, I suppose there are from six to seven thousand of them now employed in building the Pacific railroad. They are there found to be very valuable laborers, patient and effective; and, I suppose, before the present year closes, ten or fifteen thousand of them, at least, will be employed on that great work.

The State of California has undertaken, at different times, to pass restrictive statutes as to the Chinese. The State has imposed a tax on their right to work the mines, and collected it ever since the State has been organized—a tax of four dollars a month on each Chinaman; but the Chinese could afford to pay that and still work in the mines, and they have done so. Various acts have been passed imposing a poll tax or head tax, a capitation tax, upon their arrival at the port of San Francisco; but all such laws, when tested before the supreme court of the State of California, the supreme tribunal of that people, have been decided to be unconstitutional and void.

Mr. HOWARD. A very just and constitutional decision, undoubtedly.

Mr. CONNESS. Those laws have been tested in our own courts, and when passed under the influence of public feeling there they have been declared again and again by the supreme court of the State of California to be void, violative of our treaty obligations, an interference with the commerce of the nation. Now, then, I beg the honorable Senator from Pennsylvania, though it may be very good capital in an electioneering campaign to declaim against the Chinese, not to give himself any trouble about the Chinese, but to confine himself entirely to the injurious effects of this provision upon the encouragement of a Gypsy invasion of Pennsylvania. I had never heard myself of the invasion of Pennsylvania by Gypsies. I do not know, and I do not know that the honorable Senator can tell us, how many Gypsies the census shows to be within the State of Pennsylvania. The only invasion of Pennsylvania within my recollection was an invasion very much worse and more disastrous to the State, and more to be feared and more feared, than that of Gypsies. It was an invasion of rebels, which this amendment, if I understand it aright, is intended to guard against and to prevent the recurrence of. On that occasion I am not aware, I do not remember that the State of Pennsylvania claimed the exclusive right of expelling the invaders, but on the contrary my recollection is that Pennsylvania called loudly for the assistance of those sister States to aid in the expulsion of those invaders—did not claim it as a State right to exclude them, did not think it was a violation of the sovereign rights of the State when the citizens of New York and New Jersey went to the field in Pennsylvania and expelled those invaders.

But why all this talk about Gypsies and Chinese? I have lived in the United States for now many a year, and really I have heard more about Gypsies within the last two or three months than I have heard before in my life. It cannot be because they have increased so much of late. It cannot be because they have been felt to be particularly oppressive in this or that locality. It must be that the Gypsy element is to be added to our political agitation, so that hereafter the negro alone shall not claim our entire attention. Here is a simple declaration that a score or a few score of human beings born in the United States shall be regarded as citizens of the United States, entitled to civil rights, to the right of equal defense, to the right of equal punishment for crime with other citizens; and that such a provision should be deprecated by any person having or claiming to have a high humanity passes all my understanding and comprehension.

Mr. President, let me give an instance here, in this connection, to illustrate the necessity of the civil rights bill in the State of California; and I am quite aware that what I shall say will go to California, and I wish it to do so. By the influence of our "southern brethren," who I will not say invaded California, but who went there in large numbers some years since, and who seized political power in that State and used it, who made our statutes and who expounded our statutes from the bench, negroes were forbidden to testify in the courts of law of that State, and Mongolians were forbidden to testify in the courts; and therefore for many years, indeed, until 1862, the State of California held officially that a man with a black skin could not tell the truth, could not be trusted to give a relation in a court of law of what he saw and what he knew. In 1862 the State Legislature repealed the law as to negroes, but not as to Chinese. Where white men were parties the statute yet remained, depriving the Mongolian of the right to testify in a court of law. What was the consequence of preserving that statute? I will tell you. During the four years of rebellion a good many of our "southern brethren" in California took upon themselves the occupation of what is there technically called "road agents." It is a term well known and well understood there. They turned out upon the public highways, and became robbers, highway robbers; they seized the treasure transmitted and conveyed by the express companies, by our stage lines, and in one instance made a very heavy seizure, and claimed that it was done in accordance with the authority of the so-called confederacy. But the authorities of California hunted them down, caught a few of them, and caused them to be hanged, not recognizing the commission of Jeff. Davis for those kinds of transactions within our bounds. The spirit of insubordination and violation of law, promoted and encouraged by rebellion here, affected us so largely that large numbers of— I will not say respectable southern people, and I will not say that it was confined to them alone—but large numbers of persons turned out upon the public highways, so that robbery was so common upon the highways, particularly in the interior and in the mountains of that State, that it was not wondered at, but the wonder was for anybody that traveled on the highways to escape robbery. The Chinese were robbed with impunity, for if a white man was not present no one could testify against the offender. They were robbed and plundered and murdered, and no matter how many of them were present and saw the perpetration of those acts, punishment could not follow, for they were not allowed to testify. Now, sir, I am very glad indeed that we have determined at length that every human being may relate what he heard and saw in a court of law when it is required of him, and that our jurors are regarded as of sufficient intelligence to put the right value and construction upon what is stated.

So much for what has been said in connection with the application of this provision to the State that I in part represent here. I beg my honorable friend from Pennsylvania to give himself no further trouble on account of the Chinese in California or on the Pacific coast. We are fully aware of the nature of that class of people and their influence among us, and feel entirely able to take care of them and to provide against any evils that may flow from their presence among us. We are entirely ready to accept the provision proposed in this constitutional amendment, that the children born here of Mongolian parents shall be declared by the Constitution of the United States to be entitled to civil rights and to equal protection before the law with others.

Mr. HOWARD. There is a typographical error in the amendment now under consideration. The word "State" in the eleventh line is printed "States." It should be in the singular instead of the plural number, so as to read "all persons born in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State" (not States) "wherein they reside." I move that that correction be made.

Mr. JOHNSON. I suggest to the Senator from Michigan that it stands just as well as it is.

Mr. HOWARD. I wish to correct the error of the printer; it is printed "States" instead of "State."

The PRESIDENT pro tempore. The correction will be made.

Mr. JOHNSON. I doubt whether it is an error of the printer.

The PRESIDENT pro tempore. The question is on the amendment proposed by the Senator from Wisconsin to the amendment of the Senator from Michigan to the resolution before the Senate.

Mr. DOOLITTLE. I moved this amendment because it seems to me very clear that there is a large mass of the Indian population who are clearly subject to the jurisdiction of the United States who ought not to be included as citizens of the United States. All the Indians upon reservations within the several States are most clearly subject to our jurisdiction, both civil and military. We appoint civil agents who have a control over them in behalf of the Government. We have our military commanders in the neighborhood of the reservations, who have complete control. For instance, there are seven or eight thousand Navajoes at this moment under the control of General Carlton, in New Mexico, upon the Indian reservations, managed, controlled, fed at the expense of the United States, and fed by the War Department, managed by the War Department, and at a cost to this Government of almost a million and a half of dollars every year. Because it is managed by the War Department, paid out of the commissary fund and out of the appropriations for quartermasters' stores, the people do not realize the enormous expense which is upon their hands. Are these six or seven thousand Navajoes to be made citizens of the United States? Go into the State of Kansas, and you find there any number of reservations, Indians in all stages, from the wild Indian of the plains, who lives on nothing but the meat of the buffalo, to those Indians who are partially civilized and have partially adopted the habits of civilized life. So it is in other States. In my own State there are the Chippewas, the remnants of the Winnebagoes, and the Pottawatomies. There are tribes in the State of Minnesota and other States of the Union. Are these persons to be regarded as citizens of the United States, and by a constitutional amendment declared to be such, because they are born within the United States and subject to our jurisdiction?

Mr. President, the word "citizen," if applied to them, would bring in all the Digger Indians of California. Perhaps they have mostly disappeared; the people of California, perhaps, have put them out of the way; but there are the Indians of Oregon and the Indians of the Territories. Take Colorado; there are more Indian citizens of Colorado than there are white citizens this moment if you admit it as a State. And yet by a constitutional amendment you propose to declare the Utes, the Tabahuaches, and all those wild Indians to be citizens of the United States, the great Republic of the world, whose citizenship should be a

these communities, as I call them, will remain in the Union until by treaty with some Power outside or organized inside we consent to let them go out of the Union.

It is said that such a resolution as I proposed would effect the very object at which the rebellion was aimed. What was that? They aimed, if I understood their purpose, to throw off utterly and altogether the authority of the United States. Their proclamation was that within their respective limits the United States should exercise no control whatever. The resolution which I submitted to the Senate asserted, on the other hand, that the United States within those respective limits should exert the sole control for the time being. Is there no difference between the two propositions? We called them traitors because they denied that the United States had any authority within their limits. Is it traitorous to say that the United States has more power than it had before they raised the standard of rebellion?

But if it be not disloyal to the United States to assert that stretch of authority on its part it is said it is disloyal to the States; that it tramples upon the rights of the States. How does it trample upon the rights of States? I admit, of course, that the authority of this Government is limited. I admit that we can exercise no authority but what is delegated to us in the Constitution. I admit that all the rest of the authority belonging to Government is reserved to the States. We have no quarrel and no dispute upon these points. I admit that the right of representation is a right which is given by the Constitution to the several States. But I desire to say once more to the Senate that that right of representation is not a right given to all States. Nobody claims it for any State outside of the American Union, and I say it belongs to no State inside of the American Union unless it conforms to the conditions which the Constitution imposes upon every State. When those conditions are set aside and abjured, then that right falls. It can be claimed by no State inside of the Union unless it be conceded to the State first by the Congress of the United States. It is the lack of that concession which prevents Colorado from having representation here to-day. She claims to be a State. She has adopted her constitution. She has sent here her representatives. The two Houses have agreed by a majority of their votes to admit them. But the President has vetoed the bill, and so there is upon the statute-book no law authorizing them to send representatives here, and they are not received. But does that exclude Colorado from the Union, or does it trample upon the right of a State? That right has never been conceded to her by Congress yet, and she does not insist upon the exercise of it until it be conceded.

But you tell me this right has been conceded once by Congress to Louisiana, to Mississippi, and to Alabama. Yes, Mr. President, it was conceded once to those communities which I call them, to each of the others which have been in rebellion. How, then? Answer me, what is the consequence of that? When the right and the character of a State was conceded by an act of Congress to the State of Alabama or the State of Mississippi, did the United States stipulate forever thereafter to exercise none of the powers which she had before exercised in those limits under any circumstances whatever? When Congress first conceded the right to Alabama to send her representatives here, was that a right which continued to her under all circumstances whatever beyond the power of forfeiture? If so, you must concede that that right remained during the very heat and strife of the war. If she could not forfeit that; if it was a continual, perpetual right, your doors would have been bound to swing open at the knock of her representatives, if she sent them here when the war was at its height, and you were protected against having representatives from your direst and deadliest enemies in these Halls only by the simple circumstance that they were a little too chivalrous or not sufficiently impudent to send them here to claim the right.

It will not be asserted that that right cannot be forfeited. No Senator on this floor who really loves the authority of this Government and means to abide by it and uphold it will pretend that Alabama, while this war was waging, could send her representatives here. "Oh," but you say, "why not let her send them here if they were loyal?" Why, sir, Alabama, while she was disloyal, would not choose loyal representatives, but if she did choose loyal representatives her representatives could not come this side of her lines without the permission of your Army. It was an offense against the laws of the United States for any man, no matter what were his personal dispositions, to come through those lines without the permission of the Government. There was a wall built up between everybody on that side and on this; not merely Congress, but your military boundaries were closed against every man, let his personal dispositions be what they might, coming from the rebellious districts.

But, Mr. President, I say that this right conceded to those States was not an absolute, unconditional, continuing right. It is a right to be exercised only under certain conditions. Every State claiming the right to send representatives here must show, first, the authority of Congress to do it; secondly, must show that they have a government, administering their own local affairs, which is republican in form; thirdly, it must be a State which has no engagements and no treaties either with another State or with any foreign Power; for that is expressly prohibited by the Constitution to all States; and fourthly, it must have a government, every officer of which, executive, legislative, and judicial, must be under an oath to support the Constitution of the United States; because the Constitution expressly forbids that any authority of government shall be wielded in any State by officers who are not under such an oath.

I insist that whenever a State violates either of these conditions it forfeits in law, and Congress may declare a forfeiture in fact, of the right to make its own laws, and of the right to participate in making our laws. Congress may declare that forfeiture in fact, because if you have not the authority to declare that forfeiture you cannot enforce these clauses of the Constitution. If the State of Mississippi sees fit to set up a government which is not republican but monarchical in form, to vest all the local power in the hands of a single individual for life, and in his heirs, and if you cannot interfere with the exercise of that authority by such a tribunal, by such a form of government, and strip him of it by an act of Congress, that clause of the Constitution is a dead letter. There is no other remedy to cure such a wrong as that. And so if they make treaties with other States or with foreign Powers; and so if they refuse to let their officers take the oath to support the Constitution of the United States, unless you have the power to resume the function which you delegated to her as a State, you cannot enforce those three commandments of the Constitution.

Sir, I admit it is hard to degrade a State to a Territory; I admit it is a harsh remedy to take the prerogatives of a State from a great community; but it is not so harsh after all as to take their lives; and when by the express words of your statute they forfeited their lives and you remit them that, is it worth while to talk of the harshness of taking these prerogatives of government from them?

But you say that although this right of local government is forfeited by the disloyal majority, it still lives in the loyal minority. I should say it was a very harsh and unjust remedy to take wantonly the prerogatives of a State from a loyal minority, simply because the majority about them were disloyal and traitorous. It has been said, where you find ten loyal men in a State there is the State, and you must let it be and exist. Mr. President, there is some plausibility in that. I meet it by asking where you can, in any one of these communities, find the local power in the hands of ten loyal men. Nay, I ask you where, in any one of these communities, outside of Tennessee, and perhaps Arkansas, you can find ten loyal men exercising any portion of that local authority? Loyalty is not tolerated in these local governments. Talk to the American Congress about stripping loyal men of authority in South Carolina or elsewhere! Loyal men have no authority there, they have had no authority from the beginning of this struggle. Talk about the harshness to the loyal men of taking the prerogatives of States from these communities! I do not see the hardship to loyal men. Every particle of local authority vested by the Constitution in a State had been secured to the hands of traitors, and by the exercise of that power they had forced whatever of loyalty there was in the community into an unholy and unwilling subserviency to the cause of rebellion. Is it harsh to loyal men to take power from the hands which use it thus? I do not conceive it to be so. When we take power from or deny power to the majority in these rebellious States, we simply deny it to the worst enemies the loyal men in these communities have or can have; and when we find that power in the hands of their direst enemies, to wrest it from them, it seems to me, is not only the highest duty which we owe to them, but for it we have the clearest warrant of the Constitution.

I do not agree with the Senator from Vermont [Mr. POLAND] that the framers of the Constitution never contemplated such an emergency as this, and therefore never provided for it. I say, in the express letter of the Constitution you have the authority to do just what I ask to have done. I will read it. After enumerating certain express powers which Congress may exercise, the Constitution declares that it shall have power—

"To make all laws which shall be necessary and proper for carrying into execution the foregoing power and all other powers vested by this Constitution in the Government of the United States or in any department or officer thereof."

If the power which that resolution asserted is not given there you cannot frame a clause which would clothe Congress with that power more clearly.

Mr. President, upon this question I have said all, perhaps more than I ought to have said. The question has passed from the consideration of Congress. There were difficulties outside of the Constitution in the way of the exercise of that authority, no matter how clearly it resided in the Congress of the United States. When Congress met here the President of the United States himself had for months been busy with the work that he called reconstruction. He had exercised, himself, the very authority which I claimed for Congress. He had abolished every one of those governments by a word of his mouth, and had done just what I asked Congress to do—established provisional governments. He had taken steps to supersede those which he called provisional governments with others which he called State governments, but which are to-day only provisional governments, nothing more nor less.

It has seemed good to the committee of fifteen not to disturb unnecessarily what the President had done, but to take his handiwork and to work it into some complete plan of reconstruction. Hence, it seems to have been thought advisable by them to let these organizations stand or stagger as they might, to do what they could with the work of home government, and to take the question from that point and settle if they could some terms upon which the other right, the right of representation, should be conceded to them by Congress. They have finally submitted, or there is submitted to the Senate, a joint resolution for an

amendment of the Constitution of the United States. Allow me briefly to run over its propositions.

It first proposes to declare that "all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the States wherein they reside." That is the first proposition. Is there any objection to it? The Senator from Indiana [Mr. HENDRICKS] yesterday, I think, assailed this proposition as one calculated to degrade the great right of American citizenship, a right which he seemed to think should be held exclusively to the use and behoof of the nobler and loftier races of the world. It degrades, does it, sir, the character of American citizenship to admit all men to it who are born and reared upon American soil? Mr. President, I dissent from that idea altogether, and I was surprised to hear it fall from the lips of the Senator from Indiana, of all men in the world. I thought he was a Democrat. I thought he boasted himself the champion of equal rights. I thought that was the bread and the meat and the drink of his political creed. I did not think he belonged to that class of nobility that measure their exaltation by the number of negroes they have under their heels. I did not suppose he felt it necessary to stand upon the necks of human beings in order to secure his patent of nobility; and I was surprised to hear this sentiment fall from his lips. I differ from it so widely and so radically as this, that I say there is no one proposition in the proposed amendment, and nothing in the Constitution as it stands, which will do so much to elevate the character and the dignity of American citizenship as that simple proposition. Nay, sir, I go further, and I tell you you will never have occasion to boast but you will always have occasion to blush for American citizenship until the time shall come when you can say to all the world that American institutions do not raise a man that is not worthy to be an American citizen and is not clothed with its panoply. I will vote for this proposition, and I shall not fear that American citizenship will be degraded by incorporating this clause in the Constitution.

It proposes further to say that—

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Sir, does any one object to putting that proposition into the Constitution? Does any one on this floor desire to reserve to any State the right to abridge the privileges or immunities of citizens? Do you do it in the State in which you reside, sir, [Mr. HENDRICKS in the chair,] and whose legislation and institutions you have done so much to mold? Is it done in any of the States represented here? I cannot deny it for all of them; but for many of them I do happen to know that no such abridgment of privileges or immunities is tolerated. Is it necessary, however, to incorporate such an amendment into your Constitution? Do you find in any of these communities seeking to participate in the legislation of the United States an appetite so diseased as seeks to abridge these privileges and these immunities, which seeks to deny to all classes of its citizens the protection of equal laws? Yes, Mr. President, I am sorry to say, we do find just such an appetite, and it is necessary to amend your Constitution in this year of our Lord in order to prevent the gratification of that diseased appetite. It is known to the wide world now that but for the authority which has been exerted on the part of the United States most of these communities which now seek the right to participate in our legislation would have denied to a large portion of their respective populations the plainest and most necessary rights of citizenship. The right to hold land when they had bought it and paid for it would have been denied them; the right to collect their wages by the processes of the law when they had earned their wages; the right to appear in the courts as suitors for any wrong done them or any right denied them; the right to give testimony in any court, even when the facts might be within their knowledge—all these rights would have been denied in most if not all of these communities but for the fact, for which I have once before rendered and now again render thanks to the President of the United States, that he sat his face against these provisions or most of them, and said he would not tolerate them nor allow them to be sanctioned in any one of these communities.

Most of these pretenses have been abandoned in most of these communities; but, sir, these are not the only rights that can be denied; these are not the only particulars in which unequal laws can be imposed. I have taken considerable pains to look over the actual legislation which has taken place in these several communities with reference to their several constituencies. I could, it seems to me, interest the Senate for a long time by reading from that legislation, but I shall not delay the Senate longer than to call its attention to a single instance. I read not long since a statute enacted by the Legislature of Florida for the education of her colored people. I read it in a Florida newspaper. The paper boasted itself that Florida was the first State to step forward and attempt the work of educating the children of her colored population. And now, sir, I ask the attention of the Senate to the provision which that Legislature made for the education of their colored population. They make provision for the education of their white children also, and everybody who has any property there is taxed for the education of the white children. Black and white are taxed alike for that purpose; but for the education of colored children a fund is raised only from colored men. It amounts to one dollar a head upon all colored males between the ages of twenty-one and fifty-five years. There were in 1860 between twelve thousand three hundred and twelve thousand four hundred colored males between the ages of twenty and fifty-five in Florida, so that that fund would yield about twelve thousand dollars dedicated to the work of educating the colored children of Florida—not a magnificent endowment, one would think. But how is it to be expended? First, there is to be a superintendent of colored schools for the State to be paid out of it, and he is to receive a salary of $2,000. That reduces it essentially. Next, there is to be an assistant superintendent of colored schools for each county at $200 a year. There are in the State of Florida, I believe, thirty-nine counties, which would give $7,800 to the assistant superintendents. Add that to the salary of the State superintendent, and it takes $9,800 from the school fund to pay the superintendents, leaving $2,200 to pay the teachers. But the fund is not left quite so destitute as that; they require each one of the teachers to pay five dollars to the fund to get a license to teach. They are to be examined, their fitness ascertained, and if permission is given them to teach they are to pay five dollars, and that goes to the fund. That swells it; when that license is purchased they can set up a school. Into that school, however, it is worthy of remark that no child can go without permission of the superintendent or his assistant, and no child can stay a day without the permission of the superintendent or his assistant, and the teacher who has paid five dollars for the permission to teach cannot hold that permission a day longer than the superintendent or assistant superintendent sees fit to allow, for the statute expressly authorizes the superintendent or assistant superintendent to vacate or annul the certificate whenever he shall see fit for incompetency or "other good cause"—any cause which seems good to the superintendent or assistant superintendent.

There, Mr. President, I have submitted to you one of the statutes in one of these States, as you will have them to be, touching one of the great interests not only of this colored population but of the State itself, and I ask you, any of you to-day, if in view of one such fact as that you dare hesitate to put in the Constitution of the United States a positive inhibition upon exercising this power of local government to sanction such a crime as I have just portrayed.

Again, sir, we propose to change the basis of representation in the different States. We propose to base it still upon numbers; but it is proposed to say that if in any State the right of suffrage is denied to any portion of its male inhabitants over the age of twenty-one years, then a certain portion of the inhabitants of that State shall be excluded from the numbers counted in the basis of representation. Is that objected to? Yes. Is it not just? Will you tell me what reason there is why when three million people inhabiting these States are denied the right to vote for Representatives, other three millions should have a double representation in the Congress of the United States? To all the people who are allowed to choose Representatives in those States we give by this amendment just the representation that we give to the same number of people in any other State. The effect of it simply is to say that those people who are not allowed to choose Representatives shall not be represented. They cannot be represented; it is a physical impossibility. It is no use to talk about three million colored people being represented, when not one of them is consulted in the choice of Representatives. The Representatives chosen for those men are representing some other men, not them.

I am sorry to have to put that clause into our Constitution, as I am sorry for the necessity which calls upon us to put the preceding clause into the Constitution. I wish there was no community and no State in the United States that was not prepared to say with my friend from Nevada that all men may be represented in the Congress of the United States and shall be represented and shall choose their own Representatives. That is the better doctrine; that is the true doctrine. I would much prefer, myself, to unite with the people of the United States in saying that hereafter no man shall be excluded from the right to vote, than to unite with them in saying that hereafter some men may be excluded from the right of representation.

Sir, to the debate which we have had on this question of the right of suffrage I have listened with a great deal of interest. I trust I have derived some instruction from it, but after all it is not so much as I think would have come to me but for the fact that since I have first known politics at all, I think I have known that no State can deny to any large portion of its adult male population the right to vote, the right to an equal voice in the making of its laws and the choice of its officers, without danger to that State, the whole community, as well as great wrong to the individuals excluded.

I know it is said that these colored people who have just been released from slavery down there in these communities are not fit to vote. I admit it. Who is fit to vote? Only the man who always knows how to vote right, and who always will vote right, is really fit to vote; and, tried by that standard, how many of us are qualified to vote? These people, it is said, are very ignorant, very debased, utterly uncultured and untutored. Yes, Mr. President, I believe that is so. Who made them so? The very men who you insist shall have the exclusive right of voting there. Is it more dangerous to be an ignorant man than to make an ignorant man? Tell me that. Is he a more dangerous member of the State who simply is ignorant, than he who having the power to