# CITIZENSHIP

## OF THE

# UNITED STATES

———————

BY

FREDERICK VAN DYNE, LL. M.,

Assistant Solicitor of the Department of State of the
United States.

———————

**Fred B. Rothman & Co.**
LITTLETON, COLORADO
1980

Entered according to Act of Congress, in the Year nineteen hundred three, by
FREDERICK VAN DYNE,
In the Office of the Librarian of Congress, at Washington, D. C.

ISBN: 0-8377-1229-7

E. R. ANDREWS PRINTING COMPANY, Rochester, N. Y.

# CITIZENSHIP

## OF THE

# UNITED STATES

————————

BY

FREDERICK VAN DYNE, LL. M.,

Assistant Solicitor of the Department of State of the
United States.

————————

THE LAWYERS' CO-OPERATIVE PUBLISHING CO.

ROCHESTER, NEW YORK

1904

Entered according to Act of Congress, in the Year nineteen hundred three, by
FREDERICK VAN DYNE,
In the Office of the Librarian of Congress, at Washington, D. C.

E. R. ANDREWS PRINTING COMPANY, Rochester, N. Y.

# PART I.

## CITIZENSHIP BY BIRTH.

————

### CHAPTER I.

#### CITIZENSHIP BY BIRTH IN THE UNITED STATES.

1. Common-law doctrine.
2. Civil rights act and 14th Amendment are declaratory of common-law rule.
3. Children born in United States of alien parentage.
4. Dual citizenship of children of aliens born in United States; election of nationality.

**1. Common-law doctrine.**— There is no uniform rule of international law covering the subject of citizenship. Every nation determines for itself who shall, and who shall not, be its citizens. According to the law of some states, citizenship by birth depends upon the place of birth. This is the *jus soli*, or common-law doctrine. According to the law of other states, citizenship depends upon the nationality of the parents. This is the *jus sanguinis*,—sometimes erroneously termed the doctrine of the law of nations, because it obtains in many countries. In some countries both elements exist, the one or the other, however, predominating. By the law of the United States, citizenship depends, generally, on the place of birth; nevertheless the children

3

of citizens, born out of the jurisdiction of the United States, are
also citizens. The existence of these two doctrines, side by side,
in this country, is the cause of much of the confusion which has
arisen in relation to citizenship in the United States. Formerly,
the lack of any definition of citizenship in our fundamental law
and in our statutes further complicated the matter; and the
somewhat ambiguous language employed in supplying this de-
fect rendered it a debatable question whether or not it was in-
tended to declare the common-law doctrine.

The Constitution of the United States, while it recognized
citizenship of the United States in prescribing the qualifications
of the President, Senators, and Representatives, contained no
definition of citizenship until the adoption of the 14th Amend-
ment, in 1868; nor did Congress attempt to define it until the
passage of the civil rights act, in 1866. 14 Stat. at L. 27, chap.
31, U. S. Comp. Stat. 1901, p. 1268. Prior to this time the
subject of citizenship by birth was generally held to be regulated
by the common law, by which all persons born within the limits
and allegiance of the United States were deemed to be natural-
born citizens thereof.

It appears to have been assumed by the Supreme Court of
the United States in the case of *Murray* v. *The Charming Betsy*
(1804) 2 Cranch, 64, 119, 2 L. ed. 208, 226, that all persons
born in the United States were citizens thereof. Chief Justice
Marshall said in that case: "Whether a person born within the
United States, or becoming a citizen according to the established
laws of the country, can devest himself absolutely of that charac-
ter otherwise than in such manner as may be prescribed by law,
is a question which it is not necessary at present to decide."
See also *Inglis* v. *Sailor's Snug Harbor,* 3 Pet. 99, 7 L. ed. 617,
and *Shanks* v. *Dupont,* 3 Pet. 242, 7 L. ed. 666.

In *M'Creery* v. *Somerville* (1824) 9 Wheat. 354, 6 L. ed.

109, which concerned the title to land in the state of Maryland, it was assumed that children born in that state of an alien were native-born citizens of the United States.

This matter was elaborately considered in the case of *Lynch v. Clarke,* 1 Sandf. Ch. 583, decided in 1844 in New York. In that case one Julia Lynch, born in New York in 1819, of alien parents, during their temporary sojourn in that city, returned with them the same year to their native country, and always resided there afterwards. It was held that she was a citizen of the United States. After an exhaustive examination of the law, the court said that it entertained no doubt that every person born within the dominions and allegiance of the United States, whatever the situation of his parents, was a natural-born citizen; and added that this was the general understanding of the legal profession, and the universal impression of the public mind.

The executive departments of our government have repeatedly affirmed this doctrine.

Mr. Marcy, Secretary of State, in 1854, in an instruction to Mr. Mason, United States Minister to France, said: "In reply to the inquiry which is made by you, . . . whether 'the children of foreign parents born in the United States, but brought to the country to which the father is a subject, and continuing to reside within the jurisdiction of their father's country, are entitled to protection as citizens of the United States,' I have to observe that it is presumed that, according to the common law, any person born in the United States, unless he be born in one of the foreign legations therein, may be considered a citizen thereof until he formally renounces his citizenship." Mr. Marcy to Mr. Mason, June 6, 1854, MSS. Inst. France.

Attorney General Black, in 1859, held that "a free white person born in this country of foreign parents is a citizen of the United States." 9 Ops. Atty. Gen. 373.

Attorney General Bates, in 1862, held that a child born in the United States of alien parents who have never been naturalized is, by the fact of birth, a native-born citizen of the United States, entitled to all the rights and privileges of citizenship. 10 Ops. Atty. Gen. 382.

And in the same year Attorney General Bates, in the celebrated opinion given by him to Mr. Chase, the Secretary of the Treasury, on the citizenship of free men of color born in the United States, said: "As far as I know, Mr. Secretary, you and I have no better title to the citizenship which we enjoy than the 'accident of birth,'—the fact that we happened to be born in the United States. And our Constitution, in speaking of natural-born citizens, uses no affirmative language to make them such, but only recognizes and reaffirms the universal principle, common to all nations, and as old as political society, that the people born in a country do constitute the nation, and, as individuals, are natural members of the body politic. If this be a true principle (and I do not doubt it), it follows that every person born in this country is, at the moment of birth, prima facie a citizen; and he who would deny it must take upon himself the burden of proving some great disfranchisement strong enough to override the 'natural-born' right as recognized by the Constitution in terms the most simple and comprehensive, and without any reference to race or color, or any other accidental circumstance. That nativity furnishes the rule, both of duty and of right as between the individual and the government, is a historical and political truth so old and so universally accepted that it is needless to prove it by authority." 10 Ops. Atty. Gen. 394.

It is beyond doubt that, before the enactment of the civil rights act of 1866 (Rev. Stat. § 1992, U. S. Comp. Stat. 1901, p. 1268), or the adoption of the constitutional amendment, all white persons, at least, born within the sovereignty of

the United States, whether children of citizens or foreigners, excepting only children of ambassadors or public ministers of a foreign government, were native-born citizens of the United States. *United States* v. *Wong Kim Ark,* 169 U. S. 674, 42 L. ed. 900, 18 Sup. Ct. Rep. 456.

**2. Civil rights act and 14th Amendment are declaratory of common-law rule.—** The civil rights act, adopted April 9, 1866 (Rev. Stat. § 1992, U. S. Comp. Stat. 1901, p. 1268), contains this language: "All persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are declared to be citizens of the United States."

. The 1st section of the 14th Amendment to the Constitution, adopted in 1868, declares that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside."

These two definitions, which are practically identical, are declaratory of the common law.

The clause in the civil rights act defining citizenship was proposed in the Senate. In the course of the debate in that body, Senator Trumbull, the chairman of the judiciary committee, who drew the bill, said: "It is competent for Congress to declare, under the Constitution of the United States, who are citizens. If there were any question about it, it would be settled by the passage of a law declaring all persons born in the United States to be citizens thereof. That this bill proposes to do." Cong. Globe, 1st Sess. 39th Congress, pt. 1, p. 475.

In the discussion Senator Morrill asked the following question, to which no reply was made: "As matter of law, does anybody deny here, or anywhere, that the native-born is a citizen, and a citizen by virtue of his birth alone?" Id. p. 570.

In reply to the remarks of Senator Henderson, of Missouri, in

regard to the various amendments which had been proposed to
the 1st section of the act, Senator Trumbull said: "The sen-
ator from Missouri and myself desire to arrive at the same point
precisely, and that is to make citizens of everybody born in the
United States who owe allegiance to the United States.
We cannot make a citizen of the child of a foreign minister
who is temporarily residing here. There is a difficulty
in framing the amendment so as to make citizens of all
the people born in the United States, and who owe allegiance to
it. I thought that might, perhaps, be the best form in which to
put the amendment at one time, 'that all persons born in the
United States, and owing allegiance thereto, are hereby declared
to be citizens;' but, upon investigation, it was found that a sort
of allegiance was due to the country from persons temporarily
residing in it whom we would have no right to make citizens,
and that that form would not answer. Then it was suggested
that we should make citizens of all persons born in the United
States not subject to any foreign power or tribal authority. The
objection to that was, that there were Indians not subject to
tribal authority, who yet were wild and untamed in their habits,
who had by some means or other become separated from their
tribes, and were not under the laws of any civilized community,
and of whom the authorities of the United States took no juris-
diction. . . . Then it was proposed to adopt the amend-
ment as it now stands,—that all persons born in the United
States, not subject to any foreign power, excluding Indians not
taxed, shall be citizens." Id. p. 572.

When the bill came back to the House with the amendments
made by the Senate, Mr. Wilson, of Iowa, chairman of the house
judiciary committee, said: "The 1st section of the bill contains
the following declaration concerning citizenship: That all per-
sons born in the United States, and not subject to any foreign
power, excluding Indians not taxed, are hereby declared to be

citizens of the United States.  .  .  .   This provision, I main-
tain, is merely declaratory of what the law now is." He cited,
among other authorities, the following quotation from Rawle on
the Constitution, p. 80:  "Every person born within the United
States, its territories or districts, whether the parents are citi-
zens or aliens, is a natural-born citizen in the sense of the Con-
stitution, and entitled to all the rights and privileges appertain-
ing to that capacity."   Id. pt. 2, pp. 1115, 1117.

Mr. Thayer, of Pennsylvania, said that the bill was an enact-
ment simply declaring that all men born upon the soil of the
United States shall enjoy the fundamental rights of citizenship.
Id. p. 1151.

Mr. Broomall said: "The first provision of the bill declares
that all persons born in the United States, and not subject to
any foreign power, are citizens of the United States.  As a
positive enactment, this would hardly seem necessary.  Even as
a declaration of existing law, a proposition that at most can only
be said to embrace the true meaning of the word 'citizen' would
seem to find its more appropriate place in the elementary
treatises upon law, rather than upon the statute books.  What is
a citizen but a human being who, by reason of his being born
within the jurisdiction of a government, owes allegiance to that
government?"  Id. p. 1262.

The 14th Amendment was pending before the same Congress
which enacted the civil rights law.  Objections were made to
that law, and great doubt was expressed as to its validity.  To
obviate the objections which had been raised to its 1st section,
and to place the common rights of American citizenship under
the protection of the national government, it was deemed wise
to incorporate the declaration in the fundamental law.  The
phraseology adopted in the amendment is somewhat different
from that of the civil rights act.  For the qualifying phrase,

"not subject to any foreign power," is substituted the affirmative one, "subject to the jurisdiction thereof." The words, "excluding Indians not taxed," are omitted as unnecessary, such persons not being deemed to be "subject to the jurisdiction" of the United States. The amendment also declares that all persons who are citizens of the United States by reason of their birth or naturalization are also citizens of the state in which they reside.

The amendment as it came from the House contained no definition of citizenship. Senator Howard, of Michigan, proposed to insert such a definition. He said: "The first amendment is to § 1, declaring that 'all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the states wherein they reside.'* . . . This amendment which I have offered is simply declaratory of what I regard as the law of the land already,—that every person born within the limits of the United States, and subject to their jurisdiction, is, by virtue of natural law and national law, a citizen of the United States. This will not, of course, include persons born in the United States who are foreigners, aliens, who belong to the families of ambassadors or foreign ministers accredited to the government of the United States, but will include every other class of persons. It settles the great question of citizenship, and removes all doubt as to what persons are, or are not, citizens of the United States. This has long been a great *desideratum* in the jurisprudence and legislation of this country." Cong. Globe, 1st Session, 39th Congress, pt. 4, p. 2890.

Senator Cowan asked whether the child of the Chinese immigrant, born in California, was a citizen.

---

*The amendment as finally adopted contained the language proposed by Senator Howard, except that the words "or naturalized" were inserted, without objection or discussion, at the suggestion of Mr. Fessenden.

Senator Conness said that it was proposed by the amendment to declare that the children begotten of Chinese parents in California shall be citizens. He added: "We have declared that by law; now it is proposed to incorporate the same provision in the fundamental instrument of the nation. I am in favor of doing so. I voted for the proposition to declare that the children of all parentage whatever, born in California, should be regarded and treated as citizens of the United States." Id. p. 2891.

Mr. Doolittle said that the civil rights act was the forerunner of the constitutional amendment, which was brought forward to give validity to the statute. Id. p. 2896.

Mr. Johnson said: "The Constitution as it now stands recognizes a citizenship of the United States. . . . But there is no definition in the Constitution as it now stands, as to citizenship. Who is a citizen of the United States, is an open question. The decision of the courts, and the doctrine of the commentators, is that every man who is a citizen of a state becomes *ipso facto* a citizen of the United States; but there is no definition as to how citizenship can exist in the United States except through the medium of citizenship in a state. Now, all that this amendment provides is that all persons born in the United States, and not subject to some foreign power,—for that, no doubt, is the meaning of the committee who have brought the matter before us,—shall be considered as citizens of the United States. That would seem to be, not only a wise, but a necessary, provision. If there are to be citizens of the United States entitled everywhere to the character of citizens of the United States, there should be some certain definition of what citizenship is, what has created the character of citizen as between himself and the United States; and the amendment says that citizenship may depend upon birth, and I know of no better way to

give rise to citizenship than the fact of birth within the territory
of the United States, born of parents who at the time were sub-
ject to the authority of the United States." Id. 2893.

These quotations from the debates in Congress plainly show
the intention of the framers of the civil rights act, and of the
amendment to the Constitution, to reaffirm the fundamental
principle of citizenship by birth.

**3. Children born in United States of alien parentage.**— The Fed-
eral courts have almost uniformly held that birth in the United
States, of itself, confers citizenship. In two cases the courts
have used language which has been relied upon in support of a
contrary view. These will now be considered.

In delivering the opinion of the court in the *Slaughter-House
Cases,* 16 Wall. 73, 21 L. ed. 408, Mr. Justice Miller said:
"The phrase, 'subject to the jurisdiction,' was intended to ex-
clude from its operation children of ministers, consuls, and citi-
zens or subjects of foreign states born within the United States."

This has been cited in support of the contention that the chil-
dren born in this country to aliens are not citizens of the United
States. It is to be observed, however, that this is only a *dictum.*
The question was not involved in the decision of the case before
the court. The classing together of foreign ministers and con-
suls, when it was at the time well-settled law that consuls, as
such, and unless expressly invested with a diplomatic character,
are not entitled, by the law of nations, to the privileges and im-
munities of ambassadors, shows that the statement was not form-
ulated with the same care and exactness as if the case before the
court had called for a precise definition of the phrase. And the
fact that neither Mr. Justice Miller, nor any of the justices who
took part in the decision above referred to, understood the court
to be committed to the view that children born in the United
States of alien parents were excluded from the operation of the

first sentence of the 14th Amendment, is shown by the unanimous opinion of the court in the case of *Minor v. Happersett,* 21 Wall. 162, 22 L. ed. 627, decided but two years later, when all these judges but Chief Justice Chase were still on the bench.    The court said: "Allegiance and protection are, in this connection [in relation to citizenship], reciprocal obligations. . . . At common law, with the nomenclature of which the framers of the Constitution were familiar, it was never doubted that all children born in a country, of parents who were its citizens, became themselves, upon their birth, citizens also.    These were natives or natural-born citizens, as distinguished from aliens or foreigners.    Some authorities go further, and include as citizens children born within the jurisdiction, without reference to the citizenship of their parents.    As to this class there have been doubts, but never as to the first.    For the purposes of this case it is not necessary to solve these doubts.    It is sufficient for everything we have now to consider that all children born of citizen parents within the jurisdiction are themselves citizens."

The decision in this case was that a woman born of citizen parents within the United States was a citizen of the United States, although not entitled to vote, the elective franchise not being essential to citizenship.

In the case of *Elk* v. *Wilkins,* 112 U. S. 99–103, 28 L. ed. 645–647, 5 Sup. Ct. Rep. 41, the Supreme Court, in construing the words "subject to the jurisdiction thereof," said: "The evident meaning of these last words is, not merely subject in some respect or degree to the jurisdiction of the United States, but completely subject to their political jurisdiction, and owing them direct and immediate allegiance."

This language has also been cited in support of the contention that birth in the United States to alien parents does not confer American citizenship.    What the court decided in this case was

**14** CITIZENSHIP.

that an Indian born a member of one of the Indian tribes within
the United States, which still existed and was recognized as an
Indian tribe by the United States, who had voluntarily separated
himself from his tribe, and taken up his residence among the
white citizens of a state, but who did not appear to have been
naturalized, or taxed, or in any way recognized or treated as a
citizen, either by the United States or by the state, was not a
citizen of the United States, as a person born in the United
States, "and subject to the jurisdiction thereof," within the
meaning of the clause in question. The court said that by the
Constitution, as originally established, "Indians not taxed" were
excluded from the persons according to whose numbers repre-
sentatives in Congress and direct taxes were apportioned among
the several states, and Congress was empowered to regulate com-
merce, not only with foreign nations and among the sev-
eral states, but with the Indian tribes; that the Indian
tribes, being within the territorial limits of the United
States, were not, strictly speaking, foreign states, but were
alien nations, distinct political communities, the members
of which owed immediate allegiance to their several tribes,
and were no part of the people of the United States; that the
alien and dependent condition of one of those tribes could not be
put off at their own will, without the action or assent of the
United States; and that they were never deemed citizens, except
when naturalized, collectively or individually, under explicit
provisions of a treaty, or of an act of Congress; and therefore
that "Indians born within the territorial limits of the United
States, members of, and owing immediate allegiance to, one of
the Indian tribes (an alien, though dependent, power), although
in a geographical sense born in the United States, are no more
'born in the United States and subject to the jurisdiction there-
of,' within the meaning of the 1st section of the 14th Amend-

ment, than the children of subjects of any foreign government born within the domain of that government, or the children born within the United States of ambassadors or other public ministers of foreign nations." And it was observed that the language used in defining citizenship, in the 1st section of the civil rights act of 1866 (14 Stat. at L. 27, chap. 31, U. S. Comp. Stat. 1901, p. 1268), by the very Congress which framed the 14th Amendment, was, "all persons born in the United States, and not subject to any foreign power, excluding Indians not taxed."

This decision concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country.

In *McKay* v. *Campbell,* 2 Sawy. 118, Fed. Cas. No. 8,840, decided by the United States circuit court in 1871, it was held that the son of a British father and a Chinook Indian woman, born in Oregon during the joint occupation of the country under the convention between the United States and Great Britain, was not a citizen of the United States. This decision was not based on the fact that the father was an alien, but on the ground that the son was not born subject to the exclusive jurisdiction of the United States. The circuit court said: "The rule of the common law . . . is plain and well settled, both in England and America. Except in the case of children of ambassadors, who are in theory born upon the soil of the sovereign whom the parent represents, a child born in the allegiance of the King is born his subject, without reference to the political status or condition of its parents. Birth and allegiance go together."

The court continued: "When it is said that, by the common law, a person born of alien parents, and in the allegiance of the

United States, is born a citizen thereof, it is necessarily under-
stood that he is not only born on soil over which the United
States has or claims jurisdiction, but that such jurisdiction for
the time being is both actual and exclusive, so that such person
is, in fact, born within the power, protection, and obedience of
the United States.  Generally speaking, the various places in
the world are claimed or admitted, for the time being, to be
under the exclusive jurisdiction of some particular sovereign or
government, so that a person born at any one of them is, without
doubt, born in the allegiance of such particular sovereign or
government.  But that is not this case,—which in this respect
is a singular one.  Its parallel has not been found in the books.
The country of the plaintiff's birth was, at the time thereof,
jointly occupied by the citizens and subjects of two governments
in pursuance of a treaty to that effect.  Under the circumstances,
neither government can be considered as exercising general ex-
clusive jurisdiction over the country and its inhabitants."

Quoting the language of § 1 of the 14th Amendment, the
court said: "This is nothing more than declaratory of the rule
of the common law, as above stated.  To be a citizen of the
United States by reason of his birth, a person must not only be
born within its territorial limits, but he must also be born sub-
ject to its jurisdiction,—that is, in its power and obedience.
The only other construction of this clause that I can imagine
possible is the following:  Taken literally, it does not appear
to require that the person should be born 'subject to the jurisdic-
tion of the United States;' but, if he is born within its territorial
limits, whether under its jurisdiction or not, and afterwards be-
comes subject to such jurisdiction, he then, and so long as this
status continues, becomes and remains a citizen of the United
States.  .  .  .  But I think such construction fanciful and arti-
ficial.  It is not to be presumed that the amendment was made to

the Constitution to change the rule of the common law, but rather to declare and enforce it uniformly throughout the United States and the several states, and especially in the case of the negro."

In the case of *Re Look Tin Sing,* 10 Sawy. 353, 21 Fed. 905, decided in 1884, the United States circuit court held that a person born in the United States of Chinese parents who were themselves aliens and incapable of becoming naturalized was a citizen of the United States. Look Tin Sing was born in California in 1870, his parents being Chinese subjects who had resided in California since 1864. When he was nine years of age he went to China, and five years later returned to the United States. His admission was resisted on the ground that he was without the certificate of identity required of Chinese persons by the acts of 1882 and 1884 (22 Stat. at L. 58, chap. 126, § 4, and 23 Stat. at L. 115, chap. 220, § 4). Mr. Justice Field, who delivered the opinion of the court, cited approvingly the case of *Lynch* v. *Clarke,* 1 Sandf. Ch. 583, and said: "Independently of the constitutional provision, it has always been the doctrine of this country, except as applied to Africans brought here and sold as slaves, and their descendants, that birth within the dominions and jurisdiction of the United States of itself creates citizenship. The clause as to citizenship was inserted in the amendment, not merely as an authoritative declaration of the generally recognized law of the country so far as the white race is concerned, but also to overrule the doctrine of the *Dred Scott Case,* affirming that persons of the African race brought to this country and sold as slaves, and their descendants, were not citizens of the United States, nor capable of becoming such. . . . The clause changed the entire status of these people. It lifted them from their condition of mere freedmen, and conferred upon them, equally with all other native-born, the rights of citizenship. When it was adopted the naturalization

Cɪᴛ. 2

laws of the United States excluded colored persons from becoming citizens, and the freedmen and their descendants, not being aliens, were without the purview of those laws. So, the inability of persons to become citizens under those laws in no respect impairs the effect of their birth, or of the birth of their children, upon the status of either as citizens under the amendment in question."

Quoting the language of the 1st section of the Amendment, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside," the court said: "This language would seem to be sufficiently broad to cover the case of the petitioner. He is a person born in the United States. Any doubt on the subject, if there can be any, must arise out of the words 'subject to the jurisdiction thereof.' They, alone, are subject to the jurisdiction of the United States who are within their dominions and under the protection of their laws, and with the consequent obligation to obey them, when obedience can be rendered; and only those thus subject by their birth or naturalization are within the terms of the amendment. The jurisdiction over these latter must, at the time, be both actual and exclusive. The words mentioned except from citizenship children born in the United States of persons engaged in the diplomatic service of foreign governments, such as ministers and ambassadors, whose residence, by a fiction of public law, is regarded as part of their own country. This extraterritoriality of their residence secures to their children born here all the rights and privileges which would inure to them had they been born in the country of their parents.* Persons born on a public vessel of a foreign country, whilst within the waters of the

---

*See For. Rel. 1891, pp. 19, 21.

United States, and consequently within their territorial juris-
diction, are also excepted.   They are considered as born in the
country to which the vessel belongs.   In the sense of public law,
they are not born within the jurisdiction of the United States.
The language used has, also, a more extended purpose.   It was
designed to except from citizenship persons who, though born or
naturalized in the United States, have renounced their alle-
giance to our government, and thus dissolved their political con-
nection with the country."

With this explanation of the meaning of the words, "subject
to the jurisdiction thereof," Justice Field said:   "It is evident
that they do not exclude the petitioner from being a citizen.   He
is not within any of the classes of persons excepted from citizen-
ship; and the jurisdiction of the United States over him at the
time of his birth was exclusive of that of any other country."

This decision has since been followed by the Federal courts.
See the cases of *Ex parte Chin King,* 35 Fed. 354; *Re Yung
Sing Hee,* 36 Fed. 437; *Re Wy Shing,* 36 Fed. 553; *Gee Fook
Sing* v. *United States,* 1 C. C. A. 211, 7 U. S. App. 27, 49 Fed.
146; and *Re Wong Kim Ark,* 71 Fed. 382.

In *Wy Shing's Case,* decided in 1888, Judge Sawyer said:
"In *Look Tin Sing's Case,* 10 Sawy. 353, 21 Fed. 905, after
a full argument by able counsel and careful consideration by
the court, Mr. Justice Field, with the concurrence of the circuit
and district judges, held that a person born in the United States,
of Chinese parents not engaged in the diplomatic service of any
foreign government, is born subject to the jurisdiction of the
United States, and is a citizen thereof, under the provisions of
the 14th Amendment to the national Constitution.   .   .   .   I
am still satisfied with this ruling, but, if I were in doubt, I
should not presume to overrule Mr. Justice Field upon a ques-
tion which he has so maturely considered and decided.   If the

point was erroneously decided, then children of Caucasian parentage, born under similar circumstances, are not citizens; and hundreds of thousands have for years been unlawfully enjoying and exercising all the rights of citizens, civil and political."

In the similar case of *Gee Fook Sing* v. *United States,* the court said: "Inasmuch as the 14th article of the Amendments to the Constitution of the United States declares that all persons born in the United States, and subject to the jurisdiction thereof, are citizens of the United States, and of the state wherein they reside, the laws excluding immigrants who are Chinese laborers are inapplicable to a person born in this country, and subject to the jurisdiction of this government, even though his parents were not citizens, nor entitled to become citizens, under the laws providing for the naturalization of aliens."

In the *Case of Wong Kim Ark,* decided in January, 1896, by the United States district court for the northern district of California, it was contended by counsel for the United States, who were opposing his admission into this country, that, according to the rule of international law, the political status of the child follows that of the father; that this doctrine exists in the United States, and not that of the common law; that the words "subject to the jurisdiction thereof," in the 14th Amendment, mean subject to the political jurisdiction of the United States; that, therefore, a person born in this country of a Chinese father and mother, both domiciled residents of the United States, is not a citizen of the United States. Judge Morrow, in delivering the opinion of the court, said: "The 14th Amendment to the Constitution of the United States must be controlling upon the question presented for decision in this matter, irrespective of what the common law or international doctrine is. But the interpre-

tation thereof is undoubtedly confused and complicated by the
existence of these two doctrines, in view of the ambiguous and
uncertain meaning of the qualifying phrase 'subject to the juris-
diction thereof,' which renders it a debatable question as to which
rule the provision was intended to declare. Whatever of doubt
there may be is with respect to the interpretation of that phrase.
Does it mean, 'subject to the laws of the United States,' com-
prehending, in this expression the allegiance that aliens owe, in
a foreign country, to obey its laws; or does it signify, 'to be
subject to the political jurisdiction of the United States,' in
the sense that is contended for on the part of the government?
This question was ably and thoroughly considered in *Re Look
Tin Sing,* 10 Sawy. 353, 21 Fed. 905, where it was held that
it meant subject to the laws of the United States. . . . The
opinion discusses and decides the precise question involved in
the case at bar. There, as here, a person of Chinese descent,
born in the United States, but whose parents had always been
subjects of the Emperor of China, claimed the right to land in
the United States by virtue of his right as a citizen thereof,
and, as such citizen, to be unaffected by any of the Chinese
exclusion acts. The court held that, although born here of
parents who were subjects of the Emperor of China, he was a
citizen [of the United States] within the meaning of the 14th
Amendment."

The court, after quoting copiously from Justice Field's
opinion in *Look Tin Sing's Case,* and referring to the *Cases of
Chin King, Yung Sing Hee,* and *Gee Fook Sing,* said: "It is
clear that these decisions, . . . determining, as they do,
the identical question involved in the case at bar, are conclusive
and controlling upon this court, unless the Supreme Court of the
United States has directly and authoritatively, and not by way

of *dictum,* announced and laid down a doctrine at variance with
that expounded in the cases in this circuit."

The court referred to the statement (mentioned above) in
the *Slaughter-House Cases,* 16 Wall. 36, 21 L. ed. 394, and to
*Elk* v. *Wilkins,* 112 U. S. 94, 28 L. ed. 643, 5 Sup. Ct. Rep.
41, and held that the former was but *obiter dictum,* while the
latter did not dispose of the matter. In conclusion, Judge
Morrow said: "Counsel for the United States have argued
with considerable force against the common-law rule and its
recognition, as being illogical and likely to lead to perplexing,
and perhaps serious, international conflicts, if followed in all
cases. But these observations are, obviously, addressed to the
policy of the rule, and not to its interpretation. The doctrine
of the law of nations,* that the child follows the nationality of
the parents, and that citizenship does not depend upon mere
accidental place of birth, is undoubtedly more logical, reason-
able, and satisfactory, but this consideration will not justify
this court in declaring it to be the law against controlling judi-
cial authority. It may be that the executive departments of the
government are at liberty to follow this international rule in
dealing with questions of citizenship which arise between this
and other countries, but that fact does not establish the law for
the courts in dealing with persons within our own territory. In
this case the question to be determined is as to the political
status and rights of Wong Kim Ark under the law in this coun-

---

*There is, in reality, no international-law rule of citizenship whereby the
children born of the subjects or citizens of one country in the territory of
another follow the nationality of the parents. Whether the children born
abroad of the citizens or subjects of a state shall have the nationality of
their parents, is a question for the exclusive determination of the municipal
law of the individual state. A nation is supposed to be the only proper
judge of who are its citizens or subjects. International law has nothing
to do with the question.

try. . . . From the law as announced and facts as stipulated, I am of opinion that Wong Kim Ark is a citizen of the United States within the meaning of the citizenship clause of the 14th Amendment." 71 Fed. 382.

This case being taken, on appeal, to the Supreme Court, that tribunal, in March, 1898 (169 U. S. 649, 42 L. ed. 890, 18 Sup. Ct. Rep. 456), affirmed the judgment of the court below, and authoritatively settled the question we have been considering. The court laid down these propositions:

1. By the common law, every child born in England of alien parents was a natural-born subject, unless the child of a diplomatic representative of a foreign government, or of an alien enemy in hostile occupation of the place where the child was born.

2. This rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the Constitution as originally established.

3. There is no ground for the theory that, at the time of the adoption of the 14th Amendment of the Constitution of the United States, there was any settled and definite rule of international law, generally recognized by civilized nations, inconsistent with the ancient rule of citizenship by birth within the dominion.

4. The Constitution of the United States must be interpreted in the light of the common law.

5. The 14th Amendment and the civil rights act of 1866 (14 Stat. at L. 27, chap. 31, U. S. Comp. Stat. 1901, p. 1268) reaffirmed in the most explicit and comprehensive terms the fundamental principle of citizenship by birth.

6. It is the inherent right of every independent nation to determine for itself and according to its own Constitution or laws what classes of persons shall be entitled to its citizenship.

24                    CITIZENSHIP.

The court said that "the real object of the 14th Amendment of the Constitution, in qualifying the words, 'all persons born in the United States,' by the addition, 'and subject to the jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest words (besides children of members of the Indian tribes, standing in a peculiar relation to the national government, unknown to the common law), the two classes of cases,—children born of alien enemies in hostile occupation* and children of diplomatic representatives of a foreign state,—both of which, as has already been shown, by the law of England, and by our own law, from the time of the first settlement of the English colonies in America, had been recognized exceptions to the fundamental rule of citizenship by birth within the country."

Acting Secretary Adee in an instruction to the United States Embassy in Rome, August 8, 1901, said:  "The position of the Department is that birth in the United States, irrespective of the nationality of the parents, confers American citizenship. In view of the decisions of our Federal courts, there can be no doubt of the correctness of this position."  For. Rel. 1901, p. 303.

The foregoing establishes, beyond controversy, that, by our law, the children born to foreigners in the United States are citizens of the United States.

**4. Dual citizenship of children of aliens born in United States; election of nationality.**— It is objected to this disposition of the

---

*The children of enemies, born in a place within the dominions of another sovereign then occupied by them by conquest, are still aliens; but the children of the natives, born during such temporary occupation by conquest, are, upon a reconquest or reoccupation by the original sovereign, deemed, by a sort of postliminy, to be subjects from their birth, although they were then under the actual sovereignty and allegiance of an enemy. *Inglis* v. *Sailor's Snug Harbor*, 3 Pet. 156, 7 L. ed. 637.

question that it leaves room for frequent conflicts of law in cases where the alien parent is a subject of a country whose laws declare that the children born abroad, of its subjects, are also its subjects. From the fact that every state has the right to determine by its own law who shall be entitled to its citizenship, conflicts of law result, and it frequently happens that a person has a dual nationality. Such conflicts are not resolved by a resort to the principles of international law. In respect to all persons as to whose nationality a difference of legal theory can exist, international law has made no choice, and it is left open to states to act as they like. Hall, International Law, 4th ed. chap. 5, § 66. As in conflicts of law in relation to other matters, however, states have shown a disposition to relax sovereign rights, and have made mutual concessions by which the effects of conflicts of law in regard to nationality are to a considerable extent avoided.

It is a principle, recognized by a large number of states, that where there is a conflicting claim to the allegiance of a person, —one country claiming him by reason of his birth within its jurisdiction, and the other by virtue of his parentage,— he must, upon reaching majority, or within a reasonable time thereafter, make an election of nationality.

The British act of 1870 declares that "any person who is born out of Her Majesty's dominions, of a father being a British subject, may, if of full age, and not under any disability, make a declaration of alienage, . . . and, from and after the making of such declaration, shall cease to be a British subject." 33 & 34 Vict. 104, chap. 14.

The right of election is also recognized by the laws of France, Spain, Belgium, Greece, Bolivia, Italy, Portugal, and Mexico.

CITIZENSHIP.

Hall, International Law, 3d ed. pp. 222, 223 ; 2 Wharton, International Law Dig. 404.

The practical recognition of this principle by this government is illustrated in the following cases:

Mr. Seward held, in 1868, that "the son born in this country (of a native Prussian) acquired the right of electing to which country he should claim citizenship.   This election he appears to have exercised in favor of Prussia by his residence there for years with his father and by a continued residence there after arriving at the age of twenty-one years."   Mr. Seward to Mr. Banks, April 7, 1868, MSS. Dom. Let.

Mr. Fish held that "the minor child of a Spaniard, born in the United States, and while in the United States, or in any other country than Spain, is a citizen of the United States. The United States has, however, recognized the principle that persons, although entitled to be deemed citizens by its laws, may also, by the law of some other country, be held to allegiance in that country."   Mr. Fish to Mr. Cushing, February 16, 1877, MSS. Inst. to Spain; 2 Wharton, International Law Dig. 396.

Mr. Evarts, in an instruction to the United States Minister at Paris, held that a child who, born in the United States to French parents, goes in his minority to France and there remains voluntarily after he has become of full age, may be held to have abjured his American nationality.   Mr. Evarts to Mr. Noyes, December 31, 1878, MSS. Inst. to France.

And in an instruction to Mr. White, United States Minister to Germany, Secretary Evarts said that the sons born in this country to a German, naturalized here, are, though they were taken back, for a few years during their minority, to Germany, citizens of the United States, they having returned to this country before having arrived at full age, and electing it as their

domicil when arriving at full age.    MSS. Inst. to Germany, June 6, 1879, 2 Wharton, International Law Dig. 397.

Minor children born in this country to naturalized citizens, afterwards temporarily visiting Germany, are entitled to passports to return to the United States on the eve of their coming of age.    Mr. Evarts to Mr. White, April 23, 1880, MSS. Inst. to Germany, 2 Wharton, International Law Dig. 397.

And in another case Mr. Evarts said: "A person born in the United States has a right, though he has intermediately been carried abroad by his parents, to elect the United States as a nationality when he arrives at full age."    Mr. Evarts to Mr. Cramer, November 12, 1880, MSS. Inst. to Denmark, 2 Wharton, International Law Dig. 397.

Friedrich De Bourry was born in New York city, in 1862, of Austrian parents then temporarily resident in that city, where he remained until he was five years of age, when he accompanied his mother to Europe.    Two years later his father joined him and his mother in Vienna, where the father died in 1880. The son engaged in the Austrian railway service until 1886, at which time he applied to the United States Legation for a passport as an American citizen.    The matter being referred to the Department of State, Mr. Bayard declined to grant the passport because there was no evidence that young De Bourry had ever made, or intended to make, an election to become a citizen of the United States.    Said he: It is not "pretended that when, on December 5, 1883, the present memorialist ar-·rived at full age, he took any steps to make or record his election of citizenship in the United States.    For several years before that date he was old enough, with his mother's permission, which it is plain, from her affidavit, she was ready to give, to come to the country of his birth, if it had been the country of his intended citizenship.    He alleges no effort of this kind, nor any

act or event indicating his election of United States citizenship when he arrived at full age. . . . He has exhibited no such proof of an election, on arriving at full age, of United States citizenship as now entitles him to a passport. An election, in a case of dual or doubtful allegiance, which is the utmost which can be claimed in the present case, must be made on attaining majority, or shortly afterwards, and must be signified by acts plainly expressive of intention, such as immediate preparations to return to the elected country." Mr. Bayard to Mr. Lee, July 24, 1886, MSS. Inst. to Austria, 2 Wharton, International Law Dig. 401, 402.

In the *Case of Steinkauler,* 15 Ops. Atty. Gen. 18, who was born in the United States of German parents and taken to Germany at the age of four years, and who was called upon to report for duty in the German army when twenty years of age, Attorney General Pierrepont said: "Young Steinkauler is a native-born American citizen. There is no law of the United States under which his father or any other person can deprive him of his birthright. He can return to America at the age of twenty-one, and in due time, if the people elect, he can become President of the United States. . . . I am of opinion that when he reaches the age of twenty-one years he can then elect whether he will return and take the nationality of his birth, with its duties and privileges, or retain the nationality acquired by the act of his father. This seems to me to be 'right reason,' and I think it is law." In view of the fact that the son was domiciled with the father, and subject to him under the law during his minority, and as he declined to give any assurance of intention of ever returning to the United States and claiming his American nationality by residence here, the Attorney General held that he could not rightfully invoke the aid of this government to relieve him from military duty in Germany dur-

ing his minority. See also *Case of Blesch,* For. Rel. 1877, p. 247, and the *Case of Pipping's Sons,* For. Rel. 1899, pp. 600, 603.

François Heinrich was born in the United States of Austrian parents, and was taken to Austria when two years of age, where he remained for twenty years, when he was called upon to render military service. He claimed exemption on the ground that he was an American citizen. There was in force between the United States and Austria a treaty of naturalization, providing that citizens of the one country, who have resided in the territories of the other uninterruptedly at least five years, and during such residence have become naturalized, shall be held to be citizens of the latter country. According to the Austrian law, the children born abroad to subjects of Austria are Austrians. Secretary Fish, upon the advice of Attorney General Williams (14 Ops. Atty. Gen. 154), held that, though François Heinrich was a native of this country, and as such originally clothed with American nationality, yet, having resided in Austria uninterruptedly far beyond the period mentioned in the treaty, and having at different times obtained passports from the Austrian government and traveled under its protection as an Austrian subject, he must be deemed to have acquired Austrian citizenship. Mr. Fish to Baron Lederer, December 24, 1872, For. Rel. 1873, p. 78.

Bernard J. Gautier, who claimed as an American citizen before the United States and Mexican claims commission, convention of 1868 (15 Stat. at L. 679), was born in Texas of French parents, and at the age of nineteen years removed to Mexico with his mother, a widow, where they established a commercial house. While in Mexico he presented to a commission, established under a treaty between Mexico and France, a claim as a French subject. The French and Mexican commission

considered him entitled to French nationality, and made an award in his favor.   The United States and Mexican commission held that, as it did not appear that the parents of the claimant were naturalized during their residence in Texas, it was to be presumed that they retained their original French nationality; that the claimant, who left the United States before arriving at the age of twenty-one years, was entitled, according to the French Code, to retain the nationality transmitted by his parents; that the laws of Mexico did not forbid such election; but that he was not entitled to renounce his French nationality and elect that of the United States, after he had abandoned the latter country to establish himself in another, and after he had made a valid act of adoption of French nationality.   Moore, International Arbitrations, 2450.

In the case of Josef Georg Surmann, who was born in Cleveland, Ohio, in 1873, of a German father, and who, in 1874, was taken by his father to Germany where he had continued to reside, Secretary Olney, in 1896, said: "Josef Georg Surmann is, according to the Constitution and laws of the United States, a citizen thereof by birth.   Conformably to a general rule of international law, followed by this Department in its special rulings in cases as they arise, the young man might, if sojourning in a foreign country, have been required, on attaining the age of twenty-one, to make formal option of allegiance.   It does not appear whether he ever made such option, or was afforded an opportunity to do so.   Were he now called upon to elect American allegiance, and were he to demonstrate his immediate purpose of returning to the United States, here to dwell and discharge the duties of citizenship, a passport might be issued to him by the United States ambassador at Berlin upon being satisfied of the bona fides of the case.   Otherwise, following the precedents established for many years, to which you advert, this

Department would be constrained to regard Josef Georg Sur-
mann as having voluntarily relinquished his right to continued
protection as a citizen of the United States by reason of and
during his prolonged and indefinite sojourn abroad after attain-
ing majority." Mr. Olney to Mr. von Reichenau, November
20, 1896, For. Rel. 1897, p. 182.