THE

# WORKS

OF

# DANIEL WEBSTER.

VOLUME VI.

---

BOSTON:
CHARLES C. LITTLE AND JAMES BROWN.
1851.

Entered according to Act of Congress, in the year 1851, by
GEORGE W. GORDON AND JAMES W. PAIGE,
in the Clerk's Office of the District Court of the District of Massachusetts.

CAMBRIDGE:
STEREOTYPED BY METCALF AND COMPANY,
PRINTERS TO THE UNIVERSITY.
PRINTED BY HOUGHTON AND HAYWOOD.

# THE CASE OF THRASHER.

*Mr. Webster to Mr. Barringer.*

Department of State, Washington, December 13, 1851.

SIR, — The object of this despatch is to call your attention particularly to the case of John S. Thrasher, a native-born citizen of the United States, but for some years past a resident in Havana, and there lately tried for high treason or conspiracy, convicted, sentenced to eight years' confinement to hard labor, and sent to Spain in execution of that sentence. He has respectable friends and connections in the United States who feel much interest for him, and who have pressed his case upon the consideration of this department, earnestly invoking the interposition of the government in his behalf.

It is much to be regretted that Mr. Thrasher has made no communication whatever to this department respecting the circumstances of his case, so as to enable us to see what are the precise grounds of his complaint.

We have used all the means in our power to learn the particulars, as you will perceive by copies of two letters addressed by this department to the American consul at Havana. To these letters we have received as yet no answer. A despatch on this subject was prepared for you some days ago, but before it was delivered to the messenger a communication was received from Mr. Calderon, her Majesty's plenipotentiary here, communicating a copy of a letter of the Governor-General of Cuba to him, and also an opinion of the Real Audiencia Pretorial (Royal Court of Judicature) upon the construction of the seventh article of the treaty between the United States and Spain. The translation of these documents has

necessarily caused some delay. You will perceive that the Spanish authorities of the island represent that Mr. Thrasher had been long a resident in Havana; had become domiciled there, and had taken the oath of allegiance to the Spanish crown; and therefore, as they suppose, was answerable to the ordinary tribunals of the country for any criminal act committed by him.

This causes it to be the more regretted that he has made no communication to the government of his own case, as he understands it. He has indeed, through the press, addressed a general letter of remonstrance to the government and people of the United States, and this is all we hear from him personally. Nevertheless, his case has been thought deserving of attention, and there is a wish on the part of government to do all which may be proper in his behalf. If the official account of the Spanish authorities be correct, Mr. Thrasher appears to have *expatriated himself*, and to have become, at least for the time, a subject of the Crown of Spain. He had chosen a new government and a new home; and so long as he chose to remain under the authority and protection of that government, he would seem to have little right to set up against it any immunity founded on his original and native character as a citizen of the United States. There is no doubt that any one who chooses to reside in a country is bound to conform to its laws, and is amenable to its tribunals for their violation; the more especially if he has promised subjection and obedience to those laws, and taken an oath of allegiance to the sovereign power.

Mr. Thrasher's friends insist, nevertheless, that on his trial he was deprived of certain privileges secured to citizens of the United States by the seventh article of our treaty with Spain of 1795. But it may be doubtful whether, after having sworn allegiance to the Spanish government, he can longer claim the privileges and immunities of an American citizen. In the United States, as you know, the oath of allegiance is the consummation of the proceedings by which a foreigner becomes a citizen of this country, and renounces all allegiance to every foreign government. It may be doubtful, also, whether, if he were to be regarded in all respects as an American citizen, **the provisions of the seventh article of the treaty of 1795 have been violated in his case**

Probably, under existing circumstances, the most useful course for the government of the United States to pursue in his behalf, and in order to obtain his release, is to make the same application for him which has been made in favor of the persons connected with the expedition of Lopez, who have, in like manner, been sent to Spain. His case, however, is certainly less flagrant than theirs. They were violent invaders, proceeding to Cuba with arms in their hands to make war upon the Spanish government and people. He at most could be only guilty of some connivance, or secret countenance, of these unlawful proceedings. You will perceive, therefore, that his case is one more fit for a lenient consideration than that of those with whom the project of invasion originated, and who were made prisoners in attempting its forcible execution. You will present this point as fully as may be to the consideration of the Queen's government, and urge it with earnestness.

In the instruction of this department, No. 48, considerations were presented which it was hoped would prevail on that government to release those persons who had been taken prisoners in the expedition of Lopez. The expectation that such a release would be ordered is now a good deal strengthened by information which the department has received, that those of the prisoners who were British subjects have already been liberated.

Mr. Thrasher is represented as an amiable and intelligent man, and, as his friends represent the matter, his conduct was principally instigated, not so much by sympathy with the invaders in their general objects, as by a desire to minister to their necessities. We cannot judge of this, because we have neither any proof nor any statement of the particular acts in which the alleged treason or conspiracy consisted. But, however this may be, you will present to her Catholic Majesty's government, in as strong a manner as may be consistent with propriety, the expediency of pardoning him with the rest, so that nothing may remain in the form of lingering punishment of an individual to keep alive the recollection of occurrences equally lamented by both governments. The unthinking and imprudent have been most severely admonished by events; those who violated the law have seen that punishment always awaits such violation; and we may be allowed to hope that the exercise on the part of her Majesty's government of forbearance and clemency will not tend to encourage criminal enterprises in future.

Her Majesty's government cannot doubt the motives which have actuated that of the United States in preventing and repressing, to the utmost of its power, these invasions of Spanish territory. It cannot doubt its full and perfect disposition to fulfil all its obligations, and to maintain with Spain the most friendly relations. And the President directs me to say, that he hopes that her Majesty's government, being thus fully assured of the entire good faith of that of the United States, will readily listen to the suggestions which I have been directed to make in behalf of all the prisoners; and I repeat, with a still more strengthened conviction, the sentiment which I expressed in my despatch No. 48, that the restoration of perfect harmony and solid and durable peace between the two countries will be aided and promoted by the release of all these miserable men from further imprisonment.

With a view to its safety and despatch, this instruction is sent to you by a special bearer.

I am, Sir, very respectfully, your obedient servant,

DANIEL WEBSTER.

To DANIEL M. BARRINGER, ESQ., &c., &c., *Madrid.*

*Mr. Webster to the President of the United States.*

Department of State, Washington, December 23, 1851.

The Secretary of State, to whom has been referred a resolution of the House of Representatives of the 15th instant, in the following words: " *Resolved*, That the President of the United States be requested, so far as in his judgment may be compatible with the public interest, to communicate to this House any information in possession of the executive respecting the imprisonment, trial, and sentence of John S. Thrasher, in the island of Cuba, and his right to claim the protection of the government as a native-born citizen of the United States"; has the honor to report to the President, that all the official information in possession of this department respecting the imprisonment, trial, and sentence of Mr. John S. Thrasher, is contained in the despatches of Allen F. Owen, Esquire, late United States Consul at Havana, together with a correspondence between him and the Governor-General of the island of Cuba, and in a letter addressed by the Governor-General to Don A. Calderon de la Barca, her Catholic Majesty's Minister

44 *

in the United States; copies of all of which are herewith transmitted.

There is no doubt that John S. Thrasher is a citizen of the United States by birth, nor is there any doubt that he has resided in the island of Cuba for a considerable number of years, engaged in business transactions, sometimes as a merchant, and sometimes as the conductor of a newspaper press; although the precise period and duration of such residence are not known. On this point, the department has sought in vain for exact information. Mr. Thrasher himself has made no communication to this department, although he has, through the press, addressed a general letter of remonstrance to the government and people of the United States.

In the letter from the Governor of Cuba to her Catholic Majesty's Minister in the United States, already mentioned, it is stated that he has been, not only a resident in Havana for a considerable time, but domiciled there by regular proceedings; and that he has, in solemn form, sworn allegiance to the Spanish crown. There is no evidence in the possession of the government to show what was his purpose with regard to returning to his native country, at any fixed or definite time. Other members of his family are understood to be, like himself, residents in Cuba, his father having gone to that island some years ago.

These are all the known general facts respecting the nature of his residence in Havana, which have come to the knowledge of this department.

It appears that soon after the failure and breaking up of the late expedition of Narcisso Lopez, in the invasion of Cuba by him and the troops under his command, Mr. Thrasher was arrested and tried for high treason or conspiracy against the crown of Spain, condemned to eight years' imprisonment to hard labor, and sent to Spain in execution of that sentence. There is no evidence in the department to show what were the particular acts of treason or conspiracy alleged, or proved, against him. We have only the general statement, although pains has been taken to ascertain particulars.

The first general question, then, is, as to his right to exemption from Spanish law and Spanish authority, on the ground of his being a native-born citizen of the United States.

The general rule of the public law is, that every person of full

age has a right to change his domicile; and it follows, that when he removes to another place, with an intention to make that place his permanent residence, or his residence for an indefinite period, it becomes instantly his place of domicile; and this is so, notwithstanding he may entertain a floating intention of returning to his original residence or citizenship at some future period. The Supreme Court of the United States has decided, "that a person who removes to a foreign country, settles himself there, and engages in the trade of the country, furnishes by these acts such evidences of an intention permanently to reside in that country, as to stamp him with its national character"; and this undoubtedly is in full accordance with the sentiments of the most eminent writers, as well as with those of other high judicial tribunals, on the subject. No government has carried this general presumption farther than that of the United States, since it is well known that hundreds of thousands of persons are now living in this country who have not been naturalized according to the provisions of law, nor sworn any allegiance to this government, nor been domiciled amongst us by any regular course of proceedings. What degree of alarm would it not give to this vastly numerous class of men, actually living amongst us as inhabitants of the United States, to learn that, by removing to this country, they had not transferred their allegiance from the governments of which they were originally subjects to this government? And, on the other hand, what would be the condition of this country and its government, if the sovereigns of Europe, from whose dominions they have emigrated, were supposed to have still a right to interpose to protect such inhabitants against the penalties which might be justly incurred by them in consequence of their violation of the laws of the United States? In questions on this subject, the chief point to be considered is the *animus manendi*, or intention of continued residence; and this must be decided by reasonable rules and the general principles of evidence. If it sufficiently appear that the intention of removing was to make a permanent settlement, or a settlement for an indefinite time, the right of domicile is acquired by a residence even of a few days.

It is undoubtedly true that an American citizen who goes into a foreign country, although he owes local and temporary allegiance to that country, is yet, if he performs no other act

Case 8:25-cv-00201-DLB   Document 46-10   Filed 02/03/25   Page 9 of 15

changing his condition, entitled to the protection of his own government; and if, without the violation of any municipal law, he should be treated unjustly, he would have a right to claim that protection; and the interposition of the American government in his favor would be considered as a justifiable interposition. But his situation is completely changed, when, by his own act, he has made himself the subject of a foreign power. And a person found residing in a foreign country is presumed to be there *animo manendi*, or with the purpose of remaining; and to relieve himself of the character which this presumption fixes upon him, he must show that his residence was only temporary, and accompanied all the while with a fixed and definite intention of returning. If in that country he engages in trade and business, he is considered by the law of nations as a merchant of that country; nor is the presumption rebutted by the residence of his wife and family in the country from which he came. This is the doctrine as laid down by the United States courts. And it has been decided that a Spanish merchant, who came to the United States and continued to reside here and carry on trade after the breaking out of war between Spain and Great Britain, is to be considered an American merchant, although the trade could be lawfully carried on by a Spanish subject only. But the necessity of any presumption in Mr. Thrasher's case is entirely removed, if, in fact, he actually took out letters of domiciliation, in order to enable him to transact business such as a Spanish subject or a domiciliated foreigner can alone transact, and actually swore allegiance to the Spanish crown. For the purpose of showing the mode by which foreigners are domiciled in the island of Cuba, and the duties thereby imposed upon them, and also by what means they obtain the ultimate right of naturalization, I have thought it worth while to quote at length a translation of the royal decree of January 17, 1815, and also the royal colonization decree of October 21, 1817. It is understood that no change has been made, by royal decrees, in the requirements of the Spanish law of domicile and naturalization since the last of those periods.

"All foreigners belonging to powers and countries that are friendly to me, who may wish to establish themselves, or who may already be established, in the island of Cuba, must produce suitable evidence before

he government of said island that they profess the Roman Catholic religion, and without this indispensable qualification they will not be allowed to become domiciled there ; but my vassals in these dominions, and those inhabiting the Indies, need not be compelled to certify to this effect, inasmuch as, in regard to them, there can be no doubt upon this point.

" Those foreigners who shall be admitted conformably to the provisions of the foregoing article, shall take the oath of allegiance and vassalage before the governor, by which they shall promise to obey the general laws and ordinances of the Indies, to which all Spaniards are amenable.

" At the expiration of the first five years of residence in the island, on the part of foreign colonists, and on their contracting then the obligation to remain there perpetually, they shall be allowed all the rights and privileges of naturalization, equally with such children as they may have brought with them, or who may have been born to them in the aforesaid island, in order that the same may consequently be allowed to hold honorable offices, both civil and military, according to the talents of each individual."

The same decree also provides that " a foreigner may reside in Cuba for the period of three months without letters of domicile," but that on his remaining there without such letters beyond the time specified, " he becomes guilty of disobedience to the laws, and amenable to such just punishment as, after a close examination of the cause, may be imposed on him."

Upon the same subject, and in corroboration of the above, the royal colonization decree of October 21, 1817, says: —

" Letters of domicile shall be issued to any foreign colonist who professes the Roman Catholic religion, and takes the oath of allegiance, by means of which, during five years of residence, it shall be optional with him either to return to his own country, or to present himself before the superior magistrate at the expiration of those five years, for the purpose of obtaining his naturalization papers, which will be granted to him without any great formality, in order that, on being thus naturalized, he may enjoy all the rights and privileges appertaining to Spaniards, as well as his sons and legitimate descendants."

On the 6th of March, 1818, the Governor-General, in view of the above-mentioned royal decree of October 21, 1817, issued a *Bando Real*, in which it is provided, that,

" In the absence of the requisite qualifications in regard to the pro-

fession of the Catholic faith, the fact shall be noted down in the letters of domicile, which will then be issued on probation for the term of two years. If, at the expiration of those two years, the applicant cannot produce satisfactory evidence of his professing our sacred religion, the letter of domicile shall be taken away from him, and he will then be considered in the light of merely a transient foreigner, and, as such, be compelled to leave this island at the expiration of three months, in pursuance of the twenty-eighth article of the royal decree."

But, independently of a residence with intention to continue such residence, independently of any domiciliation, independently of the taking of an oath of allegiance or of renouncing any former allegiance, it is well known that by the public law an alien, or a stranger born, for so long a time as he continues within the dominions of a foreign government, owes obedience to the laws of that government, and may be punished for treason, or other crimes, as a native-born subject might be, unless his case is varied by some treaty stipulations; but this duty of obedience to the laws, arising from local and temporary allegiance, ceases, of course, the moment he transfers himself back to his original country.

An American citizen by birth, owing of course a native allegiance to the United States, going abroad and obtaining no residence under a foreign government, and professing to such government no allegiance, and who should yet commit acts of hostility or war against this country, would seem to bring himself within the act of Congress which declares that, if any person or persons owing allegiance to the United States of America shall levy war against them, or shall adhere to their enemies, giving them aid and comfort, within the United States or elsewhere, he or they shall be adjudged guilty of treason. And the reason is plain, since his allegiance in such a case is original and native, and has not been transferred, nor lost in any other local allegiance arising from residence elsewhere, but continues to be the primitive tie which binds him to his country.

But, as has been already said, every foreigner born, residing in a country, owes to that country allegiance and obedience to its laws so long as he remains in it, as a duty imposed upon him by the mere fact of his residence, and the temporary protection which he enjoys, and is as much bound to obey its laws as native subjects or citizens. This is the universal understand-

ing in all civilized states, and nowhere a more established doctrine than in this country.

Mr. Jefferson, when Secretary of State, in his letter to Gouverneur Morris of the 16th of August, 1793, speaking of the right of private citizens to make war upon a country with which the government of the United States is at peace, says: —

"If one citizen has a right to go to war of his own authority, every citizen has the same. If every citizen has that right, then the nation (which is composed of all its citizens) has a right to go to war by the authority of its individual citizens. But this is not true, either on the general principles of society, or by our Constitution, which gives that power to Congress alone, and not to the citizens individually. Then the first position was not true; and no citizen has a right to go to war of his own authority; and for what he does without right, he ought to be punished. Indeed, nothing can be more obviously absurd, than to say that all the citizens may be at war, and yet the nation at peace.

"It has been pretended, indeed, that the engagement of a citizen in an enterprise of this nature was a divestment of the character of citizen, and a transfer of jurisdiction over him to another sovereign. Our citizens are certainly free to divest themselves of that character by emigration, and other acts manifesting their intention, and may then become the subjects of another power, and free to do whatever the subjects of that power may do. But the laws do not admit that the bare commission of a crime amounts of itself to a divestment of the character of citizen, and withdraws the criminal from their coercion. They would never prescribe an illegal act among the legal modes by which a citizen might disfranchise himself; nor render treason, for instance, innocent, by giving it the force of a dissolution of the obligation of the criminal to his country."

This is in accordance with the opinion of the Circuit Court of the United States for Pennsylvania, by whom it was stated, in 1793, that, "if one citizen of the United States may take part in the present war, ten thousand may. If they may take part on one side, they may take part on the other; and thus thousands of our fellow-citizens may associate themselves with different belligerent powers, destroying not only those with whom we have no hostility, but destroying each other. In such a case, can we expect peace among their friends who stay behind? And will not a civil war, with all its lamentable train of evils, be the natural effect?"

Our citizens, who resort to countries where the trial by **jury**

is not known, and who may there be charged with crime, frequently imagine, when the laws of those countries are administered in the forms customary therein, that they are deprived of rights to which they are entitled, and therefore may expect the interference of their own government. But it must be remembered, in all such cases, that they have of their own free will elected a residence out of their native land, and preferred to live elsewhere, and under another government, and in a country in which different laws prevail.

They have chosen to settle themselves in a country where jury trials are not known; where representative government does not exist; where the privilege of the writ of *habeas corpus* is unheard of; and where judicial proceedings in criminal cases are brief and summary. Having made this election, they must necessarily abide its consequences. No man can carry the ægis of his national American liberty into a foreign country, and expect to hold it up for his exemption from the dominion and authority of the laws and the sovereign power of that country, unless he be authorized to do so by virtue of treaty stipulations.

The definition of crimes, the denouncement of penalties for their commission, and the forms of proceeding by which guilt is to be ascertained, are high prerogatives of sovereignty, and one nation cannot dictate them to another without being liable to the same dictation herself.

The friends of Mr. Thrasher interpose in his behalf the seventh article of the treaty of 1795, which declares that, in all cases of offences committed by any citizen or subject of the one party within the jurisdiction of the other, the same shall be prosecuted by order and authority of law only, and according to the regular course of proceeding in such cases. They shall also be allowed to employ such advocates as they may judge proper before the tribunals of the other party, who shall have free access to be present at the proceedings in such causes, and at the taking of all examinations and evidence which may be exhibited in the said trials.

As the public law, however, does in no case impart to foreigners residing in any country privileges which are denied to its own citizens or subjects, except, perhaps, that of leaving the country, it may be thought doubtful whether, by the arti-

cle of the treaty referred to, the parties could have contemplated any thing more than to place citizens of the United States within Spanish jurisdiction on an equality with Spanish subjects, and Spanish subjects in the United States on an equality with our own citizens, in criminal proceedings. A citizen of Spain in this country might complain, perhaps, of a trial by jury here, because of the supposed partialities and prejudices of juries; while an American in Spain complains of condemnation, in summary form, by judges, without the intervention of a jury to ascertain his guilt. The question arising on the latter clause of this seventh article of the treaty with Spain may not be entirely clear or free from difficulty, especially when it is known that the minister who negotiated this treaty on the part of the United States appears to have attached considerable importance to this right of selecting and employing counsel. Mr. Thomas Pinckney, the American negotiator, says, in a letter on the subject of the treaty, that the first part of this seventh article was taken from the sixteenth article of our treaty with Prussia, and that he added the latter part because he considered it a good stipulation in all situations, but particularly in Spain.

We can readily imagine why it should have been stipulated in the treaty, that the trial of an American citizen in Spain should be open and public, because we know that, as late as the year 1795, there existed in Spain an ecclesiastical jurisdiction, having power over life and death, whose proceedings were always secret. Whether it was intended by the parties that this right of selecting counsel in the case of the arrest or the trial of an American citizen, for treason, or other crime against the civil law, should extend further, or be broader, than in the case of a Spanish subject prosecuted for a similar offence, may be matter of doubt and controversy. The view which the Spanish courts of the highest jurisdiction take of it, may be seen by the communication of the Royal Court of Judicature accompanying the letter of the Governor-General to Mr. Calderon. But, however all this may be, the general question still returns, whether this right secured by treaty, whatever it is, be not justly limited to such persons as are at the time in all respects American citizens, having never vol-

untarily changed their domicile or taken upon themselves a new allegiance.

In this view of the case, it might therefore be asked whether, if Mr. Thrasher had been a native-born subject of her Catholic Majesty, his trial and its result would have been different from what they actually were.

If indeed Mr. Thrasher, in his arrest and trial, did not enjoy the benefits which native-born Spanish subjects enjoy in like cases, but was more harshly treated, or more severely punished, for the reason that he was a native-born citizen of the United States, it would be a clear case of the violation of treaty obligations, and would demand the interposition of the government. There exists in this department no proof of any such extraordinary treatment of Mr. Thrasher. It may have taken place. In the absence of all other information, reference is made on that point, as well as on all the rest of the case, to the letter of the Governor-General of Cuba to Mr. Calderon, her Catholic Majesty's Minister Plenipotentiary to this government.

For the further information of the House of Representatives, I also transmit herewith a copy of the despatch of the 13th instant, from this department to the Minister of the United States at Madrid, and of despatches to the acting consul at Havana of the 12th and 28th of November last.

DANIEL WEBSTER.

To THE PRESIDENT.