**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

CASA, INC., *et al.*,                    *

     **Plaintiffs,**                    *

v.                                    *            Civ. No. DLB-25-201

DONALD J. TRUMP, *et al.*,            *

     **Defendants.**                    *

**<u>MEMORANDUM OPINION</u>**

In 1868, the United States Congress ratified the Fourteenth Amendment to the United States Constitution. The Citizenship Clause of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV, § 1, cl. 1.

More than 150 years after the Fourteenth Amendment was ratified, the newly-sworn-in President of the United States Donald J. Trump signed an Executive Order called "Protecting the Meaning and Value of American Citizenship." *See* Exec. Order No. 14,160, 90 Fed. Reg. 8449 (Jan. 29, 2025) (the "Order" or "Executive Order"). The Executive Order interprets the Citizenship Clause of the Fourteenth Amendment in a manner that the Supreme Court has resoundingly rejected and no court in the country has ever endorsed. If the Order is allowed to take effect, it would deny citizenship by birth to U.S.-born persons whose mothers are in the country unlawfully or temporarily and whose fathers are not citizens or lawful permanent residents at the time of the person's birth.

The day after the Executive Order was issued, CASA, Inc. and Asylum Seeker Advocacy Project, two nonprofit organizations that provide services to immigrants, and five pregnant women

without permanent legal status who expect to give birth in the United States in the coming months filed this lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. The plaintiffs allege that the Executive Order violates the Fourteenth Amendment to the Constitution and the Immigration and Nationality Act. They request a preliminary injunction that enjoins implementation and enforcement of the Executive Order until the merits of their claims are resolved. The government opposes preliminary injunctive relief.

The plaintiffs easily have met the standard for a preliminary injunction. There is a very strong likelihood of success on the merits. The plaintiffs will face irreparable harm without injunctive relief. And the balance of the equities and the public interest strongly weigh in favor of a preliminary injunction. The motion for a preliminary injunction is granted. The defendants are enjoined from implementing and enforcing the Executive Order.

## I.     Background

At noon on January 20, 2025, President Trump took the oath of office of the President of the United States. Later that day, President Trump signed an Executive Order called "Protecting the Meaning and Value of American Citizenship." The Executive Order purports to interpret the clause "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment. In Section 1 of the Order, titled "Purpose," the Order explains that "[t]he Fourteenth Amendment has always excluded from birthright citizenship persons who were born in the United States but not 'subject to the jurisdiction thereof.'" Exec. Order § 1. Section 1 continues:

> Among the categories of individuals born in the United States and not subject to
> the jurisdiction thereof, the privilege of United States citizenship does not

automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*Id.*

Section 2 of the Order establishes the policy of the United States government. *See id.* § 2. Under Section 2, no federal department or agency "shall issue documents recognizing United States citizenship, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" to a person whose mother was unlawfully present or lawfully present with only temporary status and whose father was neither a United States citizen nor lawful permanent resident at the time of that person's birth. *Id.* § 2(a). The policy applies only to persons who are born in the United States on or after February 19, 2025. *Id.* § 2(b). It does not impact the ability of other people, including children of lawful permanent residents, to get documentation of their American citizenship. *Id.* § 2(c).

Section 3 of the Order discusses enforcement. *Id.* § 3. It instructs the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Commissioner of Social Security to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and that their agencies' officers, employees, and agents act in accordance with the Order. *Id.* § 3(a). It also instructs the heads of executive departments and agencies to issue public guidance regarding their implementation of the Order within 30 days of its issuance. *Id.* § 3(b).

On January 21, 2025, the plaintiffs filed this lawsuit against President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department

of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America. ECF 1, ¶¶ 50–56. Each individual defendant is sued in their official capacity. *Id.* The plaintiffs claim that the Executive Order violates the Fourteenth Amendment, *id.* ¶¶ 101–08, and the Immigration and Nationality Act ("INA"), *id.* ¶¶ 109–14. They seek declaratory and injunctive relief. *Id.* at 37–38.

The two organizational plaintiffs are CASA, Inc. ("CASA") and Asylum Seeker Advocacy Project ("ASAP"). CASA is a nonprofit organization headquartered in Prince George's County, Maryland. *Id.* ¶ 19. It "is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 175,000 members." *Id.* Its mission "is to create a more just society by building power and improving the quality of life in working-class Black, Latino/a/e, Afro-descendent, Indigenous, and immigrant communities." *Id.* ¶ 20. It helps members apply for public benefits and offers free legal consultations. *Id.* ¶ 22. CASA does not issue formal membership to anyone under the age of 15, though it does provide services to young people and their families. *Id.* ¶ 24. CASA's members include women without lawful status who are pregnant or plan to give birth in the United States. *Id.* ¶ 25. Under the Order, their children born in the United States would no longer be U.S. citizens.

ASAP is a nonprofit organization headquartered in New York, New York. *Id.* ¶ 31. It "is the largest membership-based organization of asylum-seekers in the United States, with over 680,000 members from more than 175 countries who reside in all 50 states and several U.S. territories." *Id.* "ASAP's mission is to help its members—individuals seeking asylum—to build a more welcoming United States." *Id.* ¶ 32. To that end, it provides members with community and legal support. *Id.* ASAP does not extend formal membership to people under the age of 14, but the benefits of ASAP membership may extend to them through their parents' membership. *Id.* ¶ 35.

Most ASAP members have applied for asylum and cannot be deported while their asylum applications are pending. *Id.* ¶ 36. ASAP expects that "[h]undreds or even thousands of [its] members will give birth to children in the United States over the coming weeks and months[.]" *Id.* ¶ 37. Despite being born in the United States, those children would not be U.S. citizens under the Order.

The individual plaintiffs—Maribel, Juana, Trinidad Garcia, Monica, and Liza—are proceeding under pseudonyms.[1] ECF 3. Maribel is a member of CASA. ECF 1, ¶ 45. She is undocumented and has lived in the United States for 18 years. *Id.* She is pregnant and due in July 2025. *Id.* Juana is also a CASA member. *Id.* ¶ 46. She has a pending asylum claim. *Id.* She is two months pregnant. *Id.* Trinidad Garcia is a member of ASAP. *Id.* ¶ 47. She and her partner came to the United States on tourist visas in 2017 and filed affirmative asylum applications. *Id.* They are awaiting their asylum interview. *Id.* Trinidad Garcia is pregnant and due in August 2025. *Id.* She and her partner are citizens of Venezuela. *Id.* Venezuela does not provide consular services in the United States, so she fears that her child would be rendered stateless by the Order. *Id.* Monica is also an ASAP member from Venezuela. *Id.* ¶ 48. She has Temporary Protected Status and has filed an application for asylum. *Id.* She is pregnant and due in August 2025. *Id.* Like Trinidad Garcia, she fears that her child would be rendered stateless by the Order. *Id.* Liza is married to an ASAP member who is seeking asylum. *Id.* ¶ 49. Liza is currently in lawful status on a student visa. *Id.* She is pregnant and due in May 2025. *Id.* She and her husband are Russian citizens who fear

---

[1] The individual plaintiffs have asked to proceed under pseudonyms because they "fear that the U.S. government and members of the public could retaliate against them or their minor children because of their participation in this lawsuit." ECF 3, at 1. The government does not oppose the motion "provided that [p]laintiffs provide the identities of those individuals on request if necessary to permit [it] to fully defend this case." ECF 39, at 1. The motion to proceed under pseudonyms is granted. If the government needs to know the identities of the individual plaintiffs to defend this case, it may file a request for relief from the Court.

persecution from the Russian government. *Id.* They are afraid to apply for Russian citizenship for their child and are worried their child will be rendered stateless by the Order.[2]

The plaintiffs filed a motion for a temporary restraining order and preliminary injunction. ECF 2. The government opposed the preliminary injunction. ECF 40. The plaintiffs filed a reply. ECF 46. Three amici filed briefs: a group of local governments and local government officials, ECF 37; the Immigration Reform Law Institute, ECF 63; and the State of Tennessee, ECF 50. The Court heard argument on the motion on February 5, 2025.

**II.    Discussion**

The plaintiffs seek a preliminary injunction that enjoins the implementation and enforcement of the Executive Order. The government argues that the plaintiffs do not have a cause of action and that preliminary injunctive relief is unwarranted. The Court finds that the plaintiffs do have a cause of action and that preliminary injuctive relief is warranted.

**A.    Reviewabilty of the Executive Order**

As a threshold matter, the Court must decide if the plaintiffs' constitutional claim is subject to judicial review. *See Am. Forest Res. Council v. United States*, 77 F.4th 787, 796 (D.C. Cir. 2023) ("Before [the court] turn[s] to the merits, [it] must decide whether the plaintiffs' claims are reviewable.").[3]

---

[2] Unless otherwise noted, the "plaintiffs" refers to the individual plaintiffs and members of the organizational plaintiffs who are pregnant.

[3] The Court need not decide whether it may review the plaintiffs' statutory claim because the plaintiffs are entitled to a preliminary injunction on their constitutional claim. The claims are essentially coterminous because the statute mirrors the Citizenship Clause. Although the Court has a "duty to avoid deciding constitutional questions presented unless essential to proper disposition of a case," *Harmon v. Brucker*, 355 U.S. 579, 581 (1958), the constitutional question presented here is essential to the proper disposition of the issues before the Court.

The plaintiffs claim the Executive Order violates the Fourteenth Amendment's Citizenship Clause. There is no question that the Court may review the constitutionality of the Executive Order and grant injunctive relief. The Supreme Court consistently has "sustain[ed] the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution." *See Bell v. Hood*, 327 U.S. 678, 684 (1946); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). The Supreme Court has affirmed that "the President's actions may . . . be reviewed for constitutionality." *See Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *see also Dalton v. Specter*, 511 U.S. 462, 473–74 (1994). And it is "well established that '[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.'" *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Franklin*, 505 U.S. at 815 (Scalia, J., concurring)); *see also id.* at 1326 ("[A]n independent claim of a President's violation of the Constitution would certainly be reviewable."). In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court explained that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. 320, 327 (2015). Pursuant to this authority, the Supreme Court has reviewed constitutional challenges to executive orders. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 582 (1952); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 795–96 (1985). During President Trump's first term, the Supreme Court decided a constitutional challenge to one of his proclamations. *See Trump v. Hawaii*, 585 U.S. 667, 697–99 (2018) (reaching the merits of an Establishment Clause challenge to a Presidential Proclamation).

The government insists the plaintiffs have an "available and exclusive mechanism to challenge disputes about citizenship under the INA." ECF 40, at 9. According to the government, the plaintiffs must pursue their claims through a declaratory action under 8 U.S.C. § 1503(a) of the INA. Section 1503(a) allows "any person who is within the United States" and who "claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States" to seek declaratory relief after "the final administrative denial of such right or privilege." 8 U.S.C. § 1503(a).

This INA provision does not prevent the plaintiffs from bringing a facial constitutional challenge to the Executive Order. The text of the INA does not indicate that § 1503(a) is the exclusive remedy for challenging the denial of a right to citizenship under the Fourteenth Amendment. The Supreme Court has cautioned against reading a statutory right to judicial review "as an exclusive route to review" when the text neither "expressly" nor "implicitly" limits the Court's jurisdiction. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (statute permitting judicial review of the Securities and Exchange Commission's rules and orders was not the "exclusive route to review" constitutional claims against a government board subject to the Commission's good-cause removal power); *see also Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023) (concluding federal statutes allowing courts of appeal to review an agency order "d[id] not displace district court jurisdiction over . . . far-reaching constitutional claims"). Indeed, judicial review under the INA is not the exclusive mechanism to challenge policies that deny citizenship. *See, e.g.*, *Tuaua v. United States*, 788 F.3d 300, 302–03 (D.C. Cir. 2015).

Further, the plaintiffs cannot pursue their constitutional challenge to the Executive Order under § 1503(a). The statute provides a cause of action to "any person who is within the United

States" who "claims a right or privilege as a national of the United States." 8 U.S.C. § 1503(a).

The plaintiffs are not seeking "a judgment declaring [their children] to be [] national[s] of the

United States" after the denial of a particular right or privilege, *id.*, such as the denial of a passport,

*see, e.g.*, *Cambranis v. Blinken*, 994 F.3d 457, 465 (5th Cir. 2021) (reviewing challenge under §

1503(a) brought after denial of passport application); *Kiviti v. Pompeo*, 467 F. Supp. 3d 293, 303

(D. Md. 2020) (same). Instead, the plaintiffs seek immediate injunctive relief from the Executive

Order because the Order is facially unconstitutional and denies citizenship to their unborn children.

So the government is incorrect: Section 1503(a) of the INA does not offer the plaintiffs an

exclusive and available remedy for their constitutional challenge to the Executive Order.

The plaintiffs can seek protection from unconstitutional executive action in this Court. As

the Supreme Court has explained:

> "The very essence of civil liberty . . . certainly consists in the right of every
> individual to claim the protection of the laws, whenever he receives an injury. One
> of the first duties of government is to afford that protection." Traditionally,
> therefore, "it is established practice for this Court to sustain the jurisdiction of
> federal courts to issue injunctions to protect rights safeguarded by the Constitution
> and to restrain individual state officers from doing what the 14th Amendment
> forbids the State to do."

*Davis v. Passman*, 442 U.S. 228, 242 (1979) (first quoting *Marbury v. Madison*, 5 U.S. (1 Cranch)

137, 163 (1803); and then quoting *Bell*, 327 U.S. at 684). The Court can review the plaintiffs'

claim that the Executive Order violates the Fourteenth Amendment.

### B.    Motion for Preliminary Injunction

To obtain a preliminary injunction, the plaintiffs must establish four factors: (1) that they

are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary

relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in

the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The plaintiffs must satisfy all four factors to obtain a preliminary injunction. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

The plaintiffs have shown they are entitled to this extraordinary remedy.

### 1.  Likelihood of Success

The Citizenship Clause of the Fourteenth Amendment states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1, cl. 1. The plaintiffs claim the Executive Order violates the Fourteenth Amendment because the order denies citizenship to persons who are born in the United States and are "subject to the jurisdiction thereof." The President sees it differently. On the President's account, "the categories of individuals born in the United States and not subject to the jurisdiction thereof" include any child (i) whose "mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth" or (ii) whose "mother's presence in the United States at the time of said person's birth was lawful but temporary . . . and the father was not a United States citizen or lawful permanent resident at the time of said person's birth." Exec. Order § 1. Examples of "lawful but temporary" presence include, "but [are] not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa." *Id.* According to the Executive Order, "the privilege of United States citizenship does not automatically extend to" these U.S.-born children. *Id.*

The President's novel interpretation of the Citizenship Clause contradicts the plain language of the Fourteenth Amendment and conflicts with 125-year-old binding Supreme Court precedent. At the turn of the twentieth century, the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), resolved any debate about the scope of the Citizenship Clause and the meaning of "subject to the jurisdiction thereof." *Wong Kim Ark* forecloses the President's interpretation of the Citizenship Clause.

The case arose when Wong Kim Ark, who was born in San Francisco to parents who were Chinese citizens, traveled to China for a temporary visit and was denied re-entry into the United States "upon the sole ground that he was not a citizen of the United States." *Id.* at 653. Wong Kim Ark insisted he was a U.S. citizen because he was born in California. *Id.* If he was a citizen, the "Chinese Exclusion Acts," which prohibited "persons of the Chinese race, and especially Chinese laborers, from coming into the United States," would not apply to him. *Id.*

The Supreme Court framed "the question presented" like this:

whether a child born in the United States, of parents of Chinese descent, who at the time of his birth are subjects of the emperor of China, but have a permanent domicile and residence in the United States, and are there carrying on business, and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States, by virtue of the first clause of the fourteenth amendment of the constitution: 'All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.'

*Id.*

To answer this question, the Supreme Court began with the text of the Constitution and determined that the "constitution nowhere defines the meaning of these words." *Id.* at 654. It then interpreted the Citizenship Clause "in the light of the common law, the principles and history of which were familiarly known to the framers of the constitution." *Id.* The Court observed that "[t]he language of the constitution . . . could not be understood without reference to [English] common

law." *Id.*; *see id.* at 655 ("The interpretation of the constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." (quoting *Smith v. Alabama*, 124 U.S. 465, 478 (1888))).

The Court prefaced its review of English common law as follows:

The fundamental principle of the common law with regard to English nationality was birth within the allegiance—also called 'ligealty,' 'obedience,' 'faith,' or 'power'— of the king. The principle embraced all persons born within the king's allegiance, and subject to his protection. Such allegiance and protection were mutual,—as expressed in the maxim, 'Protectio trahit subjectionem, et subjection protectionem,'—and were not restricted to natural-born subjects and naturalized subjects, or to those who had taken an oath of allegiance; but were predicable of aliens in amity, so long as they were within the kingdom. Children, born in England, of such aliens, were therefore natural-born subjects. But the children, born within the realm, of foreign ambassadors, or the children of alien enemies, born during and within their hostile occupation of part of the king's dominions, were not natural-born subjects, because not born within the allegiance, the obedience, or the power, or, as would be said at this day, within the jurisdiction, of the king.

*Id.* at 655. That principle, as the Court explained, pervaded English common law cases. *See id.* at 655–58.

After a lengthy discussion of common law cases, the Court concluded:

It thus clearly appears that by the law of England for the last three centuries, beginning before the settlement of this country, and continuing to the present day, aliens, while residing in the dominions possessed by the crown of England, were within the allegiance, the obedience, faith or loyalty, the protection, the power, and the jurisdiction of the English sovereign; and therefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador, or of an alien enemy in a hostile occupation of the place where the child was born.

*Id.* at 658.

The Court found that this "same rule was in force in all the English colonies upon this continent down to the time of the Declaration of Independence, and in the United States afterwards, and continued to prevail under the constitution as originally established." *Id.* In cases decided after

12

the Declaration of Independence, courts in the United States "assumed . . . that all persons born in the United States were citizens of the United States." *Id.* (citing *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 119 (1804)). The Court noted that, in *Levy's Lessee v. McCartee*, 31 U.S. (6 Pet.) 102 (1832), Justice Story "treated it as unquestionable that by [the principles of common law] a child born in England of alien parents was a natural-born subject." 169 U.S. at 662. And in *United States v. Rhodes*, Justice Swayne also relied on English common law:

> All persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens. Birth and allegiance go together. Such is the rule of the common law, and it is the common law of this country, as well as of England. We find no warrant for the opinion that this great principle of common law has ever been changed in the United States. It has always obtained here, with the same vigor, and subject only to the same exceptions, since as before the Revolution.

*Id.* at 662–63 (quoting *United States v. Rhodes*, 27 F. Cas. 785, 790 (C.C.D. Ky. 1866) (Swayne, Cir. J.)). Justice Sewall of the Supreme Court of Massachusetts stated in *Kilham v. Ward*:

> The doctrine of common law is that every man born within its jurisdiction is a subject of the sovereign of the country where he is born; and allegiance is not personal to the sovereign in the extent that it has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born.

*Id.* (quoting *Kilham v. Ward*, 2 Mass. (1 Tyng) 236, 264–65 (Mass. 1806)).

After an extensive review of English common law, decisions of courts in the United States, and recent acts of Congress, the Supreme Court concluded: "Here is nothing to countenance the theory that a general rule of citizenship by blood or descent has displaced in this country the fundamental rule of citizenship by birth within its sovereign." *Id.* at 674. The Court concluded that the Fourteenth Amendment and the Civil Rights Act of 1866, enacted two years before the Fourteenth Amendment, "finally put at rest" any "doubt" that before their enactment, "all white persons, at least, born within the sovereignty of the United States, whether children of citizens or

of foreigners, excepting only children of ambassadors and public ministers of a foreign government, were native-born citizens of the United States." *Id.* at 674–75.

      With their enactment, the Fourteenth Amendment and the Civil Rights Act of 1866 "reaffirmed in the most explicit and comprehensive terms . . . the fundamental principle of citizenship by birth within the dominion." *Id.* at 675. Enacted first, the Civil Rights Act of 1866 states, in part: "All persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States." *Id.* (quoting Civil Rights Act of 1866, ch. 31, § 1, 14 Stat. 27, 27). Soon after Congress enacted the Civil Rights Act of 1866, the "same congress . . . evidently thinking it unwise, and perhaps unsafe, to leave so important a declaration of rights to depend upon an ordinary act of legislation, which might be repealed by a subsequent congress, framed the fourteenth amendment of the constitution." *Id.* After reciting the text of the Fourteenth Amendment's Citizenship Clause, the Court stated:

> As appears on the face of the amendment, as well as from the history of the times, this was not intended to impose any new restrictions upon citizenship, or to prevent any persons from becoming citizens by the fact of birth within the United States, who would thereby have become citizens according to the law existing before its adoption.

*Id.* at 676. The "main purpose [of the Citizenship Clause] doubtless was . . . to establish the citizenship of free negroes, which had been denied" in *Dred Scott v. Sandford*, 60 U.S. 393 (1857), and "to put it beyond all doubt that all blacks, as well as whites, born or naturalized within the jurisdiction of the United States, are citizens of the United States." *Id.* The amendment's "opening words, 'All persons born,' are general, not to say universal, restricted only by place and jurisdiction, and not by color or race." *Id.*

      The Court then interpreted the clause "subject to the jurisdiction thereof." *Id.* at 676–82. At the time, the only case that had decided the meaning of the clause was *Elk v. Wilkins*, 112 U.S.

94 (1884). *Wong Kim Ark*, 169 U.S. at 680. Justice Gray, the author of *Wong Kim Ark*, authored

*Elk* only four years earlier. As Justice Gray stated in *Wong Kim Ark*, the *Elk* Court held that "an

Indian born a member of one of the Indian tribes within the United States . . . was not a citizen of

the United States, as a person born in the United States, 'and subject to the jurisdiction thereof,'

within the meaning of the clause in question." *Id.* The *Wong Kim Ark* Court stated the rationale for

the *Elk* holding:

> Indian tribes, being within the territorial limits of the United States were not, strictly
> speaking, foreign states, but were alien nations, distinct political communities, the
> members of which owed immediate allegiance to their several tribes, and were not
> part of the people of the United States . . . Indians born within the territorial limits
> of the United States, members of, and owing immediate allegiance to, one of the
> Indian tribes (an alien, though dependent, power), although in a geographical sense
> born in the United States, are no more "born in the United States, and subject to the
> jurisdiction thereof," within the meaning of the first section of the fourteenth
> amendment, than the children of subjects of any foreign government born within
> the domain of that government, or the children born within the United States of
> ambassadors or other public ministers of foreign nations.

*Id.* at 681. Justice Gray then explained why *Elk* did not apply to the case at bar: "The decision in

*Elk v. Wilkins* concerned only members of the Indian tribes within the United States, and had no

tendency to deny citizenship to children born in the United States of foreign parents of Caucasian,

African, or Mongolian descent, not in the diplomatic service of a foreign country." *Id.* at 682.

Having distinguished *Elk* as a unique case that "concerned only members of the Indian

tribes within the United States," the *Wong Kim Ark* Court determined that:

> [t]he real object of the fourteenth amendment of the constitution, in qualifying the
> words 'all persons born in the United States' by the addition 'and subject to the
> jurisdiction thereof,' would appear to have been to exclude, by the fewest and fittest
> words (besides children of members of the Indian tribes, standing in a peculiar
> relation to the national government, unknown to the common law), the two classes
> of cases—children born of alien enemies of hostile occupation, and children of
> diplomatic representatives of a foreign state—both of which . . . by the law of
> England and by our own law, from the time of the first settlement of the English
> colonies in America, had been recognized exceptions to the fundamental rule of
> citizenship by birth within the country.

*Id.* at 682.

> Ultimately, the *Wong Kim Ark* Court made these "irresistibl[e] . . . conclusions":

> The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory, in the allegiance and under the protection of the country, including all children here born of resident aliens, with the exceptions or qualifications (as old as the rule itself) of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and with the single additional exception of children of members of the Indian tribes owing direct allegiance to their several tribes. The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, domiciled within the United States. Every citizen or subject of another country, while domiciled here, is within the allegiance and the protection, and consequently subject to the jurisdiction, of the United States.

*Id.* at 693. Except in rare instances, the Fourteenth Amendment guarantees U.S. citizenship to any child born on U.S. soil. *See id.*

The *Wong Kim Ark* Court then applied these holdings to the facts before it. Recall that Wong Kim Ark was denied re-entry into the United States because it was believed he was not a citizen, and if he was not a citizen, the Chinese Exclusion Acts barred his entry into the United States. *Id.* at 653. The Court determined that no legislation to exclude Chinese citizens could apply to a person "born in the United States of Chinese parents." *Id.* at 694–99. Yet the United States could "exclude" or "expel from the country persons of the Chinese race, born in China, and continuing to be subjects of the emperor, though having acquired a commercial domicile in the United States . . . ." *Id.* at 699. The Supreme Court had upheld the Acts previously based on "the right to exclude or to expel all aliens," *id.*, including "Chinese persons not born in this country'"— a population of people who had "'never been recognized as citizens of the United States, nor authorized to become such under the naturalization laws," *id.* at 702 (quoting *Fong Yue Ting v. United States*, 149 U.S. 698, 716 (1893)). The Acts could lawfully exclude someone born in China "who had acquired a commercial domicile in the United States" but "voluntarily left . . . with the

intention of returning." *See id.* at 700 (citing *Lem Moon Sing v. United States*, 158 U.S. 538 (1895)).

The *Wong Kim Ark* Court acknowledged that Congress could deny naturalization to someone born in China. *Id.* But the Fourteenth Amendment "contemplates two sources of citizenship . . . birth and naturalization." *Id.* Congress's "power of naturalization . . . is a power to confer citizenship, not a power to take it away." *Id.* at 703. The Court affirmed that "citizenship by birth is established by the mere fact of birth under the circumstances defined in the constitution." *Id.* at 702. So although "[a] person born out of the jurisdiction of the United States can only become a citizen by being naturalized," "[e]very person born in the United States, and subject to the jurisdiction thereof, becomes at once a citizen of the United States, and needs no naturalization." *Id.*

In the end, the Court answered the initial question presented—"whether a child born in the United States, of parents of Chinese descent, who at the time of his birth, are subjects of the emperor of China, but have a permanent domicile and residence in the United States . . . and are not employed in any diplomatic or official capacity under the emperor of China, becomes at the time of his birth a citizen of the United States"—"in the affirmative." *Id.* at 705.

The government does not dispute that *Wong Kim Ark* is binding precedent. Nor does it argue that *Wong Kim Ark* was wrongly decided or should be overturned. Instead, the government claims that, under *Wong Kim Ark*, to be "subject to the jurisdiction" of the United States, a person's parents must, at the time of the person's birth, be lawfully domiciled in the United States, ECF 40, at 14, 24–26, and bear "'direct and immediate allegiance' to this country, unqualified by an allegiance to any other foreign power," *id.* at 4. Nothing in *Wong Kim Ark* remotely supports the government's narrow reading of the decision.

To address the government's arguments, the Court first must clarify *Wong Kim Ark*'s holding. *Wong Kim Ark* held that, under the Fourteenth Amendment, "[e]very person born . . . in the United States" is "subject to the jurisdiction thereof" and thus a citizen by birth, *id.* at 702, unless they fall into one of the recognized exceptions to citizenship by birth, *id.* at 693. *See also id.* at 657–58 (describing exceptions to citizenship by birth for children of hostile occupiers or diplomats under English common law); *id.* at 658 ("[T]herefore every child born in England of alien parents was a natural-born subject, unless the child of an ambassador or other diplomatic agent of a foreign state, or of an alien enemy in hostile occupation of the place where the child was born."); *id.* at 682 (finding "subject to the jurisdiction thereof" excludes "by the fewest and fittest words (besides children of members of the Indian tribes . . .), the two classes of cases,—children born of alien enemies of hostile occupation, and children of diplomatic representatives of a foreign state"); *id.* at 693 ("The fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth within the territory . . . with the exceptions . . . of children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory, and . . . children of members of the Indian tribes owing direct allegiance to their several tribes.").

The government seems to dismiss *Wong Kim Ark*'s holding, and the lengthy analysis that supports it, as dicta. On the government's account, *Wong Kim Ark*'s holding was limited to the specific facts of the case: A person born in the United States whose foreign-born parents were "domiciled" in the United States at the time of his birth is "subject to the jurisdiction of" the United States. ECF 40, at 24–26. *Wong Kim Ark* cannot reasonably be read that narrowly. However, even if not part of the Court's holding, *Wong Kim Ark*'s statements that every person born in the United States is "subject to the jurisdiction thereof" and thus a citizen by birth (with certain exceptions)

certainly are not dicta. "Dictum is a 'statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.'" *Payne v. Taslimi*, 998 F.3d 648, 654–55 (4th Cir. 2021) (quoting *Pittston Co. v. United States*, 199 F.3d 694, 703 (4th Cir. 1999)). If "a precedent's reasoning" is "necessary to the outcome," it "must be followed." *Id.* at 655.

*Wong Kim Ark*'s statement that the "fourteenth amendment affirms the ancient and fundamental rule of citizenship by birth" with certain recognized exceptions, 169 U.S. at 693, could not "have been deleted without seriously impairing the analytical foundations of the holding," *see Payne*, 998 F.3d at 654. Even a cursory review of the decision reveals that this statement and similar statements were not "peripheral" to the holding. They were central to it. And there can be no question that the Court gave them "full and careful consideration." *See id.* at 655. The Court thoroughly discussed the history of citizenship by birth at English common law, the decisions of U.S. courts applying the common law, and the history and text of the Fourteenth Amendment. *See Wong Kim Ark*, 169 U.S at 655–82. A more "full and careful consideration" is hard to imagine. And these statements and the Court's reasoning were "necessary to the outcome" of the case. *See Payne*, 998 F.3d at 655. Without them, the Court could not have determined that Wong Kim Ark was a U.S. citizen under the Fourteenth Amendment and not excludable from the country under the Chinese Exclusion Acts. They "must be followed." *Id.*

Even if they were dicta, this Court is not free to ignore them. "[C]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003)). This Court "is 'bound by Supreme Court

dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *See United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (quoting *Gaylor v. United States*, 74 F.3d 214, 217 (10th Cir. 1996)). Though *Wong Kim Ark* can hardly be considered "recent," the Supreme Court's continual recognition that people born in the United States are citizens by birth confirms that this Court must, at the very least, treat *Wong Kim Ark*'s interpretation of the Fourteenth Amendment "as authoritative." *See Wynne*, 376 F.3d at 298 n.3.

Return to the government's arguments. The government argues that, under *Wong Kim Ark*, a person's parents must, at the time of the person's birth, be lawfully domiciled in the country for the person to be "subject to the jurisdiction" of the United States. ECF 40, at 14, 24–26. The government insists *Wong Kim Ark* imposes a parental domicile requirement for citizenship under the Fourteenth Amendment because the Court mentioned "domicile" or "domiciled" throughout the opinion. True, the Court included in the question presented at the beginning of the opinion, and in the answer at the end of the opinion, that Wong Kim Ark's parents "at the time of his birth" had "a permanent domicile and residence in the United States." *Id.* at 653, 705. Also true, the Court stated: "The amendment, in clear words and in manifest intent, includes the children born within the territory of the United States of all other persons, of whatever race or color, *domiciled* within the United States." *Id.* at 693 (emphasis added). However, the fact that Wong Kim Ark's parents were domiciled and resided in the United States was not essential to the holding or outcome. And even though the Court described the parents of "children born within the territory of the United States" as "domiciled within the United States," the word "domicile" does not appear in the text of the Fourteenth Amendment. And English common law did not impose a parental domicile requirement. In fact, under English common law and the decisions of United States courts that

followed it, the right to citizenship by birth included children of non-citizen parents not domiciled in the country. *Wong Kim Ark*, 169 U.S. at 657 (noting the English common law rule that "every person born within the dominions of the crown" was an English subject—"no matter whether of English or of foreign parents, and, in the latter case, whether the parents were settled, or merely temporarily sojourning, in the country"); *Calvin's Case*, 77 Eng. Rep. 377, 384 (1608) ("[L]ocal obedience being but momentary and uncertain, is yet strong enough to make a natural subject, for if he hath issue here, that issue is . . . a natural born subject . . . ."); *Lynch v. Clarke*, 1 Sand. Ch. 583, 683 (N.Y. Ch. 1844) (applying English common law and holding plaintiff was an American citizen because she was born in the United States even though her parents were only temporarily sojourning in the United States when she was born). These cases were part of the common law that the Fourteenth Amendment affirmed. *Wong Kim Ark*, 169 U.S. at 693. To be a "person[] born . . . in the United States" and "subject to the jurisdiction thereof" does not require the person's parents to be domiciled in the United States at the time of birth.[4]

 Next, the government argues that, under *Wong Kim Ark*, a person born in the United States is "subject to the jurisdiction" of the United States only if he is "born 'in the allegiance and under the protection of this country,'" ECF 40, at 13 (quoting *Wong Kim Ark*, 169 U.S. at 693), and his allegiance is "unqualified by 'allegiance to any alien power," *id.* (quoting *Elk*, 112 U.S. at 101–02). The government misconstrues the language in *Wong Kim Ark*. As the Court explained: "The fundamental principle of the common law with regard to English nationality was *birth within the*

---

[4] The government cites *Benny v. O'Brien*, which suggested that the Fourteenth Amendment exempted from citizenship "those born in this country of foreign parents who are temporarily traveling here, and children born of persons resident here in the diplomatic service of foreign governments." 32 A. 696, 698 (N.J. Sup. Ct. 1895). *Benny*, a decision from an intermediary New Jersey court that came down before *Wong Kim Ark*, has no precedential value.

*allegiance*—also called 'ligealty,' 'obedience,' 'faith,' or 'power'—*of the king*. The principle embraced all persons *born within the king's allegiance . . . .*" 169 U.S. at 655 (emphasis added). Put differently, "[a]ll persons born in the allegiance of the king are natural-born subjects, and all persons born in the allegiance of the United States are natural-born citizens." *Id.* at 662 (quoting *Rhodes*, 27 F. Cas. at 790). That is to say, "every man born within its jurisdiction is a subject of the sovereign of the country where he is born." *Id.* at 663 (quoting *Kilham*, 2 Mass. at 265). "[A]llegiance is not personal to the sovereign in the extent that it has been contended for; it is due to him in his political capacity of sovereign of the territory where the person owing the allegiance was born." *Id.* (quoting *Kilham*, 2 Mass. at 265). At common law, the only people born within the kingdom without allegiance to the king were children of diplomatic representatives or hostile occupiers. *Id.* at 659–60. That is because they were not entitled to the king's protection under common law. Children of diplomatic representatives were "born under the actual protection and in the dominions of a foreign prince." *Id.* at 660 (quoting *Inglis v. Trs. of Sailor's Snug Harbor*, 28 U.S. 99, 155 (1830) (opinion of Story, J.)). Children of hostile occupiers certainly were not entitled to any protection of the sovereign. *Id.* All this is to say: if a person is born in the United States and does not belong to one of the traditional classes of excepted persons, the person is born "within the allegiance" of the United States and "subject to the jurisdiction" of the United States. *Wong Kim Ark* did not hold, as the government maintains, that a person born in the United States is only "subject to the jurisdiction of" the United States if the person bears exclusive allegiance to the United States at the time of birth.

Contrary to the government's positions, *Wong Kim Ark* did not interpret "subject to the jurisdiction thereof" in the Citizenship Clause of the Fourteenth Amendment to exclude persons

born in the United States whose parents are not domiciled in the United States or persons who hold allegiance to another country.

The Executive Order directly conflicts with *Wong Kim Ark*. Under *Wong Kim Ark*, a person "born in the United States" and "subject to the jurisdiction thereof" encompasses every person born in this country save specific classes of people. The Executive Order purports to expand the classes of people that are not "subject to the jurisdiction thereof" and thus to deny citizenship by birth to people who are entitled to it under the Constitution. The children targeted by the Executive Order do not fit within any of the limited exceptions to citizenship by birth identified in *Wong Kim Ark*. They are not children of ambassadors, children of enemies in the country during a hostile occupation, children born on foreign seas, or children born into Indian tribes.[5] They are children whose citizenship by birth has been recognized in this country since the ratification of the Fourteenth Amendment. When the children described in the Executive Order are born, they will be United States citizens under the Fourteenth Amendment and long-standing Supreme Court

---

[5] On the same day the President issued the Executive Order at issue here, he issued another Executive Order that describes "an unprecedented flood of illegal immigration" in which "millions of illegal aliens" who "present significant threats to national security and public safety" have entered the country illegally. Exec. Order § 1 (quoting Exec. Order No. 14159, "Protecting the American People Against Invasion" (Jan. 20, 2025)). In its briefing, the government suggests that a broad, inclusive reading of the Citizenship Clause's "subject to the jurisdiction thereof" will result in citizenship by birth "to the children of individuals who present such threats, including even unlawful enemy combatants who enter this country in an effort to create sleeper cells or other hostile threats." ECF 40, at 21. The government seems to advocate for a broader reading of one of the exceptions to citizenship by birth—"children born of alien enemies in hostile occupation"—to include the children described in the Executive Order. *See id.* (quoting *Wong Kim Ark*, 169 U.S. at 682). The meaning of the clause "subject to the jurisdiction thereof" was explained clearly in *Wong Kim Ark*. It is meant to be expansive. *See Wong Kim Ark*, 169 U.S. at 682. The exception for "children born of alien enemies in hostile occupation" applies during a hostile occupation "of part of the king's dominions." *Id*. A "hostile occupation" entails the "firm possession" of a territory that enables the occupier "to exercise the fullest rights of sovereignty over that place." *United States v. Rice*, 17 U.S. (4 Wheat.) 246, 254 (1819). This exception to citizenship by birth plainly does not apply to the children described in the Executive Order.

precedent. The President does not have the authority to strip them of their constitutional right to citizenship by birth.

The government cites no case decided after *Wong Kim Ark* that supports the President's interpretation of the Fourteenth Amendment. And there is none. Instead, the government relies principally on two cases decided before *Wong Kim Ark*: *Elk v. Wilkins*, 112 U.S. 94 (1884), and *The Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872). *Elk* and the *The Slaughter-House Cases* are no help to the government. *Wong Kim Ark* discussed both cases at length and distinguished them. *See* 169 U.S. at 676–82. It found that *Elk*'s interpretation of "subject to the jurisdiction thereof" did not apply outside the context of Indian tribes because *Elk* "concerned only members of the Indian tribes within the United States, and had no tendency to deny citizenship to children born in the United States of foreign parents of Caucasian, African, or Mongolian descent, not in the diplomatic service of a foreign country." *Id.* at 682. Thus, *Elk*'s holding is confined to members of Indian tribes. The children identified in the Executive Order are not akin to members of Indian tribes, who, in the nineteenth century, enjoyed a unique political status and quasi-sovereignty.[6] *See Elk*, 112 U.S. at 119–20 (Harlan, J., dissenting) ("[I]t would be obviously inconsistent with the semi-independent character of such a tribe, and with the obedience they are expected to render to their tribal head, that they should be vested with the complete rights—or, on the other, subjected to the full responsibilities—of American citizens."). *Elk* does not apply to this case. Nor do *The Slaughter-House Cases*. The government relies on the following language from *The Slaughter-House Cases*: "The phrase 'subject to its jurisdiction' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states, born within the United States." 83 U.S. at 73. The government argues "subjects of foreign states" includes the children

---

[6] Congress gave members of Indian tribes citizenship by birth in 1924. 8 U.S.C. § 1401(b).

described in the Executive Order. ECF 40, at 18. The problem for the government is that *Wong Kim Ark* repudiated this language from *The Slaughter-House Cases* because it was "wholly aside from the question in judgment, and from the course of reasoning bearing upon that case," and "[i]t was unsupported by any argument, or by any reference to authorities." *Id.* at 678.[7] The government has not identified any case that supports the President's interpretation of the Fourteenth Amendment.

In the 125 years since *Wong Kim Ark*, the Supreme Court has never questioned whether a child born in the United States—whose parents did not have lawful status or were in the country temporarily—was an American citizen. In *United States ex rel. Hintopoulos v. Shaughnessy*, the petitioners, who were married to each other, worked as crew members on foreign ships that came into port in the United States. 353 U.S. 72, 73 (1957). They entered the United States lawfully and remained in the country after their 29-day visas expired. *Id.* at 73. The wife gave birth three months after her permission to stay expired and two months after her husband's permission to stay expired. *Id.* Half a year later, deportation proceedings were instituted against both parents, and they asked to suspend deportation "on the ground of the economic detriment that would befall their minor son in the event they were deported." *Id.* at 74. The Court remarked that their child was, "of course, an

---

[7] The only other cases the government says support its position that parental domicile is necessary to be "subject to the jurisdiction" of the United States are *Chin Bak Kan v. United States*, 186 U.S. 193 (1902), and *Kwock Jan Fat v. White*, 253 U.S. 454 (1920). In *Chin Bak Kan*, the Court stated the ruling in *Wong Kim Ark* and included the fact that Wong Kim Ark's parents "ha[d] a permanent domicil[e] and residence in the United States." 186 U.S. at 200 (quoting *Wong Kim Ark*, 169 U.S. at 649). In *Kwock Jan Fat*, the petitioner claimed to be a U.S. citizen by birth, but a government investigation concluded that he was born in China and entered the United States as a minor. 253 U.S. at 455–56. The parties did not dispute that if the petitioner's parents were who he said they were, he would have been born to them "when they were permanently domiciled in the United States" and would be a U.S. citizen. *Id.* at 457 (citing *Wong Kim Ark*). Both cases reference *Wong Kim Ark* only in passing. Neither case held that a person's parents must be domiciled in the United States for their U.S.-born children to be "subject to the jurisdiction" of the United States.

American citizen by birth." *Id.* at 73; *see also id.* at 79 (Douglas, J., dissenting) ("The citizen is a five-year-old boy who was born here and who, therefore, is entitled to all the rights, privileges, and immunities which the Fourteenth Amendment bestows on every citizen."). Similarly, in *INS v. Errico*, the Supreme Court considered two appeals of deportation orders. 385 U.S. 214, 214 (1966). Both petitioners entered the United States by making fraudulent misrepresentations to immigration officials, and after entry, each had a child in the United States. *Id.* at 215–16. Even though the children's parents had procured entry into the country by fraud, the Court did not question that the children were American citizens by virtue of their birth in the United States. *See id.* (stating first petitioner's child "acquired United States citizenship at birth" and second petitioner's child "became an American citizen at birth"). And in *Hamdi v. Rumsfeld*, the Supreme Court "consider[ed] the legality of the Government's detention of a United States citizen on United States soil as an 'enemy combatant.'" 542 U.S. 507, 509 (2004) (plurality). An amicus brief urged the Court to find that the enemy combatant was not a citizen because his parents were in the United States on temporary visas when he was born. *See* Br. for The Claremont Inst. Ctr. for Constitutional Jurisprudence as Amicus Curiae Supporting Respondents, *Hamdi v. Rumsfeld*, 542 U.S. 507 (2004) (No. 03-6696), 2004 WL 871165. Despite this urging, the Court recognized that the person detained was an American citizen because he was born in the United States. 542 U.S. at 509–10.

In other cases, the Supreme Court never has intimated that the immigration status of parents might affect whether their U.S.-born children are citizens at birth. *See, e.g.*, *INS v. Rios-Pineda*, 471 U.S. 444, 446 (1985) (noting that the undocumented respondent—who had entered the country without permission—"had given birth to a child, who, born in the United States, was a citizen of this country"); *Vance v. Terrazas*, 444 U.S. 252, 255 (1980) ("Appellee . . . was born in this country, the son of a Mexican citizen. He thus acquired at birth both United States and Mexican

citizenship."); *Rogers v. Bellei*, 401 U.S. 815, 828 (1971) (acknowledging that American citizenship law "follows English concepts with an acceptance of the jus soli"); *Nishikawa v. Dulles*, 356 U.S. 129, 131 (1958) ("Petitioner was born in Artesia, California, in 1916. By reason of that fact, he was a citizen of the United States, and because of the citizenship of his parents, he was also considered by Japan to be a citizen of that country."); *Kawakita v. United States*, 343 U.S. 717, 720 (1952) (noting that petitioner was born in the United States to Japanese citizen parents and "was thus a citizen of the United States by birth"); *Hirabayashi v. United States*, 320 U.S. 81, 96 (1943) (confirming that people of Japanese descent were citizens because they were "born in the United States"); *Perkins v. Elg*, 307 U.S. 325, 327, 329 (1939) (citing *Wong Kim Ark* and finding that the plaintiff was still an American citizen because of her birth in the United States, even though she had moved abroad as a minor and acquired Swedish citizenship); *Morrison v. California*, 291 U.S. 82, 85 (1934) ("A person of Japanese race is a citizen of the United States if he was born within the United States."); *Weedin v. Chin Bow*, 274 U.S. 657, 670 (1927) (discussing *Wong Kim Ark* and noting that a child born in the United States "was nevertheless, under the language of the Fourteenth Amendment, a citizen of the United States by virtue of the jus soli embodied in the amendment"); *Ah How v. United States*, 193 U.S. 65, 65 (1904) (stating petitioners offered evidence that they were born in the United States "and therefore each was a citizen").

The government's only response to these Supreme Court cases: "[I]t is not unusual for the Supreme Court, after fully exploring a legal issue, to reach a conclusion that conflicts with earlier assumptions." ECF 40, at 28. That is no response at all.

The Executive Order flouts the plain language of the Fourteenth Amendment to the United States Constitution, conflicts with binding Supreme Court precedent, and runs counter to our

nation's 250-year history of citizenship by birth. The plaintiffs have shown an extremely strong likelihood that they will succeed on the merits of their constitutional claim.

## 2. Irreparable Harm

"Citizenship is a most precious right[,] . . . expressly guaranteed by the Fourteenth Amendment to the Constitution . . . ." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963); *see also Perez v. Brownell*, 356 U.S. 44, 64 (1958) (Warren, J., dissenting) ("Citizenship is man's basic right for it is nothing less than the right to have rights."). The right to American citizenship is "a right no less precious than life or liberty." *Klapprott v. United States*, 335 U.S. 601, 616 (1949) (Rutledge, J., concurring in result). The "deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *accord Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."); *Ross v. Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987) ("[T]he denial of a constitutional right . . . constitutes irreparable harm for purposes of equitable jurisdiction").

Here, the plaintiffs have established a strong likelihood of success of the merits on their claim that the Executive Order violates the Fourteenth Amendment. The denial of the precious right to citizenship for any period of time will cause them irreparable harm.

The government argues that any harm is "speculative" because the plaintiffs' children will have "other routes of obtaining status," such as seeking asylum. ECF 40, at 29. This argument is callous and wrong. The irreparable harm to the plaintiffs and their unborn children is concrete and imminent. If the Court does not enjoin enforcement of the Executive Order, children born in the United States who are subject to the Order immediately will be denied the benefits and rights of

U.S. citizenship. The benefits of citizenship include access to certain government public benefit programs such as health care through the Children's Health Insurance Program and food assistance through the Supplemental Nutrition Assistance Program. *See* ECF 37, at 10. The rights of citizenship include the right to live in the United States lawfully and without fear of deportation. Without an injunction, all U.S.-born children subject to the Executive Order will have no legal status in this country when they are born. Without legal status at birth, children could be placed in removal proceedings and deported. Many of the plaintiffs have pending asylum applications or temporary legal status and are not subject to removal. If the Order goes into effect, their children will be without legal status and may be subject to removal even if they are not. The Order may cause some plaintiffs to be separated from their children. *See Wanrong Lin v. Nielsen*, 377 F. Supp. 3d 556, 564–65 (D. Md. 2019) (finding plaintiff would be irreparably harmed if deported and separated from his wife and children in the United States).

Additionally, some of the children of the plaintiffs will be stateless if the Order goes into effect. *See* ECF 2-5, ¶ 4 (statement of plaintiff Liza that her child would be stateless without American citizenship as she and her husband cannot safely apply for Russian citizenship for their child); ECF 2-7, ¶¶ 7–9 (statement of plaintiff Monica that her child would be stateless without American citizenship because there is no Venezuelan consulate in the United States where she could apply for her child's Venezuelan citizenship). For stateless newborns, their "very existence [will be] at the sufferance of the country in which [they] happen[] to find [themselves]." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

Without an injunction, the plaintiffs will face instability and uncertainty about the citizenship status of their newborn babies, and their children born on U.S. soil will be denied the

rights and benefits of U.S. citizenship. The Executive Order, if not enjoined, will cause the plaintiffs and their children grave, irreparable harm.

### 3.  Balance of Equities and Public Interest

The final two factors are the balance of the equities and the public interest. The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda*, 34 F.4th at 365 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). To balance the equities, the Court considers "the relative harms to the applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)). The equities and the public interest weigh very strongly in the plaintiffs' favor.

Today, virtually every baby born on U.S. soil is a U.S. citizen upon birth. That is the law and tradition of our country. That law and tradition will remain the status quo pending the resolution of this case. The government will not be harmed if enforcement of the Executive Order is enjoined. "[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013) (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). And "upholding constitutional rights surely serves the public interest." *Id.* (quoting *Giovani*, 303 F.3d at 521); *accord Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest."). If the Executive Order is not enjoined, local governments will face significant harm. Local governments are responsible for issuing birth certificates, which, under the Order, will no longer automatically prove citizenship. *See* ECF 37,

at 14. The Order would require local governments to either change the information provided on birth certificates or develop an entirely new process to verify citizenship. *Id.* at 15. Additionally, localities will bear a financial burden if the Order takes effect. Currently, local governments receive federal funding for foster care expenses and health care for children who "qualif[y]" for assistance. 8 U.S.C. § 1641(b)–(c). A noncitizen "qualifie[s]" if they are a lawful permanent resident or have received one of several forms of humanitarian relief, such as asylum or refugee status. *Id.* People with only temporary legal status, such as student or work visas, or people without any legal status are generally not considered "qualified" for these programs. *See* 8 U.S.C. § 1611(a). If children born in the U.S. are not citizens upon birth, they will not be entitled to federal benefits, and local governments will bear the financial burden for public services. ECF 37, at 9–12. These collateral consequences on local municipalities and taxpayers surely do not serve the public interest.

The balance of the equities and the public interest strongly weigh in favor of a preliminary injunction that maintains the status quo during litigation.

All four factors weigh in favor of a preliminary injunction.

#### 4. Nationwide Injunction

"District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020)). Indeed, "[a] district court may issue a nationwide injunction so long as the court 'mold[s] its decree to meet the exigencies of the particular case.'" *Id.* (alteration in original) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)).

Only a nationwide injunction will provide complete relief to the plaintiffs. ASAP has "over 680,000 members . . . who reside in all 50 U.S. states and several U.S. territories." ECF 1, ¶ 31. ASAP expects that "[h]undreds or even thousands of ASAP members will give birth to children in the United States over the coming weeks and months." *Id.* ¶ 38. Because ASAP's members reside in every state and hundreds of them expect to give birth soon, a nationwide injunction is the only way "to provide complete relief" to them. *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Further, "a nationwide injunction may be appropriate when the government relies on a 'categorical policy.'" *See HIAS*, 985 F.3d at 326. The Executive Order is a categorical policy. A nationwide injunction against the categorical policy in the Executive Order is appropriate. It also is necessary because the policy concerns citizenship—a national concern that demands a uniform policy. *See Arizona v. United States*, 567 U.S. 387, 394–95 (2012) (noting that the federal government has "constitutional power to 'establish an *uniform* Rule of Naturalization'" (emphasis added) (quoting U.S. Const. art. 1, § 8, cl. 4)). A nationwide injunction is appropriate and necessary.

**III.    Conclusion**

For the foregoing reasons, the motion for a preliminary injunction is granted. The Court enjoins the implementation and enforcement of the January 20, 2025 Executive Order 14160, "Protecting the Meaning and Value of American Citizenship." A separate order follows.

Date: February 5, 2025

Deborah L. Boardman
United States District Judge