```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MARYLAND
 2                        SOUTHERN DIVISION

    _____
 3                                  )
    CASA, INC., et al.,             )
 4                                  )
                    Plaintiff,      )
 5                                  )
        v.                          )  Case No. 8:25-cv-00201-DLB
 6                                  )
    DONALD J. TRUMP, et al.,        )
 7                                  )
                    Defendants.     )
 8  _____)

 9                                  Greenbelt, Maryland
                                    February 5, 2025
10                                  10:08 a.m.

11           PRELIMINARY INJUNCTION AND MOTIONS HEARINGS

12           BEFORE THE HONORABLE DEBORAH L. BOARDMAN
                    United States District Judge
13
                     A P P E A R A N C E S
14
    ON BEHALF OF THE PLAINTIFFS:
15
        GEORGETOWN UNIVERSITY LAW CENTER
16      INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
        600 New Jersey Avenue, N.W.
17      Washington, DC  20001
        (202) 662-9765
18      BY:  JOSEPH MEAD, ESQUIRE
             (202) 662-9765
19           jm3468@georgetown.edu
        BY:  WILLIAM POWELL, ESQUIRE
20           (202) 661-6629
             whp25@georgetown.edu
21
                        (Continued)
22

23                   PATRICIA KLEPP, RMR
                     Official Court Reporter
24               6500 Cherrywood Lane, Suite 200
                  Greenbelt, Maryland  20770
25                      (301) 344-3228
```

```
1                    A P P E A R A N C E S (Cont'd)

2   ON BEHALF OF THE PLAINTIFFS:  (Cont'd)

3        ASYLUM SEEKER ADVOCACY PROJECT
         228 Park Avenue South #84810
4        New York, New York  10003
         BY:  CONCHITA CRUZ, ESQUIRE
5             (305) 484-9260
              conchita.cruz@asylumadvocacy.org
6
    ON BEHALF OF THE DEFENDANTS:
7
         UNITED STATES DEPARTMENT OF JUSTICE
8        Civil Division
         950 Pennsylvania Avenue, N.W.
9        Washington, D.C.  20530
         BY:  ERIC HAMILTON, DEPUTY ASSISTANT ATTORNEY GENERAL
10            (202) 514-3301
              eric.hamilton@usdoj.gov
11
         UNITED STATES DEPARTMENT OF JUSTICE
12       Civil Division, Federal Programs Branch
         1100 L Street, N.W.
13       Washington, D.C.  20005
         BY:  BRAD P. ROSENBERG, SPECIAL COUNSEL
14            (202) 514-3374
              brad.rosenberg@usdoj.gov
15       BY:  YURI FUCHS, TRIAL ATTORNEY
              (202) 598-3869
16            yuri.s.fuchs@usdoj.gov
         BY:  ROBERT CHARLES MERRITT, TRIAL ATTORNEY
17            (202) 616-8098
              robert.c.merritt@usdoj.gov
18
         UNITED STATES ATTORNEY'S OFFICE
19       36 S. Charles Street, 4th Floor
         Baltimore, Maryland  21201
20       BY:  MELISSA E. GOLDMEIER, ASSISTANT U.S. ATTORNEY
              (410) 209-4855
21            melissa.goldmeier@usdoj.gov

22

23

24

25
```

1                        P R O C E E D I N G S

2          (Call to order of the Court.)

3               THE COURTROOM DEPUTY:  All rise.  The United States

4     District Court for the District of Maryland is now in session,

5     the Honorable Deborah L. Boardman presiding.

6               THE COURT:  All right, good morning.  Please be

7     seated.

8               Please call the case.

9               THE COURTROOM DEPUTY:  The matter now pending before

10     the Court is Civil Action No. DLB-25-0201, CASA, Inc, et al. v.

11     Donald J. Trump, et al.  The matter now comes before the Court

12     for a preliminary injunction hearing.

13               Counsel, please identify yourselves for the record,

14     beginning with counsel for the plaintiffs.

15               MR. MEAD:  Good morning, Your Honor.

16               Joseph Mead on behalf of Plaintiffs, and with me at

17     counsel table is William Powell and Conchita Cruz.

18               THE COURT:  Okay.  Good morning.

19               MR. HAMILTON:  Good morning, Your Honor.

20               Eric Hamilton, Deputy Assistant Attorney General for

21     the Civil Division, on behalf of the defendants, and my

22     colleagues will introduce themselves.

23               MR. ROSENBERG:  Good morning, Your Honor.

24               Brad Rosenberg from the Department of Justice,

25     Civil Division, Federal Programs Branch, on behalf of

```
 1   Defendants.
 2           MR. FUCHS:  Good morning.
 3           Yuri Fuchs, from the Department of Justice,
 4   Civil Division, Federal Programs Branch, on behalf of
 5   Defendants.
 6           MR. MERRITT:  Good morning.
 7           Robert Charles Merritt from the Federal Programs
 8   Branch, on behalf of the defendants.
 9           MS. GOLDMEIER:  Melissa Goldmeier -- it's
10   G-O-L-D-M-E-I-E-R -- Assistant United States Attorney, on behalf
11   of defendants.
12           THE COURT:  Good morning.  Good to see you all.
13           Okay.  We're here for a hearing on the plaintiffs'
14   motion for a preliminary injunction.  The plaintiffs ask the
15   Court to enjoin the President of the United States, the
16   Secretary of the Department of State, the Attorney General, the
17   Secretary of the Department of Homeland Security, the Director
18   of the U.S. Citizenship and Immigration Services, and the
19   Commissioner of the Social Security Administration from
20   implementing and enforcing an Executive Order issued by
21   President Trump called Protecting the Meaning and Value of
22   American Citizenship.
23           Before we get to the PI motion, let's talk about the
24   plaintiffs' motion to proceed under pseudonyms; that was ECF 3.
25   I have reviewed the defendants' response.  It looks like there's
```

1  no objection, provided if they ever need the identities to

2  defend the case, they can seek leave to do so.  Is that the

3  defendants' position?

4          MR. HAMILTON:  Yes, Your Honor.

5          THE COURT:  Okay.

6          Mr. Mead, what's your response?

7          MR. MEAD:  That's acceptable to us, provided there are

8  appropriate protective orders and it is in fact needed to

9  prosecute the case.

10          THE COURT:  That would only be if the names need to be

11  disclosed.  So right now, the motion to proceed under pseudonyms

12  is granted.  All right.

13          Okay.  I've reviewed all of the briefs.  I've also

14  reviewed the three amicus briefs that were filed.  I think one

15  was filed yesterday from the State of Tennessee; I reviewed

16  that.

17          Mr. Mead, I assume you are taking the lead here; is

18  that correct?

19          MR. MEAD:  Yes, Your Honor.

20          THE COURT:  Okay.  So I've read the declarations that

21  you submitted in support of your motion.  Is there any other

22  evidence you wish to present before I hear your argument?

23          MR. MEAD:  No, Your Honor.

24          THE COURT:  Okay.

25          Okay.  It's your motion; I'll hear from you.  And just

1    know, I have read all of the cases, I have read your briefs, so

2    you can just jump right in with what you think is your best

3    argument for a preliminary injunction.

4              MR. MEAD:  Thank you, Your Honor.

5              So Joseph Mead, again, on behalf of the plaintiffs.

6              For well over a century, the Fourteenth Amendment has

7    been understood to guarantee citizenship to all persons born in

8    the United States, subject to only a few narrow, historically

9    grounded exceptions.  Generations of children born in the

10   United States have grown up with that promise, and with full

11   access to the American Dream, they have made the American Dream

12   brighter; they have become teachers, doctors, lawyers,

13   scientists, they've built industry, and they've served in the

14   military.

15             The President's Executive Order declares that

16   everyone's been getting it wrong this whole time.  Defendants

17   propose a reimagination of the Fourteenth Amendment's phrase,

18   "subject to the jurisdiction of the United States."  The

19   government's position is wrong as a matter of binding precedent,

20   it's wrong as a matter of constitutional text, it's wrong as a

21   matter of statutory language, and it's wrong as a matter of

22   history.

23             I appreciate the Court's statement that you have read

24   the materials, I will not go through all of those, but I welcome

25   the Court's questions on anything that the Court has a question

1    about.

2         I --

3         THE COURT:  Let me ask you this.  What in your view is

4    the holding of Wong Kim Ark?  What's the holding?

5         MR. MEAD:  The holding?  The holding is that children

6    born to foreign nationals are -- within the United States are

7    subject to jurisdiction of the United States and therefore

8    entitled to birthright citizenship.  I think the lessons of

9    Wong Kim Ark, the reasoning of it, control this case for a

10   couple of reasons.

11        The first is, the Court situated the

12   Fourteenth Amendment against the historical backdrop in which it

13   was enacted.  As a matter of history, birthright citizenship in

14   this country was available to almost everybody.  Dred Scott

15   decision represented a departure from that practice.  The

16   Fourteenth Amendment was meant to expand birthright citizenship,

17   to make it nearly universal, subject to only the few narrow

18   exceptions that had been recognized in the common law.

19        The second lesson of Wong Kim Ark is that it adopts an

20   interpretation of the word "jurisdiction" consistent with the

21   historical practice and well-settled meaning of the time.  So

22   the Court looked to cases like Schooner Exchange, where the

23   Supreme Court talked about jurisdiction in the sense that we

24   would typically use it today, which is the power that a

25   sovereign has over its territory and the people in it.

1              THE COURT:  Let me ask you this.  The defendants and

2    amici from Tennessee, perhaps others, they focus on the language

3    in Wong Kim Ark that talks about domicile within the

4    United States.  In particular, there's a line in Wong Kim Ark

5    that says, "The amendment, in clear words and in manifest

6    intent, includes the children born, within the territory of the

7    United States, of all other persons of whatever race or color

8    domiciled within the United States."

9              The word "domiciled" is sprinkled throughout

10   Wong Kim Ark.

11             What do I make of that, and what import does it have

12   here?

13             MR. MEAD:  I think it is true that domicile is

14   mentioned throughout the Court's opinion, and that was a fact

15   that was present before the Court in the case before it, but the

16   Court's reasoning, its implication of Schooner Exchange, its

17   reflection of the historical common law, none of that depended

18   on domicile or turned on domicile.

19             What the defendants are seeking to do is to pluck a

20   fact from the case and turn it into a rule of constitutional

21   law.

22             There were other facts in the case.  The Court

23   mentioned, for example, that Wong Kim Ark's parents were Chinese

24   subjects.  Of course the rule does not -- is not limited to

25   children of Chinese subjects; it applies equally to children of

1    German subjects.

2          The Court's invocation of Schooner Exchange I think is

3    instructive here.  In Schooner Exchange, the Court, the

4    Supreme Court, applied a concept of jurisdiction that applied to

5    everybody who was visiting the United States, subject,

6    of course, to exceptions such as that for foreign ministers and

7    later recognized to be things like invading armies.

8          I think the defendants' position -- I count a few

9    different interpretations of the phrase "subject to

10   jurisdiction" in defendants' brief.  At points, they seem to

11   suggest that jurisdiction is actually about allegiance to a

12   foreign power.  Any allegiance to a foreign power, it brings one

13   outside the United States' jurisdiction.  At times, they

14   suggest, for example, that if a child is born to foreign

15   nationals, that child will not be subject to U.S. jurisdiction,

16   and I think that that argument is flatly inconsistent with any

17   interpretation of Wong Kim Ark.  So perhaps the government is

18   arguing that Wong Kim Ark should be overturned, but of course,

19   that is not something that this Court is empowered to do.

20          THE COURT:  Well, absolutely not.  I actually don't

21   read their briefs to say that Wong Kim Ark is either bad law or

22   should be overturned.  I'll hear from them shortly, but -- okay.

23          MR. MEAD:  So they also invoke this domicile rule.

24   There is very little in the pre-ratification history to suggest

25   that when a -- when somebody were to reference jurisdiction,

1    they were imposing a domicile requirement.  The word "domicile"

2    of course did not appear in the text of the Constitution, so

3    it's an inference that would have to be drawn that domicile was

4    somehow meant to be included in the word "jurisdiction," and I

5    don't think that there is support for that proposition.

6          Another argument or interpretation of the Fourteenth

7    Amendment that defendants have put forward is that there is an

8    exception.  In addition to the specific, narrow exceptions that

9    the Supreme Court identified in Wong Kim Ark, there's an

10   additional exception for traveling -- I'm sorry, for temporary

11   visitors.  That's a little bit different than domicile; I want

12   be clear about that.  Somebody could be not domiciled within the

13   United States but also here for a long period of time.  So that

14   also is not something that was well grounded in case law before

15   the Fourteenth Amendment was enacted.

16         I want to emphasize that even if there was such an

17   exception for temporary visitors, it would do very little to

18   justify the Executive Order as written.  The people covered by

19   the Executive Order, the parents covered by the Executive Order

20   are -- lived here for years and decades; they're not temporary

21   visitors.  They are the people we work with, they have -- they

22   own the houses down our street.  They have made America their

23   home, and they are entitled to have their children subject to

24   the same constitutional right to citizenship that every other

25   child born in the United States has.

```
 1              And I think that this demonstrates that the

 2   Executive Order's departure from settled law is so abrupt, it's

 3   such a departure from what we've been doing for over a century

 4   that it's led to a great deal of confusion.  The

 5   Executive Order, when it uses phrases like "temporary" -- when

 6   it purports to deny citizenship for temporary but lawful

 7   parents, it's unclear what that means.  How temporary is

 8   temporary enough, three years, five years?  We don't have the

 9   answer to that.

10              THE COURT:  Well, it gives some examples.  It says,

11   "such as but not limited to visiting the United States under the

12   auspices of the visa waiver program or visiting on a student

13   work or tourist visa."

14              MR. MEAD:  Those are some examples, but that is not

15   the universe of temporary but lawful visitors that might be

16   covered.

17              THE COURT:  And under current law, if those people

18   here on those temporary visas have a baby, their child is a

19   U.S. citizen; correct?

20              MR. MEAD:  That is correct.

21              THE COURT:  Okay.  You were saying that those are just

22   examples, and there could be other instances, so it's ill

23   defined and vague.

24              MR. MEAD:  I just want to close the loop on that to

25   point out that people who are here under temporary protected
```

1    status, people who have deferred action after being a childhood

2    arrival, and asylum seekers all have lawful presence and in a

3    sense are temporary, because they have not been granted

4    permanent residency status, but they will often be here for

5    years and decades and have the intent to remain for years and

6    decades.

7            THE COURT:  So do you think that they are covered

8    under this Executive Order?

9            MR. MEAD:  I think it is unclear, and I think that

10   they have a legitimate fear that their children will be -- not

11   have their citizenship recognized.  I think it's a question for

12   the government what the scope of the Executive Order is.

13           What is clear is that there are a number of people who

14   today, at least based on the historical understanding of the

15   Fourteenth Amendment, would have their children have -- be

16   recognized as U.S. citizens, and this Executive Order takes that

17   away; it infringes upon the most like fundamental constitutional

18   right.

19           Having -- being a citizen, being considered a citizen

20   is the foundation for so many other rights, and it is causing

21   real-world -- confusion, fear, real-world harm for countless

22   people today.  And the Executive Order's departure from this

23   well-settled history should be enjoined.

24           THE COURT:  You ask for a nationwide injunction.

25   Tennessee says I should not do a nationwide injunction.  What is

```
 1   your position on that, if in fact I think an injunction is

 2   warranted here?

 3              MR. MEAD:  We believe a nationwide injunction is --

 4   and I should say, a "universal injunction" is the phrasing that

 5   we've preferred, simply because ASAP's members are spread

 6   throughout the country.  So an injunction that applied that --

 7   there's no version of an injunction that could solve our

 8   plaintiffs' harm that would apply apart from across the country.

 9              But our answer is that the Fourth Circuit has

10   repeatedly affirmed nationwide injunctions in situations similar

11   to this, where an Executive Order or some government action is

12   on its face unconstitutional and is causing harm just across the

13   board.  An injunction that is limited to only the parties,

14   for example, would be difficult to administrator and it would

15   cause a lot of confusion about whether a child born to, you

16   know, an ASAP member, you know, father but not mother, how that

17   would work out; I think there would be a lot of questions there.

18              I think the way to alleviate the injury, and the

19   stigmatic injury, the dignitary harm of intruding on the

20   constitutional rights of a class of people, is best solved by a

21   universal injunction against this facially unconstitutional

22   Executive Order.

23              THE COURT:  All right.  I have another question about

24   one of the cases that the parties cite.  I think you cited it in

25   your opening brief.  It's Plyler v. Doe, a Supreme Court case
```

```
 1   from 1982, an equal protection case, in which the Court was
 2   interpreting the phrase "within the jurisdiction," and you cite
 3   Footnote 10.  How does that help you?
 4            MR. MEAD:  I think the idea behind the case is, it
 5   takes a broad understanding of jurisdiction to encompass
 6   undocumented immigrants.  It's true, as the government points
 7   out, that it has not directly on point interpreted the same
 8   constitutional phrase, but the idea of jurisdiction encompassing
 9   undocumented immigrants, there's no carve-out for undocumented
10   immigrants.  It's clear that undocumented immigrants are subject
11   to all of the same United States laws, they're subject to the
12   United States regulatory power.  They are not equivalent or akin
13   to an invading army, for example.
14            THE COURT:  Do you need Plyler?
15            MR. MEAD:  We do not need Plyler; this case is
16   controlled by Wong Kim Ark and the other cases that we cite.
17   The case names I do not have in front of me, but we do cite
18   others where the Supreme Court recognized that the 14th
19   Amendment Citizenship Clause applied to undocumented immigrants.
20            THE COURT:  Okay.
21            MR. MEAD:  So I welcome the Court's further questions,
22   but otherwise, we ask that you grant the motion.
23            Thank you.
24            THE COURT:  All right, thank you.
25            Mr. Hamilton, will you be taking the lead for the
```

 1    United States?

 2            All right.

 3            Good morning.

 4            MR. HAMILTON:  Good morning, Your Honor.

 5            The Court should deny Plaintiffs' motion for a

 6    preliminary injunction.  Plaintiffs have not shown that they are

 7    likely to succeed on the merits of their claims.  Their argument

 8    rests on a misreading of the Fourteenth Amendment to the

 9    U.S. Constitution.  The Fourteenth Amendment was enacted to

10    repudiate the shameful decision of Dred Scott against Sandford

11    and ensure it would never again be the law of this country that

12    an African American might be denied American citizenship based

13    on his or her race, but the framers of that act did not intend

14    to and did not in fact create a loophole to be exploited by

15    temporary visitors to the country and illegal aliens.

16            The Citizenship Clause of the Fourteenth Amendment

17    says that all persons born or naturalized in the United States

18    and subject to the jurisdiction thereof are citizens of the

19    United States.  It's that "subject to the jurisdiction thereof"

20    clause that is in dispute, and it's a clause that the

21    U.S. Supreme Court interpreted short in time after the

22    Fourteenth Amendment was ratified.  It did so in Elk against

23    Wilkins and then again in the Wong Kim Ark cases.  Both say that

24    the clause needs to be "born into the allegiance of the

25    country."  Elk in particular says that it needs to be completely

1   subject to the political jurisdiction.

2            THE COURT:  So Elk -- let's just be clear.  I've read

3   Elk.  Elk is unique to members of Indian tribes born in the

4   United States.  Can we agree on that?

5            MR. HAMILTON:  Well, I would certainly agree that that

6   was the issue in Elk, just as the issue in Wong Kim Ark was a

7   foreign national who's domiciled in the United States, but

8   nonetheless, the case contains language that's interpreting

9   "subject to the jurisdiction thereof," and that language is

10  repeated in Wong Kim Ark, which uses the direct and immediate

11  allegiance language again.

12           THE COURT:  Okay.  So I have the same question for you

13  that I had for Mr. Mead.  What in your view is the holding of

14  Wong Kim Ark?

15           MR. HAMILTON:  Wong Kim Ark's holding is that a child

16  born of Chinese parents who had, quote, "a permanent domicile

17  and residence in the United States is subject to the

18  jurisdiction of the United States."  And Wong Kim Ark is very

19  helpful in that the case begins and ends by identifying its

20  question presented, and it includes the fact of Mr. Wong's

21  parents in --

22           THE COURT:  So I agree, the case has bookends.  It

23  starts out with a very specific -- fact-specific question

24  presented, and then it ends, answering that fact-specific

25  question in the affirmative.  In between, there is 40 pages of

1   analysis and discussion of English common law, more recent

2   United States decisions, textual interpretation, some

3   congressional history, and then there is a holding about three

4   quarters of the way, that, to me, as I read your papers, you

5   seem to not want the Court to follow.

6           So help me understand, once again, is it your position

7   that the holding of Wong Kim Ark is the last paragraph of the

8   majority opinion?

9           MR. HAMILTON:  Yes, yes, that -- which includes that

10  domicile condition.  Domicile, as Your Honor noted, is mentioned

11  throughout the Wong Kim Ark majority opinion.  I counted 20

12  references to domicile.  And my friend on the other side says,

13  well, Wong Kim Ark also noted that Mr. Wong's parents were of

14  Chinese descent, is that part of its holding, but some of those

15  references to domicile come in cases like the Benny case, from

16  the New Jersey Supreme Court, which included domicile in stating

17  the rule for the Citizenship Clause.  And the U.S. Supreme Court

18  repeated that domicile language in Benny.  And so --

19          THE COURT:  Let's just assume for purposes of your

20  argument that domicile of the parents of the child born in the

21  U.S. is relevant, that the parents have to be domiciled here

22  before their child can be a natural-born citizen.  Where in

23  Wong Kim Ark is domicile defined?  What does that mean?

24          MR. HAMILTON:  I don't think Wong Kim Ark defines

25  domicile.  It didn't have to do so.  You know, the parents

```
 1   were -- it found that they were in -- they were domiciled in the

 2   United States, but we would get the meaning of domicile from the

 3   common law.  And domicile is not something that temporary

 4   visitors to the United States or illegal aliens are capable of

 5   establishing.

 6           THE COURT:  Hold on.  I need a case, contemporaneous

 7   with this period, that you say supports your definition or

 8   interpretation of "domicile."

 9           MR. HAMILTON:  Well, we -- our papers cite the

10   Martinez cases, which defines "domicile" as an individual's

11   true, fixed, and permanent home.  And the temporary visitors to

12   the country and illegal aliens are incapable of establishing a

13   domicile, because their presence in the United States is

14   inherently of a nonpermanent nature.  Temporary visitors are

15   only allowed to be in the United States for a limited period of

16   time, and illegal aliens are not permitted to be in the

17   United States at all; they are subject to the rule.

18           THE COURT:  Well, your interpretation of Wong Kim Ark

19   seems to me to be novel.  Is there any case law -- other than

20   the portions of Wong Kim Ark that you have cited, is there any

21   other case that supports the President's interpretation of the

22   Fourteenth Amendment?

23           MR. HAMILTON:  There is, and our brief, at pages 23 to

24   24, references 1902 and 1920 U.S. Supreme Court cases, so not

25   long in time after the 1898 Wong Kim Ark decisions, that include
```

1    domicile in stating Wong Kim Ark's rule.  We also cite in our

2    brief a 1910 report of the Department of Justice, which is not a

3    case but still, we think, relevant authority, that said,

4    Wong Kim Ark goes no further than addressing children of

5    foreigners domiciled in the United States.

6         That report continues, It has never been held and is

7    very doubtful that children of temporary visitors have

8    U.S. citizenship.  And plaintiffs respond to that by saying,

9    well, later in that, that same report says that a child has the

10   right to elect citizenship.  But that's not quite right; the

11   report says that the child might elect nationality, which is a

12   concept distinct from that of citizenship.

13        THE COURT:  So other than those two Supreme Court

14   cases from 1902 and 1920, are there any other Supreme Court

15   cases in which the Court has even questioned the domicile of the

16   parents and whether that impacts a child's citizenship if

17   they're born in the United States?

18        MR. HAMILTON:  Well, I don't think the issue has

19   really come up.  You know --

20        THE COURT:  Is that because everyone has assumed it's

21   been settled by the Fourteenth Amendment in Wong Kim Ark?

22        MR. HAMILTON:  Well, no, because as our papers point

23   out, there are authorities pre- and postdating Wong Kim Ark that

24   did not read it the way that recent executive branch practice

25   has, but we certainly acknowledge that recent executive branch

 1   practice has been different than the substance of the

 2   President's Executive Order.

 3          THE COURT:  Well, what -- you say, recent executive

 4   branch action.  What other executive, other than

 5   President Trump, has taken this position?

 6          MR. HAMILTON:  Well, so again, there's that 1910

 7   DOJ report, but then, our papers also cite an 1885 decision of

 8   the State Department, denying citizenship to an applicant with

 9   temporary visitor parents.  And there are other treatises from

10   the late 19th century, after the Citizenship Clause.  We cite

11   the Hall and Morse treatises.

12       (Reporter requesting clarification.)

13          MR. HAMILTON:  I'm sorry, yes.

14          Yes.  So we cite a decision of the U.S. State

15   Department in 1885 that denied citizenship to an applicant who

16   had temporary visitor parents.  And we also cite --

17          THE COURT:  That -- hold on.  That was before

18   Wong Kim Ark.

19          MR. HAMILTON:  It was, it was, yes, but it's close in

20   time to ratification of the Fourteenth Amendment, which we think

21   makes it more relevant authority than the recent executive

22   practice.

23          THE COURT:  Okay.  So what I've heard from you is that

24   you believe "subject to the jurisdiction thereof" and the

25   Citizenship Clause of the Fourteenth Amendment includes a

1    domicile requirement.

2            Other than that, are there any other requirements?

3    What I've read in your papers and I heard reference to earlier

4    was an allegiance requirement?  Tell me about that, and what's

5    the source of that position or --

6            MR. HAMILTON:  Yes.

7            THE COURT:  -- the legal basis for that position?

8            MR. HAMILTON:  Yes.  So that is Elk and Wong Kim Ark,

9    because both interpret "subject to the jurisdiction thereof" to

10   mean being born into the allegiance of a country.  And so

11   then --

12           THE COURT:  But doesn't -- I've read the portions of

13   the common law, some of which are from the 1600s.  As I read the

14   cases where this language "born into the allegiance" comes from,

15   it merely means you are born in the soil of the sovereign, so

16   you are born where the king has his kingdom, you are born in the

17   United States.  So it's not about your parents' home country and

18   their allegiance, which is what your paper suggests.  As I read

19   the cases, "born into allegiance" means born in the country.

20           MR. HAMILTON:  I think what Your Honor is describing

21   is the jus soli principle of English common law, and that's

22   something that Plaintiffs raised in their opening brief but they

23   seemed to have retreated from in their reply brief.  That is,

24   again, a principle of British common law.  It's premised on the

25   idea that anyone within the British kingdom's borders owes some

 1    unalterable allegiance to the British monarch, and that premise

 2    is inconsistent with American law.  This country, of course,

 3    was --

 4              THE COURT:  Okay.  So then show me -- I've got

 5    Wong Kim Ark in front of me.  Where in this opinion does it say

 6    allegiance to the United States is a requirement to being

 7    subject to the jurisdiction thereof?

 8              MR. HAMILTON:  I -- I don't have the page cite, but I

 9    believe there is a line in Wong Kim Ark that says, "subject to

10    the jurisdiction thereof" means born in the allegiance and under

11    the protection of the country.

12              THE COURT:  Right.  That phrase, "born in the

13    allegiance" comes from the common law that you just said doesn't

14    apply.  So I'm confused.

15              MR. HAMILTON:  Well, right.  So the -- the distinction

16    is that the jus soli principle was about this idea -- let back

17    up.

18              I think that the "born into the allegiance" concept

19    carried over.  The distinction is that persons who are within

20    a -- within the United States' borders don't automatically have

21    this same presumptive allegiance to the United States that

22    existed in the British kingdom, because our country, citizenship

23    is founded on a social contract, and it's not founded on this

24    relationship between the monarch and the people within that

25    country's borders.  That did not carry over from British

1  common law to the United States.

2          THE COURT:  All right.  Let's switch gears just

3  slightly.

4          One reading of Wong Kim Ark is that its holding is

5  that citizenship by birth is a right to anyone born here, except

6  for four classes of people, and I want to go through those four

7  classes.  And at the end of this, my question will be, do you

8  contend that any of the people in the Executive Order fall

9  within one of those four classes.

10         Class one, children of foreign ambassadors or

11  diplomats.

12         MR. HAMILTON:  I -- so I think this is a hard question

13  to answer, because the Executive Order is the beginning of the

14  policy-making process for the federal government.  It's a

15  communication between the President and his subordinates in the

16  executive branch.  And what that Executive Order directs, it

17  doesn't directly regulate any of the plaintiffs or anyone

18  outside the executive branch; it directs the heads of executive

19  departments and agencies to begin a policymaking process,

20  fashion guidance and rules, and unfortunately, a result of the

21  temporary restraining order entered in Seattle is that that

22  process has not been permitted to go forward.  So --

23         THE COURT:  Okay.  I'm going to keep going through the

24  classes.  Thank you.

25         MR. HAMILTON:  Of course.

```
 1                 THE COURT:  Children of enemies here under hostile
 2     occupation.
 3                 MR. HAMILTON:  I don't have a different answer.
 4                 THE COURT:  Children born on foreign ships.
 5                 MR. HAMILTON:  Again, I --
 6                 THE COURT:  Okay, all right.
 7           And we're not talking about children born as members
 8     of Indian tribes, correct?
 9                 MR. HAMILTON:  Correct.
10                 THE COURT:  All right, okay.
11           All right.
12                 MR. HAMILTON:  If I could make a comment on those
13     exceptions, though, because I do think they are relevant to the
14     preliminary injunction in that they present a significant
15     problem for the plaintiffs with the rule they announce, which is
16     that the Citizenship Clause, they say, does not -- or applies to
17     anyone who must necessarily submit to the rule of U.S. law.
18                 That can't be right, because Indians are subject to
19     the rule of U.S. law; the U.S. can regulate Indian commercial
20     activities, property, and adoption, it can punish Indians for
21     crimes.  Foreign diplomats can be sued in civil court.  And it's
22     true that there is an immunity that applies to foreign
23     diplomats, but that's something that Congress can abrogate.  And
24     it can't be true that Congress can turn on and off the
25     Citizenship Clause by expanding and contracting immunity.
```

1          THE COURT:  Is it your position that Wong Kim Ark is

2     good law and binding precedent?

3          MR. HAMILTON:  We -- we have not taken a position

4     that, you know, what Wong Kim Ark is, is bad law.  We think that

5     it is consistent with the rule that we have laid out for the

6     Citizenship Clause.

7          THE COURT:  What gives the President the authority to

8     interpret the Fourteenth Amendment in the manner that he has

9     done so in the Executive Order?

10         MR. HAMILTON:  So the Vesting Clause and the Take Care

11     Clauses of the U.S. Constitution.  The President is the head of

12     the executive branch, and 8 U.S.C. 1401, as well as the

13     Citizenship Clause, sets rules for who is entitled to

14     citizenship in the United States, and it is the duty of the

15     agencies and departments under his control to faithfully carry

16     out those requirements.

17         THE COURT:  This Executive Order identifies two

18     different classes of people that should be excluded from

19     natural-born citizenship.  My question is, where does the

20     President get the authority to create these classes?

21         MR. HAMILTON:  Well, I don't think he has created

22     these classes; these were created by the Citizenship Clause of

23     the Fourteenth Amendment.  The President is simply aligning

24     executive branch implementation of the Citizenship Clause and

25     the INA to what those authorities require.

```
 1              THE COURT:  All right.
 2              Let's talk about one of the other preliminary
 3    injunction factors.  We focused almost exclusively on the
 4    likelihood of success on the merits.
 5              Let's say that I believe it's a close call on the
 6    merits but perhaps it tips a bit in favor of the plaintiffs.
 7    What's the harm to the government if an injunction is issued?
 8              MR. HAMILTON:  Well, the harm to the government --
 9    there are a couple that come to my mind right away.  One would
10    be that the government would potentially then be treating people
11    as citizens who are not entitled to citizenship.
12              Another harm -- and this is a harm that I noted
13    earlier in connection with the Seattle temporary restraining
14    order --
15              THE COURT:  Wait, hold on a minute.
16              Is this Executive Order intended to say, this is how
17    it always should have been, or is this intended to say, this is
18    how it's going to be going forward?
19              MR. HAMILTON:  It's a going-forward Executive Order,
20    prospective only.  In fact, no --
21              THE COURT:  So what's the harm if we push the pause
22    button, keep the status quo as it's been for 250 years, and let
23    this question be decided on the merits?  What's the harm in
24    doing that?
25              MR. HAMILTON:  Well, the earlier that executive branch
```

```
 1   practice can be aligned with the Citizenship Clause, the better,

 2   but an additional harm -- and this is the harm from -- you know,

 3   that I flagged in connection with the Seattle TRO -- is that

 4   executive departments and agencies haven't even had the

 5   opportunity to work on the guidance and rules to put -- to kind

 6   of lay out what implementation looks like for this executive

 7   order.

 8           THE COURT:  How is that harm?  That means they have

 9   less work to do.

10           MR. HAMILTON:  Well, it also means that the Court

11   would be in a better position to evaluate the policy and also to

12   evaluate how the policy affects any individual plaintiffs.

13           THE COURT:  But this is the policy; I'm holding the

14   Executive Order.  So why do we need more than what is in the

15   Executive Order to understand the policy?

16           MR. HAMILTON:  Well, I certainly think that the

17   Executive Order -- you know, I certainly agree that there's a

18   lot in the Executive Order to understand the policy.  My only

19   point is that Sections 3 as well as 2 do note that there is work

20   for the executive branch to do, and it seems that the judicial

21   branch would be in a better position to understand the full

22   effects of the policy once that work has taken place.

23           THE COURT:  Okay.

24           MR. HAMILTON:  I'd also note, you know, since we're

25   talking about the early point at which this is taking place,
```

1    Plaintiffs are making a facial challenge, and that means that

2    they have to show that the Executive Order is unlawful in all of

3    its applications.  That would mean that someone who even comes

4    to the United States temporarily on a 30-day visitor visa,

5    someone who might even admit that they came to the United States

6    for the sole purpose of having a child here and giving that

7    child American citizenship, that that application would also

8    have to be held to be unconstitutional.

9             THE COURT:  Well, don't -- I need all phones off.

10            Those two examples you just gave, those people, if

11   they have a child in the United States under the current law,

12   those children are natural-born citizens, correct?

13            MR. HAMILTON:  Under present executive branch

14   practice.

15            THE COURT:  Okay.

16            All right.  Just give me one moment, please.

17            Do you have anything to say about Plyler and whether

18   it cuts in your favor or in the plaintiffs' favor?

19            MR. HAMILTON:  Yes.  Thank you, Your Honor.

20            Plyler I don't think is particularly relevant.  As

21   Your Honor noted, its Footnote 10 is simply repeating a -- some

22   language in Wong Kim Ark suggesting that there's some symmetry

23   between the Citizenship Clause and the Equal Protection Clause,

24   but that symmetry doesn't exist.  Again, Elk against Wilkins

25   held that Indians are not within the Citizenship Clause of the

1    Constitution, and yet, those persons are within the protection

2    of the Equal Protection Clause.  Plaintiffs also don't cite

3    anything for the proposition that diplomats would lack rights

4    under the Equal Protection Clause, but they are outside the

5    Citizenship Clause of the Fourteenth Amendment.

6            THE COURT:  Okay.  Let's go back to the domicile

7    discussion.

8            So as I read Wong Kim Ark, several times -- it's long,

9    and I think we can agree, it's somewhat dense -- towards the

10   latter part of the opinion, maybe the last quarter, Justice Gray

11   discusses the Chinese Exclusions Act, which is what is teed up

12   at the outset, which is essentially why this case came to be.

13   Wong Kim Ark, born in San Francisco, went to China, where his

14   parents were from, came back, tried to get back into the

15   country, was denied because they didn't think he had citizenship

16   and the Chinese Exclusions Act barred him from entry.

17           The Court in Wong Kim Ark talks about those acts, and

18   to me, it seems like -- the emphasis on "domicile," in my

19   opinion, seems to stem from that discussion, which is that his

20   parents were domiciled here and were permanent here, but it

21   seems that it was in the context of the Chinese Exclusions Act

22   and not in the context of British common law or the history of

23   citizenship by birthright.

24           What's your view of that?

25           MR. HAMILTON:  Yeah, I -- I would respectfully

1    disagree with that, because as I noted earlier, Wong Kim Ark --

2    one of the domicile references in Wong Kim Ark is the Benny

3    decision of the New Jersey Supreme Court, which interpreted the

4    Citizenship Clause shortly after its ratification, and it makes

5    sense that domicile would come up in this context, because in

6    the common law, a person owed allegiance to the country where he

7    is domiciled.

8          Our brief cites the Carlisle opinion of the

9    U.S. Supreme Court for that, and that provides that link between

10   domicile and being born into the allegiance of the

11   United States.

12         THE COURT:  Okay.  Just give me one minute, please.

13         One of the amici, I think it's Tennessee -- and I know

14   you're not representing the state of Tennessee, but one of the

15   amici suggests that a residency requirement is necessary.  Is

16   that the same as a domicile requirement, in your mind?

17         MR. HAMILTON:  I think these concepts do have a

18   connection, and that even goes back to the text of the

19   Citizenship Clause, which -- after saying that persons covered

20   by it are citizens of the United States, it says that they are

21   also citizens of the state wherein they reside.  So some form of

22   residence is necessarily inherent in persons who fall within the

23   Citizenship Clause of the Constitution, and temporary visitors

24   and illegal aliens are not able to establish a legal residence

25   in the United States.  Temporary visitors, their time in the

```
 1   U.S. is short, it -- well -- or it is of a limited nature, and

 2   illegal aliens, of course, are not lawfully permitted to be

 3   present in the United States in the first place.

 4          THE COURT:  All right.  Let's look at the

 5   Executive Order together.  Hopefully, you have it in front of

 6   you.

 7          MR. HAMILTON:  I do.

 8          THE COURT:  Okay.  I was talking with Mr. Mead about

 9   the -- the people that are excluded from citizenship under this

10   order include someone whose mother's presence in the

11   United States at the time of birth was lawful but temporary, and

12   there are some examples of what temporary is; we talked about

13   that.  What does temporary mean?

14          MR. HAMILTON:  Well, the -- again, I don't have a lot

15   to add, but the Executive Order doesn't say, itself.  There is

16   the identification of a few examples that Your Honor

17   identified, but again, it's sub- -- Section 3 in -- yeah, it's

18   Section 3 that directs the different executive department

19   agencies and departments to work on fashioning that guidance

20   that will be helpful in answering specific questions about

21   applications.

22          THE COURT:  Okay.  Give me one moment.  Let me go

23   through my notes, okay.

24          I don't think I have any more questions for you right

25   now.  If you have anything else you'd like to say, I'd be happy
```

```
1   to hear it.
2           MR. HAMILTON:  Yes.  If I could answer a question
3   Your Honor asked my friend on the other side about nationwide
4   injunctions, if the Court is inclined to enter any sort of
5   injunctive relief, it should be limited to the parties that are
6   here as Plaintiffs.  The Fourth Circuit has repeatedly vacated
7   or stayed nationwide injunctions.  We cite an earlier CASA case,
8   Case De Maryland, Inc. against Trump from 2020, as well as
9   Emergency One against American FireEagle.  At bottom, a
10  nationwide injunction is inconsistent with the Article III
11  power, which is to decide cases and controversies, not to set
12  nationwide rules for a policy.
13          THE COURT:  Thank you.
14          MR. HAMILTON:  Thank you, Your Honor.
15          THE COURT:  Mr. Mead.
16          MR. MEAD:  Thank you, Your Honor.
17          Just very briefly, we've talked a lot about domicile.
18  Domicile is not written into the text of the Constitution.  As a
19  matter of pre-Fourteenth Amendment practice, domicile was not an
20  element of establishing birthright citizenship.  The cases we
21  cite on page 9 of our reply brief and elsewhere, such as
22  Calvin's Case, which was an English common law case, Lynch v,
23  Clarke, which was a New York case from the 1840s, these cases
24  extend birthright citizenship to people who are present in the
25  United States on only a temporary basis.  Moreover, the
```

 1    understanding of jurisdiction was that it applied to people

 2    regardless of whether they are domiciled in the United States or

 3    not.

 4              The government's position that complete allegiance is

 5    required is also difficult to square with this domicile test.

 6    Wong Kim Ark's parents, even if they were domiciled in the

 7    United States, did not owe complete allegiance to the

 8    United States; they were subjects of China, as the

 9    Supreme Court's opinion noted.  They owed a measure of

10    allegiance to the Chinese government.

11              My friend on the other side has cited the Benny

12    decision, which was a New Jersey Supreme Court decision.  I want

13    to emphasize that at the time, the New Jersey Supreme Court was

14    not the court of last resort; it was a lower court.  And it can

15    be confusing, sometimes, to -- when courts are not -- when

16    courts are called Supreme Court when they are not the court of

17    last resort.  It is true that that decision contains language

18    suggesting there might be a domicile requirement, but this lower

19    court decision was not key to the holding, because there's no

20    question that the person there was entitled to citizenship.

21              I would finally note that domicile -- that there's

22    nothing about domicile as a matter of common law or today that

23    requires a person's presence be lawful.  The Justice Story's

24    treatise, which reflects a common law understanding of domicile,

25    mentions that a person can be domiciled even if they have a

1    fugitive purpose.

2            The test of domicile is about residence and intent to

3    remain.  Whether that presence is lawful under whatever test has

4    never been part of the domicile requirement, but ultimately,

5    domicile is not in the Fourteenth Amendment, and imposing a

6    domicile requirement would take what is currently a clear rule,

7    are you born in the United States, and are you not part of one

8    of these narrow exceptions, and it would turn it into a

9    complicated test about what is the parent's intent at the moment

10    they give birth.

11            And that is inconsistent with hundreds of millions of

12    people who have been able to establish their U.S. citizenship

13    solely by virtue of having been born in the country, showing a

14    birth certificate.  And I think the departure from this

15    long-standing practice suggests there is something that has gone

16    awry.

17            So we ask that the injunction be granted.

18            Thank you.

19            THE COURT:  Thank you.

20            All right.  Just give me one moment.

21            Okay.  I want to thank counsel for their written

22    submissions and your argument today.

23            Here is my ruling.

24            At noon on January 20th, 2025, President Donald J.

25    Trump took the oath of office of the President of the

1    United States.  Later that day, President Trump signed an

2    Executive Order called Protecting the Meaning and Value of

3    American Citizenship.

4            The Executive Order purports to interpret the

5    Citizenship Clause of the Fourteenth Amendment, in particular,

6    the clause, "subject to the jurisdiction thereof."

7            In Section 1, the Executive Order states, "Among the

8    categories of individuals born in the United States and not

9    subject to the jurisdiction thereof, the privilege of

10   United States citizenship does not automatically extend to

11   persons born in the United States:  (1) when that person's

12   mother was unlawfully present in the United States and the

13   father was not a United States citizen or lawful permanent

14   resident at the time of said person's birth, or (2) when that

15   person's mother's presence in the United States at the time of

16   said person's birth was lawful but temporary, such as but not

17   limited to visiting the United States under the auspices of the

18   visa waiver program or visiting on a student work or tourist

19   visa, and the father was not a United States citizen or lawful

20   permanent resident at the time of said person's birth."

21           Section 2 of the Executive Order establishes the

22   policy of the United States Government.  Under Section 2, no

23   federal department or agency shall issue documents recognizing

24   United States citizenship or accept documents issued by state,

25   local, or other governments or authorities purporting to

1  recognize United States citizenship to a person whose mother was

2  unlawfully present or lawfully present with only temporary

3  status and whose father was neither a United States citizen nor

4  lawful permanent resident at the time of that person's birth.

5           The policy applies to persons who are born in the

6  United States of America on or after February 19th, 2025, two

7  weeks from today.

8           Section 3 of the order discusses enforcement.  It

9  instructs the Secretary of State, the Attorney General, the

10  Secretary of Homeland Security, and the Commissioner of

11  Social Security to take all appropriate measures to ensure that

12  the regulations and policies of their respective departments and

13  agencies are consistent with this order and that their agencies,

14  officers, employees, and agents act in accordance with the

15  order.

16           It also instructs the heads of executive departments

17  and agencies to issue public guidance within 30 days of the

18  order regarding their implementation of it.

19           The day after the Executive Order was issued, CASA,

20  Incorporated and Asylum Seeker Advocacy Project, two nonprofit

21  organizations that provide services to immigrants, and five

22  pregnant women without lawful status, who expect to give birth

23  in the United States in the coming months, filed this lawsuit.

24  They allege that the Executive Order violates the

25  Fourteenth Amendment to the United States Constitution and the

1    Immigration and Nationality Act.  They request a

2    preliminary injunction that enjoins implementation and

3    enforcement of the Executive Order until the merits of their

4    claims are resolved.

5           The government opposes preliminary injunctive relief.

6           The plaintiffs easily have met the standard for a

7    preliminary injunction.  All four preliminary injunction factors

8    weigh in favor of enjoining the implementation and enforcement

9    of the Executive Order.

10          First, there is a very strong likelihood that the

11   plaintiffs will succeed on the merits of their

12   Fourteenth Amendment claim.  The Executive Order conflicts with

13   the plain language of the 14th Amendment, contradicts

14   125-year-old binding Supreme Court precedent, and runs counter

15   to our nation's 250-year history of citizenship by birth.

16          The United States Supreme Court has resoundingly

17   rejected the President's interpretation of the

18   Citizenship Clause of the Fourteenth Amendment.  In fact, no

19   Court in the country has ever endorsed the President's

20   interpretation.  This Court will not be the first.

21          The likelihood of success on the merits of the

22   plaintiffs' constitutional claim is high.

23          Second, the Plaintiffs will face irreparable harm if

24   the Executive Order is not enjoined.  Citizenship is a most

25   precious right, expressly guaranteed by the Fourteenth Amendment

1  to the Constitution.  It has been said that the right to

2  United States citizenship is a right no less precious than life

3  or liberty.  The deprivation of a constitutional right for even

4  minimal periods of time unquestionably constitutes irreparable

5  injury.

6       If the Court does not enjoin enforcement of the

7  Executive Order, children subject to an order will be denied the

8  rights and benefits of U.S. citizenship, and their parents will

9  face instability and uncertainty about the citizenship status of

10 their newborn babies.

11      The denial of the precious right to citizenship for

12 any period of time will cause irreparable harm.

13      Finally, the balance of the equities and the

14 public interest weigh in favor of a preliminary injunction.

15 Today, virtually every baby born on U.S. soil is a U.S. citizen

16 upon birth.  That is the law and tradition of our country; that

17 law and tradition are and will remain the status quo pending the

18 resolution of this case.

19      The government will not be harmed by a

20 preliminary injunction that prevents it from enforcing an

21 Executive Order likely to be found unconstitutional.  If

22 anything, our system of government is improved by an injunction

23 that prevents unconstitutional executive action.

24      The plaintiffs have clearly established that they are

25 entitled to a preliminary injunction.  Their motion for a

1    preliminary injunction is granted.

2           This injunction applies nationwide.  Only a nationwide

3    injunction will provide complete relief to the plaintiffs.  One

4    of the plaintiffs has over 680,000 members who reside in all

5    50 states and several U.S. territories.  That organizational

6    plaintiff expects that hundreds or even thousands of its members

7    will give birth to children in the United States over the coming

8    weeks and months.  Because the organization's members reside in

9    every state and hundreds of them expect to give birth soon, a

10   nationwide injunction is the only way to provide complete relief

11   to them.

12          Further, a nationwide injunction against the

13   Executive Order is appropriate and necessary because the

14   Executive Order concerns citizenship, a national concern that

15   demands a uniform policy.

16          It is hereby ordered that the defendants are enjoined

17   throughout these United States from implementing and enforcing

18   Executive Order No. 14160, called Protecting the Meaning and

19   Value of American Citizenship, or taking any other action that

20   fails to recognize the citizenship of persons subject to the

21   Executive Order until further order of this Court.

22          Soon after this hearing, I will enter a written order

23   and issue a memorandum opinion that more fully explains the

24   reasons for my decision and the preliminary injunction.

25          Mr. Hamilton, do you intend to appeal my ruling to the

1    Fourth Circuit, or should I set a deadline for the government to

2    file a responsive pleading?

3              MR. HAMILTON:  Your Honor, I don't have the authority

4    to state the position on the appeal, but we would ask that the

5    normal 60-day response deadline be entered.

6              THE COURT:  Okay.

7              All right, very good.

8              Thank you all very much.

9              THE COURTROOM DEPUTY:  All rise.  This Honorable Court

10   now stands adjourned.

11        (The proceedings were adjourned at 11:11 a.m.)

12                        *      *      *

1             CERTIFICATE OF OFFICIAL REPORTER

2      I, Patricia Klepp, Registered Merit Reporter, in and for

3 the United States District Court for the District of Maryland,

4 do hereby certify, pursuant to 28 U.S.C. § 753, that the

5 foregoing is a true and correct transcript of the

6 stenographically-reported proceedings held in the above-entitled

7 matter and the transcript page format is in conformance with the

8 regulations of the Judicial Conference of the United States.

9                           Dated this 6th day of February, 2025.

10

11

12                   _____/s/_____

                  PATRICIA KLEPP, RMR

13                   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25