**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **CASA, INC.,** *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | **Civ. No. DLB-25-201** |
| **DONALD J. TRUMP,** *et al.*, | * | |
| Defendants. | * | |

**MEMORANDUM OPINION**

Parents, on behalf of their children and expected children, bring this class action challenging an Executive Order that seeks to strip children born on U.S. soil of their constitutional and statutory right to U.S. citizenship. They seek an injunction that halts enforcement of the Executive Order and a declaration that the Executive Order is unlawful. The plaintiffs have moved for class certification. The motion is granted.

I.    **Background**

A.    **The Fourteenth Amendment and the Immigration and Nationality Act**

The Citizenship Clause of the Fourteenth Amendment states:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV, § 1, cl. 1.

Congress codified this right in the Immigration and Nationality Act of 1952 ("INA"). The INA states that "[t]he following," including "a person born in the United States, and subject to the jurisdiction thereof," "shall be nationals and citizens of the United States at birth." 8 U.S.C. § 1401.

### B.    The Citizenship Executive Order

A recent Executive Order seeks to upend this constitutional and statutory right. On January 20, 2025, the President issued Executive Order 14,160 (the "Executive Order"), entitled "Protecting the Meaning and Value of American Citizenship," which states:

> Among the categories of individuals born in the United States and not subject to the jurisdiction thereof, the privilege of United States citizenship does not automatically extend to persons born in the United States: (1) when that person's mother was unlawfully present in the United States and the father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) when that person's mother's presence in the United States at the time of said person's birth was lawful but temporary (such as, but not limited to, visiting the United States under the auspices of the Visa Waiver Program or visiting on a student, work, or tourist visa) and the father was not a United States citizen or lawful permanent resident at the time of said person's birth.

Exec. Order § 1.

Section 2 of the Executive Order establishes the policy of the United States government. *Id.* § 2. Under § 2, no federal department or agency "shall issue documents recognizing United States citizenship" or "accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship" of such a person. *Id.* § 2(a). The policy applies only to persons who are born in the United States after February 19, 2025. *Id.* § 2(b).

Section 3 of the Executive Order discusses enforcement. *Id.* § 3. It instructs the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, and the Commissioner of the Social Security Administration to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and to ensure that their agencies' officers, employees, and agents act in accordance with the Executive Order. *Id.* § 3(a). It also instructs the heads of executive departments and agencies to issue public guidance within 30 days of the Executive Order regarding their implementation of it. *Id.* § 3(b).

C.      The Lawsuit

On January 21, 2025, CASA, Inc. ("CASA") and Asylum Seeker Advocacy Project ("ASAP")—two nonprofit organizations that provide services to immigrants—and five pregnant women without permanent immigration status who expected to give birth in the United States in the coming months filed this lawsuit to preserve the constitutional right to citizenship by birth pursuant to the Citizenship Clause of the Fourteenth Amendment. ECF 1. The plaintiffs claimed that the Executive Order violates the Fourteenth Amendment, *id.* ¶¶ 101–08, and the INA, *id.* ¶¶ 109–14. They sought declaratory and injunctive relief. *Id.* at 37–38. They sued the President, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services ("USCIS"), the Commissioner of the Social Security Administration, and the United States of America. *Id.* ¶¶ 50–56.

The plaintiffs requested, and on February 5, 2025, the Court entered, a preliminary injunction to enjoin implementation and enforcement of the Executive Order until the merits of their claims are resolved. *CASA, Inc. v. Trump*, 763 F. Supp. 3d 723 (D. Md. 2025). On February 11, the government appealed, *Trump v. CASA, Inc.*, No. 25-1153 (4th Cir.), and asked this Court to "stay the injunction's nationwide application" pending appeal "so the injunction provides relief only to the individual plaintiffs and the members of the organizational plaintiffs who have been identified in Plaintiffs' complaint or preliminary injunction papers," ECF 70. This Court denied the request for a partial stay. *CASA, Inc. v. Trump*, No. DLB-25-0201, 2025 WL 545840 (D. Md. Feb. 18, 2025). The government requested the same partial stay from the Fourth Circuit, which likewise denied the relief. *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *1–2 (4th Cir. Feb. 28, 2025).

The government then asked the Supreme Court to stay the nationwide aspect of the preliminary injunction. Application for a Partial Stay of the Injunction Issued by the United States District Court for the District of Maryland, *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025) (No. 24A884). The Supreme Court consolidated the application with two similar applications in other cases concerning birthright citizenship, *Washington v. Trump*, 765 F. Supp. 3d 1142 (W.D. Wash. 2025), *aff'd*, No. 25-807, 2025 WL 2061447 (9th Cir. July 23, 2025); and *Doe v. Trump*, 766 F. Supp. 3d 266 (D. Mass. 2025), *appeal pending*, No. 25-1170 (1st Cir.). *See Trump v. CASA, Inc.*, 145 S. Ct. 1917 (2025) (mem.).

On June 27, 2025, the Supreme Court granted the partial stays, "but only to the extent that the injunctions are broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2562–63 (2025). At the same time, the Supreme Court noted Federal Rule of Civil Procedure 23 as a possible avenue for broader preliminary injunctive relief. *Id.* at 2555. Justice Kavanaugh put a finer point on it in his concurrence:

> Plaintiffs who challenge the legality of a new federal statute or executive action and request preliminary injunctive relief may sometimes seek to proceed by class action under Federal Rule of Civil Procedure 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide, regionwide, or even nationwide.

*Id.* at 2567 (Kavanaugh, J., concurring) (first citing *A. A. R. P. v. Trump*, 145 S. Ct. 1364, 1370 (2025) (per curiam); and then citing *Califano* v. *Yamasaki*, 442 U. S. 682, 701–03 (1979)). Justice Alito cautioned against abuse of this approach. *See id.* at 2565 (Alito, J., concurring) (noting "the availability of . . . class certification" could "potentially threaten the practical significance of [the Court's] decision," which "will have very little value if district courts award relief to broadly defined classes without following 'Rule 23's procedural protections' for class certification" (quoting *id.* at 2555–56 (majority opinion))).

4

Within hours of the Supreme Court's decision, the plaintiffs filed an amended class action complaint, ECF 96, a motion to certify the class, ECF 97, and an emergency motion for a classwide temporary restraining order and preliminary injunction that enjoins the Executive Order as to the putative class, ECF 98. The government opposed the motions, ECF 106 & 111, and the plaintiffs replied, ECF 107 & 113. The motion for class certification is ripe.[1]

## II.     The Class Action

The plaintiffs in the amended class action complaint are CASA, ASAP, and eight individual plaintiffs: Maribel, Juana, Trinidad Garcia, Monica, individually and as next friends to their respective future children; Liza, individually and as next friend to L.B.; Ashley, individually and as next friend to K.K.; Andrea, individually and as next friend to E.T.P.; and Niurka, individually and as next friend to L.G. ECF 96, ¶¶ 20–49. The plaintiffs allege that their children "w[ere] or will be born in the United States after February 19, 2025" and that "[t]he Executive Order purports to deny these babies their constitutionally and statutorily guaranteed United States citizenship." ECF 96, ¶ 9. Of the individual plaintiffs, seven—Juana, Trinidad Garcia, Monica, Liza, Ashley, Andrea, and Niurka—bring their claims on behalf of themselves as parents, on behalf of their children, and on behalf of similarly situated children and parents.[2]

---

[1] On July 29, 2025, the Fourth Circuit dismissed the government's appeal of the preliminary injunction to "allow the district court to comport expeditiously with the Supreme Court's directions in *CASA*, ensuring that any injunction complies with that decision" and to "allow for an immediate ruling on the plaintiffs' motion for class-wide relief, so that appellate review of the merits of that relief can come sooner rather than later." *CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 2141296, at *1 (4th Cir. July 29, 2025). In a separate opinion that will issue immediately after this one, the Court grants the motion for a classwide preliminary injunction.

[2] The Court granted the plaintiffs' motions to proceed pseudonymously on the record on February 5 and June 30, 2025. ECF 67, 68, 105, 123. The government argues that the "decision to proceed pseudonymously may impact this Court's assessment of class certification." ECF 106, at 18 n.5. For reasons explained later, it does not.

Juana, who is pregnant, lives in Maryland. ECF 2-4, ¶¶ 2, 6; *see* ECF 96, ¶ 42. She fled from Colombia and has a pending asylum claim, on which her 12-year-old daughter, who also lives in the United States, is a derivative. ECF 2-4, ¶¶ 3, 5. Her partner, who is her unborn baby's father, also is seeking asylum. *Id.* ¶ 4. Juana is afraid to return to Colombia and worried that her unborn baby "will be born without a country as a result of this Executive Order" and "could be denied U.S. citizenship and deported to Colombia without [her]." *Id.* ¶¶ 6, 7. She states that "[i]t is important to [her] that [her] child is a U.S. citizen so they can have a better quality of life and fully engage with all that the United States has to offer," and that it does not "make[] sense for [her] child to be denied the benefits of citizenship they deserve once they are born in the U.S." *Id.* ¶ 8.

Trinidad Garcia, who is pregnant, lives in North Carolina. ECF 97-8, ¶¶ 3, 8; *see* ECF 96, ¶ 43. She and her husband came to the United States on tourist visas from Venezuela in 2017. ECF 97-8, ¶ 4. They stayed and have been working with work permits. *Id.* ¶¶ 4, 6. They have a pending affirmative asylum application with the USCIS, and they have Temporary Protective Status ("TPS"). *Id.* ¶ 5. Trinidad Garcia is "very worried and anxious about the possibility that [her] baby might not be born a U.S. citizen," and she and her husband "want [their] child to receive a U.S. passport and proof of U.S. citizenship as soon as they are born." *Id.* ¶¶ 10–11. She "feel[s] it would be impossible" to get their child Venezuelan citizenship if they wanted it, because as asylum seekers, they cannot leave the country and "there are no Venezuelan consular services in the United States," and therefore, "[t]here is no way for [them] to approach the Venezuelan government regarding [their] baby's citizenship." *Id.* ¶ 12. Trinidad Garcia is worried that, "[i]f [their] U.S.-born baby is not able to get U.S. citizenship at birth, . . . their child will not be a citizen of any country or be able to get important identity documents." *Id.* ¶ 13. She also "is worried that [she]

will have to apply for asylum for [her] baby and [is] confused about what the process would be like," and she is "worried that [she] will have to hire someone to help [their] baby apply for immigration status, or pay the government for application fees, which could cost [her] family a significant amount of money." *Id.* She is scared that the baby will be separated from the family and deported. *Id.* ¶ 14.

Monica, who is pregnant, lives in South Carolina. ECF 97-6, ¶¶ 3, 8; *see* ECF 96, ¶ 44. She and her husband are from Venezuela and have been in the United States since 2019. ECF 97-6, ¶¶ 4–5. They both have TPS and pending affirmative asylum applications with USCIS. *Id.* ¶ 4. Monica cannot travel outside the United States without losing her asylum claim. *Id.* ¶ 10. Like Trinidad Garcia, she is worried her child will be stateless. *Id.* ¶ 12. Her anxiety about her unborn child's status "has made [her] pregnancy more difficult than it otherwise would be," and she and her husband are "afraid of bringing more life into this world" because of the Executive Order. *Id.* ¶ 9. She "want[s] [her] child to have U.S. citizenship because they will be born here and belong here," and "the Constitution says [her] child has a right to U.S. citizenship." *Id.* ¶¶ 13, 14. She notes that citizenship will give her child legal protections, opportunities, and the right to "remain safely by [her] side as [her] husband and [she] pursue [their] asylum claim here." *Id.* ¶ 13.

Liza declares that she and her husband are from Russia but cannot return there for fear of persecution. ECF 97-5, ¶¶ 2, 4; *see* ECF 96, ¶ 45. She has a student visa, and he has a pending asylum claim. ECF 97-5, ¶¶ 3–4. Their child, L.B., was born after February 19, 2025, in the United States. *Id.* ¶ 5. Liza describes constant worry, fear, and anxiety from the Executive Order and her concerns that the baby could be detained or deported. *Id.* ¶¶ 6–9. She worries that her baby "will be denied access to healthcare and cutting-edge educational opportunities that do not exist

elsewhere," but "[m]ost importantly," she "want[s] L.B. to be a U.S. citizen because citizenship will ensure L.B.'s safety." *Id.* ¶ 9.

Ashley declares that she has "been living in the United States lawfully for over 10 years" and that she and her husband have valid H-1B visas, which they had when their baby, K.K., was born. ECF 97-3, ¶¶ 4–8; ECF 96, ¶ 46. They want their child, who "was born in and is being raised in the United States," "to be a U.S. citizen to be protected by the full rights and freedoms granted under the U.S. Constitution." ECF 97-3, ¶ 9. Ashley states that "[c]itizenship will provide K.K. access to essential services and legal protections exclusive to U.S. citizens, supporting K.K.'s wellbeing, safety, and security." *Id.* She expresses fear and uncertainty about what could happen if her baby is denied citizenship. *Id.* ¶ 10.

Andrea declares that she is pursuing asylum and that she and her husband were both undocumented when their baby, E.T.P., was born. ECF 97-2, ¶ 4; *see* ECF 96, ¶ 47. She states she "want[s] [her] child to have the full dignity and rights of citizenship, including access to educational opportunities and the benefits to which they are entitled." ECF 97-2, ¶ 5.

Niurka declares that she, her husband, and their older child "fled to the United States from Cuba" after suffering political persecution, and they do not intend to return. ECF 97-7, ¶ 3; *see* ECF 96, ¶ 48. They have pending applications for asylum and to become lawful permanent residents. ECF 97-7, ¶ 3. Their child, L.G., was born in the United States after February 19, 2025. *Id.* ¶ 4. Niurka "want[s] L.G. to have U.S. citizenship because [she] want[s] L.G. to grow up with the certainty of belonging to this nation . . . ." *Id.* ¶ 5. They are scared and "worried about L.G.'s citizenship being in a legal limbo," L.G. being stateless, being threatened with deportation, and the harms that could happen if L.G. had to go to Cuba. *Id.* ¶¶ 6–8.

As in the original complaint, the plaintiffs claim the Executive Order violates the Fourteenth Amendment and the INA. They allege the Executive Order would harm the newborn and unborn babies subject to the Executive Order. ECF 96, ¶ 14. According to the plaintiffs, "the Executive Order would throw into doubt the citizenship status of thousands of children across the country" and "threaten[] these newborns' identity as United States citizens and interfere[] with their enjoyment of the full privileges, rights, and benefits that come with U.S. citizenship, including calling into question their ability to remain in their country of birth." *Id.* ¶ 13. They assert that "[t]he children deprived of citizenship may have no status or right to remain in the United States with their family, even as their older siblings will often be United States citizens and as their parents will often be authorized to live in the United States," and "these children may not have access to citizenship in *any* country, leaving them stateless, living forever at the temporary sufferance of wherever find themselves." *Id.* ¶ 14.

As for harm to the parents, the plaintiffs claim they "will be directly harmed by the denial of the benefits of citizenship to their children." *Id.* The plaintiffs also claim

> [p]arents will face significant harm, including increased stress and anxiety that comes from the U.S. government treating their children differently from other U.S.-born children, and from the prospect of their children facing statelessness and an uncertain fate in the land of their birth. Immigrant parents, including those who cannot be deported because of a pending asylum claim or other immigration application, will also face the reality that their U.S.-born child could be subject to deportation.

*Id.* ¶ 15.

They seek a declaration that the Executive Order is unconstitutional and violates the INA; a declaration that "all children born in the United States to noncitizen parents covered by the Executive Order are citizens of the United States and are entitled to all of the rights and privileges that such status provides, regardless of the immigration status of their parents;" and an "injunction enjoining Defendants from enforcing the Executive Order, or taking any other action that fails to

recognize citizenship to individuals born within the United States to noncitizens covered by the Executive Order." *Id.* at 41.

### III.    Class Certification

To certify a class, the plaintiffs must show that the class they propose complies with the requirements of Federal Rule of Civil Procedure 23(a) and (b). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345–46, 350 (2011); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357, 365 n.18 (4th Cir. 2014).

Under Rule 23(a), they plaintiffs must satisfy four prerequisites. Fed. R. Civ. P. 23(a)(1)–(4). They are "numerosity . . . , common questions of law or fact, typicality, and representative parties who adequately protect the interests of the class." *CASA*, 145 S. Ct. at 2555 (citing Fed. R. Civ. P. 23(a)). To establish those prerequisites, the plaintiffs must identify at least one class representative. *See* Fed. R. Civ. P. 23(a); *Wal-Mart*, 564 U.S. at 348–49. The class representatives, or named plaintiffs, "must be part of the class and possess the same interest and suffer the same injury as the class members." *Wal-Mart*, 564 U.S. at 348–49 (quoting *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977). Thus, "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.* at 349. Without an appropriate class representative, courts will not make "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart*, 564 U.S. at 348 (quoting *Califano*, 442 U.S. at 700–01).

"[I]f Rule 23(a) is satisfied," the plaintiffs must show that their suit qualifies as one of the three types of class actions under Rule 23(b). Fed. R. Civ. P. 23(b)(1)–(3); *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ("The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)."). Here, the plaintiffs pursue a Rule 23(b)(2) class action.

In analyzing whether the Rule 23(a) and (b)(2) requirements have been met, courts must evaluate the plaintiffs' motion beyond "a mere pleading standard." *See Wal-Mart*, 564 U.S. at 350. Instead, courts may certify the proposed class only "after a rigorous analysis[] that the prerequisites of Rule 23(a) [and (b)] have been satisfied." *Id.* at 350–51 (quoting *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982)); *Comcast*, 569 U.S. at 33–34 (noting "[t]he same analytical principles govern Rule 23(b)"). This analysis may include "prob[ing] behind the pleadings" as well as "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart*, 564 U.S. at 350–51 (quoting *Gen. Tel.*, 457 U.S. at 160). The analysis may "overlap with the merits of the plaintiff's underlying claim," but courts cannot "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Wal-Mart*, 564 U.S. at 351); *see Brown v. Nucor Corp.*, 785 F.3d 895, 903 (4th Cir. 2015). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 466 (citing *Wal-Mart*, 564 U.S. at 351 n.6); *see Brown*, 785 F.3d at 903.

### A.    Rule 23(b)(2)

The plaintiffs seek to certify a class under Rule 23(b)(2). Certification under Rule 23(b)(2) is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Wal-Mart*, 564 U.S. at 360;

*see Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994) ("What is important is that

the relief sought by the named plaintiffs should benefit the entire class."). For a Rule 23(b)(2)

class, the injunction or declaratory relief must be "indivisible," meaning "the conduct is such that

it can be enjoined or declared unlawful only as to all of the class members or as to none of them."

*Wal-Mart*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of*

*Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "[T]his requirement is almost automatically

satisfied in actions primarily seeking injunctive relief. 'When a suit seeks to define the relationship

between the defendant(s) and the world at large, . . . (b)(2) certification is appropriate.'" *Baby*

*Neal*, 43 F.3d at 58 (quoting *Weiss v. York Hosp.*, 745 F.2d 786, 811 (3d Cir. 1984)).[3]

Here, the requirements of Rule 23(b)(2) are easily met. The plaintiffs seek declaratory and

injunctive relief. They ask the Court to declare that the Executive Order is unconstitutional and

violates the INA; to declare that "all children born in the United States to noncitizen parents

covered by the Executive Order are citizens of the United States and are entitled to all of the rights

---

[3] "Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). But recently, the Fourth Circuit limited this "ascertainability" requirement to Rule 23(b)(1) and (b)(3) classes, for which "issues of notice and damages are at play," holding "[t]here is no threshold ascertainability requirement in [a] Rule 23(b)(2) case, which seeks only declaratory and injunctive relief from a discriminatory policy." *Kadel v. Folwell*, 100 F.4th 122, 160–61 (4th Cir. 2024), *judgment vacated on other grounds, Folwell v. Kadel*, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025) (mem.). The Fourth Circuit noted that other "courts of appeals have consistently declined to impose an ascertainability requirement in 23(b)(2) cases requesting that a party be enjoined from certain actions." *Id.* (citing *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978); *Shelton v. Bledsoe*, 775 F.3d 554, 559–63 (3d Cir. 2015); *Cole v. City of Memphis*, 839 F.3d 530, 542 (6th Cir. 2016); *Shook v. El Paso County*, 386 F.3d 963, 972–73 (10th Cir. 2004)). And Rule 23(b)(2)'s advisory committee note "state[s] that 'illustrative' examples of a Rule 23(b)(2) class 'are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, *usually one whose members are incapable of specific enumeration.*'" *Id.* at 161 (quoting Fed. R. Civ. P. 23 advisory committee's note to 1966 amendment).

and privileges that such status provides, regardless of the immigration status of their parents"; and to enjoin the defendants from enforcing the Executive Order. ECF 96, at 41. Both a declaratory judgment that the Executive Order is unconstitutional and unlawful and an injunction that enjoins the enforcement of the Executive Order would be indivisible; they would provide complete relief to all class members. The plaintiffs have satisfied Rule 23(b)(2).[4]

## B.    Rule 23(a)

To satisfy Rule 23(a), the plaintiffs must establish numerosity, commonality, typicality, and adequacy of representation. They have done so here.

### 1.    Numerosity

There is numerosity if the class is "so numerous that joinder of all members is impracticable." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021) (quoting Fed. R. Civ. P. 23(a)(1)). "[T]here is no mechanical test for numerosity and the determination 'turns on the nature of the claim of discrimination asserted by the plaintiffs and the number of persons who could have been injured by such discrimination.'" *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984) (quoting *Kelley v. Norfolk & W. Ry.*, 584 F.2d 34, 35 (4th Cir. 1978) (per curiam)). The Fourth Circuit "has stated that 74 members is 'well within the range appropriate for class certification,' and has upheld the certification of a class with as few as 18 members." *Yates v. NewRez LLC*, 686 F. Supp. 3d 397, 404 (D. Md. 2023) (citation omitted) (quoting *Brady v. Thurston Motor Lines*, 726 F.2d 136, 145 (4th Cir. 1984)) (citing *Cypress v. Newport News Gen.*

---

[4] The defendants argue that the plaintiffs cannot meet Rule 23(b)(2)'s requirement that "the party opposing the class has acted or refused to act" because the defendants were enjoined before they could act and thus the case is premature. ECF 111, at 3 (quoting Fed. R. Civ. P. 23(b)(2)). This case is not premature. The Executive Order directed the defendant agencies to implement the Executive Order's terms. Those agencies would have acted if this Court and others did not enjoin them.

*& Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967)). And courts in this district have noted that "[a] class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical." *E.g.*, *Yost v. Elon Prop. Mgmt. Co.-Lexford Pools 1/3, LLC*, No. ELH-21-1520, 2023 WL 185178, at *6 (D. Md. Jan. 13, 2023) (alteration in original) (quoting *Baehr v. Creig Northrop Team, P.C.*, WDQ-13-0933, 2014 WL 346635, at * 8 (D. Md. Jan. 29, 2014)); *Dameron v. Sinai Hosp. of Balt., Inc.*, 595 F. Supp. 1404, 1408 (D. Md. 1984).

Numerosity is easily met in this case. The defendants acknowledge that the plaintiffs propose "a class of enormous size." ECF 106, at 19; *see also* Application for a Partial Stay of the Injunction Issued by the United States District Court for the District of Maryland at 3, *CASA*, 145 S. Ct. 2540 (No. 24A884) (noting the Executive Order applies to "millions of [people] across the country"). And the plaintiffs cite evidence that each year, "'an average of about 255,000 babies born on U.S. soil' would no longer receive U.S. citizenship at birth if the Executive Order went into effect." ECF 97, at 11 & n.4 (quoting Penn State Social Science Research Institute, *Ending Automatic Birthright Citizenship Would Significantly Increase the Size of the U.S. Unauthorized Population, New Projections Show* (May 13, 2025), https://pop.psu.edu/news/ending-automatic-birthright-citizenship-would-significantly-increase-size-us-unauthorized [https://perma.cc/V25T-YLCX]).

There is numerosity.

## 2. Commonality

There is commonality if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The plaintiff must "demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 350 (quoting *Gen. Tel.*, 457 U.S. at 157). "Their claims must depend upon a common contention . . . . That common contention, moreover, must be of such a

nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* That is to say, the class action must have "the capacity . . . to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Nagareda, *supra* at 132).

The class representatives and the class members suffer the same injury: the denial of U.S. citizenship.[5] Their claims depend on the same contention: that "[t]he Executive Order purports to deny these babies their constitutionally and statutorily guaranteed United States citizenship." ECF 96, ¶ 9. Stated as a question of law common to the class: Does the Executive Order violate the Fourteenth Amendment's Citizenship Clause and the INA? The resolution of this common question of law will resolve the central issue of whether the children are entitled to birthright citizenship. To be sure, the plaintiffs identify injuries to children caused by the denial of citizenship, such as the denial of public benefits for nutrition, health, and welfare for which newborn citizens are eligible. ECF 96, ¶¶ 94–95. These injuries are not necessarily common to all children in the class, but such minor differences are no bar to finding commonality because the injury at the core of their claims—the denial of citizenship—is common to all of them. *See Wilson v. Eagle Nat'l Bank*, No. JRR-20-1344, 2023 WL 2478933, at *11 (D. Md. Mar. 13, 2023) ("Minor differences in the underlying facts of individual class members' cases do not defeat a showing of commonality where there are common questions of law." (quoting *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 216 (D. Md. 1997))). To answer the question of law common to the class, the Court will not need to decide extraneous issues such as whether the children denied citizenship also are denied public benefits. The class representatives and the class members share a common

---

[5] "Class representatives" refers to the parents acting as next friends to their children; their claims are the claims of the children.

injury, and a resolution of their common question of law will resolve the issue that is central to their claims.

The defendants argue that "varying factual circumstances of members of Plaintiffs' desired class defeat . . . commonality and typicality." ECF 106, at 16. As the defendants see it, these "factual circumstances" could affect the members' "domicile." *Id.* at 16–17. "Domicile," according to the defendants, turns on how long the parents of a child born in the United States have been in the United States, the parents' immigration statuses, and whether the parents wish to remain here. *See id.* at 18–19. In the defendants' view, the parents' domicile is relevant to commonality and typicality because the parents' domicile is relevant to whether the child is entitled to birthright citizenship. On the defendants' account, the grant of citizenship for people born in the United States "and subject to the jurisdiction thereof," U.S. Const. amend. XIV, § 1, cl. 1, only extends to persons whose parents are domiciled in the United States. ECF 106, at 17–19. The defendants believe that "birthright citizenship depends on domicile," and "individuals covered by the Executive Order are *categorically* not domiciled in the United States." *Id.* at 17. The defendants argue that if the Court accepts the first premise—that birthright citizenship depends on domicile—but disagrees with the second premise—that individuals covered by the Executive Order are categorically not domiciled in the United States—then the Court will have to engaged in a member-by-member inquiry about "whether different class members are entitled to relief," which will depend upon "individualized factual determinations—and attendant legal analysis—regarding their domiciles." *Id.*

The defendants' arguments touch on the merits of the claims. Though courts cannot "engage in free-ranging merits inquiries at the certification stage," merits questions "may be considered" if "they are relevant to determining whether the Rule 23 prerequisites for class

certification are satisfied." *Amgen*, 568 U.S. at 466. Because the defendants contend that the merits may be relevant to determining commonality, the Court must accept their invitation to wade into the merits in order to address their argument.

On the merits, the defendants' argument stumbles out of the gate. The foundational premise of their argument—that the citizenship of a U.S.-born child is determined by their parents' domicile—was rejected by this Court when it previously analyzed the likelihood of success on the merits of the constitutional claim. Relying on the text of the Fourteenth Amendment and *United States v. Wong Kim Ark*, 169 U.S. 649 (1898), the Court found that, "[t]o be a 'person[ ] born . . . in the United States' and 'subject to the jurisdiction thereof' does not require the person's parents to be domiciled in the United States at the time of birth." *CASA*, 763 F. Supp. 3d at 739 (alteration in original). Other courts have found similarly. *See Washington*, 2025 WL 2061447, at *7–14; *Barbara v. Trump*, No. 25-cv-0244, 2025 WL 1904338, at *6 (D.N.H. July 10, 2025); *Washington*, 765 F. Supp. 3d at 1150; *Doe*, 766 F. Supp. 3d at 272, 284–85. In fact, since *Wong Kim Ark*, no court has found that the domicile of the parents of a child born in the United States determines whether the child has birthright citizenship. Because the domicile of the parents of a child born in the United States is irrelevant to whether that child is entitled to U.S. citizenship, any differences among the domiciles of the parents of class members are not relevant to the common question of law. So the defendants' concern that the Court might have to engage in "individualized factual determinations" and "attendant legal analysis" regarding the domiciles of class members is no concern at all. There are no factual circumstances of the class members that would defeat commonality.

When the Court determines whether the Executive Order is constitutional and whether it violates the INA, it will resolve "in one stroke" the issue that is central to the validity of the class

claims. *See Wal-Mart*, 564 U.S. at 350. The plaintiffs have established commonality for the children's claims.[6]

But they have not established commonality for the parents' claims. The Executive Order denies citizenship to children born after its effective date; it does not deny citizenship to their parents. Thus, the parents themselves do not "suffer[] the same injury" as their children. *See Wal-Mart*, 564 U.S. at 350 (quoting *Gen. Tel.*, 457 U.S. at 157).

Moreover, the parents do not even suffer the same injury as their counterparts in the proposed class. For instance, the plaintiffs allege the parents "will be directly harmed by the denial of the benefits of citizenship to their children." ECF 96, ¶ 14. Those benefits include the Supplemental Nutrition Assistance Program, welfare programs such as Temporary Assistance for Needy Families, and healthcare programs such as the Children's Health Insurance Program, the Affordable Care Act, and Medicaid. *Id.* ¶¶ 12–13, 95; *see* ECF 97-5, ¶¶ 9–10 (Liza's declaration stating that she wants her child to receive healthcare). But not all parents will seek these benefits— either because they do not plan to remain in the United States or because they do not qualify for or need them.

Other harms to the parents are the uncertainty, stress, and fear caused by the Executive Order and the potential denial of citizenship to their U.S.-born children. ECF 2-4, ¶¶ 6–7 ("I am worried that my child will be born without a country as a result of this Executive Order . . . . The

---

[6] The two cases the government cites to contest commonality are inapposite. In *DaSilva v. Border Transfer of MA, Inc.*, the court noted that "commonality may be defeated" where "different state laws apply to different members of a putative class and there are relevant differences between those state laws." 296 F. Supp. 3d 389, 398 (D. Mass. 2017) (footnote and citations omitted). The *DaSilva* Court cited *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 370 (4th Cir. 2004), in which the Fourth Circuit observed that the plaintiffs cannot meet their burden "of showing that common questions of law predominate . . . when the various laws have not been identified and compared." *Id.* at 398–99. Unlike *DaSilva* and *Gariety*, this case does not involve different state laws that apply to different members of the class, and the common question of law is clearly identified.

thought that my unborn child could be denied U.S. citizenship and deported to Colombia without me is terrifying."); ECF 97-3, ¶ 10 ("I am afraid of what it would mean for our family if the government were to deny K.K. U.S. citizenship. My husband and I both have legal status here, yet the thought that our U.S.-born child's citizenship could be questioned feels destabilizing and unjust. . . . [I]f K.K.'s citizenship were stripped away, we don't know what options would remain—K.K. has no citizenship in any other country. The uncertainty about travel, belonging, and even basic protections is distressing."); ECF 97-5, ¶¶ 6–9 ("When I heard that President Trump signed an Executive Order that would have denied L.B. U.S. citizenship, my world fell apart. . . . I was constantly worried that, without U.S. citizenship, L.B. would be stateless . . . . This constant anxiety took a toll on my mental health, and Igor's as well. . . . That possibility [of statelessness] frightens me and leaves me with so many scary questions. . . . I am very worried about the Executive Order. Without U.S. citizenship, I worry that L.B. will be denied access to healthcare and cutting-edge educational opportunities that do not exist elsewhere."); ECF 97-6, ¶ 9 ("The anxiety and stress I feel about the possibility that my child could be denied U.S. citizenship has made my pregnancy more difficult than it otherwise would be. I feel unsure of what will happen and cry frequently. . . . [T]his Executive Order has made me afraid of bringing more life into this world."); ECF 97-7, ¶¶ 7–8 ("We are worried about L.G.'s citizenship being in a legal limbo . . . and of L.G. not having citizenship in any country. . . . We are also scared about the possibility that L.G.'s U.S. citizenship could be questioned – and if that happens, whether L.G. could be threatened with deportation. It is very frightening to think of this . . . ."); ECF 97-8, ¶¶ 10–11, 13–14 ("I am very worried and anxious about the possibility that my baby might not be born a U.S. citizen. . . . [or] a citizen of any country or be able to get important identity documents. . . . I am also worried that I will have to apply for asylum for my baby . . . . I am worried that I will have to hire someone

to help our baby apply for immigration status . . . . I am also afraid that my family may be separated if my child is not given U.S. citizenship at birth. . . . I am especially scared about to where the U.S. Government could deport my baby.").

The uncertainty, stress, and fear that these parents are experiencing are not necessarily common to all parents in the proposed class. For example, if a baby subject to the Executive Order is born prematurely in the United States to parents who wanted their child to be born elsewhere, or if a baby has citizenship in another country by virtue of their parents' citizenship, the parents may not feel the same uncertainty, stress, and fear that the class representatives are experiencing. The class representatives cannot establish that every parent of a child subject to the Executive Order will "have a viable claim" and "a right to recovery." *See Stafford*, 123 F.4th at 681. The plaintiffs have not shown commonality for the parents' claims.[7]

### 3. Typicality

There is typicality if the class representatives are "part of the class and possess the same interest and suffer the same injury as the class members." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Gen. Tel.*, 457 U.S. at 156 (internal quotation marks omitted)). The representatives' claims must "arise[] from the same event, practice, or course of conduct that gives rise to the claims of other class members" and be "based on the same legal theory." 1 *Newberg & Rubenstein on Class Actions* § 3:29 (6th ed. 2022). The claims must be "so interrelated that the

---

[7] Because the parents individually do not suffer the same injury as the children or as other parents, the parents individually also cannot meet the requirements for typicality and adequacy of representation. *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006) (noting there is typicality if the class representatives, *inter alia*, "suffer the same injury as the class members" (quoting *Gen. Tel.*, 457 U.S. at 156)); *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (noting there is adequacy of representation if the class representatives, *inter alia*, "'suffer the same injury' as the class members" (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997)).

interests of the class members will be fairly and adequately protected in their absence." *Deiter*, 436 F.3d at 466 (quoting *Gen. Tel.*, 457 U.S. at 157 n.13). The representatives' claims "cannot be so different from the claims of absent class members that their claims will not be advanced by [the representatives'] proof of [their] own individual claim[s]." *Id.* at 466–67. In other words, "as goes the claim of the named plaintiff, so go the claims of the class." *Id.* at 466 (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)). Though the class representatives' and the class members' claims do not have to be "perfectly identical or perfectly aligned," typicality is met if no differences "strike[] at the heart of the respective causes of actions." *Id.* at 467. The typicality requirement "tends to merge with the commonality and adequacy-of-representation requirements." *Id.* at 466 (first citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997); and then citing *Gen. Tel.*, 457 U.S. at 157 n.13); *see also 1988 Tr. for Allen Child. Dated 8/8/88 v. Banner Life Ins. Co.*, 28 F.4th 513, 523 (4th Cir. 2022) (noting that courts "need not tarry for long" on typicality analysis after considering commonality because the two requirements "tend to merge" (quoting *Gen. Tel.*, 457 U.S. at 157 n.13)).

Typicality is satisfied for the same reasons commonality is satisfied. The class representatives and the class members bring the same claims, suffer the same injury, and have the same interests. The class representatives' claims are typical of the class.

The defendants insist that "discovery is warranted . . . . to assess whether [the plaintiffs] satisfy the typicality requirement." ECF 106, at 19. They say they need discovery about "the class representatives' immigration statuses, how long they have been present in the United States, . . . facts related to their demonstrated intention to stay and make the United States their lawful home," and "the ways in which the class representatives intend to utilize the benefits of American

citizenship." *Id*. This attempt to derail early class certification with a fishing expedition into factual matters wholly unrelated to typicality, or certification in general, is rejected.

Though pre-certification discovery "relating to the issues involved in maintainability" is often permitted, the pre-certification discovery the defendants seek is not necessary to determine typicality (or any certification requirement). *See Doctor v. Seaboard Coast Line R.R.*, 540 F.2d 699, 707 (4th Cir. 1976) (quoting *Huff v. N. D. Cass Co.*, 485 F.2d 710, 713 (5th Cir. 1973) (en banc)); *see also Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1312 (9th Cir. 1977) ("Whether or not discovery will be permitted in a case of this nature [a class action] lies within the sound discretion of the trial court." (citation omitted)). The discovery the defendants claim they need concerns the domicile of the class representatives. The Court has already explained why the domicile of the parents of U.S.-born children is irrelevant to commonality. For the same reasons, the domicile of the class representatives is irrelevant to typicality. Even if the information were relevant, the defendants have it. The class representatives have submitted declarations describing their immigration status, how long they have been in the United States, and their desire to remain here. *See* ECF 2-4, ¶¶ 3–8; 97-2, ¶¶ 4–5; 97-3, ¶¶ 4–10; 97-5, ¶¶ 2–9; 97-6, ¶¶ 3–5, 13; 97-7, ¶¶ 3, 6; 97-8, ¶¶ 3–6, 14. The defendants have not identified any "reasonably contested class issues" that would justify pre-certification discovery. *See Bearden v. Honeywell Int'l Inc.*, 720 F. Supp. 2d 932, 942 (M.D. Tenn. 2010) (quoting *In re Allstate Ins. Co. Underwriting & Rating Pracs. Litig.*, 917 F. Supp. 2d 740, 751 (M.D. Tenn. 2008)). The request for pre-certification discovery is denied.

Typicality is satisfied.

#### 4. Adequacy of Representation

Representation is adequate "if the class representative 'will fairly and adequately protect the interests of the class.'" *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (quoting *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)). There cannot be any "fundamental" "conflicts of interest between named parties and the class they seek to represent." *Id.* (first quoting *Ward*, 595 F.3d at 180; and then quoting *Amchem*, 521 U.S. at 625). "A conflict is not fundamental when . . . all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Id.* (alteration in original) (quoting *Ward*, 595 F.3d at 180). Just like for typicality, the "class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* (quoting *Amchem*, 521 U.S. at 625–26). Also, "[a] class representative must 'be of a character to vigorously pursue the case.'" *D.N.N. v. Baker*, No. JRR-25-1613, 2025 WL 2098633, at *11 (D. Md. July 25, 2025) (quoting *Monroe v. City of Charlottesville*, 579 F.3d 380, 385 (4th Cir. 2009)).

There is no conflict of interest between the class representatives and the class members. They share the same injury, the same objections, the same factual and legal positions, and the same interest in challenging the Executive Order. If the class representatives obtain a ruling that the Executive Order is unconstitutional or violates the INA, all class members will benefit from that ruling and obtain the same relief. The class representatives have no interest antagonistic to the class members. Their interests are identical.

Upon review of the class representatives' declarations, the Court finds that they will prosecute the action vigorously on behalf of the entire class. *See* ECF 97-3, ¶ 11; ECF 97-4, ¶¶ 2–3; ECF 97-5, ¶ 13; ECF 97-6, ¶¶ 17–18; ECF 97-7, ¶¶ 9–10; ECF 97-8, ¶ 17. By pursuing their

own claims, the class representatives necessarily will pursue declaratory and injunctive relief that will benefit all class members.

The defendants argue that because the class representatives are proceeding pseudonymously, "it is not possible for the class members to assess . . . in a void" whether the class representatives are "similarly situated to the rest of the class" or whether the class representatives "adequately represent them." ECF 106, at 22. In the defendants' view, "[a]bsent any such mechanism, the choice of named Plaintiffs to proceed pseudonymously defeats their assertion of adequate representation and should preclude class certification." *Id.*

This argument might have merit if the plaintiffs were pursuing a Rule 23(b)(3) class. Before a Rule 23(b)(3) class is certified, potential class members are given notice about the suit, class representatives, and class counsel, and the class members can opt out of the suit if they believe the class representatives will not adequately represent their interests. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 655 (4th Cir. 2019) ("Unlike other forms of class actions, Rule 23(b)(3) requires notice to class members, who are afforded an opportunity to opt-out of the class at the certification stage."). Thus, if this were a Rule 23(b)(3) class, the identities of the class representatives could be relevant to the absent class members' assessment of whether the class representatives will represent them adequately.

But this is not a Rule 23(b)(3) class. This is a Rule 23(b)(2) class. Rule 23(b)(2) class members do not have an opportunity to opt out, and district courts are not obliged "to afford them notice of the action." *Wal-Mart*, 564 U.S. at 362; *see Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 n.25 (4th Cir. 2006) ("Unlike Rule 23(b)(3), Rule 23(b)(2) neither requires that absent class members be given notice of class certification nor allows class members the opportunity to opt-out of the class action."). So contrary to the defendants' view, absent class

24

members do not need to know the identity of the class representatives to make an informed decision about participating in the lawsuit because they do not get to choose whether to participate in a Rule 23(b)(2) class action.

There is no question that the class representatives, despite proceeding pseudonymously, will adequately represent the interests of the absent class members. This is because the hallmark of a Rule 23(b)(2) class is that the relief benefits class representatives and class members alike. *See Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015). It should be no surprise, then, that in appropriate circumstances, courts have allowed class representatives in Rule 23(b)(2) classes to proceed pseudonymously. *E.g.*, *J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 40 n.2, 41 (D. Md. 2020); *Doe 1 v. Nielsen*, 357 F. Supp. 3d 972, 981 n.2, 984 (N.D. Cal. 2018); *Doe v. U.S. Immigr. & Customs Enf't*, No. 23-00971, 2024 WL 4389461, at *4 (D.N.M. Oct. 3, 2024).[8]

---

[8] The use of pseudonyms is appropriate in this case. The plaintiffs asked to hide their true identities because they fear governmental retaliation—including deportation—and public harassment and intimidation. *See, e.g.*, ECF 100, at 5–6; ECF 97-3, ¶ 3 (Ashley's declaration that she fears that "members of the public" might "seek [her and her child] out to harm [them] if they disagree with [her] viewpoint that birthright citizenship is a guarantee and a right under the U.S. Constitution"); ECF 97-7, ¶ 2 (Niurka's declaration that she fears that "people in the United States with anti-immigrant beliefs may retaliate and do damage to [her] family"). Among the factors relevant to proceeding pseudonymously is the "risk of retaliatory physical or mental harm." *See James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993). Courts have permitted plaintiffs to proceed under pseudonyms due to the risk of retaliation. *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, No. TDC-17-0361, 2017 WL 818255, at *2 (D. Md. Mar. 1, 2017). And "this Court and others nationwide have recognized that a plaintiff's vulnerable immigration status may be properly considered 'a matter of sensitive and highly personal nature' warranting the use of a pseudonym." *M.A. v. U.S. Citizenship & Immigr. Servs.*, No. JMC-24-2040, 2024 WL 3757873, at *2 (D. Md. Aug. 12, 2024) (quoting *Doe v. Doe*, 85 F.4th 206, 211 (4th Cir. 2023)); *see, e.g.*, *Hisp. Interest Coal. v. Governor of Ala.*, 691 F.3d 1236, 1247 & n.8 (11th Cir. 2012); *Doe*, 2024 WL 4389461, at *2; *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 507 (M.D. Pa. 2007), *aff'd in part, vacated in part*, 620 F.3d 170 (3d Cir. 2010), *judgment vacated sub nom. City of Hazleton v. Lozano*, 563 U.S. 1030, and *aff'd in part, rev'd in part*, 724 F.3d 297 (3d Cir. 2013). Moreover, the public interest in the identity of the plaintiffs is reduced when, as here, the lawsuit involves a "pure legal challenge to an Executive Order, such that the individual plaintiffs play only a minor role in the litigation." *Int'l Refugee Assistance Project*, 2017 WL 818255, at *3; *cf. R.F.M. v. Nielsen*, 365 F. Supp. 3d 350, 371 (S.D.N.Y. 2019) ("[W]here a plaintiff attacks governmental activity, for

The defendants cite a host of cases in which courts have rejected class representatives' requests to proceed pseudonymously. All of them are either distinguishable or unpersuasive. In *Rapuano v. Trustees of Dartmouth College*, the plaintiffs sought to represent a Rule 23(b)(3) class pseudonymously, and the court expressed concern because "[p]utative class members have an interest in knowing the identities of all class representatives so that they may assess whether the representatives adequately represent them and whether they wish to participate in the action." 334 F.R.D. 637, 649 (D.N.H. 2020). Here, in contrast, the plaintiffs bring a Rule 23(b)(2) class, and absent class members do not get to decide whether to participate. In *Sherman v. Trinity Teen Solutions, Inc.*, the court found that the plaintiff's "interests [we]re not sufficiently exceptional to outweigh the public interest in maintaining open judicial proceedings in this case." 339 F.R.D. 203, 205 (D. Wyo. 2021). There, the court was concerned that "it would be difficult to determine if he and his counsel have conflicts of interest with other class members." *Id.* at 206. The court also reasoned that for the plaintiff "to vigorously prosecute the interests of the class. . . , the other class members should know who is representing them." *Id.* Here, it was not difficult to determine if the class representatives and the class members have a conflict of interest. And here, anonymity will not discourage the class representatives from vigorously prosecuting the class's interests because their interests are identical. In *In re Ashley Madison Customer Data Security Breach Litigation*, a class action against a "cheating website" for people who are married or in committed relationships, the court employed "a totality-of-the-circumstances balancing test" and found that the plaintiffs did not "'ha[ve] a substantial privacy right'" that "'outweigh[ed] the customary constitutionally-embedded presumption of openness in judicial proceedings.'" No. 2669, 2016 WL

---

example a governmental policy or statute, the plaintiff's interest in proceeding anonymously is considered particularly strong." (alteration in original) (quoting *EW v. N.Y. Blood Ctr.*, 213 F.R.D. 108, 111 (E.D.N.Y. 2003))).

1366616, at *1, *2 (E.D. Mo. Apr. 6, 2016) (quoting *Roe v. St. Louis Univ.*, No. 08-CV-1474, 2009 WL 910738, at *3 (E.D. Mo. Apr. 2, 2009)). Therefore, the court required the plaintiffs "to disclose their identities so that the public, including the putative class members they [sought] to represent, kn[e]w who [was] guiding and directing the litigation," even though the disclosure "could expose their sensitive personal and financial information . . . to public scrutiny and exacerbate the privacy violations underlying their lawsuit," leading to "potentially catastrophic personal and professional consequences." *Id.* at *1, *4. But here, the class members have enough information about the class representatives to know who is guiding the litigation. In *J.R. v. Atrium Health, Inc.*, the court denied a motion to proceed pseudonymously where the "Plaintiffs' chief concern appear[ed] to be protection of individuals' medical information and conditions" because "there are mechanisms to address such concerns including the complete or partial sealing of documents under Local Rule 6.1 and protective orders that control the use and dissemination of such information." No. 24-CV-0382, 2024 WL 3032890, at *1 (W.D.N.C. June 17, 2024). Here, partial sealings or protective orders cannot address the plaintiffs' concerns about government retaliation. In *Doe (1) v. University of Kansas Hospital Authority*, the plaintiffs' medical data were compromised when accessed by a physical therapist who did not have a treatment relationship with them. No. 25-CV-2200, 2025 WL 1634958, at *2–3 (D. Kan. June 9, 2025). The court found the plaintiffs' fear of danger "too speculative" to warrant allowing them to proceed pseudonymously because the plaintiffs did "not allege that Physical Therapist has contacted, threatened, or engaged in physical violence against them" or that "a risk of physical reprisal exists if their names are made public." *Id.* at *3. Here, in contrast, the fear of retaliation is not speculative; the news is replete with reports of deportations, and the defendants have not assured the plaintiffs they will not retaliate against them. Indeed, the government takes the position that the Executive Order "is an integral part of

President Trump's broader effort to repair the United States' immigration system" based on his "recogni[tion] [that] individuals unlawfully in this country 'present significant threats to national security and public safety,' and the severity of these problems warrants a panoply of immigration measures." ECF 106, at 5 (quoting Exec. Order No. 14,159, Protecting the American People Against Invasion, 90 Fed. Reg. 8443, 8443 (Jan. 20, 2025)).

The class representatives will fairly and adequately protect the interests of the class. Adequacy of representation is met.

### C.    Class Definition

The plaintiffs propose the following class definition: "All children who have been born or will be born in the United States on or after February 19, 2025, who are designated by Executive Order 14,160 to be ineligible for birthright citizenship, and their parents." ECF 97, at 1–2. The defendants object that this definition is too broad.

A class definition is too broad when "it sweeps within it persons who could not have been injured by the defendant's conduct." *See Stafford v. Bojangles' Rests., Inc.*, 123 F.4th 671, 682 (4th Cir. 2024) (quoting *Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009)). An overly broad class definition does not "'reach the thresholds of class certification'" because it reflects "underlying flaws with the classes' commonality, predominance, and typicality." *Id.* at 681 (quoting *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 933 (5th Cir. 2023)). "An overbreadth problem, however, can and often should be solved by refining the class definition[s] . . . ." *Id.* at 682 (alteration in original) (citation modified).

The plaintiffs' proposed class definition is too broad because it includes the phrase "and their parents." As the Court has found, the parents, in their individual capacities, cannot establish they will suffer the same injury as the children or as other parents. Because the parents, in their

individual capacities, cannot satisfy commonality or typicality, the Court does not include the parents as class members.

The defendants argue that the class definition is overbroad for another reason: the definition includes children who "*will be born*." ECF 106, at 22. As the defendants see it, these not-yet-conceived children lack standing and the capacity to sue, and they should not be included in the class definition. *Id.* These arguments fail.

Start with the argument that children who have yet not been conceived lack standing and thus cannot be part of the class. The Supreme Court has not "address[ed] the distinct question whether every class member must demonstrate standing *before* a court certifies a class." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 n.4 (2021). But the Fourth Circuit has refused "to import standing concepts into the class certification analysis." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 777 (4th Cir. 2023). Thus, "[o]nce threshold individual standing by the class representative is met, a proper party to raise a particular issue is before the court[, and] there is no further, separate 'class action standing' requirement." *Id.* at 779 (quoting *Newberg* § 2:1). Here, the class representatives have established standing. They include Liza, next friend to L.B.; Ashley, next friend to K.K.; Andrea, next friend to E.T.P.; and Niurka, next friend to L.G. They also include Juana, Trinidad Garcia, and Monica, who currently are pregnant with children who will be subject to the Executive Order and who bring claims on behalf of their future children. These class representatives have standing to sue on behalf of other children who are subject to the Executive Order. There is no further class action standing requirement at this stage.

Next consider the argument that not-yet-conceived children lack the capacity to sue. This argument, too, is without merit. The defendants cite no authority for the notion that only class members with the capacity to sue may be included in a Rule 23(b)(2) class definition. In the

absence of any contrary authority, the Court finds there is no separate "capacity to sue" requirement for class members at the certification stage for the same reasons there is no "separate 'class action standing' requirement" for class members at the same stage. *See Carolina Youth Action Project*, 60 F.4th at 777.

The defendants' argument fails for the additional reason that the not-yet-conceived children are future claimants, and courts routinely certify Rule 23(b)(2) classes that include future claimants—including young children. *See, e.g.*, *Bullock v. Bd. of Educ.*, 210 F.R.D. 556, 562 (D. Md. 2002) (certifying class of "all school-age children aged three and older who, on or after November 1, 2000 . . . have lived, live or will live in Montgomery County, Maryland" and who, during that period, are homeless); *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 246, 271 (5th Cir. 2018) (approving certification of a class that included "all children now, or in the future" in the state's permanent care); *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 291 (D. Mass. 2011) (certifying class of "all children who are now or will be in the foster care custody of the Massachusetts Department of Children and Families as a result of abuse or neglect"); *Refugee & Immigrant Ctr. for Educ. & Legal Servs.*, No. 25-cv-306, 2025 WL 1825431, at *46 (D.D.C. July 2, 2025) (certifying a class "consisting of all individuals who are or will be subject to [Presidential] Proclamation [10,888] and/or its implementation and who are now or will be present in the United States"); *J.G.G. v. Trump*, No. 25-cv-766, 2025 WL 1577811, at *28 (D.D.C. June 4, 2025) ("The Government's argument that the inclusion of 'future claimants' renders a class non-ascertainable is at odds with existing law on Rule 23(b)(2) actions, which often include future members." (citing *O.A. v. Trump*, 404 F. Supp. 3d 109, 160 (D.D.C. 2019) (collecting cases)); *A. B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 838 (9th Cir. 2022) ("'The inclusion of future class members in a class is not itself unusual or objectionable,' because '[w]hen the future persons referenced become

members of the class, their claims will necessarily be ripe.'" (alteration in original) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1118 (9th Cir. 2010), *abrogated on other grounds as recognized by Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1199 (9th Cir. 2022)).[9]

Just as these courts certified Rule 23(b)(2) classes that included future claimants, this Court, too, certifies a Rule 23(b)(2) class that includes future claimants. The future claimants here—children "who will be born"—are the "persons" the Executive Order targets. The Executive Order declares that "the privilege of United States citizenship does not automatically extend" to "persons who are born within the United States after 30 days from the date of this order." Exec. Order §§ 1, 2(b). While the Executive Order has a start date, it has no end date. If allowed to stand, the Executive Order, by its terms, would be the law of the land forever. The moment any child who is subject to the Executive Order is born—whether that child is conceived tomorrow or years from now—they will qualify as a class member and their claim will be ripe. Any class definition

---

[9] Future claimants are often considered when courts determine whether numerosity is met. *See*, *e.g.*, *Haw. State Dep't of Educ.*, 30 F.4th at 833, 838 (concluding that numerosity was satisfied where class included "all present and future Campbell [High School] female students and potential students who participate, seek to participate, and/or are or were deterred from participating in athletics at Campbell"); *J.D. v. Azar*, 925 F.3d 1291, 1322 (D.C. Cir. 2019) (noting that "classes including future claimants generally meet the numerosity requirement due to the 'impracticality of counting such class members, much less joining them'" (quoting *Newberg* § 3:15)); *Kingdom v. Trump*, No. 25-CV-691, 2025 WL 1568238, at *13 (D.D.C. June 3, 2025) (finding numerosity satisfied where the proposed class included 1,028 "current . . . BOP inmates diagnosed with gender dysphoria" and "an unknown number of future class members" "who receive such a diagnosis in the future"); *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 253 (3d Cir. 2016) (noting factors relevant to numerosity include "the ability to identify future claimants"); *see also Hinton v. District of Columbia*, 567 F. Supp. 3d 30, 53 (D.D.C. 2021) (considering "the likely number of transgender inmates who are *or will be* subject to DOC's allegedly discriminatory use of protective custody at intake" to determine numerosity (emphasis added)).

that omits children "who will be born" would exclude the very "persons" the Executive Order

targets. Indeed, the class definition *must* include children "who will be born."[10]

    The Court defines the class as follows:

> Any child who has been born or will be born in the United States after February 19,
> 2025, (1) whose mother was unlawfully present in the United States and whose
> father was not a United States citizen or lawful permanent resident at the time of
> said person's birth, or (2) whose mother's presence in the United States at the time
> of said person's birth was lawful but temporary and whose father was not a United
> States citizen or lawful permanent resident at the time of said person's birth.[11]

### D.    Simultaneous Class Certifications

    This Court is not the only one to consider whether to certify a class of people harmed by

the Executive Order. The U.S. District Court for the District of New Hampshire provisionally

certified a class of children born on or after February 20, 2025, who fall under the terms of the

Executive Order. *See Barbara*, 2025 WL 1904338, at *1, *4. The defendants argue "there is no

need for this Court to certify a duplicative nationwide class for the children who are already

members of the *Barbara* class." ECF 111, at 2. The Court disagrees. "[I]t is not uncommon to find

pending simultaneously in different federal or state courts a number of individual suits and class

---

[10] In what appears to be a throwaway argument, the defendants argue that "[a] judicial order resolving the rights of 'parties that did not exist' yet at the time of the decision would raise 'significant questions under the Due Process Clause.'" ECF 106, at 22 (quoting *McLaughlin Chiropractic Assoc's v. McKesson Corp.*, 145 S. Ct. 2006, 2017 n.5 (2025)). This undeveloped argument hardly deserves attention, but the Court addresses it because of the passing reference to due process concerns. *McLaughlin* is completely irrelevant. The case did not involve due process concerns that might arise if a class includes children who do not exist at the time an order resolving the parties' rights is entered. The defendants have not identified any due process concerns that pose a barrier to Rule 23(b)(2) class certification in this case.

[11] The Court modifies the plaintiffs' proposed definition so that the definition stands on its own and does not have an internal reference to the Executive Order. The Court also replaces "on or after February 19" with "after February 19" to be consistent with the Executive Order, the allegations in the amended complaint, and the argument in the motion for class certification. *See* Exec. Order § 2(b) (referring to babies born "after 30 days from the [January 20, 2025] date of this order"); ECF 96, ¶¶ 8–10, 28, 29, 38, 39, 46–48; ECF 97, at 4, 7, 8. *But see* ECF 96, ¶ 104 (proposing a class to include babies born "on or after February 19"); ECF 97, at 4, 19 (same).

actions based on the same events and transactions." *Newberg* § 10:33. One court's certification of a class does not "forestall[] other related cases" because "neither the filing of a class action nor even the grant of a class certification motion has any formal effect on litigation elsewhere." *Id.* Only a final judgment would "preclude[] all other lawsuits concerning the same transaction and occurrence pursued by class members." *Id.* "[A] parallel action has no effect on a competing action until a final judgment is reached. That is even true for the certification decision." *Sharp Farms*, 917 F.3d at 309 (Quattlebaum, J., concurring) (citing *Newberg* § 10:33). The provisional class certification of a nearly identical class in a different district does not obviate the need for class certification here.

> ### E.    Scope of Class

The defendants alternatively ask the Court to limit the class to individuals in this judicial district. They cite no authority that supports their request. That is because the law is not on their side.[12]

> Nothing in Rule 23 . . . limits the geographical scope of a class action that is brought in conformity with that Rule. . . . Nor is a nationwide class inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.

---

[12] The lone case the defendants cite, *Bova v. Cox Commc'ns, Inc.*, No. 01-00090, 2001 WL 1654708 (W.D. Va. Dec. 12, 2001), is not on point. The *Bova* plaintiffs sought certification of a class of customers who received cable internet services from the defendant, which provided the services pursuant to franchise agreements with local governments in several states. *Id.* at *1. The court found that the local governments "derive[d] a significant amount of revenue from the franchise fees" and should be able to represent their interests in court, but that the court lacked personal jurisdiction over governments outside Virginia. *Id.* at *4. Because these possibly indispensable parties were outside the court's jurisdiction, the court found that a nationwide class action "would not be a superior method for the fair and efficient adjudication of the controversy." *Id.* Here, there are no indispensable parties outside the Court's jurisdiction that might impede the fair and efficient adjudication of this case.

*Califano*, 442 U.S. at 702. What this Court must do is "take care to ensure that nationwide relief is indeed appropriate in the case before it, and that certification of such a class would not improperly interfere with the litigation of similar issues in other judicial districts." *Id.* Then, "[i]f a class action is otherwise proper, and if jurisdiction lies over the claims of the members of the class, the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties." *Id.*

Courts routinely certify classes that include members outside of the court's jurisdiction. *See, e.g.*, *Berry*, 807 F.3d at 606, 609 (holding that district court properly certified Rule 23(b)(2) class of "all individuals in the United States about whom the Accurint database contained information from November 2006 to April 2013," which was "roughly 200 million people"); *J.O.P.*, 338 F.R.D. at 65 (certifying Rule 23(b)(2) class of "[a]ll individuals nationwide" who met criteria in class definition); *Hewlett v. Premier Salons Int'l, Inc.*, 185 F.R.D. 211, 214, 222 (D. Md. 1997) (certifying Rule 23(b)(2) class of "all African-Americans who, from December 1, 1993 to November 1, 1996, were denied any service at a salon operated by Premier," a company that operated salons in all 50 states); *Planned Parenthood v. Azar*, No. CCB-20-361, 2020 WL 3893241, at *4, *8 (D. Md. July 10, 2020) (certifying nationwide Rule 23(b)(2) class of "all enrollees in individual-market Affordable Care Act ('ACA') exchange plans whose plans [met certain requirements]"); *see also Edmonson v. Eagle Nat'l Bank*, 344 F.R.D. 72, 82 (D. Md. 2023) (certifying Rule 23(b)(3) class comprised of "[a]ll individuals in the United States" who met certain criteria). And in *CASA*, the Supreme Court recognized the availability of nationwide classwide relief when necessary to provide complete relief to the class. *See CASA*, 145 S. Ct. at 2555; *see also id.* at 2567 (Kavanaugh, J., concurring).

Here, the scope of the class must be nationwide because the Executive Order applies to children nationwide. The Executive Order's denial of birthright citizenship is not limited to children born in the District of Maryland. The denial extends to "persons who are born within the United States." Exec. Order § 1. Indeed, certification of a nationwide class of children subject to the Executive Order is not only appropriate; it is necessary. Accordingly, the Court certifies the following nationwide class:

> Any child who has been born or will be born in the United States after February 19, 2025, (1) whose mother was unlawfully present in the United States and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) whose mother's presence in the United States at the time of said person's birth was lawful but temporary and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth.

## IV.    Class Counsel

Because the Court has certified a class, the Court must appoint class counsel. Fed. R. Civ. P. 23(g)(1). The Court must consider

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). The Court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

The plaintiffs seek to have attorneys from the Georgetown Law Institute for Constitutional Advocacy and Protection ("ICAP") and ASAP appointed as class counsel. In support of their request, they submitted declarations from Joseph Mead, Special Litigation Counsel at ICAP, and Zachary Manfredi, Litigation and Advocacy Director at ASAP. ECF 97-9 & 97-10. Although the

defendants oppose class certification, they do not oppose appointment of counsel from ICAP and ASAP.

The plaintiffs identify the work that counsel has done thus far in this case and their knowledge of the applicable law:

> Attorneys from [ICAP and ASAP] have litigated this case since the onset, including in this Court, the Fourth Circuit, and the Supreme Court. . . . Counsel have spent the last several months identifying and analyzing the constitutional and statutory defects of the Executive Order, and they have worked to build the legal arguments and factual record that supported the preliminary injunction this Court previously entered. Counsel are therefore deeply familiar with the case and the applicable law; indeed, counsel have already litigated issues arising in this case up to the Supreme Court.

ECF 97-1, at 17. The plaintiffs also state that their attorneys "have devoted extensive resources to engaging with plaintiffs and others whose children may be harmed by the Executive Order." *Id.*

The plaintiffs cite counsel's experience with class actions, complex litigation more generally, and claims like those asserted in the amended class action complaint, and they provide examples of their knowledge in this area of law:

> These attorneys have experience litigating complex class action lawsuits in federal court. . . .
>
> Beyond their fluency with the issues and arguments in this case, counsel are recognized experts in constitutional law, administrative law, civil rights litigation, and litigation involving the government. ICAP has previously litigated cases challenging the legality of federal policy relating to immigration, including challenges to the Department of Homeland Security's Public Charge Rule and Diversity Visa Rule. *See CASA de Maryland, Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020), *vacated on rehearing en banc*, 981 F.3d 311 (2020); *E.B. v. U.S. Dep't of State*, 583 F. Supp. 3d 58 (D.D.C. 2022). ASAP attorneys have previously litigated numerous challenges to federal policy, including the government's termination of Deferred Action for Childhood Arrivals, poor treatment of people in civil detention, separation of families at the U.S.-Mexico border, and delays in work authorization to asylum seekers. *E.g.*, *CASA de Maryland, Inc., v. Mayorkas* (formerly *CASA v. Wolf*), No. 20-cv-02118 (D. Md.) (asserting APA and federal statutory claims); *Romero Najera v. Barr, et al.*, No. 20-cv-00866 (C.D. Cal.) (individual habeas). And counsel have brought numerous challenges to the constitutionality and legality of other federal, state, and local policies, including through class actions and cases seeking facial invalidation of laws.

*Id.* at 17–18.

Upon consideration of the Rule 23(g)(1)(A) factors, the Court finds that counsel will fairly and adequately represent the class. The attorneys from ICAP and ASAP are appointed as class counsel.

## V.    Conclusion

For the foregoing reasons, the motion for class certification is granted consistent with this opinion. The attorneys from ICAP and ASAP are appointed as class counsel. Liza, as next friend to L.B.; Ashley, as next friend to K.K.; Andrea, as next friend to E.T.P.; Niurka, as next friend to L.G.; and Juana, Trinidad Garcia, and Monica, as next friends to their future children are designated class representatives. A separate Order follows.

Date: August 7, 2025

Deborah L. Boardman
United States District Judge