**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CASA, INC. *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>DONALD J. TRUMP *et al.*,<br><br>*Defendants*. | Case No.: 8:25-cv-00201-DLB<br>Honorable Deborah L. Boardman |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR ADDITIONAL CLASSWIDE PRELIMINARY INJUNCTIVE RELIEF OR A CLASSWIDE TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS


INTRODUCTION ........ 1
BACKGROUND ........ 2
LEGAL STANDARD ........ 5
ARGUMENT ........ 6
I. The Court May Issue Further Preliminary Injunctive Relief to the Certified Class. ........ 6
II. Plaintiffs Are Likely to Succeed on the Merits. ........ 10
A. Plaintiffs Have Pre-Enforcement Standing. ........ 10
B. The Order Is Unconstitutional as Applied to the Certified Class. ........ 14
III. The Remaining Factors Tip Decisively in Favor of Granting a TRO or PI. ........ 22
IV. The Court's Immediate Intervention Is Warranted. ........ 26
CONCLUSION ........ 28

## INTRODUCTION

Through the Citizenship Clause of the Fourteenth Amendment, "[a] child born on American soil and subject to American law was made an American citizen." *Trump v. Barbara*, 146 S. Ct. 2438, 2449 (2026). On January 20, 2025, President Trump tried to alter that constitutional rule. He signed an Executive Order declaring that children born to parents present in the United States unlawfully or temporarily would no longer be citizens.

Plaintiffs brought this lawsuit to protect the constitutional right to birthright citizenship. This Court certified a nationwide class of children affected by the Executive Order and entered a class-wide preliminary injunction barring enforcement of the Order. In *Barbara*, the Supreme Court affirmed a nearly identical class-wide injunction. The Supreme Court explained that "children born of parents unlawfully or temporarily present in the United States" are "citizens at birth" because they "satisfy both elements of the Citizenship Clause: they are 'born ... in the United States' and 'subject to the jurisdiction thereof.'" *Id.* at 2450 (alteration in original).

*Barbara* thus specifically held that the members of the certified class in this case are citizens under the Fourteenth Amendment. In defiance of *Barbara*, on August 6, 2026, the President issued a new Executive Order continuing his campaign to redefine birthright citizenship. This Order reframes the categories of people born in the United States that the President seeks to deprive of citizenship. But at least as applied to the class, the new Executive Order is necessarily unconstitutional because the Supreme Court just held that all class members are citizens.

This Court should enter additional preliminary injunctive relief to clarify that Defendants must honor the citizenship of class members during the pendency of this litigation, no matter how many times the President orders them to take unconstitutional action against the class. The President cannot unilaterally amend the Constitution.

Alternatively, Plaintiffs request that the Court enter a temporary restraining order or preliminary injunction barring enforcement of the 2026 Executive Order until 14 days after issuance of the implementation guidance contemplated in Section 3(b) of the Order, to prevent the irreparable harm that would result if Defendants begin enforcing the Order against the certified class immediately upon issuance of the guidance.

**BACKGROUND**

On the first day of his second term in office, President Trump issued an Executive Order titled "Protecting the Meaning and Value of American Citizenship." *See* Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 20, 2025) ("2025 Executive Order"). The 2025 Executive Order "provides that children born of persons unlawfully or temporarily present in the United States are not 'subject to the jurisdiction' of the United States—and thus do not qualify for citizenship under the Fourteenth Amendment or the Immigration and Nationality Act." *Trump v. Barbara*, 146 S. Ct. 2438, 2444 (2026). The next day, January 21, 2025, CASA, Inc., the Asylum Seeker Advocacy Project ("ASAP"), and five pregnant mothers filed this lawsuit. *See* ECF 1. They alleged that the Order violated the Citizenship Clause of the Fourteenth Amendment and 8 U.S.C. § 1401(a) and sought a preliminary injunction. Plaintiffs argued that the Executive Order was unconstitutional because the Citizenship Clause guarantees citizenship to all children born in the United States regardless of their parents' immigration status, with only narrow, historically recognized exceptions, and the President has no unilateral power to expand those exceptions. ECF 2-1 at 8-9.

The Court granted the motion for preliminary injunction. *CASA, Inc. v. Trump* (*CASA I*), 763 F. Supp. 3d 723, 727 (D. Md. 2025). The Court held that Plaintiffs had "shown an extremely strong likelihood that they will succeed on the merits of their constitutional claim"; that they had demonstrated irreparable injury based on the grievous harms associated with the "denial of the

precious right to citizenship for any period of time"; and that, given the likely unconstitutionality of the Order, the "balance of the equities and the public interest strongly weigh in favor of a preliminary injunction that maintains the status quo during litigation." *Id.* at 743-45.

After the Supreme Court narrowed that injunction for reasons unrelated to the merits of the case, Plaintiffs amended their complaint to seek relief on behalf of a nationwide class of children born to parents who are unlawfully or temporarily present in the United States. ECF 96. Plaintiffs contended that "[t]he Executive Branch has no power to unilaterally amend or repeal the Fourteenth Amendment and no power to disobey a clear constitutional command." *Id.* at 39.

After careful consideration of the factors governing class certification under Federal Rule of Civil Procedure 23(b)(2), the Court certified a class consisting of:

> Any child who has been born or will be born in the United States after February 19, 2025, (1) whose mother was unlawfully present in the United States and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) whose mother's presence in the United States at the time of said person's birth was lawful but temporary and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*CASA, Inc. v. Trump* (*CASA II*), 793 F. Supp. 3d 703, 730 (D. Md. 2025). The Court then issued a new class-wide preliminary injunction. *CASA, Inc. v. Trump* (*CASA III*), 793 F. Supp. 3d 687 (D. Md. 2025). The Court issued this injunction to "preserv[e] birthright citizenship for children born on U.S. soil, who unquestionably would be citizens but for the Executive Order." *Id.* at 698.

The Supreme Court granted certiorari before judgment in another birthright-citizenship lawsuit and held that all children covered by the 2025 Executive Order are entitled to citizenship under the Fourteenth Amendment. *Barbara*, 146 S. Ct. at 2450. The Supreme Court explained that the phrase "subject to the jurisdiction thereof" in the Citizenship Clause "refer[s] to the power of the United States to govern those within its territory." *Id.* The Court therefore held that "children born of parents unlawfully or temporarily present in the United States" are "citizens at birth"

because they "satisfy both elements of the Citizenship Clause: they are 'born ... in the United States' and 'subject to the jurisdiction thereof.'" *Id.* (alteration in original).

In response, the President issued a new Executive Order limiting birthright citizenship, which he framed as a continuation of the prior Order. *See* Exec. Order No. 14418, "Continuing To Protect the Meaning and Value of American Citizenship," 91 Fed. Reg. 51991 (Aug. 6, 2026), ECF 161-1 ("2026 Executive Order"). The 2026 Executive Order purports to deny citizenship to children born to noncitizen parents in several categories. As relevant to this motion, the Order claims that individuals born in the United States are not citizens if both of their parents are noncitizens and at least one of their parents is: (1) an "alien enemy, defined to include" members of certain designated terrorist organizations; (2) a "foreign government employee," including not only ambassadors but also other embassy staff, as well as employees of foreign governments or international organizations; or (3) someone who "engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in fraudulent activity to obtain citizenship." 2026 Executive Order § 2.[1]

The Order directs agency heads to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order, and that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order." *Id.* § 3(a). That provision lists no

---

[1] The 2026 Executive Order also purports to deny citizenship to children born to noncitizen parents "in a territory or territorial waters of the United States where citizenship is not conferred by Federal statute." 2026 Executive Order § 2(d). For most territories, the Order appears to have no effect because citizenship is in fact conferred by statute. *See, e.g.*, 8 U.S.C. § 1402 (Puerto Rico); *id.* § 1406 (Virgin Islands); *id.* § 1407 (Guam). American Samoa is not covered by such a statute, and there is a separate legal dispute about "whether birth in American Samoa constitutes birth within the United States for purposes of the Fourteenth Amendment." *Fitisemanu v. United States*, 1 F.4th 862, 872 (10th Cir. 2021). To the extent the Executive Order's fourth category is directed at that question, it is beyond the scope of this case.

effective date, so it may have taken effect immediately when the President signed the Order. Separately, the Order directs agencies to issue implementing guidance within 30 days. *Id.* § 3(b). The 2026 Executive Order does not rescind the 2025 Executive Order, which remains on the books. And unlike the 2025 Executive Order, the 2026 Executive Order does not specify that it is applicable only to children born after any particular date, nor does it exclude the children of lawful permanent residents from the categories of individuals it purports to deny citizenship.

## LEGAL STANDARD

"[C]ourts are vested with the inherent power to modify injunctions they have issued." *Thompson v. HUD*, 404 F.3d 821, 825 (4th Cir. 2005); *see also Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-15 (4th Cir. 2003) ("[A] district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted."); Fed. R. Civ. P. 54(b) (interlocutory orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities"). This includes authority to issue additional preliminary injunctive relief. *See J.O.P. v. DHS*, 338 F.R.D. 33, 57-63 (D. Md. 2020) (issuing expanded classwide preliminary injunctive relief against further "practices and policies" affecting the class).

In considering whether to grant additional injunctive relief, courts look to the usual four factors governing issuance of a preliminary injunction. *Id.* at 58-59. "To obtain a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Fed'n of State, Cnty. & Mun. Emps. v. SSA* (*AFSCME*), 172 F.4th 361, 366 (4th Cir. 2026) (en banc) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "The standards for granting a TRO and granting a

preliminary injunction are the same." *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024).

## ARGUMENT

### I. The Court May Issue Further Preliminary Injunctive Relief to the Certified Class.

As the Court explained earlier in this case, district courts have "plenary power" to "'make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason.'" *CASA III*, 793 F. Supp. 3d at 701 (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 578 (5th Cir. 1974)). Additional injunctive relief "may be granted where warranted by a change in the law or the circumstances." *United States v. Snepp*, 897 F.2d 138, 141 (4th Cir. 1990); *see also Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir. 2019). "The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Brown v. Plata*, 563 U.S. 493, 542 (2011) (internal quotation marks omitted). "[A]n injunction often requires continuing supervision by the issuing court and always a continuing willingness to apply its powers and processes on behalf of the party who obtained that equitable relief." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961); *see* 11A Wright & Miller's Fed. Prac. & Proc. Civ. § 2961 (3d ed.) ("[A] court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to ensure that the decree accomplishes its intended result.").

The Court here granted a classwide preliminary injunction barring enforcement of the 2025 Executive Order because Plaintiffs were "extremely likely to succeed on their claim that the Executive Order violates the Fourteenth Amendment." *CASA III*, 793 F. Supp. 3d at 696. The Court explained that "seek[ing] to deprive the class members of their constitutional right to citizenship . . . alone is sufficient to establish irreparable harm." *Id.* at 697. And the Court further

recognized that "[t]he balance of the equities clearly favors preserving birthright citizenship for children born on U.S. soil, who unquestionably would be citizens but for the Executive Order." *Id.* at 698.

Changed factual circumstances now require additional preliminary injunctive relief to prevent that same harm and preserve the status quo. The President issued the 2026 Executive Order in defiance of the Supreme Court's decision in *Barbara*. As its title indicates, the Order is "Continuing" the President's effort to deny citizenship to class members. The Court can and should issue additional injunctive relief barring enforcement of the 2026 Executive Order to prevent that continuing violation of the Constitution and to "preserv[e] birthright citizenship for children born on U.S. soil" during the pendency of this litigation. *CASA III*, 793 F. Supp. 3d at 698.

Defendants are wrong to suggest that the 2026 Executive Order is categorically "not a part of this case." ECF 161 at 4. It is true that at the time Plaintiffs filed their amended complaint and the Court issued its classwide injunction, the 2026 Executive Order did not yet exist. But this unanticipated change in circumstances is precisely why additional injunctive relief is appropriate. "A motion to modify a preliminary injunction is meant only to relieve inequities that arise *after* the original order." *J.O.P.*, 338 F.R.D. at 58 (internal quotation marks omitted). "Modification of an injunction is not warranted if the court determines that the moving party is relying upon events that actually were anticipated when the decree was entered." *Id.* (alterations and internal quotation marks omitted); *see Snepp*, 897 F.2d at 141.

Preliminary relief barring enforcement of the 2026 Executive Order is well within the scope of Plaintiffs' claims in the amended complaint. Count I of the amended complaint alleges *ultra vires* action under the Fourteenth Amendment. ECF 96 at 39. In that count, Plaintiffs contend that "all U.S.-born children who are part of the [certified] class are United States citizens"; that "[t]he

Executive Branch has no power to unilaterally amend or repeal the Fourteenth Amendment and no power to disobey a clear constitutional command"; and that "Defendants lack the authority to interfere with, deny, or fail to recognize citizenship that is granted by the United States Constitution, and they lack the authority to deny any of the rights, benefits, and privileges that accompany that citizenship." *Id.* Count II alleges *ultra vires* action under 8 U.S.C. § 1401. In that count, Plaintiffs likewise contend that "[t]he Executive Branch has no power to unilaterally amend or repeal an Act of Congress and no power to disobey a clear statutory command," and that "Defendants lack the authority to disregard an Act of Congress that recognizes citizenship." *Id.* at 40. Plaintiffs' prayer for relief seeks declaratory and injunctive relief ensuring that "all children born in the United States" within the certified class "are citizens of the United States and are entitled to all of the rights and privileges that such status provides, regardless of the immigration status of their parents." *Id.* at 41.

Plaintiffs' position in this case is that Defendants, as Executive Branch officers, lack the power to take away the citizenship that the Constitution and 8 U.S.C. § 1401 bestow on members of the class. And it is well within the ambit of this case for the Court to enjoin Defendants from depriving class members of citizenship—no matter how many times the President, who has no power to change the law of birthright citizenship, directs them to do so. Plaintiffs' fundamental claim is that it is simply not up to the Executive Branch to decide who is a citizen by birth in the United States. Under binding Supreme Court precedent, the exceptions to birthright citizenship are "a closed set for constitutional purposes." *Barbara*, 146 S. Ct. at 2470 (Kavanaugh, J., concurring in the judgment and dissenting in part).

Nor must Plaintiffs amend their complaint before the Court can issue further injunctive relief. "The purpose of interim equitable relief is to protect the movant, during the pendency of the

action, from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997). Accordingly, "a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Id.* (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)); *see also Hisp. Nat'l L. Enf't Ass'n NCR v. Prince George's County*, 535 F. Supp. 3d 393, 410-11 (D. Md. 2021). That standard is met here. Plaintiffs' claim in the complaint is that the members of the certified class are citizens of the United States and that the President cannot deny them the citizenship they are guaranteed under the Constitution. A preliminary injunction barring Defendants from denying citizenship to members of the class during the pendency of the litigation, whether pursuant to the 2026 Executive Order or any other unlawful policy or directive, would thus prevent class members "from being harmed or further harmed in the manner in which the movant contends it was or will be harmed through the illegality alleged in the complaint." *Omega World Travel, Inc.*, 111 F.3d at 16. The members of the certified class are citizens of the United States under the Constitution, as the Supreme Court recognized in *Barbara*. They are entitled to have their citizenship recognized by the Executive Branch no matter how many overlapping Executive Orders the President issues in his attempt to override the Constitution.

Beyond that, there is no particular requirement that all facts forming the basis for a preliminary-injunction motion must first appear in a complaint. "The grant of a temporary injunction need not await any procedural steps perfecting the pleadings." *United States v. Lynd*, 301 F.2d 818, 823 (5th Cir. 1962). And more broadly, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a

trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). The allegations in the amended complaint, the text of the 2026 Executive Order, and the additional declarations Plaintiffs are submitting in connection with this motion are sufficient for the Court to evaluate the claim for additional preliminary relief.[2]

**II. Plaintiffs Are Likely to Succeed on the Merits.**

**A. Plaintiffs Have Pre-Enforcement Standing.**

To start, Plaintiffs are likely to demonstrate that they have standing to enjoin enforcement of the 2026 Executive Order. Binding Fourth Circuit precedent dictates that in a class action under Rule 23(b)(2), "if a class representative has standing to seek equitable relief, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing." *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023). In other words, as this Court previously explained, "there is no . . . separate class action standing requirement." *CASA II*, 793 F. Supp. 3d at 703 (internal quotation marks omitted). The Court thus "need only determine whether a single Named Plaintiff in this case" is likely to "suffer[] a legal injury in fact" as a result of the 2026 Executive Order in order to issue additional preliminary injunctive relief. *Jonathan R. ex rel. Dixon v. Morrisey*, 178 F.4th 139, 162 (4th Cir. 2026).

Here, "at least one class representative . . . has Article III standing to seek each form of equitable relief requested," and "[n]othing more is required on that score." *Carolina Youth Action Project*, 60 F.4th at 779. "To establish standing, a plaintiff must show: (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *AFSCME*,

[2] If the Court disagrees, Plaintiffs request leave to amend their complaint to include the allegation that the 2026 Executive Order is an unconstitutional continuation of the 2025 Executive Order.

172 F.4th at 367 (internal quotation marks omitted). "At the preliminary injunction stage, a plaintiff must make a clear showing that she is likely to establish each element of standing." *Id.* (internal quotation marks omitted). Plaintiffs in this case seek to enjoin enforcement of the 2026 Executive Order before Defendants have taken action to deny their citizenship. In that pre-enforcement posture, Plaintiffs can show an injury by demonstrating "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" a government policy, and "a credible threat" of enforcement. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). This standard is met when the text of a policy covers the plaintiff and the defendant refuses to disavow enforcement. *See Chiles v. Salazar*, 146 S. Ct. 1010, 1019 n.* (2026).

Class representative Monica has standing to challenge the 2026 Executive Order based on the credible threat that her child could be denied citizenship under the "alien enemy" category of the Order. As she explains in her supplemental declaration, she and her husband are originally from Venezuela, and she has "read and heard that this government has considered or suspected almost all Venezuelans 'alien enemies' because they are supposedly connected to the Tren de Aragua gang." Monica 3d. Decl. ¶¶ 10-12. Tren de Aragua has been designated as a Foreign Terrorist Organization and as Specially Designated Global Terrorists. Dep't of State, *Designation of International Cartels* (Feb. 20, 2025), https://perma.cc/G4TM-J6Q3. Monica and her husband have no connection to Tren de Aragua. *See id.* ¶ 11. But she is "scared that by simply being Venezuelan," she and her husband "will be considered 'alien enemies' and that the government will try to deny U.S. citizenship to [her child,] A.M. and any future children who are born in the United States." *Id.* ¶ 12.

The broad, vague language of the Order's "alien enemy" category makes Monica's fears of enforcement credible. The category in the Order is "defined to include" members of groups

designated as Foreign Terrorist Organizations and Specially Designated Global Terrorists, but it is unclear whether the category is limited to those individuals or merely includes them. Either way, this category could be quite capacious. If it goes beyond the listed examples, this category could allow the government to designate any individual or group of individuals as “alien enemies” at will, leaving all children whose parents are not U.S. citizens vulnerable. It is unclear whether Defendants may try to label all immigrants from certain countries as “alien enemies.”

Even if the category is limited to the groups designated under the authorities listed in the Order, it is unclear how Defendants intend to identify members of designated organizations, which generally have no official membership rolls. The risk that Defendants might deprive class members of citizenship based on false allegations against their parents is credible. This Administration has previously used markers like seemingly innocuous tattoos to broadly and wrongly label people as members of Tren de Aragua for purposes of the Alien Enemies Act. *See* Eric Levenson, *Tattoos, Flyers and Deleted Photos: The Limited Evidence the Trump Administration Is Using to Try to Deport Migrants*, CNN (Mar. 25, 2025), https://tinyurl.com/bd5jtfw (reporting that the government identified supposed members of Tren de Aragua for purposes of the Alien Enemies Act based on arguably innocuous tattoos); *A.A.R.P. v. Trump*, 605 U.S. 91, 92-94 (2025) (describing hasty attempts to remove Venezuelans under Alien Enemies Act); *Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025) (describing “administrative error” that led to removal of Salvadoran man in connection with Alien Enemies Act deportations). Monica, her infant child, and her future children born in the United States are thus arguably covered by the 2026 Executive Order’s “alien enemy” category, and they face a credible threat of enforcement.

Class representative Liza has standing to challenge the 2026 Executive Order based on the credible threat that her child could be denied citizenship under the “commercial transaction”

category of the Order. As Liza explains in her declaration, she came to the United States from Russia with a valid student visa and "bought a plane ticket to the United States." Liza 3d. Decl. ¶ 3. At the time, she was not pregnant, but she was married and thought she and her husband "would eventually start a family." *Id.* ¶ 4. Her child, L.B., was born after February 19, 2025, in Texas, and L.B. is a member of the certified class. *Id.* ¶ 5. She worries that because she bought a plane ticket, that could be considered a "commercial transaction" that Defendants could use in order to refuse to recognize L.B.'s citizenship. *Id.* ¶ 9. Liza "learned that it is unclear whether this new Executive Order is limited to newborns born after the Order was signed, or whether it could impact people in the future, regardless of when they were born." *Id.* ¶ 10. Whereas the 2025 Executive Order specified that it was applicable only to babies born after February 19, 2025, the 2026 Executive Order includes no such limitation. Liza is "very worried about the possibility that L.B. could later be impacted and denied proof of their U.S. citizenship in the future." *Id.* ¶ 11. Like Monica, Liza is arguably covered by the 2026 Executive Order and faces a credible threat of enforcement against L.B. or her future children.

Class representative Juana is in a similar situation. She came to the United States from Colombia in 2022 and "bought a plane ticket and paid for other transportation as part of [her] journey." Juana 3d Decl. ¶ 3. She did not come to the United States for the purpose of having children here, but she had one child already and hoped to have another someday, which she eventually did. *Id.* ¶ 4. Juana's son, Y.P.C., was born in Maryland after February 19, 2025, and he is now just over one year old. *Id.* ¶ 5. She is worried that "paying for a plane ticket could be a commercial transaction under the Executive Order" and that "the government could use this provision to deny Y.P.C. his citizenship." *Id.* ¶ 9. Juana and Y.P.C. face a credible threat of enforcement.

Defendants' failure to disavow enforcement against the class representatives strongly supports their standing to challenge the 2026 Executive Order. At a meet and confer on August 24, 2026, counsel for Defendants could not say whether the 2026 Executive Order is limited to babies born after the Order was issued or instead applies to all people whose parents fit within the Order's categories. Crucially, counsel for Defendants declined to disavow enforcement against either the class representatives or other members of the class. And that all comes after the status conference held on August 18, 2026, at which counsel declined to disavow the possibility that the "alien enemy" category of the Order could encompass everyone from Venezuela—including class representatives. Defendants' inability to rule out enforcing the 2026 Executive Order against the class representatives means that Plaintiffs have standing to challenge that Order.

More broadly, the certified class necessarily includes many of the people covered by the 2026 Executive Order. The class includes *all* children born after February 19, 2025, to parents who were unlawfully or temporarily present in the United States. And the 2026 Executive Order applies to children of such parents so long as one parent is deemed an alien enemy, foreign government employee, or birth tourist. Those children are necessarily within the class. The Court can therefore be confident that the class includes a broad swath of individuals with standing to challenge the 2026 Executive Order.

**B. The Order Is Unconstitutional as Applied to the Certified Class.**

The certified class in this case, like the certified class in *Barbara*, includes all children born in the United States after February 19, 2025, whose mother was unlawfully or temporarily present in the United States at the time of the child's birth and whose father was neither a citizen nor a lawful permanent resident. *See CASA II*, 793 F. Supp. 3d at 728-29; *Barbara v. Trump*, 790 F. Supp. 3d 80, 91 (D.N.H. 2025). The Supreme Court in *Barbara* held that all members of that

certified class are entitled to citizenship at birth under the Citizenship Clause of the Fourteenth Amendment. "[C]hildren born of parents unlawfully or temporarily present in the United States" are "citizens at birth" because they "satisfy both elements of the Citizenship Clause: they are 'born ... in the United States' and 'subject to the jurisdiction thereof.'" *Barbara*, 146 S. Ct. at 2450 (alteration in original). Because the Supreme Court has held that all members of the certified class are citizens under the Constitution, any application of the 2026 Executive Order to members of the certified class will necessarily be unconstitutional. That alone justifies enjoining enforcement of the 2026 Executive Order against members of the certified class.

A closer look at the 2026 Executive Order's particular categories yields the same result. As the Supreme Court held in *Wong Kim Ark* and reaffirmed in *Barbara*, the rule of birthright citizenship in the United States under the Fourteenth Amendment is subject to only a "closed set" of narrow historical exceptions. *Barbara*, 146 S. Ct. at 2470 (Kavanaugh, J., concurring in the judgment and dissenting in part). Those exceptions are limited to "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory," or "of members of the Indian tribes owing direct allegiance to their several tribes." *United States v. Wong Kim Ark*, 169 U.S. 649, 693 (1898). All other children born in the United States are subject to its jurisdiction within the meaning of the Citizenship Clause. *Barbara*, 146 S. Ct. at 2450; *CASA I*, 763 F. Supp. 3d at 737-38.

The 2026 Executive Order commits the same error as the 2025 Executive Order by attempting to expand those categories. As relevant here, the 2026 Executive Order applies to the children of "alien enem[ies]," "foreign government employee[s]," or parents who "engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in fraudulent activity to obtain citizenship." 2026 Executive Order § 2. None of those categories maps

on to the traditional exceptions to birthright citizenship. Denying citizenship to people within those categories is thus unconstitutional.

*1. Alien Enemies*. The Order first applies to individuals if both of their parents are noncitizens and "either parent . . . is an alien enemy." *Id.* § 2(a). That term is "defined to include any member of a designated Foreign Terrorist Organization under 8 U.S.C. 1189 or Specially Designated Global Terrorist, consistent with the International Emergency Economic Powers Act, 50 U.S.C. 1701 *et seq*., and Executive Order 13224 of September 23, 2001." *Id.*

Individuals whose parents fit within this category are entitled to citizenship under the Fourteenth Amendment because they are born in the United States and are subject to its jurisdiction. They do not fit within any historical exception to birthright citizenship. "The Citizenship Clause uses jurisdiction in its ordinary sense—referring to the power of the United States to govern those within its territory." *Barbara*, 146 S. Ct. at 2450. Alleged members of designated terrorist organizations who are present in the United States are certainly subject to the Nation's "[p]ower of governing or legislating." *Id.* at 2449 (quoting N. Webster, An American Dictionary of the English Language 732 (C. Goodrich & N. Porter eds. 1865)). Indeed, the 2026 Executive Order defines the "alien enemy" category based on a parent's alleged connection to organizations that are designated pursuant to the laws of the United States.

The closest historical exception applies to "children born of alien enemies *in hostile occupation*." *Wong Kim Ark*, 169 U.S. at 682 (emphasis added). The reason children born in that circumstance are not subject to the jurisdiction of the United States depends entirely on the "hostile occupation" aspect of the exception. As the Supreme Court explained in *Barbara*, at common law this exception applied to "the people born in the King's lost dominions," over which he "had no actual power to rule." 146 S. Ct. at 2445. Such territory fell outside the King's jurisdiction because

"[h]e could not demand allegiance from—for he could not protect—those born in lands that he did not control." *Id.* "The same held true even in discrete areas within his kingdom that were temporarily outside his control," such as if enemies were to possess a castle or fort. *Id.* (internal quotation marks omitted).

The American version of the exception derives from the same principles, as illustrated in the Supreme Court's decision in *United States v. Rice*, 17 U.S. 246 (1819). That case concerned the British occupation of Castine, Maine, during the War of 1812. As Justice Story explained in his opinion for the Court, "the enemy acquired that firm possession which enabled him to exercise the fullest rights of sovereignty over that place." *Id.* at 254. Accordingly, "[t]he sovereignty of the United States over the territory was, of course, suspended, and the laws of the United States could no longer be rightfully enforced there, or be obligatory upon the inhabitants who remained and submitted to the conquerors." *Id.* "By the surrender, the inhabitants passed under a temporary allegiance to the British government, and were bound by such laws, and such only, as it chose to recognize and impose." *Id.* In that circumstance, the Supreme Court later explained in *Wong Kim Ark*, a child born to a British soldier would not be a citizen of the United States.

Fortunately, no portion of the United States is currently under hostile occupation by a foreign force. There is no area where the United States' "sovereignty" has been "suspended" or "the laws of the United States c[an] no longer be rightfully enforced." *Id.* Accordingly, there is no one in the United States today to whom the exception for children born to hostile occupiers could be applied. Instead, anyone to whom the 2026 Executive Order's "alien enemy" category could be applied is subject to the jurisdiction of the United States, and their children are entitled to birthright citizenship.

The unclear scope of the Order's "alien enemy" category further undermines any possible connection to the historical exception for occupying military forces. *See supra*, at pp. 11-12. It is also notable that during President Trump's second term, his Administration has added more than 30 entities to the list of designated Foreign Terrorist Organizations, including numerous drug cartels. *See* U.S. Dep't of State, Designated Foreign Terrorist Organizations, https://perma.cc/QS5Z-Z9X5. That drastic increase in the number of designated organizations could substantially expand the reach of the Order's "alien enemy" category, raising the risk that it could be applied to any child born to an immigrant parent who could be (rightly or wrongly) accused of some remote connection with those groups. And because only one parent needs to be labeled an alien enemy to trigger this category of the Executive Order, it could apply, for instance, to a child born in the United States to a mother who fled from a violent partner who is associated with a designated Foreign Terrorist Organization. In that circumstance, the victim of a designated Foreign Terrorist Organization would have their child deprived of citizenship. There can be no argument that such a child is not subject to the jurisdiction of the United States.

The 2026 Executive Order is thus unconstitutional as applied to members of the class whose parents fall within the Order's "alien enemy" category. Those children are born in the United States and subject to its jurisdiction, so they are entitled to citizenship under the Fourteenth Amendment.

*2. Foreign government employees.* The 2026 Executive Order's second category covers individuals if both their parents are noncitizens and "either parent of that person is a foreign government employee." 2026 Executive Order § 2(b). This category is "defined to include," but is not necessarily limited to, not only "ambassadors," but also "persons employed by a foreign embassy or consulate who are nationals of that foreign country"; persons employed by a foreign

government in an official capacity"; and "persons employed by an international organization that possess international-organization immunity." *Id.*

The Order has no effect as to the children of ambassadors, who are already excluded from birthright citizenship under *Wong Kim Ark* and *Barbara*. *See Barbara*, 146 S. Ct. at 2456 (noting the "familiar exception[] . . . for ambassadors"); *see also* 8 C.F.R. § 101.3 (providing that children are not birthright citizens if born in the United States to "a foreign diplomatic officer," defined as "a person listed in the State Department Diplomatic List, also known as the Blue List"). But the many other categories of foreign government employees named in the 2026 Executive Order go far beyond the types of foreign ministers who enjoy diplomatic immunity and are thus not subject to the jurisdiction of the United States. As *Barbara* explained, the traditional "foreign minister" exception is based on the notion that "exercising jurisdiction" over those entrusted with carrying on diplomacy on behalf of foreign nations "would 'degrade the dignity' of 'foreign sovereigns,'" and the United States is thus "understood to have impliedly waived [its] jurisdiction" over them by granting them diplomatic immunity. *Barbara*, 146 S. Ct. at 2450 (quoting *The Schooner Exch. v. McFaddon*, 11 U.S. 116, 137 (1812)).

Children born to other "foreign government officials or employees," by contrast, are "born subject to the jurisdiction of the United States." 8 C.F.R. § 101.3(b). That is because these other foreign government employees are "are subject to the local law in the same manner with other foreign residents owing a temporary allegiance to the state." *Moncada v. Rubio*, 153 F.4th 733, 739 (9th Cir. 2025) (internal quotation marks omitted). *Wong Kim Ark* explicitly noted this distinction, explaining that unlike foreign ministers, "consuls, as such, and unless expressly invested with a diplomatic character in addition to their ordinary powers, are not considered as intrusted with authority to represent their sovereign in his intercourse with foreign states . . . or

entitled by the law of nations to the privileges and immunities of ambassadors or public ministers, but are subject to the jurisdiction, civil and criminal, of the courts of the country in which they reside." *Wong Kim Ark*, 169 U.S. at 678-79. And this category of the Order goes far beyond consuls. It could include children born to anyone who works at a foreign embassy or international organization regardless of their position or duties—from security guards to janitors.

This category sweeps well beyond the "ambassador" exception and is yet another attempt by the President to rewrite the Citizenship Clause and overrule Supreme Court precedent. Under the separation of powers, he lacks authority to do either.

*3. Those who engage in commercial transactions.* Finally, the 2026 Executive Order covers individuals if both their parents are noncitizens and "either parent of that person engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in fraudulent activity to obtain citizenship." 2026 Executive Order § 2(c). This includes "when the parent(s) of the person engage in a commercial transaction to ensure that the person's mother is present in the United States, or a territory of the United States, to give birth." *Id.* § 2(c)(i).

This category is even more obviously unconstitutional than the other two. It bears no relationship whatsoever to any of the traditional exceptions identified in *Wong Kim Ark* and *Barbara*. To the contrary, the status of the children of so-called birth tourists was directly at issue in *Barbara*, and the Supreme Court held that they are citizens. "'[T]he common law rule'" of *jus soli* "'was the law'" in the United States "for the children of 'citizens' and "foreigners" alike—including those foreigners here merely on a 'temporary sojourn.'" *Barbara*, 146 S. Ct. at 2447 (quoting *Lynch v. Clarke*, 1 Sand.Ch. 583, 638, 663-64 (N. Y. Ch. 1844)).

In the Supreme Court, the Solicitor General argued that the traditional interpretation of the Fourteenth Amendment as granting citizenship to nearly all children born in the United States,

including the children of sojourners, "encouraged 'birth tourists' to travel to the United States solely to acquire citizenship for their children." Brief of Petitioners at 4, *Barbara*, 146 S. Ct. 2438 (No. 25-365). The Government encouraged the Court to adopt its reinterpretation of the Citizenship Clause to prevent the "birth-tourism industry" from "demean[ing] U.S. citizenship by extending it to people who lack any meaningful ties to the country." *Id.* at 9 (internal quotation marks and citations omitted).

The Supreme Court emphatically rejected that argument. The Court explained that "a sovereign's jurisdiction made no exception for those only temporarily present within the sovereign's territory." *Barbara*, 146 S. Ct. at 2450. In this portion of the opinion, *Barbara* relied on *Schooner Exchange*, which had explained that "[w]hen private individuals of one nation spread themselves through another as business or caprice may direct, mingling indiscriminately with the inhabitants of that other, or when merchant vessels enter for the purposes of trade, it would be obviously inconvenient and dangerous to society, and would subject the laws to continual infraction, and the government to degradation, if such individuals or merchants did not owe temporary and local allegiance, and were not amenable to the jurisdiction of the country." *Schooner Exchange*, 11 U.S. at 144. Those who engage in commercial transactions in order to give birth in the United States are "amenable to the Nation's jurisdiction" and thus their children are birthright citizens. *Barbara*, 146 S. Ct. at 2450 (internal quotation marks omitted). The dissenting Justices in *Barbara* also understood the majority as having resolved this question. *See id.* at 2524 (Thomas, J., dissenting) (describing the majority as "recognizing a constitutional right to citizenship for the children of all foreign birth tourists and illegal aliens"); *id.* (Alito, J., dissenting) ("As interpreted by the Court today, the Fourteenth Amendment confers citizenship on virtually

everyone who happens to be born in this country, including the children of 'birth tourists,' women who come here solely for the purpose of giving birth to a child and then promptly return home.").

As noted above with respect to standing, *see supra*, at pp. 12-13, this category is not even restricted to "birth tourists." It applies to parents who engage in a commercial transaction in order to have a baby in the United States regardless of whether they intend to leave the country immediately afterward, as a tourist typically would, or instead plan to remain in the United States with their child for the rest of their lives. It could therefore include parents like the class representatives, including Liza and Juana, who engaged in a commercial transaction in order to reach the United States and then later had their children here. Such immigrants are plainly subject to the jurisdiction of the United States.

The inclusion of this category in the 2026 Executive Order is thus directly contrary to the Supreme Court's interpretation of the Citizenship Clause in *Barbara*, a decision released less than two months ago. The Executive Branch is separately making efforts to limit entry into the United States by pregnant women planning to deliver their babies here. *See, e.g.*, Exec. Order No. 14419, "Ending Birth Tourism," 91 Fed. Reg. 51993 (Aug. 6, 2026); Chantelle Lee, *DOJ to Prioritize 'Birth Tourism' Probes Following Supreme Court's Birthright Citizenship Decision*, Time (July 1, 2026), https://perma.cc/NS6J-ELDK. But once those women are in the country, they are subject to the jurisdiction of the United States and their children are birthright citizens.

## III. The Remaining Factors Tip Decisively in Favor of Granting a TRO or PI.

Members of the class face immediate, irreparable harm from the 2026 Executive Order's attempt to deny them the citizenship that they are guaranteed under the Constitution, for many of the same reasons that this Court gave when enjoining enforcement of the 2025 Executive Order. Injunctive relief is necessary to prevent ongoing harm and to protect the public interest.

**A. The Executive Order Is Causing Irreparable Harm.**

It is well-established that "[t]he deprivation of a constitutional right, for even minimal periods of time, unquestionably constitutes irreparable injury." *CASA I*, 763 F. Supp. 3d at 744 (internal quotation marks omitted) (quoting *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022)); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."). Like the 2025 Executive Order, the 2026 Executive Order unconstitutionally purports to deny class members the "most precious right" of citizenship. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963). The denial of that right "for any period of time" causes them irreparable harm that is both "concrete and imminent." *CASA I*, 763 F. Supp. 3d at 744.

The 2026 Executive Order would deprive class members of "the benefits and rights of U.S. citizenship." *Id*. Denial of citizenship represents "the total destruction of the individual's status in organized society . . . a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). And it leaves class members in a precarious legal status, vulnerable to being "placed in removal proceedings and deported." *CASA I*, 763 F. Supp. 3d at 744. That could lead to the intolerable separation of parents from children. *Id*. And without access to United States citizenship, some class members will be left stateless, with their "very existence" subjected to "the sufferance of the country in which they happen to find themselves." *Id*. (alterations omitted) (quoting *Trop*, 356 U.S. at 101); *see also* Liza 3d Decl. ¶ 13; Monica 3d Decl. ¶ 15; Juana 3d Decl. ¶ 11.

And as with the 2025 Executive Order, the 2026 Executive Order imposes significant additional harm because it provides so little clarity about how or to whom it applies, causing

confusion and fear. As detailed above, the 2026 Executive Order offers little information about whether it applies only to children born after the date of its issuance or also to those born long before; about how it defines the categories of individuals from whom it purports to strip citizenship; and about the logistics of how it will be implemented, among many other ambiguities. *See* Andrea 2d Decl. ¶¶ 7-8; Liza 3d Decl. ¶¶ 9-11; Monica 3d Decl. ¶¶ 12, 14; Juana 3d Decl. ¶¶ 8-10. The 2026 Executive Order lists no effective date, and although Section 3(b) directs agencies to issue guidance within 30 days, Section 3(a) appears to require agencies to begin complying with the Order immediately. This has once again engendered widespread confusion and fear, causing class members additional irreparable harm. *See* Andrea 2d Decl. ¶ 6 (detailing how her "fears under the prior Executive Order came flooding back" when the 2026 Order was issued); Monica 3d Decl. ¶¶ 13-15 ("This new Executive Order brings me back to all of that stress and anxiety I previously felt."); Liza 3d Decl. ¶¶ 8, 11, 13 (similar); Juana 3d Decl. ¶¶ 7, 11 (similar). Mothers whose children are in the certified class, all of whom are under two years old, as well as pregnant mothers whose children will be born into the class, now face a world in which the citizenship status of their children has been thrown into uncertainty, undermining the plans they have made for those children and for their families more broadly. Others planning to start or expand their families in the future face a similar host of unanswered questions.

**B. Enjoining the Executive Order Would Serve the Public Interest.**

The third and fourth preliminary injunction factors—the balance of the equities and the public interest—also "weigh very strongly in the plaintiffs' favor." *CASA I*, 763 F. Supp. 3d at 745. Where the government is a party, those factors merge. *See Miranda*, 34 F.4th at 365 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The "law and tradition of our country" is that "virtually every baby born on U.S. soil is a U.S. citizen upon birth," *CASA I*, 763 F. Supp. 3d at 745, which the Supreme Court just reaffirmed in *Barbara*. When the Administration tried to unilaterally alter that tradition through the 2025 Executive Order, courts around the country, including this one, granted preliminary injunctions to preserve the rule of birthright citizenship under the Fourteenth Amendment. This Court should do so again in response to the Administration's renewed effort to revise the Constitution by Executive fiat. Defendants are "in no way harmed by issuance of a preliminary injunction which prevents [them] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *CASA I*, 763 F. Supp. 3d at 745 (quoting *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013)); *see also Leaders of a Beautiful Struggle*, 2 F.4th at 346 ("[I]t is well-established that the public interest favors protecting constitutional rights."); *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011) ("[U]pholding constitutional rights is in the public interest . . . .").

As before, preliminary relief will preserve a status quo that is core to our Nation's principles, has existed throughout our Nation's history, and is reflected across countless regulatory programs. *CASA I*, 763 F. Supp. 3d at 745 (identifying financial and logistical harms to local governments if the 2025 Executive Order were to go into effect). The federal government has recognized birthright citizenship since the Founding, and it will not be harmed by continuing to do so pending a final determination on the merits of this case. That is especially true given that the 2026 Executive Order again represents a drastic policy change that the Administration seeks to enact without sanction by Congress, on the heels of a contrary ruling from the Supreme Court, and it is in the public interest to protect the "separation of powers by curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided*

*Court*, 570 U.S. 547 (2016). Additional preliminary injunctive relief will also avoid throwing the parents of class members around the country into chaos as they grapple with unanswerable questions about the status of their children and families. Given the dramatic change wrought by the 2026 Executive Order and the difficulty of restoring the status quo after the Order is implemented, the public interest strongly favors an injunction.

## IV. The Court's Immediate Intervention Is Warranted.

The Court should not wait until after issuance of the guidance contemplated in Section 3(b) of the 2026 Executive Order to issue further preliminary injunctive relief. Whereas Section 3(b) includes a 30-day timeframe, Section 3(a) directs agency heads to "ensure … that no officers, employees, or agents of their respective departments and agencies act, or forbear from acting, in any manner inconsistent with this order" and contains no reference to any delay in implementation. 2026 Executive Order § 3(b). Based on the text of the Order, that provision may already be in effect, and it is causing fear and anxiety among parents about the citizenship status of their children.

Even if the 2026 Executive Order will not be enforced until after the guidance issues, the Court should not wait to grant relief. If Defendants begin enforcing the Order concurrently with issuing the guidance on Saturday, September 5, 2026, it will cause chaos on the ground, as parents, hospitals, and state officials try to determine who is a citizen of the United States in real time, with no opportunity to process whatever information federal agencies put out that day. The potential for chaos is heightened by the fact that, unlike the 2025 Executive Order, which applied only to children born after February 19, 2025, the 2026 Executive Order includes no similar provision limiting its scope to babies born after issuance of the Order. Immediate relief is necessary to prevent the irreparable harm that would result to members of the class in that situation. Part of the

wisdom of enshrining the rules of citizenship in the Constitution and the Immigration and Nationality Act is to avoid these sorts of on-the-fly changes to something as important as who counts as a United States citizen.

Granting relief before issuance of the guidance would be consistent with how courts responded to the 2025 Executive Order. That Order also called for agencies to "issue public guidance within 30 days of the date of [the Order] regarding [its] implementation with respect to their operations and activities." 2025 Executive Order § 3(b). But this Court and several others entered preliminary injunctions barring enforcement of the 2025 Executive Order without waiting 30 days, in order to prevent the "concrete and imminent" irreparable harm that would result if "children born in the United States who are subject to the Order immediately [were] denied the benefits and rights of U.S. citizenship." *CASA I*, 763 F. Supp. 3d at 744; *CASA III*, 793 F. Supp. 3d at 696-97 (collecting cases). There is no reason to treat the 2026 Executive Order any differently.

At a minimum, the Court should grant temporary relief until at least 14 days after federal agencies issue their guidance as directed by Section 3(b) of the 2026 Executive Order. That would give Plaintiffs in this and other cases sufficient time to assess the scope of the Order as interpreted by the agencies; advise the parents of class members about the potential impact of the Executive Order on their rights; and consider whether to seek additional relief at that time.

**CONCLUSION**

For the foregoing reasons, the Court should grant additional (or modified) preliminary injunctive relief barring enforcement of the 2026 Executive Order. In the alternative, the Court should enter a temporary restraining order or preliminary injunction barring enforcement of the 2026 Executive Order for 14 days after issuance of the guidance contemplated in Section 3(b) of the Order.

Respectfully submitted this August 24, 2026,

Conchita Cruz*
Jessica Hanson (D. Md. 31903)
Dorothy Tegeler*
Leidy Perez*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 600-9910
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
dorothy.tegeler@asaptogether.org
leidy.perez@asaptogether.org

*/s/ William Powell*
William Powell*
Mary B. McCord (D. Md. 21998)
Rupa Bhattacharyya*
Alexandra Lichtenstein*
INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND PROTECTION
Georgetown Law
600 New Jersey Ave. NW
Washington, D.C. 20001
Phone: (202) 662-9765
Fax: (202) 661-6730
whp25@georgetown.edu
mbm7@georgetown.edu
rb1796@georgetown.edu
arl48@georgetown.edu

*Attorneys for Plaintiffs*

**Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE AND RULE 65 CERTIFICATION**

I hereby certify that, on August 24, 2026, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Notice of this filing will be sent to all counsel who have entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. All defendants are currently represented by counsel who have entered an appearance and who receive notification of filings through the CM/ECF system. The notice provided by the CM/ECF system is sufficient to provide notice to all counsel of this filing. Fed. R. Civ. P. 5(b)(2)(E); Electronic Case Filing Policies & Procedures Manual 2.E; Standing Order 2003-08.

/s/ William Powell
William Powell