**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **CASA, INC., *et al.*,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civ. No. DLB-25-201** |
| **DONALD J. TRUMP, *et al.*,** | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

Since his second term in office began on January 20, 2025, the President has tried, through Executive Order, to upend our country's longstanding tradition of birthright citizenship and eliminate, for large swaths of Americans, the right to citizenship by birth, a right enshrined in the Citizenship Clause of the Fourteenth Amendment.

The President's first attempt occurred hours after his inauguration, when he issued Executive Order 14160, "Protecting the Meaning and Value of American Citizenship" ("2025 Executive Order"), which proclaimed that children born to non-citizen parents temporarily or unlawfully in the United States were not "subject to the jurisdiction" of the United States and thus were not entitled to citizenship under the Citizenship Clause of the Fourteenth Amendment. Exec. Order No. 14160, 90 Fed. Reg. 8449 (Jan. 29, 2025). Litigation promptly ensued. After this Court and the United States District Court for the District of New Hampshire preliminarily enjoined enforcement of the 2025 Executive Order as to identical certified classes of children, the Supreme Court held that "children born of parents unlawfully or temporarily present in the United States" are "citizens at birth" under the Constitution. *Trump v. Barbara*, 609 U.S. ----, 146 S. Ct. 2438, 2450 (2026). *Barbara* effectively invalidated the 2025 Executive Order as unconstitutional and

dispelled any doubts about the meaning and scope of the Citizenship Clause of the Fourteenth Amendment. Or so it seemed.

A month after *Barbara* came down, the President continued his efforts to abolish birthright citizenship for many Americans. This time, the President issued Executive Order 14418, "Continuing to Protect the Meaning and Value of American Citizenship" ("2026 Executive Order"), which "identifies, non-exhaustively, and prescribes action concerning certain categories of children of aliens who do not fall within the rule of birthright citizenship as announced by the Supreme Court" in *Barbara*. Exec. Order No. 14418, 91 Fed. Reg. 51991, § 1 (Aug. 11, 2026). Even a cursory review of the 2026 Executive Order's carveouts to birthright citizenship reveals they bear little to no resemblance to the "narrow exceptions" to the rule of citizenship by birth recognized by the Supreme Court in *Barbara*, 146 S. Ct. at 2450, and *United States v. Wong Kim Ark*, 159 U.S. 649, 693 (1898). But the question before the Court today is not whether the purported carveouts to birthright citizenship in the 2026 Executive Order are unconstitutional. The narrower question is whether the plaintiffs are entitled to preliminary injunctive relief because the 2026 Executive Order is likely unconstitutional as applied to the certified class. The answer to that question is yes.

The 2026 Executive Order is almost certainly unconstitutional as applied to the certified class for the simple reason that the Supreme Court in *Barbara* already decided that the children in the class are citizens at birth. This Court must, once again, preliminarily enjoin enforcement of the President's most recent attempt to strip the right to citizenship from them.

## I. Background

The plaintiffs in this case are CASA, Inc. and Asylum Seeker Advocacy Project, Inc. ("ASAP")—two nonprofit organizations that provide services to immigrants—and several

individual members of CASA and ASAP, without permanent immigration status, who were pregnant when they first filed suit in January 2025 and are now mothers to babies who were born in the United States during the pendency of this case. The defendants are President Trump, the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, the Director of U.S. Citizenship and Immigration Services, the Commissioner of the Social Security Administration, and the United States of America.

The Court has detailed the history of this case in three prior decisions. *See CASA, Inc. v. Trump*, 763 F. Supp. 3d 723 (D. Md. 2025); *CASA, Inc. v. Trump*, 793 F. Supp. 3d 687 (D. Md. 2025); *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703 (D. Md. 2025). For the sake of brevity and judicial economy, the Court assumes familiarity with the plaintiffs' initial complaint filed on January 21, 2025, ECF 1; the Court's February 5, 2025 preliminary injunction enjoining enforcement of the 2025 Executive Order, ECF 65; the Supreme Court's June 27, 2025 decision in *Trump v. CASA*, 606 U.S. 831 (2025), staying the universal aspect of the Court's preliminary injunction; the plaintiffs' amended class action complaint filed hours after *CASA*, 606 U.S. 831, was issued, ECF 96; the Court's August 7, 2025 Order certifying a Rule 23(b)(2) class of children subject to the 2025 Executive Order, ECF 130; and the Court's August 7, 2025 preliminary injunction enjoining enforcement of the 2025 Executive Order as to the certified class, ECF 132.

More than eighteen months after this case began, and just a month after it appeared to be over, the President issued the 2026 Executive Order, which, like the 2025 Executive Order, once again targets the Citizenship Clause of the Fourteenth Amendment.

### A. Citizenship Clause of the Fourteenth Amendment

The Citizenship Clause of the Fourteenth Amendment states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV, § 1, cl. 1.

In *Trump v. Barbara*, the Supreme Court held that the Citizenship Clause guarantees citizenship to children born of parents unlawfully or temporarily present in the United States, whom the 2025 Executive Order sought to deny citizenship. 146 S. Ct. at 2450.

The Supreme Court began by explaining that the "story of citizenship in the United States begins with the English common law." *Id.* at 2445. Under English common law, members of the British Empire, including American colonists, "were considered subjects of the sovereign"—a concept "conceived as the relationship between the sovereign and the people." *Id.*

> Because the sovereign's power (and thus his duty) was limited in various respects, so too was the scope of this rule. He could not demand allegiance from—for he could not protect—those born in lands that he did not control. . . . The same held true even in discrete areas within his kingdom that were temporarily outside his control.

*Id*. (citing *Calvin's Case* (1608) 77 Eng. Rep. 377, 399; 7 Co. Rep. 1a, 18a–18b (KB) (if "enemies" "possess[ed]" a "castle or fort" in the kingdom, their children would not be born "under the King's ligeance")). "And the same held true for ambassadors (and their families), who were considered—by a fiction of extraterritoriality—to remain on foreign soil and thus 'under the ligeance' of their home country." *Id.* But for all other children born in Britain, including those born to parents temporarily in the kingdom and even those "born in the realm of parents subject to expulsion," "the rule was the same: With protection came allegiance, and with allegiance came the status of a natural-born subject." *Id.* at 2446. This English "common law [concept] of citizenship—known as *jus soli*, or right of the soil" "crossed the Atlantic with the colonists—and was adopted with little

fanfare after the Revolution, as 'subject[s]' of the sovereign became 'citizens' of the States." *Id.* (citation modified).

Then, as the Civil War approached, came the "odious" decision in *Dred Scott v. Sandford*, 60 U.S. 393 (1857). *Barbara*, 146 S. Ct. at 2447. In *Dred Scott*, the Supreme Court held that free Black Americans born in the United States were not citizens of the United States because, as descendants of slaves, they were "not included, and were not intended to be included, under the word 'citizens' in the Constitution." *Barbara*, 146 S. Ct. at 2447. "For them, blood, not soil, was made the rule." *Id. Dred Scott* "had overruled the common law, but the people—eventually—would overrule the Court." *Id.* at 2448.

In 1868, Congress passed the Fourteenth Amendment "to repudiate *Dred Scott*" and "to put the great question of citizenship beyond the legislative power altogether, to settle the issue once and for all." *Id.* at 2449 (citation modified). The Citizenship Clause "mirrored the common law's criteria for citizenship." *Id.* It started, "like the common law, with territory—a child must be 'born . . . in the United States,'" and it ended, "again like the common law, with sovereign power—a child must be 'subject to the jurisdiction' of the United States, unlike (say) the families of foreign ministers." *Id.* "A child born on American soil and subject to American law was made an American citizen." *Id.*

In 1868, as today, "jurisdiction" referred to the "power of governing or legislating." *Id.* (citation modified). "The Citizenship Clause uses jurisdiction in its ordinary sense—referring to the power of the United States to govern those within its territory." *Id.* at 2450. "As in the context of *jus soli*," that "full and complete power of a nation" to govern within its territory is "impliedly waived" in "certain peculiar circumstances"—such as the children of "foreign ministers," over whom "exercising jurisdiction would degrade the dignity of foreign sovereigns." *Id.* (citation

modified). The same "fiction of extraterritoriality," *id.* at 2445, that excluded the children of foreign ministers from the common law rule of citizenship by birth also excluded the children of foreign ministers from the jurisdiction of the United States, and those children thus were not "subject to the jurisdiction" of the United States under the Citizenship Clause, *id.* at 2450. The other peculiar circumstance in the common law that exempted children of "enemies" "born in lands" over which the sovereign had no control also applies to the Citizenship Clause; those children, too, are not "subject to the jurisdiction" of the United States because the United States has no "control" over them. *Id.* at 2445; *see id.* at 2470 (Kavanaugh, J., concurring) (noting "children . . . of enemies within and during a hostile occupation of part of our territory" are excepted from the Citizenship Clause (quoting *Wong Kim Ark*, 169 U.S. at 693)).

Ultimately, the Supreme Court in *Barbara* held that the Citizenship Clause

> neatly captures the common law rule, with its broad reach and narrow exceptions. The same groups included (and excluded) by *jus soli* were included (and excluded) by the conventional understanding of jurisdiction. Excluded by both were the children of foreign ministers and members of 19th-century Indian tribes over whom the United States had ceded a part of its territorial jurisdiction to preserve its relationship with a foreign sovereign (or quasi-sovereign).
>
> No such intersovereign concerns apply to children born of parents unlawfully or temporarily present in the United States; no foreign sovereign would "have any motive for wishing" them outside this Nation's authority. Those children are thus subject to the jurisdiction of the United States. They satisfy both elements of the Citizenship Clause: they are "born . . . in the United States" and "subject to the jurisdiction thereof." Under the Constitution, they are citizens at birth.

*Id.* at 2450 (majority opinion) (citation modified).

In *Barbara*, the Supreme Court kept the "promise" of the Framers of the Fourteenth Amendment to extend citizenship "to 'every free-born person in this land.'" *Id*. at 2458 (quoting Cong. Globe, 39th Cong., 1st Sess. 600 (1866) (statement of Sen. Trumbull)). The Court reaffirmed *Wong Kim Ark*'s "guarantee" of "citizenship to all children born in the United States

and subject to its power." *Id.* at 2453. And the Court affirmed the District of New Hampshire's preliminary injunction enjoining enforcement of the 2025 Executive Order to a "provisionally certified [] nationwide class of children who would be denied citizenship by the [2025 Executive] Order."[1] *Id*. at 2445, 2458.

### B. 2026 Executive Order

On August 6, 2026, just a month after *Barbara* came down, the President issued the 2026 Executive Order. The 2026 Executive Order states that, under *Barbara*, "the Citizenship Clause of the Fourteenth Amendment to the United States Constitution extends the privilege of citizenship to children born to parents in the United States 'for whom no extraterritorial fiction applies.'" 2026 Exec. Order § 1 (citation modified). The Order "identifies, non-exhaustively, and prescribes action concerning certain categories of children of aliens who do not fall within the rule of birthright citizenship as announced by the Supreme Court" in *Barbara*. *Id.*

Section 2 establishes the following policy of the U.S. government:

> [N]o executive department or agency shall issue documents recognizing United States citizenship to, or accept documents issued by State, local, or other governments or authorities purporting to recognize United States citizenship regarding, persons when neither parent of that person is a citizen and any of the following applies:

---

[1] The provisionally certified class of children in *Barbara* is identical to the certified class in this case. *Compare Barbara*, No. 25-cv-244-JL-AJ, 2025 WL 1901936, at *1 (D.N.H. July 10, 2025) (defining class as "[a]ll current and future persons who are born on or after February 20, 2025, where (1) that person's mother was unlawfully present in the United States and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) that person's mother's presence in the United States was lawful but temporary, and the person's father was not a United States citizen or lawful permanent resident at the time of said person's birth"), *with CASA*, 793 F. Supp. 3d at 728–29 (defining class as "[a]ny child who has been born or will be born in the United States after February 19, 2025, (1) whose mother was unlawfully present in the United States and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) whose mother's presence in the United States at the time of said person's birth was lawful but temporary and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth").

> (a) either parent of that person is an alien enemy, defined to include any member of a designated Foreign Terrorist Organization under 8 U.S.C. 1189 or Specially Designated Global Terrorist, consistent with the International Emergency Economic Powers Act, 50 U.S.C. 1701 *et seq.*, and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended;
>
> (b) either parent of that person is a foreign government employee, defined to include:
>
> (i) ambassadors;
>
> (ii) persons employed by a foreign embassy or consulate who are nationals of that foreign country;
>
> (iii) persons employed by a foreign government in an official capacity; and
>
> (iv) persons employed by an international organization that possess international-organization immunity;
>
> (c) either parent of that person engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in fraudulent activity to obtain citizenship, to include:
>
> (i) when the parent(s) of the person engage in a commercial transaction to ensure that the person's mother is present in the United States, or a territory of the United States, to give birth; or
>
> (ii) when the parent(s) engage in a commercial transaction with a surrogate present in the United States, or a territory of the United States, to give birth; [or]
>
> (d) the person is born in a territory or territorial waters of the United States where citizenship is not conferred by Federal statute.

*Id.* § 2.

Section 3, the enforcement provision, commands the Secretary of the U.S. Department of State, the U.S. Attorney General, the Secretary of the U.S. Department of Homeland Security, and the Commissioner of the Social Security Administration to "take all appropriate measures to ensure that the regulations and policies of their respective departments and agencies are consistent with this order" and to ensure that their agencies' officers, employees, and agents act in accordance with the 2026 Executive Order. *Id.* § 3(a). The order directs "[t]he heads of all executive

departments and agencies [to] issue public guidance within 30 days of the date of th[e] order regarding th[e] order's implementation with respect to their operations and activities." *Id.* § 3(b).

### C. Plaintiffs' Supplement to the Amended Complaint and Preliminary Injunction Motion

After the 2026 Executive Order was issued, and after the Court lifted the stay in this case, the plaintiffs moved for additional classwide preliminary injunctive relief or a classwide temporary restraining order enjoining enforcement of the 2026 Executive Order as to the certified class. ECF 168. After expedited briefing on the request for emergency relief, ECF 170 & 174, the Court held a hearing on August 28, 2026. During the hearing, the Court denied the motion for preliminary and emergency injunctive relief without prejudice because the amended class action complaint, ECF 96, did not mention the 2026 Executive Order (nor could it have) and the Court cannot enjoin actions that are not alleged in the operative complaint. The Court granted the plaintiffs' motion to supplement the complaint pursuant to Rule 15(d). Later that day, the plaintiffs filed a supplement to their amended class action complaint, ECF 177, and a motion for a preliminary injunction, ECF 178.

In the supplement, the plaintiffs remain the same: CASA, ASAP, Maribel, and class representatives Juana, Trinidad Garcia, Monica, Liza, Ashley, Andrea, and Niurka. *Compare* ECF 177, at 1–2, *with* ECF 96, ¶¶ 20–49. The plaintiffs' supplemental claims are the same as the claims in the amended class action complaint, except that the supplemental claims challenge the 2026 Executive Order instead of the 2025 Executive Order. *Compare* ECF 177, ¶¶ 56–68, *with* ECF 96, ¶¶ 113–25. The plaintiffs claim that the 2026 Executive Order violates the Fourteenth Amendment, ECF 177, ¶¶ 56–62, and the Immigration and Nationality Act, 8 U.S.C. § 1401, ECF 177, ¶¶ 63–68. The plaintiffs filed the supplement "in addition to, not in replacement of" their amended class action complaint. ECF 177, at 4.

The new allegations concern the 2026 Executive Order. The plaintiffs allege that the new Executive Order imposes immediate, irreparable harm on members of the class by purporting to unconstitutionally deny them the "most precious right" of citizenship. *Id.* ¶ 18 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 159 (1963)). The certified class includes many of the people who would be denied citizenship under the 2026 Executive Order. *Id.* ¶ 21. The plaintiffs allege that the 2026 Executive Order "imposes significant additional harm because it provides so little clarity about how or to whom it applies, causing confusion and fear." *Id.* ¶ 22.

For example, the plaintiffs allege that because the "Executive Branch has taken a broad view of who qualifies as an alien enemy," *id.* ¶¶ 27–30, sometimes resting its conclusions on false or speculative allegations, or even tenuous markers like tattoos or family affiliations, *id.* ¶¶ 32–36, children whose parents may "rightly or wrongfully" be deemed by the government to be alien enemies face a credible threat of "being denied or stripped of their birthright citizenship" under Section 2(a) of the Executive Order, "even though they do not fall within a recognized exception to birthright citizenship," *id.* ¶ 42.

Class representative Andrea came to the United States in 2024 from an area of Mexico in which a cartel designated as a Foreign Terrorist Organization, La Nueva Familia Michoacana, is active. *Id.* ¶ 40. Andrea was assaulted by a member of the cartel, and the father of her child has a close relative who is a member of La Nueva Familia Michoacana. *Id.* The plaintiffs allege that Andrea's child, E.T.P., faces a credible threat of having either or both of his parents labeled an alien enemy and having his right to citizenship denied pursuant to Section 2(a) of the Executive Order, *id.*, even though *Barbara* already held that E.T.P. is a birthright citizen, *id.* ¶ 42. The same is true for class representative Monica's child, A.M. *Id.* ¶ 41. Monica and A.M.'s father are from

Venezuela, and the administration has deemed other Venezuelans as members of Tren de Aragua, a Foreign Terrorist Organization, merely because of their Venezuelan nationality. *Id.*

The plaintiffs further allege that Section 2(b) of the Executive Order, which purports to deny citizenship to individuals born in the United States to noncitizen parents, where either parent is a foreign government employee, also threatens to deny class members their right to birthright citizenship. *Id.* ¶¶ 43–48.

The plaintiffs allege the same as to Section 2(c), which purports to deny citizenship to individuals born in the United States to noncitizen parents where either parent "engaged in a commercial transaction to purchase or access birthright citizenship for the person, or engaged in fraudulent activity to obtain citizenship" (i.e., so-called birth tourism). *Id.* ¶¶ 49–51, 55. Class representatives Liza and Juana, for example, fear that the administration could deny their class-member children L.B. and Y.P.C., respectively, birthright citizenship because Liza and Juana each engaged in a commercial transaction (the purchase of a plane ticket) to come to the United States, got pregnant after arriving here, and then had their children here. *Id.* ¶¶ 52–54.

In their most recent motion, the plaintiffs seek a preliminary injunction or temporary restraining order enjoining the enforcement of the 2026 Executive Order as to the certified class. ECF 178, at 1. The certified class is:

> Any child who has been born or will be born in the United States after February 19, 2025, (1) whose mother was unlawfully present in the United States and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth, or (2) whose mother's presence in the United States at the time of said person's birth was lawful but temporary and whose father was not a United States citizen or lawful permanent resident at the time of said person's birth.

*See CASA*, 793 F. Supp. 3d at 730.

The defendants opposed the motion, ECF 179, and the plaintiffs replied, ECF 180.

## II. Discussion

To obtain the "extraordinary remedy" of a preliminary injunction, the movant "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Fed'n of State, Cnty. & Mun. Emps. v. Soc. Sec. Admin.* ("AFSCME"), 172 F.4th 361, 366 (2026) (en banc) (citation modified).

### A. Justiciability

Article III of the Constitution extends the "judicial Power" of the federal courts only to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1; *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). There is a case or controversy only if the claim is ripe, *Trustgard Ins. v. Collins*, 942 F.3d 195, 199 (4th Cir. 2019), and the plaintiff has standing to assert their claim, *TransUnion*, 594 U.S. at 423.

#### 1. Ripeness

A claim is ripe for adjudication if it does not "rest[] upon contingent future events that may not occur as anticipated." *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). The defendants insist this case is "quintessentially unripe" because how the 2026 Executive Order will be enforced is "no more than conjecture at this time." ECF 179, at 6 (citing *Trump v. New York*, 592 U.S. 125, 131 (2020)). They argue that "[t]he 2026 Executive Order directs agency heads to 'enforce' the Order's policy through 'all appropriate measures'" and states that the "'appropriate measures' will be set out through 'public guidance . . . regarding this order's implementation,' which has not yet issued." ECF 179, at 6 (quoting 2026 Exec. Order § 3 (citation modified)); *see also* ECF 170, at 13, 16–17. The defendants are incorrect.

The Court rejected a nearly identical argument when the defendants made it in response to the plaintiffs' challenge to the 2025 Executive Order. *See CASA*, 793 F. Supp. 3d at 717 n.4. The 2025 Executive Order, like the 2026 Executive Order, also directed the defendants to enforce the order through "all appropriate measures" and to "issue public guidance within 30 days of the date of this order regarding this order's implementation with respect to their operations and activities." 2025 Exec. Order § 3; *see* 2026 Exec. Order § 3 (same). For the same reasons the plaintiffs' challenge to the 2025 Executive Order was not premature, their challenge to the 2026 Executive Order is not premature.

Neither of the cases on which the defendants rely dictates a different result. In *Trump v. California*, the Presidential directive at issue ordered various agencies to take "appropriate" action, including sending citizenship lists to states "to the extent feasible" and "initiat[ing] a proposed rulemaking" to maintain election integrity. 609 U.S. ----, Nos. 26A124, 26A139, 2026 WL 2473573, at *1 (Aug. 24, 2026) (per curiam) (citation modified). In *Trump v. New York*, the President had issued a memorandum declaring a policy of excluding illegal aliens from the census for purposes of apportionment and directing the Secretary of Commerce to "provide information" to the President "to the extent practicable" and to implement the memorandum's policy "to the maximum extent feasible." 592 U.S. at 129–31. Whereas those cases involved Presidential directives with conditional or limiting language, the 2026 Executive Order contains no such language. It states, in no uncertain terms, that "no executive department or agency *shall* issue documents recognizing United States citizenship to, or accept documents . . . purporting to recognize United States citizenship regarding, persons when neither parent of that person is a citizen and [certain circumstances apply]." 2026 Exec. Order § 2 (emphasis added). Neither this

nor any other language in the order raises speculation about whether implementation of the order will prove feasible or practicable. The 2026 Executive Order's implementation is imminent.

Contrary to the defendants' insistence, the plaintiffs need not wait for the implementing guidance to bring this challenge. No matter what the guidance says, the 2026 Executive Order commands agencies to deny citizenship documents to several broad categories of children; that command is not contingent upon any future event that may not occur as anticipated. While the guidance may reveal how the agencies are implementing the 2026 Executive Order, the guidance will not change the terms of the 2026 Executive Order; those terms are crystal clear and ripe for challenge.

**2. Standing**

To establish standing, a plaintiff must show "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *AFSCME*, 172 F.4th at 367 (quoting *TransUnion*, 594 U.S. at 423). "At the preliminary injunction stage, a plaintiff must make a clear showing that [they are] likely to establish each element of standing." *Id.* (citation modified); *see Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 294 (4th Cir. 2024) (noting plaintiffs "must demonstrate standing with the manner and degree of evidence required at the relevant stage of the litigation" (citation modified)).

The plaintiffs must "demonstrate standing for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (quoting *TransUnion*, 594 U.S. at 431); *see also Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 778 (4th Cir. 2023) (noting that "a plaintiff must demonstrate standing for each claim it seeks to press and for each form of relief that is sought" because "standing is not dispensed in gross"

(quoting *Town of Chester v. Laroe Estates*, 581 U.S. 433, 434 (2017))). In class actions, the court "analyze[s] standing based on the allegations of personal injury made by the named plaintiffs." *Jonathan R. ex rel. Dixon v. Morrisey*, 178 F.4th 139, 161 (4th Cir. 2026). The court "need not examine the injuries alleged by *all* Named Plaintiffs." *Id.* A class action may proceed as long as "at least one [class representative has] standing to seek each form of relief requested in the complaint." *Carolina Youth Action Project*, 60 F.4th at 778.[2]

In their supplement to the amended complaint, the plaintiffs bring a constitutional claim for which they seek injunctive relief. In Count I, they claim the defendants' imminent enforcement of the 2026 Executive Order violates the Fourteenth Amendment and that the defendants are "refusing to recognize" the class members' citizenship by birth guaranteed by the Constitution and are "taking actions that are inconsistent with that citizenship." ECF 177, ¶¶ 61, 67. They seek an injunction enjoining the defendants from enforcing or applying the 2026 Executive Order "or taking any other action that fails to recognize citizenship to individuals born within the United States to members of the class." *Id.* at 21. The Court finds that class representatives Monica and Andrea have standing to pursue this claim and this relief.

The Court's analysis starts and ends with injury in fact because the other two requirements—traceabilty and redressabilty—are easily met.[3] An injury in fact is "an invasion of a legally protected interest that is concrete and particularized . . . ." *Jonathan R.*, 178 F.4th at 162

[2] Consistent with relief appropriate for Rule 23(b)(2) classes such as this, one injunction barring the defendants from enforcing the 2026 Executive Order and otherwise refusing to recognize the class representatives' and members' citizenship would "benefit the entire class" by protecting their citizenship. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

[3] The denial of the constitutional right to citizenship is directly traceable to the 2026 Executive Order, and an injunction enjoining the agency defendants from enforcing the 2026 Executive Order as to the class will redress the constitutional injury to Monica and Andrea and the class members.

(quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). "[A]n injury to one's constitutional rights" suffices for standing. *Id.* (quoting *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024)). In other words, the plaintiffs must allege that the challenged action or law "affects [them] in a personal and individual way." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (citation modified); *see Murthy*, 603 U.S. at 56 ("Federal courts can only review statutes and executive actions when necessary to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law.") (citation modified). "A federal court is not a forum for generalized grievances, and the requirement of such a personal stake ensures that courts exercise power that is judicial in nature." *Gill*, 585 U.S. at 65 (citation modified).

The alleged injury is the denial of the constitutional right to citizenship by birth. This is an injury in fact. *See Jonathan R.*, 178 F.4th at 162; *Food & Drug Admin.*, 602 U.S. at 381. The plaintiffs allege that class representatives Andrea and Monica are personally affected by the 2026 Executive Order's denial of the constitutional right to citizenship by birth. The defendants counter that neither Andrea nor Monica has standing to challenge the Executive Order because Andrea and Monica already had their babies and the Executive Order applies only prospectively to children who have not yet been born.

The 2026 Executive Order does not state that it applies prospectively. For instance, it does not state that it applies only to babies born after it was issued or after a certain date in the future. Nowhere in the order does it indicate it does not apply to children already born. Clearly, the President knows how to specify that an Executive Order on birthright citizenship applies only to children not yet born because he did so in the 2025 Executive Order, which said that the denial of citizenship by birth "shall apply only to persons who are born within the United States after 30 days from the date of this order," that is, babies born after February 19, 2025. 2025 Exec. Order

§ 2(b). The President's most recent Executive Order on birthright citizenship says nothing like that. The only fair reading of the plain language of the 2026 Executive Order is that it applies to any child who falls within any category in Section 2 of the order, which includes babies born after February 19, 2025.

Counsel for the defendants have represented to the Court in briefing and orally at the August 28, 2026 hearing that the Executive Order applies only prospectively. *See* ECF 170, at 19; ECF 179, at 3, 5. However, counsel has not, despite the Court's entreaties, submitted a sworn statement from their clients or a duly authorized agent of the White House swearing that the 2026 Executive Order applies only prospectively. The text of the order strongly supports a reading that it applies retrospectively. Defense counsel's mid-litigation representations to the contrary cannot assuage the credible threat of enforcement against members of the class. *See Bryant v. Woodall*, 1 F.4th 280, 289 (4th Cir. 2021), *as amended* (June 23, 2021) ("Unofficial and non-binding statements . . . do not and cannot override the plain text of the statutes when it comes to establishing a credible threat of enforcement." (citation modified)); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (finding that, because "the State has not disavowed any intention of invoking" the statute at issue that criminalized the appellees' conduct, the appellees were "not without some reason in fearing prosecution for violation of the [statute]"); *see also Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025) (concluding the plaintiffs showed "a credible threat of enforcement sufficient to meet their burden for demonstrating a pre-enforcement injury" in part because the government "ha[d] not represented that it disavowed enforcement in a non-litigation context, and "the government's disavowal must be more than a mere litigation position" (quoting *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010))), *cert. denied*, No. 25-923, 2026 WL 1780109 (U.S. June 22, 2026) (mem.). The Court finds that, by its plain language, the 2026

Executive Order applies to all children who meet its criteria—regardless of when they were born, which includes children in the certified class born after February 19, 2025. And that includes the children of Monica and Andrea.

"[A] litigant may bring a pre-enforcement suit seeking prospective relief against government officials so long as [they] face[] a credible threat of enforcement." *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114, 1122 (2026) (citation modified). "[A]n actual . . . enforcement action is not a prerequisite to challenging the law," provided that "the threatened enforcement" of the law or order is "sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158, 159 (2014); *see MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007); *Babbitt*, 442 U.S. at 302. Because the plaintiffs bring a pre-enforcement challenge to the 2026 Executive Order, they need not establish definitively that the 2026 Executive Order will deprive any class representative's child of citizenship. Instead, they need only establish that they face "a *credible* threat" of enforcement. *See First Choice*, 146 S. Ct. at 1122. They have done that.

The children of Monica and Andrea face a credible threat that they will be denied citizenship under Section 2(a) of the 2026 Executive Order, which applies to any child born to non-U.S. citizens if

> either parent of that person is an alien enemy, defined to include any member of a designated Foreign Terrorist Organization under 8 U.S.C. 1189 or Specially Designated Global Terrorist, consistent with the International Emergency Economic Powers Act, 50 U.S.C. 1701 *et seq*., and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

2026 Exec. Order § 2(a).[4]

---

[4] The Court already found that the class representatives have standing to sue on behalf of their children. *CASA*, 793 F. Supp. 3d at 695.

Monica and her husband are from Venezuela, and the Venezuela-based gang Tren de Aragua has been designated as a Foreign Terrorist Organization and as Specially Designated Global Terrorists. ECF 177, ¶ 41; Dep't of State, *Designation of International Cartels* (Feb. 20, 2025), https://perma.cc/VCK9-RDBH ("Today, the Department of State announces the designation of Tren de Aragua (TdA), . . . La Nueva Familia Michoacana (LNFM), [and other groups] as Foreign Terrorist Organizations (FTOs) and Specially Designated Global Terrorists (SDGTs)."). Andrea fled to the United States from Mexico after a member of La Nueva Familia Michoacana assaulted her, and her child's father "has a close relative who is a member of La Nueva Familia Michoacana," another designated FTO. ECF 177, ¶ 40. They fear that they or their children's fathers will be labeled alien enemies and that their children's citizenship will be denied. ECF 168-2, ¶¶ 12, 14 (Monica 3d decl.); ECF 168-5, ¶¶ 7, 9 (Andrea 2d decl.).

Their fear of enforcement is not speculative, as the defendants insist. Even though Monica and her husband "are not, and have never been, members of Tren de Aragua," ECF 168-2, ¶ 11, and even though Andrea and her child's father are not members of La Nueva Familia Michoacana, their fears that they might be deemed alien enemies are well-founded. In the past year, in the immigration removal context, the government illegally removed Kilmar Armando Abrego Garcia to his native El Salvador after the government hastily labeled him an MS-13 member, even though he "was subject to a withholding order forbidding his removal to El Salvador." *See Noem v. Abrego Garcia*, 145 S. Ct. 1017, 1018 (2025). The government chalked his removal up to "administrative error." *Id.* Additionally, in *AARP v. Trump*, 605 U.S. 91 (2025), the government "t[ook] steps . . . toward removing [Venezuelan] detainees under the [Alien Enemies Act]—including transporting them from their detention facility to an airport" on the belief that they were members of Tren de Aragua, *id.* at 93, even though the court had not yet determined "*whether* these Venezuelan

detainees may be lawfully removed under the Alien Enemies Act," *id.* at 99 (Kavanaugh, J., concurring). And, in *Sanchez Puentes v. Garite*, Venezuelans who previously had temporary protected status and were arrested and detained based on allegations of being Tren de Aragua members sought habeas relief. 780 F. Supp. 3d 682 (W.D. Tex. 2025). The court granted the habeas petition because the government had not provided evidence of gang membership through anything except "shoddy affidavits and contradictory testimony." *Id.* at 701. These are not isolated incidents; this appears to be a concerning pattern of behavior by government officials. *See, e.g.*, *Neiyerver Adrián Leon Rengel v. United States*, No. 26-1008 (JEB), 2026 WL 2224815, at *1 (D.D.C. Aug. 3, 2026) (detailing the plaintiffs' wrongful classification as a member of Tren de Aragua, deportation from the United States, and subsequent incarceration in El Salvadoran prison); *Y.A.P.A. v. Trump*, 785 F. Supp. 3d 1350, 1355 (M.D. Ga. 2025) (describing the plaintiff's belief that he is at risk of being wrongfully classified as an alien enemy while in immigration detention because of his tattoos); *D.B.U. v. Trump*, 779 F. Supp. 3d 1264, 1271–72 (D. Colo. 2025), *appeal dismissed*, No. 25-1164, 2025 WL 4696597 (10th Cir. May 12, 2025) (summarizing allegations by Immigration and Customs Enforcement that the plaintiffs were members of Tren de Aragua based on one plaintiff's attendance at a purported "'Tren de Aragua' party" and the other plaintiff being seen standing near an alleged Tren de Aragua member's home). Given these examples of the government hastily and without credible evidence attempting to remove people from the United States because of purported affiliations with groups deemed alien enemies, it is no wonder that Monica and Andrea fear they or their children's fathers too will be wrongly called an alien enemy and their children will be denied citizenship on that basis. They face a credible threat of enforcement of the 2026 Executive Order.

Thus, the plaintiffs sufficiently allege that Monica and Andrea have an injury in fact. They have standing to assert the constitutional claim and seek injunctive relief. Because these two class representatives have standing, the Court "need not consider whether the other plaintiffs have standing or if their claims are otherwise justiciable." *See Carolina Youth Action Project*, 60 F.4th at 778.

The defendants argue that the plaintiffs also must identify named plaintiffs whose children could be denied citizenship under Sections 2(b) and 2(c) of the 2026 Executive Order because the order has a severability clause. The defendants are incorrect. It is true that, in *California*, 2026 WL 2473573, the Supreme Court observed that "standing is not dispensed in gross," *id.* at *2 (quoting *TransUnion*, 594 U.S. at 431), and, on that basis, the Court "address[ed] each challenged provision of the [Executive] Order [before it] separately," *id.* But the Supreme Court did not say that, in every case, each provision of any Executive Order must be pled and analyzed separately. Rather, on the specific facts of that case, where the plaintiffs' complaint challenged, in different counts, different sections of an Executive Order, each of which directed a different defendant to take a different action, it was appropriate to address each challenged provision separately. *See id.* (noting "Section 2(a) directs the Secretary of Homeland Security to take appropriate action to create and distribute State Citizenship Lists"); *id.* at *3 (noting Section 2(b) "directs the Attorney General to 'prioritize' the investigation and prosecution" of federal voting law violations); *id.* at *4 (noting Section 3 "directs the Post Office to issue a notice of proposed rulemaking"); *see California v. Trump*, No. 1:26-CV-11581-IT, --- F. Supp. 3d ----, 2026 WL 1826490, at *1 n.2 (D. Mass. June 25, 2026) (lower court opinion in *California*). Because the *California* plaintiffs sought different relief as to different defendants based on different provisions in the Executive Order, the Court needed to consider the plaintiffs' standing for each distinct claim. That approach was consistent

with *TransUnion*, which held: "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." 594 U.S. at 431.

Here, the plaintiffs do not challenge the 2026 Executive Order piecemeal. The plaintiffs bring one claim challenging the constitutionality of the entire order as applied to the entire class of "citizens at birth."[5] *See Barbara*, 146 S. Ct. at 2450. To remedy that alleged violation, the plaintiffs request injunctive relief against enforcement of the entire order as to the class to preserve the citizenship of all class members. Further, the 2026 Executive Order does not direct different defendants to take different actions. Section 2 creates one policy: that citizenship by birth shall not be recognized for certain categories of people. Because *Barbara* declared all of the children in the class citizens, the named plaintiffs do not (and need not) present distinct claims for each section of the 2026 Executive Order, as the plaintiffs did in *Trump v. California. See California*, 2026 WL 1826490, at *1 n.2. The plaintiffs have done what *TransUnion* requires. Named plaintiffs Monica and Andrea have "standing for" the "claim that they press" and for the "form of relief that they seek." *See TransUnion*, 594 U.S. at 431; *Murthy*, 603 U.S. at 61 ("[T]here must be at least one plaintiff with standing to seek an injunction."). Nothing more, right now, is required.

**B. Likelihood of Success on the Merits**

The plaintiffs claim that the 2026 Executive Order threatens to deny members of the certified class the right to citizenship guaranteed by the Citizenship Clause of the Fourteenth Amendment. The Court agrees. The plaintiffs are highly likely to succeed on their claim that the

[5] The plaintiffs do not challenge Section 2(d) of the Executive Order because, by its terms, it does not threaten the citizenship of any member of the class.

2026 Executive Order infringes on the class members' Fourteenth Amendment right to citizenship by birth.

In *Barbara*, the Supreme Court held that a provisionally certified class of children born of parents unlawfully or temporarily present in the United States who were subject to the 2025 Executive Order—a class identical to the certified class in this case—were "citizens at birth" under the Citizenship Clause of the Fourteenth Amendment. 146 S. Ct. at 2450. The children "satisfy both elements of the Citizenship Clause: they are 'born . . . in the United States' and 'subject to the jurisdiction thereof.'" *Id.* The first element was never in question. As for the second element, the Court held that the children born of parents unlawfully or temporarily present in the United States were "subject to the jurisdiction thereof" because they did not fall within two of the "narrow exceptions" to the "the common law rule" of *jus soli* (right of the soil), which the Citizenship Clause "neatly capture[d]" when it was ratified: "the children of foreign ministers and members of 19th-century Indian tribes over whom the United States had ceded a part of its territorial jurisdiction to preserve its relationship with a foreign sovereign (or quasi-sovereign)." *Id.* As the Supreme Court explained, "[n]o such intersovereign concerns apply to children born of parents unlawfully or temporarily present in the United States" because "no foreign sovereign would 'have any motive for wishing' them outside this Nation's authority." *Id.* (citation modified). Thus, under *Barbara*, the class of children provisionally certified by the District of New Hampshire and the identical class of children certified by this Court are "subject to the jurisdiction of the United States" and are "citizens at birth." *Id.* at 2450. No Presidential Executive Order can undo what the Supreme Court has done.

The defendants' counterarguments are unpersuasive.

First, the defendants argue that *Barbara* did not hold that the children in the class subject to the 2025 Executive Order are citizens at birth. ECF 179, at 7. As the defendants interpret *Barbara*, the Supreme Court concluded only "that children are not *disqualified* from birthright citizenship by virtue of being born to parents unlawfully or temporarily present in the United States." *Id.* (citation modified). Not surprisingly, the defendants do not cite any language from *Barbara* to support this distorted interpretation of the opinion, and of course there is none. Though the defendants may not like it, the *Barbara* Court's conclusion was clear: The children in the class "satisfy both elements of the Citizenship Clause"—place and jurisdiction—and they are thus "citizens at birth." *Barbara*, 146 S. Ct. at 2450. Even the dissent understood the majority to hold that the 2025 Executive Order was unconstitutional in all its applications and that the class of children subject to the order are citizens by birth. *See id.* at 2524 (Thomas, J., dissenting) (describing the majority as "recognizing a constitutional right to citizenship for the children of all foreign birth tourists and illegal aliens"); *id.* (Alito, J., dissenting) ("As interpreted by the Court today, the Fourteenth Amendment confers citizenship on virtually everyone who happens to be born in this country, including the children of 'birth tourists,' women who come here solely for the purpose of giving birth to a child and then promptly return home."); *id.* at 2546 (Gorsuch, J., dissenting) (stating that the Court could "sustain th[e] injunction only if no set of circumstances exists in which the order may be applied lawfully" (citation modified)).

Second, the defendants argue that the Supreme Court "never suggested that every child" in the class "is *per se* a citizen, with no exceptions" and that the Supreme Court "did not declare that the exceptions to birthright citizenship do not apply to the class members." ECF 179, at 8. Once again, the defendants completely misread *Barbara*. When the Supreme Court explained the meaning of "subject to the jurisdiction" of the United States, it distinguished between people over

whom the United States has the power to govern (and who are thus subject to the jurisdiction of the United States) and people over whom the United States does *not* have the power to govern (and who are thus *not* subject to the jurisdiction of the United States). *See Barbara*, 146 S. Ct. at 2449–50; *see also id.* at 2445 (explaining this distinction draws from the English common law *jus soli*). The latter category of people falls into the "narrow exceptions" to the rule of citizenship by birth that are implicated when the United States does not have the "full and complete power" to govern over people born on its land. *Id.* at 2450. Those "narrow exceptions" include "children of foreign ministers" and "members of 19th-century Indian tribes over whom the United States had ceded a part of its territorial jurisdiction to preserve its relationship with a foreign sovereign (or quasi-sovereign)." *Id.* Because the "intersovereign concerns" implicated by those exceptions do not "apply to children born of parents unlawfully or temporarily present in the United States," the children in the *Barbara* class were "subject to the jurisdiction of" the United States and deemed citizens under the Citizenship Clause. *Id.* Thus, the Supreme Court did, in fact, determine that the concerns underpinning the "narrow exceptions" to birthright citizenship do not apply to the class.[6]

Next, the defendants argue that *Barbara* and *Wong Kim Ark* "leave broad space for the Executive Branch to issue directives like the 2026 Executive Order." ECF 179, at 8. As they read

---

[6] The other two exceptions are children "born on foreign public ships" and children "of enemies within and during a hostile occupation of part of our territory." *Wong Kim Ark*, 169 U.S. at 693. Those children, like children of foreign ministers and 19th century Indian tribes to whom the nation ceded territory, are not "subject to the jurisdiction" of the United States because the nation cannot legislate over or govern them. *See Wong Kim Ark*, 169 U.S. at 683–84 (explaining that children born on foreign ships are not citizens at birth because a foreign ship enters port with "implied promise that . . . she should be exempt from the jurisdiction of the country" and children of alien enemies in hostile occupation are not citizens at birth because "the laws of the United States c[annot] be rightfully enforced" over them). Though *Barbara* did not explicitly state that the reasons for these two exceptions are inapplicable to the children of the class, it did not need to state the obvious. It is obvious that children "born on foreign public ships" are not within the 2025 Executive Order's ambit, and it is equally obvious that no part of our country is under "hostile occupation" by an enemy over whom the nation does not have the power to enforce its laws.

*Barbara*, the majority did not adopt what Justice Kavanaugh in his concurrence called the "closed set" of four exceptions to birthright citizenship: "children of foreign sovereigns or their ministers, or born on foreign public ships, or of enemies within and during a hostile occupation of part of our territory" and "children of members of the Indian tribes." *Barbara*, 146 S. Ct. at 2470–71 (Kavanaugh, J., concurring) (quoting *Wong Kim Ark*, 169 U.S. at 693). While the *Barbara* majority did not join in Justice Kavanaugh's description of the four exceptions as "a closed set" or his statement "that there can be no additional exceptions recognized based on subsequent circumstances or developments," *id.* at 2471, there is no doubt that the *Barbara* majority approved of *Wong Kim Ark*, *see id.* at 2453 (majority opinion) ("We see no reason to depart from" *Wong Kim Ark*'s "guarantee" of "citizenship to all children born in the United States and subject to its power."). What's more, the *Barbara* majority cited approvingly *Wong Kim Ark*'s discussion of the common law exceptions to "the fundamental rule of citizenship by birth." *Id.* at 2452. After *Barbara*, *Wong Kim Ark* still stands erect. The common law exceptions identified in *Wong Kim Ark* were and remain the only Supreme Court-recognized exceptions to the rule of citizenship by birth.

Finally, the defendants argue that, even if there are only four exceptions to birthright citizenship, "those exceptions' capacious terms—and the common law in which they are rooted—easily permit implementation of the 2026 Executive Order." ECF 179, at 9–10. The plaintiffs, of course, disagree. *See* ECF 177, ¶¶ 42, 48, 55; ECF 180, at 9, 12. The Court will not accept the parties' invitation to wade into the waters of an advisory opinion on whether the Executive Order's purported carveouts to birthright citizenship can survive a facial constitutional challenge under *Barbara* and *Wong Kim Ark*. The narrow question presented here is whether the plaintiffs have shown a likelihood of success on the merits of their claim that the 2026 Executive Order is

unconstitutional as applied to the class. The Court has answered that question today and need not engage, at this time, in a merits analysis of the constitutionality of each of the 2026 Executive Order's purported exceptions to the rule of citizenship by birth.

The Supreme Court has spoken: Children in the certified class are "citizens at birth." *Barbara*, 146 S. Ct. at 2450. *Barbara* is the law of the land. The President must follow it. *See Marbury v. Madison*, 5 U.S. 137, 178 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). The plaintiffs have established a strong likelihood of success on the merits of their claim that the 2026 Executive Order violates the class members' Fourteenth Amendment right to citizenship.[7]

[7] The defendants suggest that the class definition may be too broad. Here, they have a point. The defendants correctly note that, as written, the class definition could include children of ambassadors because ambassadors are "temporarily present in the United States." ECF 179, at 8. Yet the defendants never raised this objection to the class definition during the class certification briefing last year. At the same time that briefing was occurring, the implementing guidance on the 2025 Executive Order issued and did not list children of ambassadors among its "highly specific list of 'aliens whose presence is lawful but temporary.'" *See* USCIS Implementation Plan of Executive Order 14160 at 2–3 (July 25, 2025), https://perma.cc/NW7T-LAGS. The implementing guidance specifically noted that "children of parents present in the United States on diplomatic visas are not subject to the jurisdiction of the United States pursuant to 8 U.S.C. 1401(a)." *Id.* at 3. So, clearly, the defendants did not believe that the 2025 Executive Order (and the class definition that mirrors it) includes children of ambassadors. Even the Supreme Court did not read the 2025 Executive Order to include children of ambassadors. In fact, the Supreme Court held that the class of children subject to the 2025 Executive Order did not include "children of foreign ministers." *Barbara*, 146 S. Ct. at 2450. Elsewhere in the opinion, the Court noted the ambassador exception again. *See id*. at 2453 ("A person is 'subject to the jurisdiction' of the government of the country in which he is physically present, even if he is only there temporarily. . . . ([U]nless he falls under one of the familiar exceptions, such as for ambassadors)."). The Court understood that the 2025 Executive Order did not intend to target children of ambassadors. After all, the ambassador exception has been recognized since before *Wong Kim Ark* and continues to be recognized today. *See* 8 C.F.R. § 101.3. If the defendants want the Court to modify the class definition to make explicit that it does not include children of ambassadors, they may file a motion to do so after meeting and conferring with the plaintiffs and attempting to reach an agreement on a revised class definition that complies with *Barbara* and *Wong Kim Ark*.

### C. Irreparable Harm

"Harm is irreparable when it cannot be fully rectified by the final judgment after trial." *PSEG Renewable Transmission LLC v. Arentz Fam., LP*, No. 25-1730, --- F.4th ----, 2026 WL 2263342, at *10 (4th Cir. Aug. 6, 2026) (citation modified). "[T]he denial of a constitutional right constitutes irreparable harm." *Doe 1 v. Off. of the Dir. of Nat'l Intel.*, 180 F.4th 536, 549 (4th Cir. 2026); *see also Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) ("[A] deprivation of a constitutional right, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

The 2026 Executive Order, if not enjoined as to the class, will deprive class members of the constitutional right to citizenship by birth. Citizenship is a "most precious right." *Kennedy*, 372 U.S. at 159. Citizenship is "the right to have rights—to freely participate in our political community." *Barbara*, 146 S. Ct. at 2458. As this Court and other courts have previously found, the plaintiffs have shown they will be irreparably harmed by an Executive Order that purports to deny them citizenship. *See, e.g.*, *CASA*, 793 F. Supp. 3d at 697 (finding "[t]he plaintiffs have shown that they and the class members will suffer irreparable harm absent an injunction" because "the Executive Order seeks to deprive the class members of their constitutional right to citizenship"); *N.H. Indon. Cmty. Support v. Trump*, 157 F.4th 29, 35 (1st Cir. 2025) (concluding that plaintiffs showed irreparable harm to "their members that were alleged in the complaint to be denied citizenship by the [2025 Executive Order] and its enforcement"), *cert. denied sub nom. Trump v. Doe*, No. 25-899, 2026 WL 1871309 (U.S. June 30, 2026) (mem.); *Doe v. Trump*, 157 F.4th 36, 78 (1st Cir. 2025) (agreeing with district court that "there was 'a grave risk of significant and irreparable harm arising from the [2025 Executive Order]' to the Doe-Plaintiffs" because "'the loss of birthright citizenship -- even if temporary and later restored at the conclusion of litigation

-- has cascading effects' that will 'very likely leave permanent scars' on the child and their family") (citation modified), *cert. denied*, No. 25-899, 2026 WL 1871309 (U.S. June 30, 2026) (mem.); *see also Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) ("[T]he prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992))).

**D. Balance of the Equities and Public Interest**

The balance of equities and public interest factors "merge when the Government is the opposing party." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (quoting *Miranda*, 34 F.4th at 365); *see Nken v. Holder*, 556 U.S. 418, 435 (2009). Both factors weigh heavily in the plaintiffs' favor here given the importance of the right at stake and the absence of harm to the government.

The right to citizenship is "no less precious than life or liberty." *Klapprott v. United States*, 335 U.S. 601, 616 (1949); *see also Kennedy*, 372 U.S. at 159 ("Citizenship is a most precious right[,] . . . expressly guaranteed by the Fourteenth Amendment to the Constitution . . . ."). The preservation of this constitutional right undeniably serves the public interest. *See Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("[I]t is well-established that the public interest favors protecting constitutional rights." (citing *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013))).

Moreover, the plaintiffs and the public at large have a significant interest in avoiding abrupt attempts to modify the Supreme Court's interpretation of the Citizenship Clause of the Fourteenth Amendment. The 2026 Executive Order, if implemented as to the class, risks creating the same "confusion and upheaval" as did the 2025 Executive Order. *See CASA, Inc. v. Trump*, No. 25-1153, 2025 WL 654902, at *2 (4th Cir. Feb. 28, 2025). If not enjoined as to the class, the 2026

Executive Order could deny the right to citizenship by birth to children whom the Supreme Court declared were citizens. *See Barbara*, 146 S. Ct. at 2449. The public interest thus favors the issuance of a preliminary injunction to maintain the status quo of birthright citizenship for the class.

Meanwhile, the defendants have not shown that a preliminary injunction poses a direct risk to the government's interests. While the defendants assert the government has an interest in carrying out its "internal operations" and "enforcement priorities," ECF 179, at 15 (quoting *California*, 2026 WL 2473573, at *4), this preliminary injunction will not impede that interest. The injunction does not enjoin the issuance of public guidance on the implementation; it enjoins the denial of citizenship to members of the class whom *Barbara* declared were citizens. *Barbara*, 146 S. Ct. at 2450–51. The government cannot claim a legitimate interest in enforcing an Executive Order that is likely unconstitutional. *See Centro Tepeyac*, 722 F.3d at 191 ("[A] state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002))).

The balance of the equities and the public interest thus weigh strongly in favor of a preliminary injunction.

**E. Scope of Relief**

The Court must tailor the injunctive relief to redress—but not exceed—the unlawful conduct that caused the injury in fact. *See Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 212 (4th Cir. 2025) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)); *see Gill*, 585 U.S. at 66 (2018). The Court has "broad discretion to craft remedies based on the circumstances of a case," *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021), provided any "preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to

the plaintiffs," *id.* (citation modified); *accord Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *CASA*, 606 U.S. at 852.

The Court previously certified a class pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the plaintiffs alleged that the defendants, by issuing and imminently enforcing the 2025 Executive Order, "acted or refused to act on grounds that apply generally to the class." *CASA*, 793 F. Supp. 3d at 716 (quoting Fed. R. Civ. P. 23(b)(2)). The Court then entered a classwide preliminary injunction narrowly tailored to redress the class's common injury. *Id.* at 702.

Now, the plaintiffs ask the Court to enter another classwide preliminary injunction. This time, the injunction would enjoin the defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them "from enforcing or applying the 2026 Executive Order against any member of the certified class or from taking any other action to interfere with, deny, or fail to recognize the citizenship of any member of the certified class." ECF 178-3.[8] This new preliminary injunction is similarly narrowly tailored to redress the class's injury: the denial of citizenship guaranteed by the Citizenship Clause of the Fourteenth Amendment. This indivisible injunction will "benefit the entire class" by preventing the defendants from denying them the right to citizenship by birth. *See Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 59 (3d Cir. 1994).

To be clear, this is not a case where "each individual class member would be entitled to a *different* injunction . . . against the defendant," *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338,

---

[8] As the Court discussed in its August 7, 2025 memorandum opinion, the plaintiffs are not entitled to a preliminary injunction enjoining the President, and the Court does not enjoin the President. *CASA*, 793 F. Supp. 3d at 695 n.3. Enjoining the defendant agencies from enforcing the 2026 Executive Order as to the class redresses the class members' injury.

360 (2011), or where "the class members' claims are highly diverse and individualized" and the plaintiffs fail to identify "a single or uniform policy or practice that bridges all their claims," *see G.T. v. Bd. of Educ. of Kanawha*, 117 F.4th 193, 205 (4th Cir. 2024) (citation modified). Here, the class members are united in their singular challenge to the 2026 Executive Order's attempt to deny them their right to citizenship under the Fourteenth Amendment.

The Court preliminarily enjoins the defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them from enforcing or applying the 2026 Executive Order against any member of the certified class or from taking any other action to interfere with, deny, or fail to recognize the citizenship of any member of the certified class. The Court does not enjoin enforcement or application of subsection 2(d), which by its terms does not threaten to deny citizenship to any member of the class. The Court also does not enjoin Section 3(b), which requires the issuance of public guidance on the implementation of the 2026 Executive Order.

If, after the guidance issues, the defendants have grounds to move to modify or dissolve the preliminary injunction, they may so move. *See* Fed. R. Civ. P. 60(b)(5); *CASA*, 793 F. Supp. 3d at 701 (noting that, "[f]or equitable and good reasons, the Court has the plenary power to dissolve a preliminary injunction"); *Glob. Dimensions, LLC v. Tackett*, No. 5:23-CV-00168-FL, 2024 WL 1235545, at *3 (E.D.N.C Jan. 16, 2024) ("[A] party seeking to dissolve a preliminary injunction must show that there has been a significant change in the facts or the law since the court issued the injunction that makes its ongoing enforcement inequitable."); *see also Gooch v. Life Invs. Ins.*, 672 F.3d 402, 414 (6th Cir. 2012) (requiring similar showing); *Gill v. Monroe Cnty. Dep't of Soc. Servs.*, 873 F.2d 647, 648–49 (2d Cir. 1989) (same); *Favia v. Ind. Univ. of Pa.*, 7

F.3d 332, 340 (3d Cir. 1993) (same); *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 578 (5th Cir. 1974) (same).

**F. Bond**

Pursuant to Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Rule 65(c) "is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999). The Court, however, "retains the discretion to set the bond amount as it sees fit or waive the security requirement" if appropriate. *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022).

Waiver of the bond requirement is appropriate in this case. An injunction maintaining the status quo on birthright citizenship would not impose a substantial hardship on the government. *See E.K. ex rel. Keeley v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 548 (E.D. Va. 2025) (finding that the impact of an injunction on the enjoined party was "minimal" because "the injunction restore[d] the status quo"); *Coreas v. Bounds*, 457 F. Supp. 3d 460, 464 (D. Md. 2020) (waiving the bond requirement when "the financial impact to [the government] of an improperly imposed injunction [was] limited and would not create any significant hardship"). While the defendants assert that such an injunction would "require [the government] to extend federal benefits to persons deemed by [the government] to lack an entitlement to [such benefits]," they offer no further details regarding this "substantial" cost or a proposed bond amount. ECF 179, at 16. When the assertion of substantial cost to the government is "unsupported and speculative," courts have declined to impose a bond. *See PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 454 (D. Md. 2025) (citation modified).

The rights at stake in this litigation also weigh in favor of waiving bond. "[T]his court has frequently waived imposition of bond by imposing a nominal bond of zero dollars where fundamental constitutional rights are at stake." *D.N.N. v. Liggins*, 822 F. Supp. 3d 543, 598 (D. Md. 2026) (citation modified) (collecting cases). Such is the case here, where the class members stand to lose their constitutional right to citizenship if they do not obtain preliminary relief.

Moreover, a substantial bond could forestall judicial review of the 2026 Executive Order. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 291 (D. Md. 2025) (waiving a bond because "the Plaintiffs seek to protect their First and Fifth Amendment rights, and because a bond of the size Defendants appear to seek would essentially forestall Plaintiffs' access to judicial review"), *opinion clarified*, 769 F. Supp. 3d 465 (D. Md. 2025), *vacated and remanded on other grounds*, 167 F.4th 86 (4th Cir. 2026); *Sustainability Inst. v. Trump*, 784 F. Supp. 3d 861, 879 (D.S.C. 2025) ("District courts often waive the bond requirement in public interest cases, recognizing that the failure to do so could prevent certain plaintiffs from obtaining meaningful judicial review."), *vacated and remanded on other grounds*, 165 F.4th 817 (4th Cir. 2026).

The Court thus declines to impose a bond here.

**III. Conclusion**

For the foregoing reasons, the plaintiffs' motion for additional classwide preliminary injunctive relief or a new classwide TRO or preliminary injunction, treated as a motion for a preliminary injunction, is granted. A separate Order and Preliminary Injunction follows.

Date: September 2, 2026

Deborah L. Boardman
United States District Judge